MICHAEL ZORKIN (Bar No. CA 313308)
THE ZORKIN FIRM
E-mail: mz@thezorkinfirm.com
6320 Canoga Ave., 15th Floor
Woodland Hills, California 91367
Phone:   323.493.8075
Fax:      323.872.5251

TOGUT, SEGAL & SEGAL LLP
Kyle J. Ortiz (NY 4818571) (*pro hac vice* pending)
kortiz@teamtogut.com
Bryan M. Kotliar (NY 5178454) (*pro hac vice* pending)
bkotliar@teamtogut.com
Ronald Howard (NY 5256086) (*pro hac vice* pending)
rhoward@teamtogut.com
Eitan Blander (NY 5693213) (*pro hac vice* pending)
eblander@teamtogut.com
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000

Attorneys to the Foreign Representatives of Golden
Sphinx Limited

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

| | |
|---|---|
| In re Golden Sphinx Limited,<br><br>　　　　　Debtor in a Foreign<br>　　　　　Proceeding. | Case No. 2:22-bk-14320-NB<br><br>Hon. Neil W. Bason<br><br>Chapter 15<br><br>**DECLARATION OF ANDREW WOOD (A) AS REQUIRED BY 11 U.S.C. § 1515 AND (B) IN SUPPORT OF FOREIGN REPRESENTATIVES' MOTION FOR (I) RECOGNITION OF THE JERSEY LIQUIDATION AS A FOREIGN MAIN PROCEEDING AND (II) CERTAIN RELATED RELIEF** |

I, Andrew Wood, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury of the laws of the United States as follows:

1.     I am a chartered accountant duly admitted to practice in Jersey and a Director at Teneo Financial Advisory Limited ("**Teneo**"), located at Forum 3, Grenville Street, St Helier, Jersey, JE2 4UF.  Alexander Adam and I are serving as joint liquidators ("**Joint Liquidators**" or "**Foreign Representatives**") of the Debtor, Golden Sphinx, Ltd. (the "**Debtor**").[1]

2.     I am over the age of 18 and, if called upon, could testify to all matters set forth in this declaration (this "**Declaration**").   I make this Declaration in my role as a joint liquidator of the Debtor.  Consistent with that role, on the basis of the information available to me (primarily this in the form of pleading, exhibits and other documents relating to the various ongoing proceedings to which Debtor is a party and to which I refer below), I have gained knowledge of the Debtor's history, day-to-day operations, assets, financial condition and business affairs.  I am also taking steps to obtain the Debtor's books and records not yet available to me and to further my understanding of its historical transactions.  All facts set forth in this Declaration are based upon my personal knowledge, my opinion based upon my experience and knowledge of the Debtor and my review of relevant documents or information supplied to me.  In preparing this Declaration, I have reviewed the (a) Chapter 15 Petition (as defined below), (b) Motion (as defined below), (c) documents prepared and/or filed in connection with the Jersey Liquidation (as defined below) and (d) relevant provisions of the Jersey Companies Law (as defined below) and other provisions of Jersey law as they relate to chapter 15 of title 11 of the United States Code (the "**Bankruptcy Code**") and other aspects of U.S. bankruptcy law referred to in this Declaration.

3.     On July 6, 2022, Alexander Adam and I were appointed joint liquidators of the Debtor, which is subject to a creditors' winding up process commenced under Art. 157(a) of the Companies (Jersey) Law 1991 (the "**Law**") under the ultimate supervision of the Royal Court of Jersey in accordance with Chapters 4 and 5 of Part 21 of the Law (the "**Jersey Liquidation**").

---

[1] Golden Sphinx Ltd. is a corporation organized and existing under the laws of Jersey with company number 78090 and registered office at Suite 3, Burlington House, St. Saviour's Road, St. Helier, JE2 4LA, Jersey.

4.      I am making this Declaration in accordance with section 1515 of the Bankruptcy Code and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**).

5.      I submit this Declaration in support of the Foreign Representatives' (a) *Chapter 15 Petition for Recognition of a Foreign Proceeding* (the "**Chapter 15 Petition**") and the (b) *the Motion for (i) Recognition of the Jersey Liquidation as a Foreign Main Proceeding, and (ii) Certain Related Relief* (the "**Motion**").[2]

## PERSONAL BACKGROUND AND QUALIFICATIONS

6.      I am a Director (in internal grade, not in a statutory capacity) at Teneo with expertise in corporate insolvency and restructuring.  I joined Teneo as a Director in June 2021 having previously held a similar position at Deloitte.  I hold a B.Com. in Commerce from the University of Birmingham.  I am also a UK qualified and Jersey licensed insolvency practitioner and fellow in good standing of the Institute of Chartered Accountants in England and Wales.

7.      I have had considerable experience in matters related to Jersey insolvency law.  I have advised companies and creditors on a large number of winding-up proceedings, insolvent restructurings, and multinational reorganizations.

## BACKGROUND

### A.      Background on the Debtor and the Jersey Liquidation

8.      The Debtor is a corporation organized and existing under the laws of Jersey bearing company number 78090 and with a registered office at Suite 3, Burlington House, St. Saviour's Road, St. Helier, JE2 4LA, Jersey.

9.      The principal assets of the Debtor are (a) the rightful ownership of a 100% interest in New Albion Property Limited ("**New Albion**"), a corporation organized and existing under the laws of England and Wales, whose sole material asset is a residence (the "**Residence**") located in Beverly Hills, California valued at approximately $45 million; and (b) certain debts due from various parties, including Itkin (defined below), M-BJEP Limited, M-NICE Limited and New

---

[2]      Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.



Albion.[3]   The Debtor acquired the shares in New Albion in 2013.  New Albion acquired the Residence in 2004, and since that time, has held title to it in fee simple.

10.     The Debtor is owned by JTC Trust Company Limited as trustee of the Amber Trust (or a legacy trust following unlawful directions by Garry Y. Itkin, the former director of the Debtor ("**Itkin**")) (the "**Trust**").  The Trust holds shares in the Debtor indirectly through JTC Nominees Limited and JTC Services Limited (formerly known as Minerva Nominees Limited and Minerva Services Limited).  JTC Trust Company, JTC Services Limited and JTC Nominee Limited as all wholly owned subsidiaries of JTC plc, a global provider of fund management and other financial services.

11.     Both the Trust and the Debtor were created as passive investment-holding vehicles, created by and operated for the ultimate benefit of Alexander Sabadash, a US citizen, his wife Larisa Sabadash, and their two adult children.

12.     In or around 2000, Mr. Sabadash hired Itkin to perform accounting services for various companies under Mr. Sabadash's ownership.  It was around this time that Itkin was also hired to manage and oversee the finances of the Debtor as a director, as well as the finances of several of Mr. Sabadash's other companies.

**B.      Itkin's Fraudulent Conduct and Subsequent Litigation**

13.     In 2014, Mr. Sabadash – who was formerly an elected Senator in Russia – was

---

[3]     The specific debts due to the Debtor are listed below.  The Debtor's interests in these debts are being litigated in the California Action (defined below).

a)     a loan receivable due to the Debtor from New Albion in the sum of £38,385,281 arising under a loan agreement made in or around June 2004, said to have been assigned by the Debtor to Itkin while he was the sole director of the Debtor under his hand and without shareholder consent;

b)     a loan receivable due from M-NICE Limited, a company incorporated in accordance with the laws of and domiciled in the Isle of Man, in the sum of $15,504,000 under an agreement dated 23 July 2013, said to have been assigned by the Debtor to Itkin while he was the sole director of the Debtor under his hand and without shareholder consent;

c)     a promissory note dated October 11, 2012 in the sum of $19,516,000 issued by M-BJEP Limited, the benefit of which was assigned to the Debtor, said to have been assigned by the Debtor to Itkin while he was the sole director of the Debtor under his hand and without shareholder consent; and

d)     the sum of $473,509 due from Itkin as money had and received having been unlawfully taken from the Debtor's bank account at First Curacao International Bank.

arrested in Moscow, apparently because of "political differences" with government representatives.

14.     On August 2, 2016, Larisa Sabadash filed a Petition for Marital Dissolution in the Los Angeles Superior Court, LASC Case No. BD644102.   *See* <u>Exhibit A</u> (Petition for Marital Dissolution).  With the filing and service of the petition, there was automatically imposed by operation of law temporary restraining orders ("**ATROs**"), which enjoined both parties from transferring, encumbering, hypothecating, or disposing of property without prior court order or written consent.  The marital dissolution proceeding and the ATROs remain pending as of the date hereof.

    *i.*     *The First Jersey Action*

15.     The Debtor asserts that, in Mr. Sabadash's absence, Itkin engaged in fraudulent and unauthorized self-dealing actions as director of the Debtor.  On November 22, 2016, after the marital dissolution proceeding had been commenced, the Debtor was named as a defendant in an action brought by Itkin (the "**First Jersey Action**") filed in the Royal Court of Jersey, Samedi Division (the "**Jersey Court**").  *See* <u>Exhibit B</u> (Billet and Summons)**.**  Itkin issued the action against the Debtor when he was sole director of the Debtor and did not defend it, leading to a default judgment.

16.     The First Jersey Action resulted in a money judgment (the "**Money Judgment**") in favor of Itkin in the amount of £505,000 plus interest and costs.  The Debtor was unsuccessful in attempting to set aside the Money Judgment.  An application to set aside judgment was lodged and came before the Jersey Co urt on July 24, 2018 whereupon it was adjourned to a date to be fixed.   Following a substantive hearing, on April 20, 2021 the application to set aside was refused.  The Court accepted that the Debtor had a prima facie defense to the action, but determined that the Debtor's delay in pursuing the application would make it unjust to set aside the Money Judgment.

17.     As a consequence of the Money Judgment, Itkin, in his capacity as director of the Debtor, caused the Debtor to unlawfully transfer 100% of the Debtor's interest in New Albion (the "**New Albion Shares**") to himself while the ATROs issued in the marital dissolution

1    proceeding remained in effect, and without permission of the court and without the knowledge,

2    authorization or consent of New Albion, the Debtor (other than Itkin himself in his capacity as

3    director), Alexander Sabadash or Larisa Sabadash.  Itkin was subsequently removed as director of

4    the Debtor and the Debtor's board passed a board resolution to void Itkin's purported transfer of

5    shares in New Albion.

6         18.    Itkin has also alleged, in the alternative, that he was entitled to appropriate the

7    New Albion Shares under the terms of a Guaranty Agreement said to be dated October 9, 2012,

8    entered into by the Debtor under his hand and without shareholder approval, when Itkin was the

9    sole director of the Debtor. The Guaranty purports to oblige the Debtor to guarantee and

10   indemnify all and any creditors of Mr. Sabadash, without limitation.  Itkin alleges that he relied

11   on the Guaranty to unlawfully transfer the New Albion Shares to himself.

12         ii.    _The California Action_

13        19.    In 2017, the Debtor, along with several other companies affiliated with Mr.

14   Sabadash, commenced an action against Itkin and other defendants in the Superior Court of the

15   State of California for the County of Los Angeles (the "**California Court**") styled _AFB Trading_

16   _One, Inc., M-BJEP Limited, M-NICE Limited, Golden Sphinx Limited; New Albion Property_

17   _Limited vs. Garry Y. Itkin, The Lighthouse Partnership Limited; and DOES 1 through 100_ (the

18   "**California Action**").  _See_ Exhibit C (Second Amended Complaint).  Among the claims asserted

19   is a claim by the Debtor against Itkin for his alleged fraudulent transfer of the New Albion Shares

20   from the Debtor to himself while he was the Debtor's sole director.  The California Action is

21   presided over by the Hon. Michael L. Stern.

22        20.    In response to the commencement of the California Action, Itkin filed a cross-

23   complaint (the "**Cross-Complaint**") asserting various claims against the Sabadashs and other

24   parties, including a cause of action (the "**Alleged Partnership Cause of Action**") against Mr.

25   Sabadash to dissolve an alleged partnership (the "**Alleged Partnership**") between Mr. Sabadash

26   and himself.  _See_ Exhibit D (Second Amended Cross-Complaint).  Through this cause of action,

27   Itkin seeks to dissolve and wind up the Alleged Partnership's remaining business, settle an

28   alleged debt of $56 million owed to Itkin using the Alleged Partnership's assets, and distribute

any remaining net amounts according to the terms of the Alleged Partnership.  The Cross-Complaint asserts that Itkin transferred the Debtor's shares in New Albion to himself as part of an "effort to preserve his share of the assets of the Partnership [by pursuing] some of the debts owed to him by the Partnership abroad," and refers to the New Albion Shares as "Partnership property." Furthermore, in interrogatory responses, Itkin identified the Debtor as a corporate entity falling under the auspices of the Alleged Partnership and the New Albion Shares that he transferred to himself as Alleged Partnership property.  *See* Exhibit E (Interrogatories Excerpt).

21.     Judge Stern has scheduled a pre-trial status conference on August 18, 2022, and anticipates commencing a jury trial on the issues on August 22, 2022.

iii.     *The Federal Action*

22.     In an effort to enforce the Money Judgment, on June 16, 2021, Itkin filed a complaint in the District Court for the Central District of California asserting a cause of action for recognition of the Money Judgment under the Uniform Foreign-Country Money Judgments Recognition Act (C.C.P. § 1713 *et. seq.*), bearing case no. 2:21-cv-04907 (the "**Federal Action**"), which has been assigned to the Hon. John A. Kronstadt.  *See* Exhibit F (Complaint in Federal Action).  The Debtor has filed counter-claims in the Federal Action for setoff and unjust enrichment.  *See* Exhibit G (Counter-complaint in Federal Action).  On June 22, 2022, the District Court entered an order continuing to August 15, 2022 a Motion to Dismiss Counterclaims filed by Itkin and a Motion for Judgment on the Pleadings filed by the Debtor.

iv.     *The Manchester Proceedings*

23.     On April 8, 2022 English solicitors instructed by Itkin caused to be served on the Debtor, at the address of its Jersey Counsel, an action issued out of the Business and Property Courts in Manchester, England (the "**Manchester Proceedings**").

24.     In the Manchester Proceedings, Itkin seeks orders declaring that the New Albion Shares are lawfully his and that the Guaranty is effective and enforceable.  Itkin also seeks orders that the benefit of a promissory note payable to the Debtor, dated October 11, 2012 in the sum of $19,516,000, was lawfully assigned to him by the Debtor when he was the Debtor's sole director, without shareholder consent.  Itkin also seeks orders establishing that a loan receivable due to the

Debtor, under a loan agreement in the sum of £15,504,000 dated July 23, 2013, had been lawfully assigned to him by the Debtor when he was the Debtor's sole director, without shareholder consent.   The Debtor had filed a defense to this claim in the English Proceeding prior to the appointment of the Joint Liquidators.

**C.    Commencement of the Jersey Liquidation and Appointment of the Joint Liquidators**

25.    On June 21, 2022, the Debtor, through JTC Law, provided notice to its creditors pursuant to Art. 160(1) of the Law of the convening of a meeting of creditors on July 6, 2022 (the "**Creditors Meeting**") with a view to the Debtor being wound up under Chapter 4 of Part 21 of the Law.  The Debtor duly convened the Creditors Meeting on July 6, 2022.

26.    By resolution dated July 5, 2022, the Debtor's sole director approved a draft members' unanimous and special resolution to be proposed to the shareholders to wind up the Debtor and nominate the Joint Liquidators.  *See* Exhibit H (resolution of Debtor's director approving written resolutions to be proposed to shareholders to wind up Debtor and nominate the Joint Liquidators).

27.    On July 6, 2022, the Debtor's Jersey domiciled registered shareholders executed a unanimous written resolution resolving to wind up the Debtor and to nominate Alexander Adam and I as Joint Liquidators for the purposes of such winding up.  *See* Exhibits I and J (shareholder resolutions for winding up of Debtor and nomination of the Joint Liquidators).

28.    At the Creditors Meeting on July 6, 2022, which was called in accordance with the provisions of Art. 160(1) of the Law following fourteen-day notice to all creditors, Alexander Adam and I were appointed Joint Liquidators in accordance with Article 161 of the Law.  *See* Exhibit K (minutes from meeting of creditors approving resolution appointing Joint Liquidators to wind up the Debtor).

29.    The commencement of the Jersey Liquidation caused an automatic stay to issue within Jersey.   As a matter of Jersey Law, once a winding up process has begun, no actions or proceedings shall be commenced or proceeded against the company except by leave of the court and subject to such terms as the court may impose.

**D.      Post-Commencement Activities and the English Proceeding**

30.      Following their appointment, the Joint Liquidators have instructed counsel in Jersey and California in order to continue the proceedings already under way in each jurisdiction, and have instructed bankruptcy counsel in connection with this application.

*i.      The Manchester Proceedings*

31.      The Joint Liquidators' Jersey counsel, Jeremy Garrood of JTC Law, is also a member of the English bar, and is acting for the Joint Liquidators in the Manchester Proceeding as well as in matters of Jersey law.

32.      On July 18, 2022, the Joint Liquidators received correspondence from Freeths LLP, on behalf of Itkin, regarding the Manchester Proceedings.

33.      The Joint Liquidators replied to Freeths LLP on July 21, 2022 seeking a consensual stay of the Manchester Proceedings in view of the Jersey Liquidation having commenced.  The automatic stay issued in the Jersey Liquidation does not extend to the Manchester Proceedings, but the parties may agree that a stay should be imposed in those proceedings.  If Itkin does not agree to a stay, the Joint Liquidators will apply to the English Court for their appointment to be recognized in England and for a stay to be imposed in the United Kingdom.

*ii.      The California Action*

34.      On July 28, 2022, Itkin filed a motion (the "**Bifurcation Motion**") to bifurcate the upcoming trial in the California Action, such that Itkin's claims against Alexander Sabadash for dissolving the Alleged Partnership and for breach of fiduciary duty would be tried first, with the trial for claims against Itkin to follow.[4]  In the alternative, Itkin argues that the proper venue for the claims pending in the State Court Action is the Royal Court of Jersey and also moves to dismiss the Debtor's claims under the doctrine of forum non conveniens.  *See* Exhibit L (Bifurcation Motion).

35.      The Joint Liquidators may seek a turnover proceeding in Jersey to retrieve the New Albion shares, to the extent they are actually held by Itkin.

---

[4]      All other cross-claims asserted in the Cross-Complaint have been dismissed.


THE ZORKIN FIRM

DECLARATION OF ANDREW WOOD

**E.      Commencement of Chapter 15 Proceeding**

36.      Alexander Adam and I have been informed by the Debtor's legal advisors that a chapter 15 proceeding is commenced by the filing of a petition for recognition (and related documents) by the "foreign representative."   We understand that "foreign representative" is defined in section 101(24) of the Bankruptcy Code to mean:

> "…a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24).

37.      The Debtor has property in the United States in the form of a retainer with Debtor's bankruptcy counsel in New York, Togut Segal & Segal LLP.  We also understand that the Debtor's claims as plaintiff in the California Action constitute property in the United States.

38.      On the date hereof, in our capacities as Foreign Representatives, we caused to be filed the Chapter 15 Petition pursuant to sections 1504 and 1515 of the Bankruptcy Code commencing this chapter 15 case in the Central District of  California, seeking recognition of the Jersey Liquidation as a "foreign main proceeding," as such term is defined in section 1502(4) of the Bankruptcy Code, or in the alternative as a "foreign nonmain proceeding," as such term is defined in section 1502(5) of the Bankruptcy Code, and seeking other necessary or appropriate relief in support of the Jersey Liquidation.

39.      I believe that recognition of the Foreign Representatives as "foreign representatives" as defined in section 101(24) of the Bankruptcy Code and recognition of the Jersey Liquidation as "foreign main proceedings" are consistent with the purpose of chapter 15 and will allow the Debtor to liquidate in the most efficient manner without jeopardizing the creditors' rights.

**F.      The Jersey Liquidation is a Foreign Main Proceeding**

40.      For the reasons set forth below, I believe that the Jersey Liquidation is a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code.

41.      I am informed that "foreign proceeding" is defined in section 101(23) of the

Bankruptcy Code to mean:

> "…a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the Debtors are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation" 11 U.S.C. § 101(24).

42.     I believe that the Jersey Liquidation falls within the foregoing definition.  As more fully explained in the Garrood Declaration filed contemporaneously herewith, the Jersey Liquidation is a (i) collective judicial proceedings, (ii) in Jersey, and (iii) governed by the Jersey statute applicable to insolvencies and debt restructurings, the Law.  In the Jersey Liquidation, the Debtor's assets and affairs are subject to the control or supervision of the Jersey Court.  The purpose of the Jersey Liquidation is to realize the assets of the company and apply them in satisfaction of the Debtor's debts in accordance with the creditors' rights of priority as set out in the Law (and associated legislation) and, to the extent a class of creditor cannot be repaid in full, on a *pari passu* basis.

43.     I am also informed that section 1517(b)(1) of the Bankruptcy Code provides that a foreign proceeding shall be recognized as a "foreign main proceeding" if the foreign proceeding is pending in the country where the debtor has "the center of its main interests" ("**COMI**").  COMI is not defined in chapter 15, but I am informed that section 1516(c) of the Bankruptcy Code provides that "[i]n the absence of evidence to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests."

44.     Prior to the commencement of the Jersey Liquidation, the Debtor's corporate activities occurred in Jersey.  The Debtor is incorporated in Jersey and is subject to the Law.  The Debtor's registered office is in Jersey.

**G.**     **Alternatively, the Jersey Liquidation is a Foreign Nonmain Proceeding**

45.     In the event that the Court concludes that the Debtor's COMI is not Jersey, I believe that this Court should recognize the Jersey Liquidation as a "foreign nonmain

THE ZORKIN FIRM

proceeding." I am informed that a foreign nonmain proceeding takes place in a jurisdiction that is not the entity's center of main interests, but where it has an "establishment," as defined as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. §§ 1502(2), (5).

46.    As of the date of the filing of the chapter 15 petition, the Foreign Representatives have centralized the Debtor's Liquidation activities in Jersey.   The Joint Liquidators have, since our appointment, played an active role in overseeing and managing the Debtor's affairs and have played a central role in the Debtor's winding up and supervising the California Action, which are the primary affairs of the Debtor. Thus, it is evident that the Debtor at the very least has an "establishment" in Jersey.

**H.    Statement Pursuant to Section 1515 of the Bankruptcy Code**

47.    I am informed that section 1515 of the Bankruptcy Code provides, in pertinent part, as follows:

   a)    A foreign representative applies to the court for recognition of a foreign proceeding in  which the foreign representative has been appointed by filing a petition for recognition.

   b)    A petition for recognition shall be accompanied by—

      (1)    a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

      (2)    a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

      (3)    in the absence of evidence referred to in paragraphs 1) and 2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

   c)    A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative

48.    Pursuant to section 1515(b) of the Bankruptcy Code, I affirm to the existence of

the Jersey Liquidation and the appointment of the Foreign Representatives as Joint Liquidators.

49.    Pursuant to section 1515(c) of the Bankruptcy Code, I believe that the Jersey Liquidation is a "foreign proceeding" as defined therein.  I am aware of no other "foreign proceedings" as defined in the Bankruptcy Code with respect to the Debtor.

*[Remainder of page left intentionally blank.]*

1      I declare under penalty of perjury under the laws of the United States of America that the

2  foregoing is true and correct to the best of my knowledge, information, and belief.

3

4  Executed on this 9th day of August 2022

5  In  St. Helier, Jersey

6

7                                Andrew Wood

8

# Exhibit A

FL-100

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| JULIE A. MILLIGAN (SBN 12441)<br>SILVERMAN & MILLIGAN LLP<br>10877 WILSHIRE BLVD., SUITE 610<br>LOS ANGELES, CA 90024<br>TELEPHONE NO.: 310-566-2409    FAX NO. 310-496-3164<br>E-MAIL ADDRESS: milligan@silmwlaw.com<br>ATTORNEY FOR (Name): PETITIONER | **CONFORMED COPY**<br>**ORIGINAL FILED**<br>Superior Court of California<br>County of Los Angeles<br><br>AUG 02 2016<br><br>Sherri R. Carter, Executive Officer/Clerk<br>By: Daniel Osorio, Deputy |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES |
|---|
| STREET ADDRESS: 111 N. HILL ST<br>MAILING ADDRESS: SAME<br>CITY AND ZIP CODE: LOS ANGELES, CA 90012<br>BRANCH NAME: STANLEY MOSK |

PETITIONER: LARISA SABADASH

RESPONDENT: ALEXANDER SABADASH

| PETITION FOR | | CASE NUMBER: |
|---|---|---|
| [X] **Dissolution (Divorce)** of:   [X] Marriage      [ ] AMENDED | | **BD644102** |
| [ ] **Legal Separation** of:   [ ] Marriage   [ ] Domestic Partnership | | |
| [ ] **Nullity** of:   [ ] Marriage   [ ] Domestic Partnership | | |

1. **LEGAL RELATIONSHIP** (check all that apply):
   a. [X] We are married.
   b. [ ] We are domestic partners and our domestic partnership was established in California.
   c. [ ] We are domestic partners and our domestic partnership was NOT established in California.

2. **RESIDENCE REQUIREMENTS** (check all that apply):
   a. [X] Petitioner [ ] Respondent   has been a resident of this state for at least six months and of this county for at least three months immediately preceding the filing of this Petition. (For a divorce, at least one person in the legal relationship described in items 1a and 1c must comply with this requirement.)
   b. [ ] We are the same sex and were married in California but are not residents of California. Neither of us lives in a state or nation that will dissolve the marriage. This case is filed in the county in which we married.
      Petitioner's residence (state or nation):                    Respondent's residence (state or nation):
   c. [ ] Our domestic partnership was established in California. Neither of us has to be a resident or have a domicile in California to dissolve our partnership here.

3. **STATISTICAL FACTS**
   a. [X] (1) Date of marriage (specify): OCTOBER 12, 1991    (2) Date of separation (specify): MAY 6, 2014
      (3) Time from date of marriage to date of separation (specify):   22 Years    7 Months
   b. [ ] (1) Registration date of domestic partnership with the California Secretary of State or other state equivalent (specify below):
      (2) Date of separation (specify):
      (3) Time from date of registration of domestic partnership to date of separation (specify):   Years    Months

4. **MINOR CHILDREN** children born before (or born or adopted during) the marriage or domestic partnership):
   a [ ] There are no minor children.
   b. [X] The minor children are:

| Child's name | Birthdate | Age | Sex |
|---|---|---|---|
| VERONICA SOPHIA SABADASH | JULY 3, 2003 | 13 | F |

"Case is assigned to Judge _Diloman_

Department _27_

   (1) [ ] continued on Attachment 4b.
   (2) [ ] a child who is not yet born.
   c. If there are minor children of Petitioner and Respondent, a completed Declaration Under Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) (form FL-105) must be attached.
   d. [ ] Petitioner and Respondent signed a voluntary declaration of paternity. A copy [ ] is [ ] is not   attached.

Page 1 of 3

FL-100

| PETITIONER: LARISA SABADASH | CASE NUMBER. |
| RESPONDENT: ALEXANDER SABADASH | |

Petitioner requests that the court make the following orders:

5. **LEGAL GROUNDS** (Family Code sections 2200–2210, 2310–2312)
   a. [x] Divorce or [ ] Legal separation of the marriage or domestic partnership based on *(check one)*:
      (1) [x] irreconcilable differences.    (2) [ ] permanent legal incapacity to make decisions.
   b. [ ] Nullity of void marriage or domestic partnership based on:
      (1) [ ] incest.    (2) [ ] bigamy.
   c. [ ] Nullity of voidable marriage or domestic partnership based on:
      (1) [ ] petitioner's age at time of registration of domestic    (4) [ ] fraud.
            partnership or marriage
      (2) [ ] prior existing marriage or domestic partnership.    (5) [ ] force.
      (3) [ ] unsound mind.    (6) [ ] physical incapacity.

6. **CHILD CUSTODY AND VISITATION (PARENTING TIME)**

|  | Petitioner | Respondent | Joint | Other |
|---|---|---|---|---|
| a. Legal custody of children to | [x] | [ ] | [ ] | [ ] |
| b. Physical custody of children to | [x] | [ ] | [ ] | [ ] |
| c. Child visitation (parenting time) be granted to | [ ] | [x] | | [ ] |

   As requested in: [ ] form FL-311    [ ] form FL-312    [ ] form FL-341(C)
                     [ ] form FL-341(D)    [ ] form FL-341(E)    [ ] Attachment 6c(1)
   d. [ ] Determine the parentage of children born to Petitioner and Respondent before the marriage or domestic partnership.

7. **CHILD SUPPORT**
   a. If there are minor children born to or adopted by Petitioner and Respondent before or during this marriage or domestic partnership, the court will make orders for the support of the children upon request and submission of financial forms by the requesting party.
   b. An earnings assignment may be issued without further notice.
   c. Any party required to pay support must pay interest on overdue amounts at the "legal" rate, which is currently 10 percent.
   d. [ ] Other *(specify)*.

8. **SPOUSAL OR DOMESTIC PARTNER SUPPORT**
   a. [ ] Spousal or domestic partner support payable to [ ] Petitioner [ ] Respondent
   b. [ ] Terminate (end) the court's ability to award support to [ ] Petitioner [ ] Respondent
   c. [x] Reserve for future determination the issue of support payable to [x] Petitioner [ ] Respondent
   d. [ ] Other *(specify)*:

9. **SEPARATE PROPERTY**
   a. [ ] There are no such assets or debts that I know of to be confirmed by the court.
   b. [x] Confirm as separate property the assets and debts in [ ] *Property Declaration* (form FL-160) [ ] Attachment 9b
         [x] the following list.    Item        Confirm to
         There are separate property assets and debts, the specific nature, extent and location of which are
         currently unknown. These will be disclosed when discovered.

**PETITION—MARRIAGE/DOMESTIC PARTNERSHIP**
                                    (Family Law)

**FL-100**

| PETITIONER: LARISA SABADASH | CASE NUMBER: |
|---|---|
| RESPONDENT: ALEXANDER SABADASH | |

**10. COMMUNITY AND QUASI-COMMUNITY PROPERTY**

a. ☐ There are no such assets or debts that I know of to be divided by the court.

b. ☒ Determine rights to community and quasi-community assets and debts. All such assets and debts are listed

☐ in *Property Declaration* (form FL-160)    ☐ in Attachment 10b.

☒ as follows *(specify)*: There are community and quasi-community property assets and debts, the specific nature, extent and location of which are currently unknown. These will be disclosed when discovered.

**11. OTHER REQUESTS**

a. ☐ Attorney's fees and costs payable by    ☐ Petitioner    ☐ Respondent

b. ☐ Petitioner's former name be restored to *(specify)*:

c. ☐ Other *(specify)*:

☐ Continued on Attachment 11c.

**12. I HAVE READ THE RESTRAINING ORDERS ON THE BACK OF THE SUMMONS, AND I UNDERSTAND THAT THEY APPLY TO ME WHEN THIS PETITION IS FILED.**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: AUGUST ,2016

LARISA SABADASH
_____
(TYPE OR PRINT NAME)

Date: AUGUST ,2016

JULIE A. MILLIGAN
_____
(TYPE OR PRINT NAME)

_____
(SIGNATURE OF PETITIONER)

_____
(SIGNATURE OF ATTORNEY FOR PETITIONER)

**NOTICE:** You may redact (black out) social security numbers from any written material filed with the court in this case other than a form used to collect child, spousal or partner support.

**NOTICE—CANCELLATION OF RIGHTS:** Dissolution or legal separation may automatically cancel the rights of a domestic partner or spouse under the other domestic partner's or spouse's will, trust, retirement plan, power of attorney, pay-on-death bank account, survivorship rights to any property owned in joint tenancy, and any other similar thing. It does not automatically cancel the right of a domestic partner or spouse as beneficiary of the other partner's or spouse's life insurance policy. You should review these matters, as well as any credit cards, other credit accounts, insurance polices, retirement plans, and credit reports, to determine whether they should be changed or whether you should take any other actions. Some changes may require the agreement of your partner or spouse or a court order.

# Exhibit B

**2016/335**

ROYAL

-2 DEC 2016

COURT

PL

## IN THE ROYAL COURT OF THE ISLAND OF JERSEY
### (Samedi Division)

Between                  **GARRY YURI ITKIN**                 **Plaintiff**

And                    **GOLDEN SPHINX LIMITED**             **Defendant**

---

### BILLET

---

ACTIONING the Defendant to witness the confirmation of the Summons, a copy of which is annexed hereto.

The Summons in this action to appear in the Royal Court on Friday the 2nd day of December 2016 was posted by me to the Defendant at Suite 3, Burlington House, St Saviour's Road, St Helier JE2 4LA on the 22nd day of November 2016.

ROYAL ⱱⱱᵈᶜ

-2 DEC 2016 ᵍᵗ

COURT



.........................................
Lucy Cox
Assistant to Advocate Blakeley

**Address for Service:**

Blakeley Legal
Lincoln Chambers
31 Broad Street
St Helier
Jersey
JE2 3RR

ITK.1-00100115627L

1

**PL**

## IN THE ROYAL COURT OF THE ISLAND OF JERSEY
### (Samedi Division)

### SUMMONS

**Golden Sphinx Limited**                                                    **DEFENDANT**
Suite 3
Burlington House
St Saviour's Road
St Helier
JE2 4LA

You are required to appear before the Royal Court, Royal Square, St Helier, Jersey on Friday 2nd December, at 2.30pm to defend the action of which particulars appear below.

IF YOU DO NOT APPEAR JUDGMENT MAY BE GIVEN IN YOUR ABSENCE

CONTRA   **Garry Yuri ITKIN**                                               **PLAINTIFF**

Actioning the Defendant to pay the sum of £[amount] Sterling which the Plaintiff claims to be due in respect of unpaid directors' fees, together with statutory simple interest calculated from the date on which the said fees were due to the date of repayment in full at the current rate of 2.25% per annum or at such rate as the court may deem just and to pay the costs of the action.

| | | |
|---|---|---|
| Claim | £ | 505,000.00 |
| Statutory Interest at 2.5% per annum until 4th August 2016 and at 2.25% from such date and to 30th November 2016 | £ | 17,066.33 |
| Court Fees | £ | 00.00 |
| Costs to date | £ | |
| TOTAL DUE BY YOU | £ | 00.00 |


ITK.1-001001152760

2        2

IF YOU DO NOT DISPUTE THE AMOUNT CLAIMED IN THIS SUMMONS and wish to settle without attending court, please remit to this office the sum of £[amount] by 10.00am the Thursday prior to the court date.

CHEQUES MUST BE PAYABLE TO: **BLAKELEY LEGAL** and sent to: Lincoln Chambers, 31 Broad Street, St Helier JE2 3RR.

This Summons was issued by
**Advocate Olaf Blakeley**
Advocate for the Plaintiff

.............................................

This $2\int$ day of ᴎᴏᴠ    20 16

**Address for Service:**

**Blakeley Legal**
**Lincoln Chambers**
**31 Broad Street**
**St Helier**
**Jersey**
**JE2 3RR**

To
Golden Sphinx Limited of
Suite 3
Burlington House
St Saviour's Road
St Helier
**JE2 4LA**



ITK.1-001001152760

3

Ƨ

# Exhibit C

MANATT, PHELPS & PHILLIPS, LLP
Robert H. Platt (Bar No. CA 108533)
Reid P. Davis (Bar No. CA 275164)
Michael Zorkin (Bar No. CA 313308)
11355 West Olympic Blvd.
Los Angeles, CA 90064
Tel: (310)312-4000
Fax: (310)312-4224

*Attorneys for Plaintiff Companies*
AFB Trading One, Inc., M-BJEP Limited,
M-NICE Limited, Golden Sphinx Limited, and New Albion Property
Limited

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

DEC 18 2017

Sherri R. Carter, Executive Officer/Clerk
By Michael Rivera, Deputy

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| AFB TRADING ONE, INC., a California corporation; M-BJEP LIMITED, an Isle of Man corporation; M-NICE LIMITED, an Isle of Man corporation, GOLDEN SPHINX LIMITED, a Jersey corporation; NEW ALBION PROPERTY LIMITED, an England corporation; <br><br> Plaintiff Companies, <br><br> vs. <br><br> GARRY Y. ITKIN, an individual; THE LIGHTHOUSE PARTNERSHIP LIMITED, an England corporation; and DOES 1 through 100, inclusive, <br><br> Defendants. | Case No.BC647351 <br><br> Assigned to Hon. Michael L. Stern Dept. 62 <br><br> **VERIFIED SECOND AMENDED COMPLAINT FOR:** <br><br> 1. **Breach of Fiduciary Duty (Claims 1 through 4);** <br> 2. **Declaratory Relief (Claims 5 through 10);** <br> 3. **Fraudulent Concealment (Claims 11 through 12);** <br> 4. **Constructive Fraud (Claims 13 through 14);** <br> 5. **Conversion (Claims 15 through 16);** <br> 6. **Accounting (Claim 17);** <br> 7. **Quiet Title (Claim 18);** <br> 8. **Cancellation of Written Instrument (Claim 19).** <br> 9. **Intentional Interference with Prospective Economic Relations (Claim 20).** <br> 10. **Intentional Interference with Contractual Relations (Claim 21).** <br><br> Complaint Filed: April 5, 2017 |

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16

- 1 -

Plaintiff Companies AFB Trading One, Inc. ("AFB"), M-BJEP Limited ("M-BJEP"), M-NICE Limited ("M-NICE"), Golden Sphinx Limited ("Golden Sphinx") and New Albion Property Limited ("New Albion") (collectively, "Plaintiff Companies"), allege as follows:

## I.
## INTRODUCTORY STATEMENT

1.      The purpose of this action is to enjoin and redress Defendant Garry Y. Itkin's ("Itkin") clandestine systematic campaign of fraud against the Plaintiff Companies.

2.      Alexander Sabadash – the sole shareholder of AFB and the beneficial owner of M-BJEP and M-NICE – hired Itkin to perform accounting functions for various companies under Mr. Sabadash's ownership. Eventually, Mr. Sabadash expanded Itkin's role to hold various fiduciary positions in the Plaintiff Companies, including serving as an officer or director in many of the Plaintiff Companies.

3.      During the ensuing years, Itkin schemed to take advantage of his various fiduciary positions and Mr. Sabadash's misplaced trust by, among other things, subtly diverting Plaintiff Companies' assets for his (Itkin's) personal gain. In addition, Itkin repeatedly borrowed significant amounts of money from Mr. Sabadash or his companies for Itkin's personal business ventures.

4.      In 2014, Mr. Sabadash – who was formerly an elected Senator in Russia – was arrested in Moscow, apparently as a result of "political differences" with government representatives. Upon Mr. Sabadash's incarceration, Itkin accelerated his fraudulent scheme, including by orchestrating a complex series of fraudulent business transactions. To that end, Itkin created numerous self-dealing contracts, security agreements, pledge agreements, releases, mortgages, and promissory notes, among other fraudulent documents – all for the purpose of manufacturing unauthorized and invalid ownership claims against Plaintiff Companies' assets.

5.      As one example of Itkin's fraudulent acts (which are more fully described herein) Itkin conspired with attorney Michael Baranov to concoct a lawsuit by one of Mr. Sabadash's companies against another of Mr. Sabadash's companies (Plaintiff AFB Trading One, Inc.). Itkin – who is not a lawyer – appeared in that action purporting to represent AFB, before AFB was

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    even served with a summons or complaint. Within two weeks of appearing and waving service

2    on behalf of AFB, Itkin stipulated with counsel for Milan, Michael Baranov, to a judgment

3    against AFB for the full amount of the damages sought against AFB. Baranov then conspired

4    with Itkin to enable the AFB judgment to be sold to Itkin personally without ever advising or

5    noticing the sole shareholder of AFB (*i.e.* Mr. Sabadash). Years later, after Mr. Sabadash was

6    incarcerated, Itkin tried to enforce the judgment to seize the shares of AFB's 100% owned

7    Subsidiaries.

8         6.    Another example of Itkin's fraudulent maneuvering occurred between September

9    20, 2016 and September 27, 2016. In the short span of just seven days, Itkin engaged in an

10   avalanche of fraudulent self-dealing in breach of his fiduciary duties by: (i) improperly removing

11   one Piotr Szymanski from his directorship of M-BJEP, M-NICE, and New Albion, (ii) assigning

12   loans worth tens of millions of dollars from Golden Sphinx to himself, (iii) backdating and

13   causing to be notarized Aircraft Mortgages (encumbering assets of M-BJEP and M-NICE) to

14   falsely show that the Mortgages were entered into in 2014, (iv) improperly amending the Articles

15   of Association of M-BJEP, purporting to award himself additional compensation in the event he

16   is removed as director, and (v) unlawfully transferring 100% of the shares of New Albion to

17   himself personally, for no consideration (which Itkin later relied upon to fraudulently obtain a

18   $2,000,000 mortgage against the residential real property owned by New Albion in Beverly Hills,

19   California – the house where Mr. Sabadash's wife and children continue to reside).

20        7.    These are but a few egregious examples of Itkin's ongoing campaign of fraudulent

21   dealings. A more fulsome picture is portrayed herein below and in the attached agreements,

22   transactions, or corporate records that were fraudulently manufactured by Itkin without the

23   knowledge or authorization of Plaintiff Companies.

24        8.    Accordingly, this action seeks to: (i) invalidate, set aside, and rescind the various

25   fraudulent self-dealing agreements and transactions executed by Itkin without authorization and

26   in breach of Itkin's fiduciary and statutory obligations to Plaintiff Companies; (ii) clear and quiet

27   title to Plaintiff Companies' valuable assets; (iii) obtain an accounting to determine the full extent

28   of Itkin's misappropriation of Plaintiff Companies' assets; (iv) enjoin Itkin from further holding

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16                              - 3 -

1    himself out as a fiduciary of Plaintiff Companies and encumbering or in any way interfering with

2    Plaintiff Companies' assets; and (v) obtain damages and redress for the harm inflicted upon

3    Plaintiff Companies as a result of Itkin's tortious acts.

4

**II.**
**THE PARTIES**

5

6        9.     Plaintiff AFB is a corporation organized and existing under the laws of the State of

7    California.

8       10.    Plaintiff M-BJEP is a corporation organized and existing under the laws of the Isle

9    of Man. Plaintiff AFB is the owner of one hundred percent (100%) of the stock of M-BJEP.

10       11.    Plaintiff M-NICE is a corporation organized and existing under the laws of the Isle

11    of Man. Plaintiff AFB is the owner of one hundred percent (100%) of the stock of M-NICE.

12       12.    Plaintiff New Albion is a corporation organized and existing under the laws of

13    England. The primary asset held by New Albion is certain improved real property within the

14    jurisdiction of this Court and located at 58 Beverly Park Drive, Beverly Hills, California 90210

15    (the "Beverly Hills House").

16       13.    Plaintiff Golden Sphinx is a corporation organized and existing under the laws of

17    Jersey. Golden Sphinx is the rightful owner of one hundred percent (100%) of the stock of New

18    Albion, which as noted above owns real property in Los Angeles, California

19       14.    Plaintiff Companies are informed and believe, and based thereon allege, that

20    Defendant Garry Y. Itkin is an individual residing in the State of California, County of Los

21    Angeles.

22       15.    Plaintiff Companies are informed and believe and based thereon allege that

23    Defendant Lighthouse Partnership Limited is a corporation organized and existing under the laws

24    of England, which has placed a trust deed on the Beverly Hills House.

25       16.    The true names and capacities, whether individual, corporate, associate or

26    otherwise of Defendants, Does 1 through 100, inclusive, are unknown to Plaintiff Companies,

27    who therefore sue said Defendants by such fictitious names (Defendant and Does 1 through 100

28    are collectively referred to herein as "Defendants"). Plaintiff Companies will amend this

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16          - 4 -

SECOND AMENDED COMPLAINT

1    Complaint to show the true names and capacities of such fictitiously named Defendants once

2    ascertained. Plaintiff Companies are informed and believe, and based thereon allege, that each of

3    the fictitiously named Defendants was involved in some or all of the wrongful conduct hereinafter

4    alleged and that Plaintiff Companies' rights against the fictitiously named Defendants arise from

5    such conduct.

6         17.    At all times herein mentioned, Defendants were the agents, servants and/or

7    employees of their co-defendants and in some manner were responsible for the events hereinafter

8    mentioned and were acting within the scope of their authority as such agents, servants and

9    employees, with the permission, consent and/or ratification of their co-defendants.

**III.**
**STATEMENT OF FACTS**

11   **A.    Itkin's Fiduciary Roles in the Plaintiff Companies**

12        18.    On August 30, 1994, the California corporation, Direct Inter-Trading Group, Inc.,

13   was renamed AFB Trading One, Inc. (hereinafter "AFB"). The purpose of AFB was to engage in

14   the manufacturing and distribution business.

15        19.    Plaintiff AFB owns interests in certain subsidiary companies, including Plaintiffs

16   M-BJEP Limited ("M-BJEP") and M-NICE Limited ("M-NICE") (collectively, the

17   "Subsidiaries").

18        20.    AFB has only one shareholder, Alexander Sabadash. Mr. Sabadash and his wife,

19   Larisa Sabadash, acted as AFB's President and Secretary, respectively, from the date of its

20   creation until in or around May 2003.

21        21.    In or around 2000, Mr. Sabadash hired Garry Y. Itkin ("Itkin" or "Defendant") to

22   perform accounting services for various companies under Mr. Sabadash's ownership.

23        22.    To enable Itkin to carry out these accounting responsibilities and to oversee AFB's

24   finances, Mr. Sabadash gave Itkin the title of President and CFO of AFB in or around May 2003.

25        23.    Around the same time, Itkin was also hired to manage and oversee the finances of

26   subsidiary companies wholly owned and controlled by AFB, including without limitation, M-

27   BJEP and M-NICE.

28        24.    Itkin was employed in similar fiduciary roles with Golden Sphinx, as a director.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16                                    - 5 -

SECOND AMENDED COMPLAINT

25.     The terms of Itkin's employment with the Plaintiff Companies were generally agreed upon orally between Mr. Sabadash and Itkin.  At no time did Mr. Sabadash or any Plaintiff Company enter into any written agreement with Itkin.  (However, Plaintiffs have since discovered that Itkin fraudulently manufactured a number of purported written agreements, which are further discussed below.)

26.     Once settled into these fiduciary positions, Itkin began a clandestine campaign to assume control over the assets of the Plaintiff Companies, in breach of Itkin's fiduciary duties, and statutory law, as described below.

**B.      The Fraudulent and Unauthorized Milan Ltd v. AFB Action**

27.     Notwithstanding that Itkin was then acting as the President and Chief Financial Officer of AFB, in December 2010, Itkin caused a company called Milan, Ltd ("Milan")[1] to bring an action against AFB.[2]  Itkin has never validly held any ownership interest in Milan, was not on the Board of Directors for Milan in December 2010, and was never authorized to cause Milan to sue AFB.

28.     Itkin intentionally concealed the Milan action from Mr. Sabadash (*i.e.* the beneficial owner of AFB and Milan).  Itkin did not cause the summons or complaint to be served on Mr. Sabadash, and no proof of service was filed with the Court.

29.     Instead, Itkin conspired with Michael Baranov, attorney for Milan, to waive service on AFB by having Itkin voluntarily enter an appearance as "counsel" of record on behalf of AFB.  Mr. Sabadash (AFB's sole shareholder) never knew of or authorized Itkin's purported representation of AFB in the Milan action.  Moreover, Itkin, who is not a member of the California bar, was legally barred from representing the corporation in a legal action because he is

---

[1] Milan, like AFB, is beneficially owned by Mr. Sabadash.  *Milan v. AFB*, Los Angeles Superior Court as Case Number BC451961, was previously ordered related to the instant action, but has since been dismissed.

[2] To be clear, Itkin was not the plaintiff or real party in interest in the Milan action, and he is not being sued in this present case based on his initiation of any judicial or other proceeding covered by Code of Civil Procedure Section 47.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16                              - 6 -

SECOND AMENDED COMPLAINT

1    not and has never been a licensed attorney in the United States.

2        30.    Within two weeks from the date Itkin voluntarily appeared in the Milan action,

3    Itkin entered into a stipulated judgment with Milan, on behalf of AFB, for $772,405, which was

4    the entire amount of damages sought in Milan's complaint.[3]  The stipulation was never known to

5    or approved by the sole shareholder of AFB, Mr. Sabadash.

6        31.    While still serving as an officer and/or director of AFB, Itkin caused Milan to

7    assign the $772,405 judgment to himself personally in exchange for the nominal sum of $9,750.

8    Itkin never advised Mr. Sabadash of the judgment that he caused to be entered against AFB, nor

9    did Itkin advise that he was purchasing the judgment against AFB for pennies on the dollar.

10       32.    Finally, in or around October 2016, Itkin moved to complete this particular

11   fraudulent scheme, seeking enforcement of the Milan judgment against the assets of AFB by

12   forcing a sheriff's sale of AFB's stock certificates.  Through these actions, Itkin hoped to acquire

13   two airplanes (collectively worth tens of millions of dollars) as well as other valuable assets

14   owned by AFB's subsidiaries.

15       33.    During the proceedings to enforce the Milan judgment, Itkin continued to

16   fraudulently conceal his actions from AFB, including by purporting to serve notice of the

17   judgment to AFB at an address that was solely controlled by Itkin (8501 Wilshire Blvd., Suite

18   330, Beverly Hills, CA 90212).  Itkin intentionally acted to avoid serving or notifying AFB's sole

19   shareholder and the then-acting members of AFB's Board of Directors, none of whom knew of

20   the underlying lawsuit, the judgment, or the enforcement proceedings against AFB.

21       34.    AFB only discovered the fraudulent Milan action and resulting judgment because

22   the Honorable Mark A. Borenstein, sitting in Department 35 of the Los Angeles County Superior

23   Court and presiding over the enforcement proceedings, ordered Itkin to serve notice to AFB at its

24   address registered on the Secretary of State's website.

25       35.    Once it was finally served with notice, AFB succeeded in having the fraudulent

26

27   [3] Itkin's stipulation to a judgment for the full amount of damages alleged is all the more egregious
     given that all alleged claims in the Milan complaint were barred by the applicable statute of
28   limitations and otherwise defensible.

MANATT, PHELPS &
PHILLIPS, LLP          318983966.16                          - 7 -
ATTORNEYS AT LAW
SAN FRANCISCO                           SECOND AMENDED COMPLAINT

1    judgment set aside.

2    **C.    Itkin's Other Fraudulent and Unauthorized Self-Dealing Actions**

3    36.    Itkin's fraudulent conduct in the Milan action was only the tip of the iceberg.  It

4    was subsequently discovered that, while serving as an officer and/or director of the Plaintiff

5    Companies, Itkin had acted secretly and without authorization, in breach of his fiduciary duties,

6    by engaging in the following acts, among others:

7    a.    On or about May 31, 2003, Itkin fraudulently entered into an Employment

8    Agreement with AFB, awarding himself a salary of $5,000 per month, without the

9    knowledge, authorization, or consent of AFB's sole shareholder, and without full

10    disclosure to and consent by vote of a disinterested board of directors.  (A true and

11    correct copy of the agreement is attached as **Exhibit 1.**)  On information and belief, it is

12    alleged that Itkin paid himself an unauthorized and undeserved salary pursuant to this

13    fraudulent agreement.

14    b.    On or about October 3, 2014, Itkin entered into a Director Agreement with

15    M-NICE appointing himself as a director and awarding himself a salary of £5,000 per

16    month.  Itkin signed on behalf of himself and M-NICE.  This agreement was not fair or

17    just to the corporation, was not disclosed to the shareholder, and was not approved by the

18    shareholder or a disinterested board of directors.  (A true and correct copy of the

19    agreement is attached as **Exhibit 2.**)  Prior to Itkin unlawfully appointing himself the

20    director of M-NICE, a corporate director served in that capacity whose fees were

21    significantly lower than the amount Itkin attempted to pay himself.

22    c.    On or about October 3, 2014, Itkin entered into an Operator Agreement

23    with M-NICE appointing himself as an operator and awarding himself a salary of £3,000

24    per month.  Itkin signed the Operator Agreement on behalf of himself as well as on

25    behalf of M-NICE.  This agreement was not fair or just to the company, was not

26    disclosed to the shareholder, and was not approved by the shareholder or a disinterested

27    board of directors.  (A true and correct copy of the agreement is attached as **Exhibit 3.**)

28    At all relevant times a professional air service provider hired by M-NICE provided all

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16                                    - 8 -

SECOND AMENDED COMPLAINT

1    operational services without the input or participation of Itkin.  As a result of this

2    unauthorized agreement, Itkin has unlawfully interfered with Plaintiff Companies'

3    possession, use, and potential sale of an airplane owned by M-NICE.

4            d.      On or about October 3, 2014, Itkin entered into an Aircraft Mortgage

5    Agreement with M-NICE encumbering M-NICE's only asset.  Itkin signed the Mortgage

6    Agreement on behalf of himself as well as on behalf of M-NICE.  This agreement was

7    not fair or just to the company, was not disclosed to the shareholder, and was not

8    approved by the shareholder or a disinterested board of directors.  (A true and correct

9    copy of the agreement is attached as **Exhibit 4.**)  This agreement was notarized on

10    September 27, 2016 and was recorded in the Isle of Man Aircraft Registry on October 10,

11    2016.  As a result of this unauthorized agreement, Itkin has unlawfully interfered with

12    Plaintiff Companies' possession, use, and potential sale of an airplane owned by M-

13    NICE.

14            e.      On or about October 3, 2014, Itkin entered into a Director Agreement with

15    M-BJEP appointing himself as a director and awarding himself a salary of £5,000 per

16    month.  Itkin signed the Director Agreement on behalf of himself as well as on behalf of

17    M-BJEP.  This agreement was not fair or just to the company, was not disclosed to the

18    shareholder, and was not approved by the shareholder or a disinterested board of

19    directors.  (A true and correct copy of the agreement is attached as **Exhibit 5.**)  Prior to

20    Itkin unlawfully appointing himself the director of M-BJEP, a corporate director served

21    in that capacity whose fees were significantly lower than the amount Itkin attempted to

22    pay himself.

23            f.      On or about October 3, 2014, Itkin entered into an Operator Agreement

24    with M-BJEP appointing himself as an operator and awarding himself a salary of £3,000

25    per month.  Itkin signed the Operator Agreement on behalf of himself as well as on

26    behalf of M-BJEP.  This agreement was not fair or just to the company, was not

27    disclosed to the shareholder, and was not approved by the shareholder or a disinterested

28    board of directors.  (A true and correct copy of the agreement is attached as **Exhibit 6.**)

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16          - 9 -

SECOND AMENDED COMPLAINT

At all relevant times a professional air service provider hired by M-BJEP provided all operational services without the input or participation of Itkin. As a result of this unauthorized agreement, Itkin has unlawfully interfered with Plaintiff Companies' possession, use, and potential sale of an airplane owned by M-BJEP.

g.     On or about October 3, 2014, Itkin entered into an Aircraft Mortgage Agreement with M-BJEP encumbering M-BJEP's only asset. Itkin signed the Mortgage Agreement on behalf of himself as well as on behalf of M-BJEP. This agreement was not fair or just to the company, was not disclosed to the shareholder, and was not approved by the shareholder or a disinterested board of directors. (A true and correct copy of the agreement is attached as **Exhibit 7.**) This agreement was notarized on September 27, 2016 and was recorded in the Isle of Man Aircraft Registry on October 10, 2016. As a result of this unauthorized agreement, Itkin has unlawfully interfered with Plaintiff Companies' possession, use, and potential sale of an airplane owned by M-BJEP.

h.     On or about October 3, 2014, Itkin caused AFB to enter Corporate Minutes approving appointment of Itkin as sole director of M-NICE; approving entry of the Aircraft Mortgage; approving the Director Agreement between M-NICE and Itkin; confirming the previous appointment of Itkin as Operator; and releasing and indemnifying Itkin from all liability. Itkin signed the Corporate Minutes on behalf of himself as well as on behalf of AFB. These Minutes were not authorized by the corporation, were not disclosed to the shareholder, and were not approved by the shareholder or a disinterested board of directors. (A true and correct copy of the minutes is attached as **Exhibit 8.**)

i.     On or about September 20, 2016, Itkin, acting without the knowledge, authorization or consent of AFB, fraudulently caused the director of M-BJEP and M-NICE, Piotr Szymanski, to be removed thus becoming the sole director of M-BJEP and M-NICE. (True and correct copies of the corporate resolutions are attached as **Exhibits 9 and 10.**)

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SECOND AMENDED COMPLAINT

j.       On or about September 20, 2016, Itkin caused Golden Sphinx to transfer a loan owed to Golden Sphinx by M-NICE for $15,504,000 to Itkin personally.  Itkin signed on behalf of M-NICE, Golden Sphinx, and himself.  This agreement was not fair or just to the company, was not disclosed to the shareholder, and was not approved by the shareholder or a disinterested board of directors.  (A true and correct copy of the note is attached as **Exhibit 11.**)  As a result of this unauthorized agreement, Itkin has unlawfully interfered with Plaintiff Companies' possession, use, and potential sale of an airplane owned by M-NICE.

k.       Itkin has claimed in public filings that Golden Sphinx transferred a promissory note it held on M-BJEP for $19,338,750 to Itkin personally.  Itkin signed on behalf of M-BJEP, Golden Sphinx, and himself.  This agreement was not fair or just to the company, was not disclosed to the shareholder, and was not approved by the shareholder or a disinterested board of directors.  As a result of this unauthorized agreement, Itkin has unlawfully interfered with Plaintiff Companies' possession, use, and potential sale of an airplane owned by M-BJEP.

l.       On or about September 20, 2016, Itkin, acting without the knowledge, authorization or consent of AFB, fraudulently manufactured a document purporting to be a resolution passed on behalf of AFB to amend the Articles of Association of M-BJEP so as to: (i) award himself additional compensation in the event he is removed as director, (ii) indemnify him from all claims, and (iii) prohibit the appointment of other directors without his consent.  This resolution was not fair or just to the company, was not disclosed to the shareholder, and was not approved by the shareholder or a disinterested board of directors.  (A true and correct copy of the resolution is attached as **Exhibit 12.**)

37.       During this decade of fraud, Mr. Sabadash paid Itkin a generous salary for what he believed was loyal service.  Itkin's salary was not based on a written agreement and Mr. Sabadash had no knowledge of the above agreements manufactured by Itkin.

38.       To this day, despite being validly removed from all of his director and/or officer positions in the Plaintiff Companies, Itkin continues to represent himself to third parties as a

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16                                    - 11 -

SECOND AMENDED COMPLAINT

director and/or officer of Plaintiff Companies, and has continued his campaign to loot the Plaintiff Companies.

**D. Itkin's Tortious Refusal to Release Wrongfully Obtained and Controlled Corporate Records of Plaintiff Companies**

39.    In addition to manufacturing the above-described self-dealing agreements, Itkin has acted unlawfully by maintaining unauthorized possession of corporate records belonging to Plaintiff Companies. Plaintiff Companies have demanded the return of these corporate books and records, but Itkin has failed and/or refused to return such books and records.

40.    Plaintiffs are informed and believe that these books and records include without limitation, company files, stock certificates, stock ledgers, minute books, contracts and agreements, correspondence, tax returns, general ledgers, books, records and accounting documents, bank statements, passwords, corporate seals, permits, licenses, and other writings relating to the Plaintiff Companies. (collectively, "the Corporate Records").

41.    Itkin is also unlawfully maintaining control over keys to the corporate office of Golden Sphinx, where company records are maintained and possessed by Itkin.

42.    Plaintiff Companies are informed and believe that Itkin maintains the Corporate Records at one or more of the following addresses: 8501 Wilshire Blvd., Suite 330, Beverly Hills, CA 90211 and/or at Itkin's home address on Mulholland Drive in Beverly Hills, California.

43.    Plaintiff Companies are the rightful owners of and/or have a special interest in the Corporate Records, and Plaintiff Companies have a right to immediate possession thereof. Itkin has wrongfully detained, continues to wrongfully detain, and has failed and refused to return the Corporate Records belonging to AFB or the Subsidiaries.

**E. Itkin's Additional Unlawful Acts to Wrest Control of the Golden Sphinx And New Albion Assets**

44.    On or around September 20, 2016, Itkin, acting without the knowledge, authorization or consent of New Albion's sole shareholder, fraudulently caused the sole director of New Albion to be removed and appointed himself as the new sole director.

45.    On or around September 26, 2016, Itkin fraudulently caused Golden Sphinx to transfer one hundred percent of the stock in New Albion to Itkin personally, without any

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16                                    - 12 -

SECOND AMENDED COMPLAINT

1  consideration, and without the knowledge, authorization or consent of New Albion or Golden

2  Sphinx.

3       46.    Plaintiff Companies are further informed and believe that the transfer of stock in

4  New Albion was done to take control of the Beverly Hills House owned by New Albion. Itkin

5  now claims a direct or indirect ownership interest in the title to the in the Beverly Hills House at

6  issue – a claim that is contested by Plaintiff Companies.

7       47.    New Albion acquired the Beverly Hills House on or about June 30, 2004. From

8  that date and continuously through to the present, New Albion has held title to the Beverly Hills

9  House in fee simple. The Beverly Hills House has continuously been so titled in the public

10  records of the County of Los Angeles, State of California from the original recording of any and

11  all applicable documents showing title to said real property up to and including the present time.

12       48.    On or around May 1, 2017, Itkin acting without the knowledge or consent of New

13  Albion or its sole shareholder, procured a mortgage for $2,000,000 through Defendant Lighthouse

14  Partnership. This mortgage was recorded ten days after the Plaintiff Companies recorded a lis

15  pendens on the Beverly Hills House. To procure the unauthorized mortgage, Itkin signed the

16  deed of trust on behalf of New Albion. This mortgage was not disclosed to or approved by New

17  Albion's rightful shareholder, and was not in the best interest of the company. (A true and correct

18  copy of the Trust Deed is attached as **Exhibit 13.**)

19       49.    New Albion never received any of the $2,000,000 in proceeds purportedly loaned

20  to it in exchange for the unauthorized mortgage taken against the company's sole asset.

21       50.    As a result of the unauthorized mortgage, Lighthouse Partnership now claims a

22  direct or indirect ownership interest in the title to the Beverly Hills House at issue.

23  **F.**    **Itkin's Removal From All Fiduciary Positions**

24       51.    Upon discovery of Itkin's numerous fiduciary breaches and fraudulent actions, Mr.

25  Sabadash acting as the sole shareholder of AFB voted by proxy and by power of attorney to

26  remove Itkin as an officer and/or director of AFB, M-BJEP and M-NICE, and to appoint new

27  officers and/or directors for each entity. This shareholder vote was conducted on or about

28  October 3, 2016. The original proxy and power of attorney were subsequently restated and

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16         - 13 -

SECOND AMENDED COMPLAINT

1    ratified in substantially identical versions executed on March 28, 2017. (True and correct copies

2    of the power of attorney and proxy are attached hereto as **Exhibits 14** and **15**, respectively.)

3        52.    AFB's actions to remove Itkin from his fiduciary positions with AFB and the

4    Subsidiaries were reconfirmed on November 15, 2016 (for AFB), and again on November 18,

5    2016 (for M-BJEP and M-NICE).

6        53.    On March 28, 2017, Mr. Sabadash ratified all corporate actions undertaken by

7    AFB, M-BJEP, and M-NICE to remove Itkin from all fiduciary positions. (True and correct

8    copies of the corporate resolutions and minutes memorializing and reconfirming the removal of

9    Itkin from his director and/or officer positions with AFB and the Subsidiaries are attached hereto

10   as **Exhibits 16 through 21**.)

11       54.    The true board of directors of each of the Plaintiff Companies have passed board

12   resolutions voiding Itkin's various unauthorized actions described above. (True and correct

13   copies of these resolutions confirming the boards' respective actions are attached as **Exhibits 22**

14   **through 25**.)

15   **G.**    **Itkin's Ongoing Unlawful Actions**

16       55.    Notwithstanding his removal from all fiduciary positions with the Plaintiff

17   Companies, Itkin continues to fraudulently misrepresent himself as an officer and/or director of

18   Plaintiff Companies by engaging in the following acts, among others:

19       56.    Itkin, representing himself as having authority to act on behalf of M-BJEP, caused

20   the Isle of Man Aircraft Registry to deny the issuance of a Certificate of Airworthiness for the

21   G550 Aircraft owned by M-BJEP. As a result of Itkin's conduct, the G550 Aircraft is grounded

22   and M-BJEP's ability to sell or charter the airplane has been stymied.

23       57.    Itkin, representing himself as having authority to act on behalf of M-NICE, also

24   refused to provide the Aircraft Registry with written consent for the renewal of a Certificate of

25   Airworthiness for the G200 Aircraft owned by M-NICE. As a result of Itkin's conduct, the G200

26   Aircraft is grounded and M-NICE's ability to sell or charter the airplane has been stymied.

27   Itkin's actions have interfered with an existing contract (of which Itkin had specific knowledge)

28   between M-NICE and a private individual who had been chartering the plane for several years.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16                                    - 14 -

SECOND AMENDED COMPLAINT

1    58.    As a result of Itkin's conduct, M-BJEP and M-NICE are harmed and have suffered

2    damage in the form of lost revenue and profit from the charter and/or sale of the G200 and G550

3    Aircraft.  M-BJEP and M-NICE will continue to suffer damages until Itkin ceases his tortious

4    interference and renounces his representations to the Aircraft Registry claiming that he is an

5    authorized operator or other fiduciary of the G200 and G550 Aircraft.

6                                **FIRST CAUSE OF ACTION**

7                             **FOR BREACH OF FIDUCIARY DUTY**

8                          (By AFB Against Itkin and Doe Defendants)

9    59.    Plaintiff incorporates herein by reference the allegations contained in Paragraphs

10    1-58 as though set forth in full herein.

11    60.    As an officer and/or director of AFB, Itkin owed fiduciary duties of loyalty,

12    confidentiality, and care to act at all times in good faith in the best interests of AFB.

13    61.    Itkin knowingly acted against the best interest of AFB and thus breached his duty

14    of loyalty and good faith by engaging in the acts and fraudulent self-dealings described above.

15    62.    Itkin knowingly failed to act as a reasonable director and officer and thus breached

16    his duty of care to AFB by engaging in the acts and fraudulent self-dealings described above.

17    63.    As a director and officer of AFB, Itkin had information related to AFB that he

18    knew or should have known was confidential. Itkin breached his fiduciary duty of confidentiality

19    by using AFB's confidential information for his benefit by engaging in the acts and fraudulent

20    self-dealings described above.

21    64.    Neither, AFB, nor its sole shareholder was informed of or consented to Itkin's

22    conduct.

23    65.    As a result of Itkin's breach of his fiduciary duties of loyalty, care, and

24    confidentiality, AFB was harmed and is entitled to compensatory damages against Itkin in an

25    amount to be determined at trial, but in excess of the minimum jurisdictional amount of this

26    Court.

27    66.    As a result of Itkin's breaches of fiduciary duties to AFB, AFB is entitled to void

28    each and all of the fraudulent agreements and contracts described above and attached hereto.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16                                    - 15 -

SECOND AMENDED COMPLAINT

1    Alternatively, AFB is entitled to rescission of each and all of the fraudulent agreements and

2    contracts described above and attached hereto.

3        67.    As a further result of Itkin's misconduct, which was fraudulent, malicious,

4    oppressive, and undertaken with deliberate and calculated disregard of AFB's rights, AFB is

5    entitled to exemplary and punitive damages against Itkin in an amount to be determined at trial.

6    **SECOND CAUSE OF ACTION**

7    **FOR BREACH OF FIDUCIARY DUTY**

8    (By M-BJEP Against Itkin and Doe Defendants)

9        68.    Plaintiff Companies incorporate herein by reference the allegations contained in

10   Paragraphs 1-67 as though set forth in full herein.

11       69.    As an officer and/or director of M-BJEP, Itkin owed fiduciary duties of loyalty and

12   care to act at all times in good faith in the best interests of M-BJEP.

13       70.    Itkin knowingly acted against the best interest of M-BJEP and thus breached his

14   duty of loyalty and good faith by engaging in the acts and fraudulent self-dealings described

15   above.

16       71.    Itkin knowingly failed to act as a reasonable director and officer and thus breached

17   his duty of care to M-BJEP by engaging in the acts and fraudulent self-dealings described above.

18       72.    As a director and officer of M-BJEP, Itkin had information related to M-BJEP that

19   he knew or should have known was confidential.  Itkin breached his fiduciary duty of

20   confidentiality by using M-BJEP's confidential information for his benefit by engaging in the acts

21   and fraudulent self-dealings described above.

22       73.    Neither, M-BJEP, nor its sole shareholder was informed of or consented to Itkin's

23   conduct.

24       74.    As a result of Itkin's breach of his fiduciary duties of loyalty, care, and

25   confidentiality, M-BJEP was harmed and is entitled to compensatory damages against Itkin in an

26   amount to be determined at trial, but in excess of the minimum jurisdictional amount of this

27   Court.

28       75.    As a result of Itkin's breaches of fiduciary duties to M-BJEP, M-BJEP is entitled

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16

- 16 -

SECOND AMENDED COMPLAINT

1   to void each and all of the fraudulent agreements and contracts described above and attached

2   hereto.  Alternatively, M-BJEP is entitled to rescission of each and all of the fraudulent

3   agreements and contracts described above and attached hereto.

4         76.    As a further result of Itkin's misconduct, which was fraudulent, malicious,

5   oppressive, and undertaken with deliberate and calculated disregard of M-BJEP's rights, M-BJEP

6   is entitled to exemplary and punitive damages against Itkin in an amount to be determined at trial.

7   **THIRD CAUSE OF ACTION**

8   **FOR BREACH OF FIDUCIARY DUTY**

9   (By M-NICE Against Itkin and Doe Defendants)

10        77.    Plaintiff Companies incorporate herein by reference the allegations contained in

11  Paragraphs 1-76 as though set forth in full herein.

12        78.    As an officer and/or director of M-NICE, Itkin owed fiduciary duties of loyalty

13  and care to act at all times in good faith in the best interests of M-NICE.

14        79.    Itkin knowingly acted against the best interest of M-NICE and thus breached his

15  duty of loyalty and good faith by engaging in the acts and fraudulent self-dealings described

16  above.

17        80.    Itkin knowingly failed to act as a reasonable director and officer and thus breached

18  his duty of care to M-NICE by engaging in the acts and fraudulent self-dealings described above.

19        81.    As a director and officer of M-NICE, Itkin had information related to M-NICE that

20  he knew or should have known was confidential.  Itkin breached his fiduciary duty of

21  confidentiality by using M-NICE's confidential information for his benefit by engaging in the

22  acts and fraudulent self-dealings described above.

23        82.    Neither, M-NICE, nor its sole shareholder was informed of or consented to Itkin's

24  conduct.

25        83.    As a result of Itkin's breach of his fiduciary duties of loyalty, care, and

26  confidentiality, M-NICE was harmed and is entitled to compensatory damages against Itkin in an

27  amount to be determined at trial, but in excess of the minimum jurisdictional amount of this

28  Court.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16             - 17 -

SECOND AMENDED COMPLAINT

84.    As a result of Itkin's breaches of fiduciary duties to M-NICE, M-NICE is entitled to void each and all of the fraudulent agreements and contracts described above and attached hereto.  Alternatively, M-NICE is entitled to rescission of each and all of the fraudulent agreements and contracts described above and attached hereto.

85.    As a further result of Itkin's misconduct, which was fraudulent, malicious, oppressive, and undertaken with deliberate and calculated disregard of M-NICE's rights, M-NICE is entitled to exemplary and punitive damages against Itkin in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

## FOR BREACH OF FIDUCIARY DUTY

(By Golden Sphinx Against Itkin and Doe Defendants)

86.    Plaintiff Companies incorporate herein by reference the allegations contained in Paragraphs 1-85 as though set forth in full herein.

87.    As an officer and/or director of Golden Sphinx, Itkin owed fiduciary duties of loyalty and care to act at all times in good faith in the best interests of Golden Sphinx.

88.    Itkin knowingly acted against the best interest of Golden Sphinx and thus breached his duty of loyalty and good faith by engaging in the acts and fraudulent self-dealings described above.

89.    Itkin knowingly failed to act as a reasonable director and officer and thus breached his duty of care to Golden Sphinx by engaging in the acts and fraudulent self-dealings described above.

90.    As a director and officer of Golden Sphinx, Itkin had information related to Golden Sphinx that he knew or should have known was confidential. Itkin breached his fiduciary duty of confidentiality by using Golden Sphinx's confidential information for his benefit by engaging in the acts and fraudulent self-dealings described above.

91.    Neither, Golden Sphinx, nor its shareholders were informed of or consented to Itkin's conduct.

92.    As a result of Itkin's breach of his fiduciary duties of loyalty, care, and confidentiality, Golden Sphinx was harmed and is entitled to compensatory damages against Itkin

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16

- 18 -

1   in an amount to be determined at trial, but in excess of the minimum jurisdictional amount of this

2   Court.

3       93.     As a result of Itkin's breaches of fiduciary duties to Golden Sphinx, Golden

4   Sphinx is entitled to void each and all of the fraudulent agreements and contracts described above

5   and attached hereto. Alternatively, Golden Sphinx is entitled to rescission of each and all of the

6   fraudulent agreements and contracts described above and attached hereto.

7       94.     As a further result of Itkin's misconduct, which was fraudulent, malicious,

8   oppressive, and undertaken with deliberate and calculated disregard of Golden Sphinx's rights,

9   Golden Sphinx is entitled to exemplary and punitive damages against Itkin in an amount to be

10  determined at trial.

11                              **FIFTH CAUSE OF ACTION**

12                             **FOR DECLARATORY RELIEF**

13                        (By AFB Against Itkin and Doe Defendants)

14      95.     Plaintiff Companies incorporate herein by reference the allegations contained in

15  Paragraphs 1-94 as though set forth in full herein.

16      96.     There exists an actual present controversy relating to the legal rights and duties of

17  AFB and Itkin with respect to the unanimous shareholder action to remove Itkin from his director

18  and/or officer positions, as reflected in the corporate records attached as **Exhibits 16 through 21**.

19      97.     Notwithstanding such actions by AFB, Itkin continues to hold himself out as being

20  an officer and/or director of AFB in purporting, without authorization, to conduct the affairs of

21  AFB and to enter into self-dealing contracts and agreements against the best interest of AFB.

22      98.     There also exists an actual present controversy relating to the legal rights and

23  duties of AFB and Itkin with respect to the fraudulent, self-dealing agreements entered into by

24  Itkin with AFB without disclosure or approval by the sole shareholder or a disinterested board of

25  directors while acting as director of AFB.  Each such contract is attached to this complaint as

26  **Exhibits 1 through 12.**

27      99.     Under California Code of Civil Procedure § 1060, AFB is entitled to a judicial

28  declaration of the rights and duties of the respective parties, including that the corporate actions

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16

- 19 -

reflected in the records attached as **Exhibits 16 through 21** are valid, that Itkin is neither an

officer nor a director of AFB, and that Itkin must immediately cease representing himself as such.

AFB is further entitled to a judicial declaration that the self-dealing agreements attached as

**Exhibits 1 through 12** are null, void, unenforceable, and have no legal effect.

100.    AFB is further entitled to a judicial declaration that Itkin has no authority to use or

access in any way bank accounts belonging to or beneficially owned by AFB, its Subsidiaries, its

shareholders, and its beneficial owners.

101.    AFB is further entitled to a judicial declaration that Itkin has no authority to object

to or interfere with the sale of any asset of AFB or its Subsidiaries in any way.

**SIXTH CAUSE OF ACTION**

**FOR DECLARATORY RELIEF**

(By M-BJEP Against Itkin and Doe Defendants)

102.    Plaintiff incorporates herein by reference the allegations contained in Paragraphs

1-101 as though set forth in full herein.

103.    There exists an actual present controversy relating to the legal rights and duties of

M-BJEP and Itkin with respect to the unanimous shareholder action to remove Itkin from his

director and/or officer positions, as reflected in the corporate records attached as **Exhibits 16

through 21.**

104.    Notwithstanding such actions by M-BJEP, Itkin continues to hold himself out as

being an officer and/or director of M-BJEP in purporting, without authorization, to conduct the

affairs of M-BJEP and to enter into self-dealing contracts and agreements against the best interest

of M-BJEP.

105.    There also exists an actual present controversy relating to the legal rights and

duties of M-BJEP and Itkin with respect to the fraudulent, self-dealing agreements entered into by

Itkin with M-BJEP without disclosure or approval by the sole shareholder or a disinterested board

of directors while acting as director of M-BJEP.  Each such contract is attached to this complaint

as **Exhibits 5 through 7, 9 and 12.**

106.    Under Code of Civil Procedure § 1060, M-BJEP is entitled to a judicial declaration

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16                                              - 20 -

SECOND AMENDED COMPLAINT

1    of the rights and duties of the respective parties, including that the corporate actions reflected in

2    the records attached as **Exhibits 16 through 21** are valid, that Itkin is neither an officer nor a

3    director of M-BJEP, and that Itkin must immediately cease representing himself as such.  M-

4    BJEP is further entitled to a judicial declaration that the self-dealing agreements attached as

5    **Exhibits 5 through 7, 9 and 12** are null, void, unenforceable, and have no legal effect.

6        107.    M-BJEP is further entitled to a judicial declaration that Itkin has no authority to

7    use or access in any way bank accounts belonging to or beneficially owned by M-BJEP, its

8    Subsidiaries, its shareholders, and its beneficial owners.

9        108.    M-BJEP is further entitled to a judicial declaration that Itkin has no authority to

10    object to or interfere with the sale of any asset of M-BJEP in any way.

11                            **SEVENTH CAUSE OF ACTION**

12                            **FOR DECLARATORY RELIEF**

13                    (By M-NICE Against Itkin and Doe Defendants)

14        109.    Plaintiff incorporates herein by reference the allegations contained in Paragraphs

15    1-108 as though set forth in full herein.

16        110.    There exists an actual present controversy relating to the legal rights and duties of

17    M-NICE and Itkin with respect to the unanimous shareholder action to remove Itkin from his

18    director and/or officer positions, as reflected in the corporate records attached as **Exhibits 16**

19    **through 21.**

20        111.    Notwithstanding such actions by M-NICE, Itkin continues to hold himself out as

21    being an officer and/or director of M-NICE in purporting, without authorization, to conduct the

22    affairs of M-NICE and to enter into self-dealing contracts and agreements against the best interest

23    of M-NICE.

24        112.    There also exists an actual present controversy relating to the legal rights and

25    duties of M-NICE and Itkin with respect to the fraudulent, self-dealing agreements entered into

26    by Itkin with M-NICE without disclosure or approval by the sole shareholder or a disinterested

27    board of directors while acting as director of M-NICE.  Each such contract is attached to this

28    complaint as **Exhibits 2 through 4, and 10 through 11.**

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16                                - 21 -

113.    Under Code of Civil Procedure § 1060, M-NICE is entitled to a judicial

declaration of the rights and duties of the respective parties, including that the corporate actions

reflected in the records attached as **Exhibits 16 through 21** are valid, that Itkin is neither an

officer nor a director of M-NICE, and that Itkin must immediately cease representing himself as

such.  M-NICE is further entitled to a judicial declaration that the self-dealing agreements

attached as **Exhibits 2 through 4, and 10 through 11** are null, void, unenforceable, and have no

legal effect.

114.    M-NICE is further entitled to a judicial declaration that Itkin has no authority to

use or access in any way bank accounts belonging to or beneficially owned by M-NICE, its

Subsidiaries, its shareholders, and its beneficial owners.

115.    M-NICE is further entitled to a judicial declaration that Itkin has no authority to

object to or interfere with the sale of any asset of M-NICE in any way.

## EIGHTH CAUSE OF ACTION

## FOR DECLARATORY RELIEF

(By Golden Sphinx Against Itkin and Doe Defendants)

116.    Plaintiff incorporates herein by reference the allegations contained in Paragraphs

1-115 as though set forth in full herein.

117.    There exists an actual present controversy relating to the legal rights and duties of

Golden Sphinx and Itkin with respect to the fraudulent purported transfer of shares without any

consideration, without the knowledge, authorization or consent of Golden Sphinx or Golden

Sphinx's shareholders.

118.    There further exists a an actual present controversy relating to the legal rights and

duties of Golden Sphinx and Itkin with respect to fraudulent, self-dealing agreements entered into

by Itkin with Golden Sphinx without disclosure or approval by the sole shareholder or a

disinterested board of directors while acting as director of Golden Sphinx.

119.    Under Code of Civil Procedure § 1060, Golden Sphinx is entitled to a judicial

declaration of the rights and duties of the respective parties, including that the transfer of shares

from Golden Sphinx to Itkin is null, void, unenforceable, and without any legal effect such that

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16                                              - 22 -

SECOND AMENDED COMPLAINT

1  Golden Sphinx is the true and lawful owner of 100% of New Albion shares.

2      120.   Golden Sphinx is further entitled to a judicial declaration of the rights and duties

3  of the respective parties, including that the fraudulent and unauthorized transfer of the promissory

4  note and loan from Golden Sphinx to Itkin (**Exhibit 11**) is null, void, unenforceable, and has no

5  legal effect.

6      121.   Golden Sphinx is further entitled to a judicial declaration that Itkin has no

7  authority to use or access in any way bank accounts belonging to or beneficially owned by

8  Golden Sphinx, its shareholders, and its beneficial owners.

9      122.   Golden Sphinx is further entitled to a judicial declaration that Itkin has no

10  authority to object to or interfere with the sale of any asset of Golden Sphinx in any way.

11  **NINTH CAUSE OF ACTION**

12  **FOR DECLARATORY RELIEF**

13  (By New Albion Against Itkin and Doe Defendants)

14      123.   Plaintiff incorporates herein by reference the allegations contained in Paragraphs

15  1-122 as though set forth in full herein.

16      124.   There exists an actual present controversy relating to the legal rights and duties of

17  New Albion and Itkin.  Namely, Itkin continues to hold himself out as being an officer and/or

18  director of New Albion, without authorization, to conduct the affairs of New Albion and to enter

19  into self-dealing contracts and agreements against the best interest of New Albion.

20      125.   Under Code of Civil Procedure § 1060, New Albion is entitled to a judicial

21  declaration of the rights and duties of the respective parties, including that Itkin is not a director

22  or officer of New Albion and must immediately cease representing himself as such.

23      126.   New Albion is further entitled to a judicial declaration that Itkin has no authority

24  to use or access in any way bank accounts belonging to or beneficially owned by New Albion, its

25  shareholders, and its beneficial owners.

26      127.   New Albion is further entitled to a judicial declaration that Itkin, having no legal

27  relationship to New Albion, is prohibited from objecting to, or interfering with, the sale of any

28  asset of New Albion in any way.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16       - 23 -

SECOND AMENDED COMPLAINT

## TENTH CAUSE OF ACTION

## FOR DECLARATORY RELIEF

(By New Albion Against Itkin and Lighthouse Partnership and Doe Defendants)

128.    Plaintiff Companies incorporate herein by reference the allegations contained in Paragraphs 1-127 as though set forth in full herein.

129.    An actual controversy has arisen and now exists between New Albion and Lighthouse Partnership, concerning their respective rights and duties with respect to the Beverly Hills House, and the fraudulent and unauthorized mortgage recorded against the Beverly Hills House by Lighthouse Partnership (**Exhibit 13**).

130.    Under Code of Civil Procedure § 1060, New Albion is entitled to a judicial declaration of the rights and duties of the respective parties, including a declaration that the mortgage recorded by Lighthouse Partnership against the Beverly Hills House is invalid and unenforceable.

## ELEVENTH CAUSE OF ACTION

## FOR FRAUDULENT CONCEALMENT

(By AFB, M-BJEP, and M-NICE Against Itkin and Doe Defendants)

131.    Plaintiff Companies incorporate herein by reference the allegations contained in Paragraphs 1-130 as though fully set forth herein.

132.    AFB, M-BJEP, and M-NICE were in a fiduciary relationship with Itkin, who served as an officer and/or director of the companies.  Itkin intentionally failed to disclose to Plaintiff Companies material facts surrounding the unauthorized transactions he entered into on behalf of, and with, AFB and the Subsidiaries, including but not limited to the following acts of concealment:

      a.    Itkin conspired and acted to wrest control over the assets owned or controlled by AFB and/or its Subsidiaries, including by: (i) initiating the baseless lawsuit against AFB on behalf of Milan; (ii) failing to hire counsel to represent AFB in the Milan suit; (iii) failing to assert a statute of limitations defense; (iv) entering into a Stipulation for Entry of Judgment against AFB without the authorization of AFB's sole shareholder;

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16

- 24 -

SECOND AMENDED COMPLAINT

1    (v) causing the fraudulently-obtained judgment against AFB to be transferred to himself

2    personally for a nominal sum; (vi) precluding AFB from purchasing the judgment; and

3    (vii) fraudulently concealing his attempts to enforce the judgment against AFB by

4    forcing the sale of AFB's shares;

5          b.     On or about May 31, 2003, Itkin fraudulently entered into an Employment

6    Agreement with AFB, awarding himself a salary of $5,000 per month, without the

7    knowledge, authorization, or consent of AFB's sole shareholder, and without full

8    disclosure to and consent by vote of a disinterested board of directors.  (A true and

9    correct copy of the agreement is attached as **Exhibit 1.**)  On information and belief, it is

10    alleged that Itkin paid himself an unauthorized and undeserved salary pursuant to this

11    fraudulent agreement.

12          c.     On or about October 3, 2014, Itkin entered into a Director Agreement with

13    M-NICE appointing himself as a director and awarding himself a salary of £5,000 per

14    month.  Itkin signed on behalf of himself and M-NICE.  This agreement was not fair or

15    just to the corporation, was not disclosed to the shareholder, and was not approved by the

16    shareholder or a disinterested board of directors.  (A true and correct copy of the

17    agreement is attached as **Exhibit 2.**)  Prior to Itkin unlawfully appointing himself the

18    director of M-NICE, a corporate director served in that capacity whose fees were

19    significantly lower than the amount Itkin attempted to pay himself.

20          d.     On or about October 3, 2014, Itkin entered into an Operator Agreement

21    with M-NICE appointing himself as an operator and awarding himself a salary of £3,000

22    per month.  Itkin signed the Operator Agreement on behalf of himself as well as on

23    behalf of M-NICE.  This agreement was not fair or just to the company, was not

24    disclosed to the shareholder, and was not approved by the shareholder or a disinterested

25    board of directors.  (A true and correct copy of the agreement is attached as **Exhibit 3.**)

26    At all relevant times a professional air service provider hired by M-NICE provided all

27    operational services without the input or participation of Itkin.   As a result of this

28    unauthorized agreement, Itkin has unlawfully interfered with Plaintiff Companies'

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16    - 25 -

SECOND AMENDED COMPLAINT

possession, use, and potential sale of an airplane owned by M-NICE.

e.      On or about October 3, 2014, Itkin entered into an Aircraft Mortgage Agreement with M-NICE encumbering M-NICE's only asset. Itkin signed the Mortgage Agreement on behalf of himself as well as on behalf of M-NICE. This agreement was not fair or just to the company, was not disclosed to the shareholder, and was not approved by the shareholder or a disinterested board of directors. (A true and correct copy of the agreement is attached as **Exhibit 4.**) This agreement was notarized on September 27, 2016 and was recorded in the Isle of Man Aircraft Registry on October 10, 2016. As a result of this unauthorized agreement, Itkin has unlawfully interfered with Plaintiff Companies' possession, use, and potential sale of an airplane owned by M-NICE.

f.      On or about October 3, 2014, Itkin entered into a Director Agreement with M-BJEP appointing himself as a director and awarding himself a salary of £5,000 per month. Itkin signed the Director Agreement on behalf of himself as well as on behalf of M-BJEP. This agreement was not fair or just to the company, was not disclosed to the shareholder, and was not approved by the shareholder or a disinterested board of directors. (A true and correct copy of the agreement is attached as **Exhibit 5.**) Prior to Itkin unlawfully appointing himself the director of M-BJEP, a corporate director served in that capacity whose fees were significantly lower than the amount Itkin attempted to pay himself.

g.      On or about October 3, 2014, Itkin entered into an Operator Agreement with M-BJEP appointing himself as an operator and awarding himself a salary of £3,000 per month. Itkin signed the Operator Agreement on behalf of himself as well as on behalf of M-BJEP. This agreement was not fair or just to the company, was not disclosed to the shareholder, and was not approved by the shareholder or a disinterested board of directors. (A true and correct copy of the agreement is attached as **Exhibit 6.**) At all relevant times a professional air service provider hired by M-BJEP provided all operational services without the input or participation of Itkin. As a result of this

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16

- 26 -

SECOND AMENDED COMPLAINT

unauthorized agreement, Itkin has unlawfully interfered with Plaintiff Companies'
possession, use, and potential sale of an airplane owned by M-BJEP.

h.     On or about October 3, 2014, Itkin entered into an Aircraft Mortgage
Agreement with M-BJEP encumbering M-BJEP's only asset.  Itkin signed the Mortgage
Agreement on behalf of himself as well as on behalf of M-BJEP.  This agreement was
not fair or just to the company, was not disclosed to the shareholder, and was not
approved by the shareholder or a disinterested board of directors.  (A true and correct
copy of the agreement is attached as **Exhibit 7.**)  This agreement was notarized on
September 27, 2016 and was recorded in the Isle of Man Aircraft Registry on October 10,
2016.  As a result of this unauthorized agreement, Itkin has unlawfully interfered with
Plaintiff Companies' possession, use, and potential sale of an airplane owned by M-
BJEP.

i.     On or about October 3, 2014, Itkin caused AFB to enter Corporate
Minutes approving appointment of Itkin as sole director of M-NICE; approving entry of
the Aircraft Mortgage; approving the Director Agreement between M-NICE and Itkin;
confirming the previous appointment of Itkin as Operator; and releasing and
indemnifying Itkin from all liability.  Itkin signed the Corporate Minutes on behalf of
himself as well as on behalf of AFB.  These Minutes were not authorized by the
corporation, were not disclosed to the shareholder, and were not approved by the
shareholder or a disinterested board of directors.  (A true and correct copy of the minutes
is attached as **Exhibit 8.**)

j.     On or about September 20, 2016, Itkin, acting without the knowledge,
authorization or consent of AFB, fraudulently caused the director of M-BJEP and M-
NICE, Piotr Szymanski, to be removed thus becoming the sole director of M-BJEP and
M-NICE. (True and correct copies of the corporate resolutions are attached as **Exhibits 9
and 10.**)

k.     On or about September 20, 2016, Itkin caused Golden Sphinx to transfer a
loan owed to Golden Sphinx by M-NICE for $15,504,000 to Itkin personally.  Itkin

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

signed on behalf of M-NICE, Golden Sphinx, and himself. This agreement was not fair or just to the company, was not disclosed to the shareholder, and was not approved by the shareholder or a disinterested board of directors. (A true and correct copy of the note is attached as **Exhibit 11.**) As a result of this unauthorized agreement, Itkin has unlawfully interfered with Plaintiff Companies' possession, use, and potential sale of an airplane owned by M-NICE.

l.      Itkin has claimed in public filings that Golden Sphinx transferred a promissory note it held on M-BJEP for $19,338,750 to Itkin personally. Itkin signed on behalf of M-BJEP, Golden Sphinx, and himself. This agreement was not fair or just to the company, was not disclosed to the shareholder, and was not approved by the shareholder or a disinterested board of directors. As a result of this unauthorized agreement, Itkin has unlawfully interfered with Plaintiff Companies' possession, use, and potential sale of an airplane owned by M-BJEP

m.      On or about September 20, 2016, Itkin, acting without the knowledge, authorization or consent of AFB, fraudulently manufactured a document purporting to be a resolution passed on behalf of AFB to amend the Articles of Association of M-BJEP so as to: (i) award himself additional compensation in the event he is removed as director, (ii) indemnify him from all claims, and (iii) prohibit the appointment of other directors without his consent. This resolution was not fair or just to the company, was not disclosed to the shareholder, and was not approved by the shareholder or a disinterested board of directors. (A true and correct copy of the resolution is attached as **Exhibit 12.**)

133.    Plaintiff Companies did not know of the concealed facts, and only discovered them later. Had Plaintiff Companies known of the concealed facts, they would have behaved differently, including by acting at an earlier time to formally remove Itkin from his fiduciary positions and to void Itkin's unauthorized self-dealing transactions.

134.    Itkin intended to deceive Plaintiff Companies by concealing the above-described facts.

135.    Plaintiff Companies reasonably relied on Itkin's deception, and were harmed as a

SECOND AMENDED COMPLAINT

1    result, in an amount to be established at trial.

2        136.    Itkin's concealment was a substantial factor in causing Plaintiff Companies' harm.

3        137.    Further facts surrounding Itkin's fraudulent actions lie uniquely within Itkin's

4    knowledge.

5        138.    Itkin's conduct was oppressive, malicious, and fraudulent thereby entitling Golden

6    Sphinx and New Albion to punitive damages in the amount proven at trial.  Itkin's fraudulent

7    conduct additionally entitles AFB and the Subsidiaries to rescission of all agreements entered into

8    by Itkin on behalf of, or with, AFB and the Subsidiaries.

9    **TWELFTH CAUSE OF ACTION**

10    **FOR FRAUDULENT CONCEALMENT**

11    (By Golden Sphinx and New Albion Against Itkin and Doe Defendants)

12        139.    Plaintiff Companies incorporate herein by reference the allegations contained in

13    Paragraphs 1-138 as though fully set forth herein.

14        140.    Golden Sphinx and New Albion were in a fiduciary relationship with Itkin, who

15    served as an officer and/or director of the companies.  Itkin intentionally failed to disclose to

16    Plaintiff Companies material facts surrounding the unauthorized transactions he entered into on

17    behalf of, and with, Golden Sphinx and New Albion, including but not limited to the following

18    acts of concealment:

19        a.    On or around September 20, 2016, Itkin, acting without the knowledge,

20    authorization or consent of New Albion's sole shareholder, fraudulently caused the sole

21    director of New Albion to be removed and appointed himself as the new sole director.

22        b.    On or around September 26, 2016, Itkin attempted to cause Golden

23    Sphinx to transfer one hundred percent of the stock in New Albion to Itkin personally.

24    The transfer of stock was done fraudulently, without any consideration, without the

25    knowledge, authorization or consent of New Albion, Golden Sphinx, or Golden Sphinx's

26    shareholders.

27        c.    On or around May 1, 2017, Itkin acting without the knowledge or consent

28    of New Albion or its shareholder procured a mortgage for $2,000,000 through Defendant

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16    - 29 -

SECOND AMENDED COMPLAINT

1    Lighthouse Partnership. Itkin fraudulently and without authority signed the deed of trust

2    on behalf of New Albion. This mortgage was not disclosed to or approved by New

3    Albion's sole shareholder and was not in the best interest of the company. (**Exhibit 13**).

4    141.    Plaintiff Companies did not know of the concealed facts, and only discovered them

5    later. Had Plaintiff Companies known of the concealed facts, they would have behaved

6    differently, including by acting at an earlier time to formally remove Itkin from his fiduciary

7    positions and to void Itkin's unauthorized self-dealing transactions.

8    142.    Itkin intended to deceive Plaintiff Companies by concealing the above-described

9    facts.

10    143.    Plaintiff Companies reasonably relied on Itkin's deception, and were harmed as a

11    result, in an amount to be established at trial.

12    144.    Itkin's concealment was a substantial factor in causing Plaintiff Companies' harm.

13    145.    Further facts surrounding Itkin's fraudulent actions lie uniquely within Itkin's

14    knowledge.

15    146.    Itkin's conduct was oppressive, malicious, and fraudulent thereby entitling Golden

16    Sphinx and New Albion to punitive damages in the amount proven at trial. Itkin's fraudulent

17    conduct additionally entitles Golden Sphinx and New Albion to rescission of all agreements

18    entered into by Itkin on behalf of, or with, Golden Sphinx and New Albion.

19    **THIRTEENTH CAUSE OF ACTION**

20    **FOR CONSTRUCTIVE FRAUD**

21    (By AFB, M-NICE, and M-BJEP Against Itkin and Doe Defendants)

22    147.    Plaintiff Companies incorporate herein by reference the allegations contained in

23    Paragraphs 1 -146 as though fully set forth herein.

24    148.    AFB, M-BJEP, and M-NICE were in a fiduciary relationship with Itkin, who

25    served as an officer and/or director of the companies. Itkin intentionally failed to disclose to

26    Plaintiff Companies material facts surrounding the unauthorized transactions he entered into on

27    behalf of, and with, AFB and the Subsidiaries, including but not limited to the acts described in

28    Paragraph 132, *supra*.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16

1    149.    Itkin intended to deceive Plaintiff Companies by concealing the above-described

2    facts.

3    150.    In reliance on Itkin's non-disclosure, AFB and its Subsidiaries continued to

4    employ him as an officer and/or director thus suffering continuous damage.

5    151.    Itkin's concealment was a substantial factor in causing Plaintiff Companies' harm.

6    152.    Further facts surrounding Itkin's fraudulent actions lie uniquely within Itkin's

7    knowledge.

8    153.    As a result of Itkin's intentional concealment of material facts, Plaintiff

9    Companies sustained damages in the amount to be proven at trial.

10    **FOURTEENTH CAUSE OF ACTION**

11    **FOR CONSTRUCTIVE FRAUD**

12    (By Golden Sphinx and New Albion Against Itkin and Doe Defendants)

13    154.    Plaintiff Companies incorporate herein by reference the allegations contained in

14    Paragraphs 1-153 as though fully set forth herein.

15    155.    Golden Sphinx was in a fiduciary relationship with Itkin, who served as an officer

16    and/or director.  By virtue of his officer and/or director role with Golden Sphinx, Itkin similarly

17    owed fiduciary duties to New Albion – a subsidiary of Golden Sphinx.  Itkin intentionally failed

18    to disclose to Plaintiff Companies material facts surrounding the unauthorized transactions he

19    entered into on behalf of, and with, Golden Sphinx and New Albion, including but not limited to

20    the acts described in Paragraph 140, *supra*.

21    156.    Itkin intended to deceive Plaintiff Companies by concealing the above-described

22    facts.

23    157.    In reliance on Itkin's non-disclosure, Golden Sphinx and New Albion continued to

24    employ him as an officer and director thus suffering continuous damage.

25    158.    Itkin's concealment was a substantial factor in causing Plaintiff Companies' harm.

26    159.    Further facts surrounding Itkin's fraudulent actions lie uniquely within Itkin's

27    knowledge.

28    160.    As a result of Itkin's intentional concealment of material facts, Golden Sphinx and

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16                - 31 -

SECOND AMENDED COMPLAINT

1  New Albion sustained damages in the amount to be proven at trial.

2  ## FIFTEENTH CAUSE OF ACTION

3  ## FOR CONVERSION

4  (By AFB, M-NICE, M-BJEP, and Golden Sphinx Against Itkin and Doe Defendants)

5  161.    Plaintiff Companies incorporate herein by reference the allegations contained in
6  Paragraphs 1-160 as though fully set forth herein.

7  162.    At all times herein mentioned, Plaintiff Companies were, and still are entitled to
8  the possession of the Corporate Records.

9  163.    Itkin intentionally and substantially interfered with Plaintiff Companies'
10  possession of the Corporate Records by wrongfully taking possession, or interfering with Plaintiff
11  Companies' possession.

12  164.    Plaintiff Companies do not consent to Itkin's possession of the Corporate Records,
13  and have demanded the return of the Corporate Records.  Itkin refused to return the Corporate
14  Records.

15  165.    Plaintiff Companies have been harmed by Itkin's possession of such property in an
16  amount to be established at trial.

17  166.    As a further result of Itkin's misconduct, which was oppressive, fraudulent,  and
18  malicious and undertaken with deliberate and calculated disregard of Plaintiff Companies' rights,
19  Plaintiff Companies are entitled to punitive and exemplary damages against Itkin in an amount to
20  be determined at trial.

21  ## SIXTEENTH CAUSE OF ACTION

22  ## FOR CONVERSION

23  (By Golden Sphinx Against Itkin and Doe Defendants)

24  167.    Plaintiff Companies incorporate herein by reference the allegations contained in
25  Paragraphs 1-166 as though fully set forth herein.

26  168.    At all times herein mentioned, Golden Sphinx has been entitled to the possession
27  of 100% of the shares of New Albion. The stock has a value in an amount to be determined
28  according to proof.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16                                           - 32 -

169. Itkin intentionally and substantially interfered with Plaintiff Companies' possession of the shares of New Albion by wrongfully taking possession, attempting to take possession, or otherwise interfering with Plaintiff Companies' possession, of the shares.

170. Plaintiff Companies' do not consent to Itkin's possession of the shares of New Albion, and demanded the return of the shares. Itkin refused to return the shares.

171. Plaintiff Companies' have been harmed by Itkin's possession or claim to possession of such property in an amount to be established at trial.

172. As a further result of Itkin's misconduct, which was oppressive, fraudulent, and malicious and undertaken with deliberate and calculated disregard of Plaintiff Companies' rights, Plaintiff Companies are entitled to punitive and exemplary damages against Itkin in an amount to be determined at trial.

## SEVENTEENTH CAUSE OF ACTION

## FOR AN ACCOUNTING

### (By all Plaintiff Companies Against Itkin and Doe Defendants)

173. Plaintiff Companies incorporate herein by reference the allegations contained in Paragraphs 1-172 as though set forth in full herein.

174. Plaintiff Companies are informed and believe, and based thereon allege, that Itkin has misappropriated assets and monies of Plaintiff Companies, and therefore a full and complete accounting of all amounts taken by Itkin while employed by or working on behalf of Plaintiff Companies is necessary, appropriate and required.

175. An accounting is necessary, appropriate and required so that the total amount due and owing to Plaintiff Companies from Itkin may be fully determined.

## EIGHTEENTH CAUSE OF ACTION

## TO QUIET TITLE

### (By New Albion Against Itkin, Lighthouse Partnership, and Doe Defendants)

176. Plaintiff incorporates herein by reference the allegations contained in Paragraphs 1-175 as though set forth in full herein.

177. New Albion is the sole titled owner in fee simple of the Beverly Hills House,

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16                                    - 33 -

SECOND AMENDED COMPLAINT

1    acquired by grant deed recorded in the County of Los Angeles on or about Jun 30, 2014.

2    178.    New Albion is informed and believes and based thereon alleges that Lighthouse

3    Partnership claims a direct or indirect interest in the above-described Beverly Hills House adverse

4    to New Albion's based on a Deed of Trust recorded in Los Angeles County for a purported

5    $2,000,000 mortgage fraudulently placed on the Beverly Hills House in favor of Lighthouse

6    Partnership. (**Exhibit 13**).

7    179.    Lighthouse Partnership was not an innocent bona fide purchaser because a lis

8    pendens on the property was recorded prior to the mortgage being recorded.

9    180.    Itkin claims a direct or indirect interest in the above-described Beverly Hills House

10    adverse to New Albion's based on Itkin fraudulently transferring New Albion stock to himself for

11    no consideration.

12    181.    New Albion seeks in this action to quiet title against any direct or indirect

13    ownership claim of Lighthouse Partnership and Itkin as of the date of this complaint.

14    **NINETEENTH CAUSE OF ACTION**

15    **FOR CANCELLATION OF A WRITTEN INSTRUMENT (CIVIL CODE § 3412)**

16    (By New Albion Against Itkin and Lighthouse Partnership and Doe Defendants)

17    182.    Plaintiff Companies incorporate herein by reference the allegations contained in

18    Paragraphs 1-181 as though set forth in full herein.

19    183.    Itkin and Lighthouse Partnership fraudulently and without valid authorization

20    caused to be recorded a Deed of Trust encumbering the Beverly Hills House owned by New

21    Albion in fee simple. (**Exhibit 13**).

22    184.    Neither Itkin nor Lighthouse partnership had any authority to place a mortgage the

23    Beverly Hills House.  Nor did New Albion receive the $2,000,000 purportedly loaned by

24    Lighthouse Partnership in exchange for the mortgage.

25    185.    If left outstanding, Plaintiff Companies reasonably apprehend that the fraudulent

26    written instrument may cause serious financial injury.

27    186.    As such, the deed of trust is void or voidable by New Albion.

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16                                          - 34 -

SECOND AMENDED COMPLAINT

## TWENTIETH CAUSE OF ACTION

## FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC

## RELATIONS

(By M-BJEP and M-NICE Against Itkin and Doe Defendants)

187.    Plaintiff Companies incorporate herein by reference the allegations contained in Paragraphs 1-186 as though set forth in full herein.

188.    M-BJEP and M-NICE were in an economic relationship with multiple parties who either chartered the G200 and G550 Aircraft or were involved in negotiating for the purchase or charter of the Aircraft.

189.    Itkin knew that the G200 and G550 Aircraft were being chartered and/or marketed for sale by M-BJEP and M-NICE.

190.    After Itkin was lawfully removed from all fiduciary positions, Itkin repeatedly misrepresented his status as an operator, director, and/or officer of M-BJEP and M-NICE and caused the G200 and G550 Aircraft to lose their Certificates of Airworthiness, rendering the Aircraft unmarketable.

191.    By engaging in this conduct, Itkin intended to disrupt the economic relationships and prospective relationships between M-BJEP, M-NICE and multiple parties who intended to charter or purchase the G200 and G550 Aircraft.  Alternatively, Itkin knew that disruption of the relationship was certain or substantially certain to occur.

192.    Itkin wrongfully and fraudulently misrepresented his status as an operator, director, and/or officer.

193.    As a direct result of Itkin's conduct , the above described economic relationship was disrupted by virtue of the G200 and G550 being grounded, rendering the Aircraft unmarketable.

194.    As a direct result of Itkin's conduct, M-BJEP and M-NICE were harmed in an amount to be established at trial.

195.    As a further result of Itkin's misconduct, which was oppressive, fraudulent,  and malicious and undertaken with deliberate and calculated disregard of Plaintiff Companies' rights,

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16

- 35 -

1  Plaintiff Companies are entitled to punitive and exemplary damages against Itkin in an amount to

2  be determined at trial.

3  **TWENTY-FIRST CAUSE OF ACTION**

4  **FOR INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**

5  (By M-NICE Against Itkin and Doe Defendants)

6      196.    Plaintiff Companies incorporate herein by reference the allegations contained in

7  Paragraphs 1-195 as though set forth in full herein.

8      197.    M-NICE entered into an oral contract with a private individual for the charter of

9  the G200 Aircraft, whereby the private individual chartered the G200 Aircraft from M-NICE in

10  exchange for monetary consideration.

11      198.    Itkin knew of the contract between M-NICE and a private individual.

12      199.    After Itkin was lawfully removed from all fiduciary positions, Itkin repeatedly

13  fraudulently misrepresented his status as an operator, director, and/or officer of M-NICE and

14  caused the G200 Aircraft to lose its Certificate of Airworthiness, resulting in the Aircraft being

15  grounded and the contract being breached.  Itkin's conduct prevented performance of the contract

16  by making it impossible for the private individual to charter the G200 Aircraft.  Consequently, the

17  private individual has abandoned the contract and refused to pay M-NICE.

18      200.    By engaging in this conduct, Itkin intended to disrupt the performance of this

19  contract between M-NICE and private individual who chartered the G200 Aircraft.  Alternatively,

20  Itkin knew that disruption of performance was certain or substantially certain to occur.

21      201.    As a direct result of Itkin's conduct, M-NICE was harmed in an amount to be

22  established at trial.

23      202.    As a further result of Itkin's misconduct, which was oppressive, fraudulent,  and

24  malicious and undertaken with deliberate and calculated disregard of Plaintiff Companies' rights,

25  Plaintiff Companies are entitled to punitive and exemplary damages against Itkin in an amount to

26  be determined at trial.

27  **PRAYER FOR RELIEF**

28      WHEREFORE, Plaintiff Companies pray for judgment against Defendants, as follows:

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## ON ALL CAUSES OF ACTION FOR BREACH OF FIDUCIARY DUTY

1.      Compensatory damages in an amount to be proven at trial but not less than this Court's jurisdictional limit;

2.      Rescission of all agreements allegedly entered into by Itkin with, or on behalf of, Plaintiff Companies;

3.      An accounting;

4.      Disgorgement of improper salary and bonuses received by Itkin from Plaintiff Companies;

5.      Disgorgement of ill-gotten profits or gains received by Itkin;

6.      For the imposition of a constructive trust; and

7.      Punitive damages, in a sum to be determined at trial.

## ON ALL CAUSES OF ACTION FOR DECLARATORY RELIEF

8.      A declaration that the Itkin has been validly removed and/or is not a director and/or officer of any of Plaintiff Companies, and that Itkin must immediately cease representing himself as such;

9.      A declaration that the Employment Agreement of May 31, 2003 between Itkin and AFB is null, void, unenforceable, and has no legal effect. (*See* **Exhibit 1.**);

10.      A declaration that the Director Agreement of October 3, 2014 between Itkin and M-NICE is null, void, unenforceable, and has no legal effect. (*See* **Exhibit 2.**);

11.      A declaration that the Operator Agreement of October 3, 2014 between Itkin and M-NICE is null, void, unenforceable, and has no legal effect. (*See* **Exhibit 3.**);

12.      A declaration that the Aircraft Mortgage of October 3, 2014 between Itkin and M-NICE is null, void, unenforceable, and has no legal effect. (*See* **Exhibit 4.**);

13.      A declaration that the Director Agreement of October 3, 2014 between Itkin and M-BJEP is null, void, unenforceable, and has no legal effect. (*See* **Exhibit 5.**);

14.      A declaration that the Operator Agreement of October 3, 2014 between Itkin and M-BJEP is null, void, unenforceable, and has no legal effect. (*See* **Exhibit 6.**);

15.      A declaration that the Aircraft Mortgage of October 3, 2014 between Itkin and M-

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16

SECOND AMENDED COMPLAINT

1    BJEP is null, void, unenforceable, and has no legal effect. (*See* **Exhibit 7.**);

2          16.    A declaration that the Corporate Minutes of October 3, 2014 entered by AFB are

3    null, void, unenforceable, and have no legal effect. (*See* **Exhibit 8.**) ;

4          17.    A declaration that the Corporate Resolution of M-BJEP of September 20, 2016

5    removing Piotr Szymanski as director is null, void, unenforceable, and has no legal effect. (See

6    **Exhibit 9**.);

7          18.    A declaration that the Corporate Resolution of M-NICE of September 20, 2016

8    removing Piotr Szymanski as director is null, void, unenforceable, and has no legal effect. (See

9    **Exhibit 10**.);

10          19.    A declaration that the Deed of Assignment of September 20, 2016 from Golden

11    Sphinx to Itkin is null, void, unenforceable, and has no legal effect. (See **Exhibit 11**.);

12          20.    A declaration that the Deed of Assignment of September 20, 2016 from Golden

13    Sphinx to Itkin is null, void, unenforceable, and has no legal effect.

14          21.    A declaration that the Corporate Resolution of AFB amending the Articles of

15    Association of M-BJEP of September 20, 2016 is null, void, unenforceable, and has no legal

16    effect.  (See **Exhibit 12**.);

17          22.    A declaration that neither Itkin nor Lighthouse Partnership has any interest in the

18    real property located at 58 Beverly Park Drive, Beverly Hills, California 90210;

19          23.    A declaration that the corporate resolutions and minutes memorializing and

20    reconfirming the removal of Itkin from his director and/or officer positions with AFB and the

21    Subsidiaries are valid and enforceable. (See **Exhibits 16 - 21**);

22          24.    A declaration that the corporate resolutions voiding all interested, self-dealing

23    transactions by Itkin with, or on behalf of, Plaintiff Companies are valid and enforceable. (See

24    **Exhibits 22 - 25**);

25          25.    A preliminary and permanent injunction enjoining and forbidding Itkin and/or

26    Lighthouse Partnership from representing himself or itself as having any claim to or against title

27    to the real property located at 58 Beverly Park Drive, Beverly Hills, California 90210;

28          26.    A preliminary and permanent injunction enjoining and forbidding Itkin from

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16                    - 38 -

SECOND AMENDED COMPLAINT

representing himself as a director and/or officer of any of Plaintiff Companies;

27.    A preliminary and permanent injunction enjoining and forbidding Itkin from using or accessing in any way the bank accounts owned by, belonging to, or beneficially owned by any of Plaintiff Companies;

28.    A preliminary and permanent injunction enjoining and forbidding Itkin from generally using, disposing, assigning or pledging assets received or obtained from Plaintiff Companies; and

29.    A preliminary and permanent injunction enjoining and forbidding Itkin from objecting to, or interfering with, the sale of any asset of any of Plaintiff Companies.

### ON ALL CAUSES OF ACTION FOR FRAUDULENT CONCEALMENT

30.    Compensatory damages in an amount to be proven at trial but not less than this Court's jurisdictional limit;

31.    Punitive and exemplary damages in an amount to be proven at trial;

32.    Rescission of all agreements entered into by fraudulent means; and

33.    A preliminary and permanent injunction enjoining and forbidding Itkin from attempting to enforce these agreements in a court of law or otherwise.

### ON ALL CAUSES OF ACTION FOR CONSTRUCTIVE FRAUD

34.    Compensatory damages in an amount to be proven at trial but not less than this Court's jurisdictional limit;

35.    Rescission of all agreements entered into by fraudulent means; and

36.    A preliminary and permanent injunction enjoining and forbidding Itkin from attempting to enforce these agreements in a court of law or otherwise;

### ON ALL CAUSES OF ACTION FOR CONVERSION

37.    For the value of each Plaintiff's property converted in an amount to be determined according to proof but in no event less than this Courts jurisdictional limit;

38.    For immediate return of all of Plaintiff Companies' property converted by Defendants;

39.    For interest at the legal rate on the foregoing sum pursuant to Section 3336 of the

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16

- 39 -

SECOND AMENDED COMPLAINT

Civil Code;

40.    For damages for the proximate and foreseeable loss resulting from Itkin's conversion;

41.    For damages for time and money properly expended in pursuit of the converted property; and

42.    For punitive and exemplary damages, in a sum to be determined at trial.

**ON THE CAUSE OF ACTION FOR AN ACCOUNTING**

43.    For an accounting of all monies paid to or received by Itkin while an officer and/or director of each or any of Plaintiff Companies and for a reasonable time period thereafter; and

44.    For an accounting of all assets, claims or other valuables directly or indirectly received or obtained by Itkin or directly or indirectly transferred to Itkin by Plaintiff Companies, including such assets he may have already disposed of.

**ON THE CAUSE OF ACTION TO QUIET TITLE**

45.    To quiet title in the aforementioned real property located at 58 Beverly Park Drive, Beverly Hills, California 90210, free and clear of any claimed direct or indirect interest by Itkin, by Lighthouse Partnership, or any other party not authorized by New Albion or Golden Sphinx.

**ON THE CAUSE OF ACTION FOR CANCELLATION OF A WRITTEN INSTRUMENT**

46.    To cancel the Deed of Trust recorded against real property located at 58 Beverly Park Drive, Beverly Hills, California 90210 as null, void, and unenforceable.

**ON THE CAUSE OF ACTION FOR INTENTIONAL INTERFERENCE WITH
PROSPECTIVE ECONOMIC RELATIONS**

47.    Compensatory damages in an amount to be proven at trial but no less than this Court's jurisdictional limit;

48.    Punitive and exemplary damages in an amount to be proven at trial;

49.    A preliminary and permanent injunction enjoining and forbidding Itkin from interfering or attempting to interfere with the charter, sale, or any other exploitation of the Aircraft by Plaintiff Companies.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

318983966.16                                    - 40 -

SECOND AMENDED COMPLAINT

**ON THE CAUSE OF ACTION FOR INTENTIONAL INTERFERENCE WITH
CONTRACTUAL RELATIONS**

50.     Compensatory damages in an amount to be proven at trial but no less than this Court's jurisdictional limit;

51.     Punitive and exemplary damages in an amount to be proven at trial; and

52.     A preliminary and permanent injunction enjoining and forbidding Itkin from interfering or attempting to interfere with the charter, sale, or any other exploitation of the Aircraft by Plaintiff Companies

**ON ALL CAUSES OF ACTION**

53.     For costs of suit incurred herein; and

54.     For such other further relief as the Court may deem just and proper.

Dated:    December 15, 2017          MANATT, PHELPS & PHILLIPS, LLP
                                     Robert H. Platt
                                     Reid P. Davis
                                     Michael Zorkin


                                     By: _____
                                         Robert H. Platt
                                         *Attorneys for Plaintiff Companies*
                                         AFB Trading One, Inc., M-BJEP Limited, M-
                                         NICE Limited, Golden Sphinx Limited AND New
                                         Albion Property Limited

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SECOND AMENDED COMPLAINT

## VERIFICATION

I, Piotr Szymanski, declare:

I have read the foregoing Complaint, including the cause of action for Quiet Title, and know the contents thereof.  The matters stated in paragraphs 176 through 181 are true and correct to my own personal knowledge, except as to those alleged on information and belief; and as to those matters, I am informed and believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this Verification was executed on the _30_ day of November, 2017, at _MONACO_____, _PRINCIPALITY OF MONACO_

_____
Piotr Szymanski

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SECOND AMENDED COMPLAINT

# Exhibit D

1  Jon A. Atabek SBN 269497
   (jatabek@atabeklaw.com)
2  ATABEK & ASSOCIATES, P.C.
   16330 Bake Parkway
3  Irvine, CA 92618
   Tel: (213) 394-5943
4  Fax: (213) 402-3413

5

6  Attorneys for Defendant and Cross-Complainants
   GARRY Y. ITKIN, and NEW ALBION PROPERTY LIMITED

7           SUPERIOR COURT OF THE STATE OF CALIFORNIA
8       FOR THE COUNTY OF LOS ANGELES, CENTRAL DIVISION

9
   AFB TRADING ONE, INC., a California        Case No.: BC647351
10 corporation; M-BJEP LIMITED, an Isle of
   Man corporation; M-NICE LIMITED, an Isle   Consolidated 12/11/17: BC669618, SC127283
11 of Man corporation; GOLDEN SPHINX
   LIMITED, a Jersey corporation; NEW         [Assigned: Hon. Michael L. Stern, Dept. 62]
12 ALBION PROPERTY LIMITED, an England
   corporation;                               SECOND AMENDED CROSS-
13                                            COMPLAINT FOR:
14         Plaintiffs,
                                              1. DISSOLUTION OF PARTNERSHIP
15 v.                                            [CORP. CODE §§ 16801, ET SEQ];
                                              2. DECLARATORY RELIEF;
16                                            3. BREACH OF FIDUCIARY DUTY;
   GARRY Y. ITKIN, an individual; THE         4. AIDING AND ABETTING BREACH
17 LIGHTHOUSE PARTNERSHIP LIMITED,               OF FIDUCIARY DUTY;
   an England corporation, and DOES 1 through 5. UNFAIR BUSINESS PRACTICES
18 100, inclusive,                               [BUS. & PROF. CODE §§ 17200, ET
                                                 SEQ];
19         Defendants.                        6. BREACH OF LEASE CONTRACT;
                                              7. CONVERSION.
20
   ─────────────────────────────────
21 GARRY Y. ITKIN, an individual; NEW            JURY DEMAND
   ALBION PROPERTY LIMITED, an England
22 corporation;

23         Cross-Complainants,

24 v.

25
   ALEXANDER SABADASH, an individual;
26 LARISSA SABADASH, an individual;
   CONRAD STAMPFLI, an individual; PIOTR
27 SZYMANSKI, an individual; THOMAS
   REYNOLDS, an individual; and ROES 1
28 through 30, inclusive,
                                              Complaint Filed: March 27, 2017
29         Cross-Defendants.                  Trial Date: TBD
30

31

32         Defendant and Cross-Complainant GARRY Y. ITKIN ("Itkin" or "Cross-Complainant"),

33 and Cross-Complainant New Albion Property Limited ("NAPL") by and through their attorneys of

record, respectfully submit this Second Amended Cross-Complaint to the Court, amending the

Cross-Complaint filed in case number SC127289, ordered consolidated for all purposes on

December 11, 2017, with the parties to use case number BC647351, and alleges as follows:

## INTRODUCTION

1.      This is an action to dissolve and wind up a partnership-at-will between two

business partners, and to apply assets toward debts owed to Itkin.

2.      In summary, two business partners contemplated dissolving and winding up their

partnership, but their discussions were cut short when one partner, Cross-Defendant

ALEXANDER SABADASH ("A. Sabadash") was suddenly arrested, convicted, and then

incarcerated in Russia. The incarcerated partner has now been convicted twice of two separate sets

of crimes, and will likely spend more than eight years in Russian Prison.

3.      During the first two years of incarceration, the non-incarcerated partner attempted

to maintain the status quo while the partners continued to discuss winding up the partnership.

However, the incarcerated partner's soon-to-be ex-wife, Cross-Defendant LARISSA SABADASH

("L. Sabadash") started taking steps to misappropriate, and wrest control of the partnership's

assets before they can be lawfully divided. And she did so with the help of an ex-lawyer of the

partnership who once extorted the partners, a lawyer with family connections to the New York

Mafia, and her head of security and butler.

4.      Initially, Cross-Complainant suspected L. Sabadash of working against both Cross-

Complainant and A. Sabadash, since her efforts to loot the partnership began shortly after L.

Sabadash had initiated divorce proceedings against A. Sabadash. So Itkin took steps to preserve

the assets of the partnership (including this lawsuit), until the assets could be lawfully divided by

the partners.

5.      However, since then, both Cross-Complainant and a deposition witness have been

subjected to acts and threats of violence by A. Sabadash, who called one witness himself to

threaten the witness's life unless he recants his testimony in this action. As such, Cross-

Complainant now firmly believes A. Sabadash and L. Sabadash are working together, and against

Cross-Complainant.

6.      This action seeks to preserve the *status quo* for the partnership and its underlying

assets, wind up the business of the partnership, and resolve the disputes relating to control of those

assets.

7.      This action also seeks damages against A. Sabadash, L. Sabadash, and their co-

conspirators for harm caused to the assets of the partnership by their acts.

**THE PARTIES**

8.     Defendant and Cross-Complainant GARRY Y. ITKIN ("Itkin") is and at all relevant times was a resident of Los Angeles County, California.

9.     Cross-Complainant NEW ALBION PROPERTY LIMITED ("NAPL") is a limited liability company incorporated in the United Kingdom. Itkin owns all shares of NAPL, which in turn owns the home where Cross-Defendant LARISSA SABADASH currently resides, located in Beverly Hills, California.

10.     Plaintiff and Cross-Defendant ALEXANDER SABADASH ("A. Sabadash"), was a resident of Los Angeles County, California, but is currently residing in Russia, where he is serving a six year prison sentence for attempted embezzlement and value added tax ("VAT") fraud, and an additional seven years for bank fraud (the subsequent conviction for bank fraud is being appealed). A. Sabadash was Itkin's business partner.

11.     Plaintiff and Cross-Defendant CONRAD STAMPFLI ("Stampfli"), is and at all relevant times was a resident of Solothurn, Switzerland. Stampfli was both Itkin and A. Sabadash's attorney at one point in time, until their relationship was terminated due to a billing dispute, wherein Stampfli engaged in civil extortion to pressure the partners to pay him.

12.     Cross-Defendant LARISSA SABADASH ("L. Sabadash"), is and at all relevant times was a resident of Beverly Hills, California, 90210. L. Sabadash is A. Sabadash's wife.

13.     Cross-Defendant THOMAS REYNOLDS ("Reynolds"), is and at all relevant times was a resident of Beverly Hills, California, 90210. Reynolds is the head of security at L. Sabadash's home.

14.     Cross-Defendant PIOTR SZYMANSKI ("Szymanski"), is and at all relevant times was a resident of the Principality of Monaco. Szymanski manages the grounds at another home in dispute in this matter, located in St. Jean Cap Ferrat, France.

15.     A. Sabadash, Stampfli, L. Sabadash, Reynolds, and Szymanski are referred to collectively herein as "Cross Defendants" or the "Sabadash Parties."

16.     Cross-Complainants are ignorant of the true names and capacities of cross-defendants sued herein as ROES 1 through 30, inclusive, and therefore sue these cross-defendants by such fictitious names. Cross-Complainants will amend this complaint to allege the true names and capacities of said cross-defendants when the same has been ascertained. Each of the fictitiously named cross-defendants is responsible in some manner for the acts complained of herein. Unless otherwise stated, all references to named defendants shall include ROE defendants as well.

ATABEK & ASSOCIATES, P.C.
Attorneys at law
10171.3

3

Second Amended Cross-
Complaint of Garry Y. Itkin
LASC Case No.: BC647351

17.     Cross-Complainants are informed and believe, and based on this information and belief allege, that at all times mentioned in this First Amended Cross-Complaint, Cross-Defendants were the agents, employees, and/or co-conspirators of their codefendants, and in doing the things alleged in this complaint were acting within the course, scope, and furtherance of such agency, employment, and/or conspiracy.

## COMMON ALLEGATIONS

**A. A. Sabadash Offers to Form a Partnership in 1998—Cross-Complainant Accepts.**

18.     During the 1990s, Itkin worked as a tax accountant in Beverly Hills, California. A. Sabadash was a client of Itkin's.

19.     Over the years, Itkin and A. Sabadash (and their spouses) became good friends.

20.     In 1998, A. Sabadash asked Itkin to move to Russia with A. Sabadash, to become business partners with A. Sabadash, and to take over the operation and growth of all of A. Sabadash's existing business ventures, as well as pursuing new business ventures.

21.     Absent significant monetary incentive, A. Sabadash's offer was not attractive on its own.

22.     A. Sabadash made this offer shortly after the fall of the Soviet Union. At the time, Russia was run largely by various local mafias, where poverty and violent crime were rampant.

23.     Additionally, some of A. Sabadash's most valuable business interests were not even under his control at the time. After the Soviet Union collapsed, many state, or communally-owned businesses were privatized through a voucher system, including a cellulose (pulp and paper) factory in Vyborg, Russia, near St. Petersburg. A. Sabadash gained title to that plant by purchasing it from a third party. However, at that time, the plant was controlled by its workers, who refused to recognize private ownership of the plant, and continued to claim communal ownership of it. The plant had no value, unless he gained control of it.

24.     Itkin also had very strong incentives to stay in the United States.

25.     At the time, Itkin lived with his wife and child in Los Angeles County.

26.     Itkin also had a successful accounting practice (still in business to this day), as well as several thriving small businesses, which provided Itkin a comfortable life style with steady income for his family.

27.     In order to induce Itkin to accept the offer, A. Sabadash offered Itkin 33% of all of the partnership's assets and earnings. A. Sabadash stated he was so confident they would succeed that he promised Itkin a minimum income of $4,000,000 per year, which Itkin could either draw upon, or reinvest into the partnership as Itkin saw fit.

ATABEK & ASSOCIATES, P.C.
Attorneys at law
10171.3

4

Second Amended Cross-
Complaint of Garry Y. Itkin
LASC Case No.: BC647351

28. Itkin did not immediately agree. As generous as A. Sabadash's offer sounded, there was little guarantee the business would grow fast enough to pay Itkin the amounts A. Sabadash was promising. Moreover, such an arrangement would require Itkin to be away from his family for long stretches of time, and in an unsafe environment that Itkin's family had fled from only twenty years before.

29. Over the course of several conversations and phone calls, A. Sabadash attempted to wear Itkin down, insisting that Itkin join him in Russia. During each of those calls, A. Sabadash reiterated the terms of his offer to Itkin, even when he knew third party witnesses were listening in. Itkin expects at least one such witness to testify at the time of trial.

30. Itkin eventually agreed, and moved to St. Petersburg, Russia, to work alongside A. Sabadash, thereby forming their partnership (the "Partnership").

**B. Early Stages of the Partnership—Itkin and A. Sabadash Operate as Partners, with A. Sabadash Putting Up Assets, and Itkin Putting up Money.**

31. At its earliest stages, the Partnership generated barely any revenue, and little in the way of comfort.

32. For instance, when Itkin first moved to St. Petersburg, Itkin and A. Sabadash lived together in a run-down, one-bedroom apartment. Itkin slept on the couch, and spent all of his time working together with A. Sabadash to enrich the Partnership, often foregoing sleep.

33. And even when Itkin did rent his own apartment, that apartment was even more squalid—the stairwell constantly smelled of human waste, and the building was dilapidated.

34. Itkin was also expected to share in Partnership costs, at least until the Partnership's own revenues were sufficient to pay all costs. This included an initial cash investment by Itkin of $100,000. Part of those funds were used to take control of the cellulose plant by hiring armed, private mercenaries to take control of the facility by force.

35. Once they had control of their active business interests, Itkin incorporated the Partnership's various business interests, and appointed himself as a director and officer of the majority of the corporate entities falling under the Partnership.

36. Itkin also took steps to modernize/westernize the Partnership's business interests, and looked into marketing their products abroad for export.

37. Toward that end, in October of 1999, Itkin and A. Sabadash joined the International Union of Economists ("IUE"), a prestigious group of academics, business people, and individuals with high influence within the government, with the aim of learning how to grow their business interests, both domestically and abroad. When they registered, Itkin and A. Sabadash applied on

ATABEK & ASSOCIATES, P.C.
Attorneys at law
10171.3

5

Second Amended Cross-
Complaint of Garry Y. Itkin
LASC Case No.: BC647351

1  behalf of their Partnership, explicitly as partners, and split the application fee of $15,000, with

2  $5,000 payable by Itkin and $10,000 payable by A. Sabadash. The membership was invaluable, as

3  it put them in contact with key government personnel, such as the Minister of Forestry—an

4  important contact for their cellulose business. A former official of the IUE has already testified to

5  the same at his deposition in this action.

6        38.     Also, both Itkin and A. Sabadash were able to draw from all bank accounts falling

7  under the Partnership, with Itkin as the primary signatory, and A. Sabadash listed as a beneficiary

8  signatory. Itkin and A. Sabadash agreed they could draw on the Partnership's accounts as needed,

9  and that they would eventually account to one another for any differences.

10        39.     During this time, Itkin and A. Sabadash held themselves out as partners to

11  employees, business associates, governmental officials, and others who dealt with them.

12        40.     Initially, Itkin and A. Sabadash saw much success, with their business steadily

13  expanding, and becoming more profitable.

14  **C.**  **Middle Stages of the Partnership—Sabadash is Elected to the Russian Senate, Itkin is**

15       **Given Full Control of the Partnership, and Business Flourishes.**

16        41.     However, the outward appearance of the Partnership eventually changed as A.

17  Sabadash developed political ambitions. In 2003, A. Sabadash was elected to the Russian Senate.

18  Because Russian law forbade A. Sabadash from having any role in any business while serving in

19  the senate, A. Sabadash asked Itkin to take on the role of sole director and officer for the bulk of

20  the corporate entities falling within the Partnership. In that role, and to satisfy necessary

21  formalities, Itkin often entered into written employment agreements with the entities. Itkin became

22  the public face of the Partnership for all purposes, and A. Sabadash was made all-but-invisible in

23  his role. Itkin continued to operate in this role for years without incident.

24        42.     The Partnership continued to grow, with assets at one point valued at more than a

25  billion dollars, including the cellulose factory, and one of Russia's largest vodka production and

26  distribution businesses. Itkin's share of the partnership well-exceeded his alternative yearly

27  minimum share of $4,000,000 he was promised by A. Sabadash.

28        43.     Itkin and A. Sabadash took draws form the Partnership at differing rates, as

29  revenues and assets were available.

30        44.     Itkin drew his share as a fairly steady draw, opting to leave most of his interests

31  invested in the Partnership. Itkin drew between approximately $300,000 and $800,000 per year, as

32  needed, for a total of approximately $8,000,000 over the course of approximately sixteen years.

33  / / /

ATABEK & ASSOCIATES, P.C.           6             Second Amended Cross-
Attorneys at law                                    Complaint of Garry Y. Itkin
10171.3                                         LASC Case No.: BC647351

45.    A. Sabadash drew a much larger share, and with less consistency. The amounts would vary as A. Sabadash used the funds to pay for a lavish lifestyle, which came with costly upkeep. Itkin agreed to this only because he and A. Sabadash agreed that they would eventually account to each other, and because Itkin controlled the corporate entities and their assets, thus allowing him to sell those assets to pay himself if needed.

46.    To support A. Sabadash's lifestyle, the Partnership purchased several large, illiquid assets for A. Sabadash's personal use, including: (1) A Gulfstream G550 jet airplane (the "G550"); (2) A Gulfstream G200 jet airplane (the "G200"); (3) A 24,237 square foot home located at 58 Beverly Park Court, Beverly Hills, CA 90210 (the "Beverly Hills Mansion"); and (4) A home on the French Riviera, located at 17 Boulevard du General de Gaulle, 06230 Saint Jean Cap Ferrat, France (the "Cap Ferrat Mansion"). Itkin consented to these purchases, because, again, Itkin controlled all of the Partnership's assets, and could always liquidate such assets as needed to pay himself an additional draw from profits if needed.

47.    The assets were (and still are), on paper, owned by the partnership's various corporate entities, and not by either Itkin or A. Sabadash directly. For instance, today, the G550 and G200 are each owned by entities incorporated in the Isle of Man, M-BJEP Ltd. ("MBJEP") and M-NICE Ltd. ("MNICE"), respectively, which are in turn owned by AFB Trading One, Inc. ("AFB"), a California corporation. The Beverly Hills Mansion is owned by NAPL, which was in turn owned by a company incorporated in the Isle of Jersey, Golden Sphinx Ltd. ("GSL"), but is now wholly owned by Itkin. And the Cap Ferrat Mansion is owned by a French limited liability company, SCI La Désirade ("SCILD").[1]

48.    In furtherance of this arrangement, the corporate entities would lease assets to A. Sabadash, or others, for their use.

49.    For instance, on paper, A. Sabadash and L. Sabadash were merely tenants in the Beverly Hills Mansion. They were permitted exclusive use and enjoyment of the property, as long as they paid the mortgage, as well as any upkeep and real property taxes for the property. In fact, in email communications with third parties, Itkin would even refer to the Beverly Hills Mansion as "corporate housing" not owned by A. Sabadash.

---

[1] Prior to 2014, some of the subsidiary entities were owned by a trust called Minerva Trust, which subsequently refused to do business with A. Sabadash after his arrest, requiring the above-mentioned reorganization, affected by Itkin with A. Sabadash's knowledge and consent.

ATABEK & ASSOCIATES, P.C.
Attorneys at law
10171.3

7

Second Amended Cross-
Complaint of Garry Y. Itkin
LASC Case No.: BC647351

50.    On the other hand, the G200 was not used by either Itkin or A. Sabadash, but rather a third party—that property was not "chartered," however, as the Isle of Man prohibits chartering of any jets registered in that jurisdiction. Rather, the G200 was "dry leased" to that third party. Pursuant to that arrangement, the third party paid $6,000,000 of the initial purchase price of the G200, and paid for all maintenance and upkeep of the G200. The Partnership did not make any money from this arrangement.

51.    Also during this time, each of the Cross-Defendants played various roles relating to the Partnership and its assets.

52.    Szymanski was the butler/grounds manager at the Cap Ferrat Mansion.

53.    Thomas was A. Sabadash and L. Sabadash's head of security at the Beverly Hills Mansion.

54.    L. Sabadash (A. Sabadash's wife) was appointed as a director of AFB at one time, though she was later removed, as she was not qualified in any capacity to work as the director of a business concern, having never worked in business before then.

55.    The Partnership also hired Stampfli to act as a director for several of its corporate entities, and as legal counsel to both Itkin and A. Sabadash generally.

**D.  Late Stages of the Partnership—Financial Troubles, Sales of Assets, and A. Sabadash's Spending and Loans.**

56.    The partnership began to suffer losses in 2011, in part due to the 2008 recession that continued to persist, and in further part due to A. Sabadash's increasingly erratic spending of Partnership assets in order to support his lavish lifestyle.

57.    At the height of A. Sabadash's spending, A. Sabadash was spending more than $1,000,000 per month.

58.    Most of that spending went toward the G550. The financing payments on the G550 alone were approximately $330,000 per month. Additionally, the Partnership paid more than $200,000 per month to Jet Aviation (an airplane management service) as operating expenses, including management fees, maintenance fees, and fuel costs. Also, to make sure he always had at least two pilots (required for a jet of that size) available at all times (so he could leave on a moment's notice), A. Sabadash hired four full-time pilots to remain on call, at a cost of $10,000 per month each, for a total cost of $40,000 per month. Those costs added up to a monthly total of $570,000 per month. And if that was not enough on its own, each flight came with additional expense. For instance, the cost of one direct flight to Los Angeles (where L. Sabadash was residing at the Beverly Hills Mansion) was approximately $200,000. A. Sabadash regularly used

ATABEK & ASSOCIATES, P.C.
Attorneys at law
10171.3

8

Second Amended Cross-
Complaint of Garry Y. Itkin
LASC Case No.: BC647351

to travel between Moscow, St. Petersburg, Los Angeles, and Nice (the nearest airport to St. Jean Cap Ferrat).

59.     A. Sabadash also dumped significant money into a third airplane that he never took delivery of. A. Sabadash pre-financed the purchase of a third jet airplane, a Gulfstream G650, which cost $50,000,000. The financing payments for the G650 were approximately $220,000 per month. And though Gulfstream began construction on the jet, the Partnership was forced to stop payment before the jet was completed. The third jet was ultimately sold for a loss of approximately $10,000,000 (not counting losses associated with the pre-financing payments).

60.     The Partnership also paid approximately $100,000 per month each in costs relating to the Beverly Hills Mansion and Cap Ferrat Mansion, for a total cost of approximately $200,000 per month. Those costs included mortgage payments, grounds-keeping, security (including Reynolds's salary), cleaning services, etc.

61.     A. Sabadash also used Partnership funds to purchase up to $5,000,000 per year in gifts for L. Sabadash. These were always gifts from jewelry designer Cartier, purchased in the name of a flight attendant working on the G550, who would then deliver the purchases to L. Sabadash. A. Sabadash did this, presumably, to avoid reporting those gifts on his taxes.

62.     The Partnership also accrued large debts to others they worked with, including Stampfli. In fact, in March, 2011, the Partnership owed hundreds of thousands of dollars in fees to Stampfli, causing Stampfli to demand payment. However, in demanding payment, Stampfli not only threatened litigation, but threatened to reveal confidential information of the partnership during that litigation that could subject the partnership to unwanted scrutiny from tax authorities.

63.     A. Sabadash asked Itkin to fire Stampfli, and not pay anything to him. Itkin, instead, took a more conciliatory tone, asking Stampfli to resign as both counsel and director from all of the entities falling within the partnership, and offering to negotiate a settlement. Itkin and Stampfli eventually reached a settlement. Needless to say, the Partnership ended its relationship with Stampfli over the incident.

64.     Due to declining profits, Itkin and A. Sabadash could no longer pay themselves from the Partnership's revenues. So they began to sell off the Partnership's assets, including shares of stock and land entitlements, to pay themselves a draw and to maintain the Partnership's illiquid assets. By 2014, Itkin paid himself only $262,500.

65.     However, A. Sabadash was not satisfied with the money he was able to scrape together by selling off the Partnership's assets. So A. Sabadash, in order to fund his lavish lifestyle, took out large loans (including some from Tavrichesky Bank) that A. Sabadash intended

1  to use to finance his lifestyle, but with no intention of repaying the loans. In furtherance of these

2  loans, and without disclosing his fraudulent intent, A. Sabadash asked Itkin to execute various

3  written guarantees given by Partnership entities to A. Sabadash's creditors that A. Sabadash could

4  use in taking out loans. For example, at A. Sabadash's request, Itkin executed such a guarantee on

5  behalf of GSL on October 9, 2012.

6       66.    The Partnership continued on this way until the spring of 2014.

7  **E.  The Partners Discuss Dissolution, and A. Sabadash is Convicted and Imprisoned.**

8       67.    Sometime shortly before May 5, 2014, Itkin and A. Sabadash met to discuss the

9  Partnership's financial condition and future. With their Russian business interests looking like

10  they were heading toward bankruptcy, Itkin noted that the illiquid assets purchased for use by A.

11  Sabadash, and the cost of maintaining those assets, left the Partnership insufficiently funded. Itkin

12  proposed selling off some of those assets in order to pay sums owed to Itkin, or, in the alternative,

13  to wind up the Partnership. The parties planned to meet on May 5, 2014, in St. Petersburg, Russia,

14  to discuss their options.

15       68.    On May 5, 2014, Itkin and A. Sabadash met in the mezzanine of the Grand Hotel

16  Europe in St. Petersburg, Russia, to further discuss money owed to Itkin by the Partnership. The

17  meeting was witnessed by an attorney, Larisa Isakova, who acted as secretary and took minutes.

18  During that meeting, A. Sabadash reaffirmed the terms of the Partnership as agreed upon in 1998.

19  During that meeting, Itkin asserted the Partnership had only paid him $8,000,000 to date, and that

20  he was still owed at least $56,000,000 by the partnership. A. Sabadash did not deny the amount of

21  money owed to Itkin by the Partnership. However, A. Sabadash also did not agree to let Itkin

22  liquidate any of the Partnership's assets to pay himself the amounts he was owed. Itkin noted that,

23  due to his control of the Partnership entities, and the guaranties given by them, he could always

24  sell off Partnership assets and pay himself back. A. Sabadash acknowledged that he understood

25  that was a possibility, and responded by stating "don't you dare," in a threatening manner.

26  Ultimately, Itkin and A. Sabadash, unable to agree on how to resolve the debt, adjourned their

27  meeting. They planned to discuss the matter again at a later date, after giving each other time to

28  cool off.

29       69.    However, on or about May 6, 2014, A. Sabadash travelled to Moscow, Russia,

30  where he was arrested by Russian authorities, and accused of attempted fraud against tax

31  authorities relating to a claimed reimbursement of $1.8 billion rubles that he never paid

32  (approximately $60 million at that time).

33  / / /

70.    Approximately one year later, A. Sabadash was tried, convicted, and sentenced to six years in prison. A. Sabadash is currently serving that prison sentence in Russia.

71.    Despite being owed large sums of money by the Partnership, at this time, Itkin did not take any action to wind up the partnership, or to collect on his share of its assets. Rather, Itkin maintained the *status quo*, hoping he and his partner would be able to come to some resolution, preferably once A. Sabadash was released from prison.

**F.    L. Sabadash Files for Divorce and Custody of Their Children, Begins Attempts to Misappropriate Partnership Assets.**

72.    On or about August 2, 2016, with A. Sabadash still in prison, L. Sabadash filed a petition for dissolution of marriage, seeking sole custody of their daughter. That action is styled *Sabadash v. Sabadash*, Los Angeles Superior Court Case No. BD644102.

73.    Itkin became aware of the divorce petition shortly thereafter, as he began receiving solicitation letters for legal services at a business office that was used for the Partnership. Those solicitations identified the case name and number.

74.    Shortly thereafter, L. Sabadash, together with a New York criminal defense lawyer with familial ties to the New York Mafia, began contacting Itkin for the purpose of determining the status of assets belonging to the Partnership. The duo went to the offices of the accountant for AFB, and actually picked up accounting and corporate records, including minutes, contracts, and other relevant documents.

75.    L. Sabadash then served a letter on Itkin through the Sabadash Parties' previous counsel in this action, Steven Lowy, who purported to represent both L. Sabadash and AFB. The letter asserted that A. Sabadash had granted a power of attorney and proxy to Stampfli, that Stampfli had removed Itkin as director from all relevant boards, and that the new boards voted to replace Itkin as officer of the Partnership entities. The letter also demanded that Itkin return "any tangible and intangible property" belonging to those entities in Itkin's possession or control. Itkin refused to turn over any of the Partnership's assets.

76.    Itkin, of course, doubted the authenticity of the GPOA. Though the signature resembled A. Sabadash's signature, the handwriting did not appear smooth, but rather shaky. Moreover, the signature was not notarized (at least not remotely compliant with notarization requirements under California law), and was in clear violation of Russian prison regulations regarding authentication of signatures by inmates (which require authentication by the warden of the prison). Given his knowledge of the divorce, and the questionable nature of the document

presented, Itkin suspected L. Sabadash was attempting to misappropriate assets belonging to the Partnership in advance of her divorce from A. Sabadash.

77.    Accordingly, Itkin again refused to turnover assets belonging to the Partnership.

78.    Instead, Itkin began taking action to lock down the assets of the Partnership, in order to preserve the *status quo*, until he had an opportunity to speak to A. Sabadash and determine what was going on.

79.    Because of A. Sabadash's incarceration, Itkin had been unable to determine whether L. Sabadash and Stampfli are working together with A. Sabadash against the Partnership, or against both A. Sabadash and the Partnership.

80.    Notably, A. Sabadash has Itkin's cell phone number. In fact, throughout 2014 and 2015, A. Sabadash regularly called Itkin to discuss the Partnership's affairs, and to discuss how to best preserve the Partnership's assets.

81.    A. Sabadash even exhibited his continued trust in Itkin by executing a General Power of Attorney in favor of Itkin in February of 2017.

82.    A. Sabadash's counsel of record in this matter has represented their ability to speak with their client in this matter by telephone—yet A. Sabadash has never called Itkin to confirm he is in fact directing any litigation efforts against Itkin.

83.    However, Itkin has subsequently come to believe A. Sabadash has in fact been working together with L. Sabadash and her co-conspirators.

84.    Specifically, during the course of this litigation, Itkin and a third party witness helpful to his case have been subjected to threats and acts of violence. According to a deposition witness in this action, A. Sabadash offered that witness $200,000 to recant his testimony, which he could pick up from L. Sabadash, and then threatened the witnesses' life when he refused the offer. Additionally, A. Sabadash implied he was responsible for "scaring" Itkin, following a recent string of shootings at Itkin's home. Thus, Itkin is informed and believes A. Sabadash and L. Sabadash are working together to misappropriate Itkin's share of partnership assets, and to prevent Itkin from collecting on his share. Those facts are detailed below.

**G.    Cross-Defendants Permit Waste of Partnership Assets.**

85.    In an effort to avoid waste and preserve partnership assets, Itkin has repeatedly offered to sell off assets and place sale proceeds in trust, and take other steps to otherwise preserve the assets at issue in this action. However, A. Sabadash, L. Sabadash, Stampfli, Reynolds, and Szymanski repeatedly refused these offers, and allowed partnership assets to waste.

/ / /

ATABEK & ASSOCIATES, P.C.
Attorneys at law
10171.3

12

Second Amended Cross-
Complaint of Garry Y. Itkin
LASC Case No.: BC647351

86.     For instance, the G550 and G200 are both currently grounded. Additionally, the jets are incurring storage and maintenance fees. Jet Aviation currently claims it is owed $1,700,000 relating to the G550 alone.

87.     Though the Sabadash Parties initially agreed to sell the G550 and place the sale proceeds in trust, they later balked. The G550 is thus continuing to incur fees and costs.

88.     Similarly, the Sabadash Parties reneged on a deal that would have allowed the Partnership to divest the G200. Szymanski, who the Sabadash Parties assert is the current sole valid director and officer of MNICE, made an offer to Itkin through an intermediary, Maxim Vologzhanin, whereby the Sabadash Parties would buy out Itkin's share of the G200 for $400,000 (approximately one third of the estimated proceeds of the sale of the G200 after paying off all liens and transactional fees). In fact, the parties had agreed on the key terms of a settlement relating to the Isle of Man lawsuit regarding the G200, and even exchanged a first draft of the settlement. Itkin was even paid the first installment of $50,000 pursuant to that agreement, and Itkin took all steps at his disposal to help procure a Certificate of Airworthiness from local aviation authorities for the G200, even though the Sabadash Parties had yet to sign the agreement. However, in a strange twist, the Sabadash Parties ultimately refused to execute the settlement agreement, or pay the remaining sums due, and cut off all communications regarding settlement of that lawsuit. Thus, the G200 remains grounded, incurring significant fees and costs, because aviation authorities in the Isle of Man are refusing to authorize release of the G200 until the parties' lawsuit in that jurisdiction is terminated.

89.     Additionally, L. Sabadash has failed and refused to pay property taxes for the Beverly Hills Mansion, allowing tax liens of more than one million dollars to accrue against the property. Such liens also constitute a breach of the terms of the original mortgage on the property from East West Bank, and put the property under threat of foreclosure—a fact brought to L. Sabadash's attention through counsel, but to no avail.

90.     Meanwhile, L. Sabadash and Stampfli engaged in a scorched earth campaign of seeking to undermine Itkin's ability to maintain the *status quo*. They have approached corporate agents around the world seeking to take possession of assets belonging to the Partnership, purporting to have wrested control of various entities belonging to the Partnership, and making false representations regarding Itkin's status and authority.

91.     Additionally, Itkin is informed and believes L. Sabadash has been conspiring with a person named Tatiana Lobanova ("Ms. Lobanova"), who was hired as a manager for various Partnership entities in Russia while those entities were in bankruptcy, in order to misappropriate

1  and funnel money into L. Sabadash—which funds have been used, in part, to finance the prolix

2  litigation pursued by L. Sabadash and the Sabadash Parties. Notably, authorities with the Federal

3  Service for Alcohol Marketing Regulation in Russia (Rosalkogolregulirovanie) recently raided

4  one of the Partnership's vodka production plants in Russia under Ms. Lobanova's management,

5  discovered illegal alcohol production and sales operations aimed to avoid paying excise taxes, and

6  detained several people connected thereto. Itkin is informed and believes the aforementioned

7  illegal alcohol production and sales were the source of some of the funds Ms. Lobanova has

8  funneled to L. Sabadash. This misappropriation is likely to become the subject of separate

9  criminal and civil prosecution in Russia.

10       92.    After L. Sabadash and Stampfli broke the *status quo*, in an effort to preserve his

11  share of the assets of the Partnership, Itkin also pursued some of the debts owed to him by the

12  Partnership abroad. For instance, Itkin sued GSL based on a separate services agreement between

13  Itkin and GSL, pursuant to which Itkin was owed substantial sums of money. Itkin filed the

14  lawsuit in the Isle of Jersey, where GSL is incorporated, and gave notice of the lawsuit to Jeremy

15  Garrood, outside counsel for GSL. Itkin obtained a judgment against GSL, which directed Itkin to

16  "distrain" upon and sell any of the assets of GSL. Pursuant to that Judgment, Itkin transferred all

17  of the shares of NAPL from GSL to Itkin. However, pursuant to an informal agreement between

18  counsel in this action not to engage in extra-judicial sales of Partnership property in this action,

19  Itkin has not yet sold those shares, or the assets of NAPL, which owns the Beverly Hills Mansion.

20  This transfer, and proper ownership of NAPL will likely be the subject of separate litigation in the

21  United Kingdom, where NAPL is incorporated.

22       93.    Moreover, Itkin has already filed suit in the Isle of Man relating to MBJEP and

23  MNICE, where both entities are incorporated. That action arises from mortgages against the G550

24  and G200 relating to sums owed to Itkin, as well as control of the entities themselves.

25       94.    In light of the uncertainty associated with the future of the Partnership, Itkin

26  determined it necessary to dissolve the Partnership, and apply its assets toward its debts, including

27  paying sums owed to Itkin.

28  **H.  A. Sabadash is Prosecuted and Convicted a Second Time— During the Investigation,**

29  **Employees Testify to the Existence of the Partnership.**

30       95.    Russian authorities pursued a second prosecution against A. Sabadash. The

31  allegations of the second prosecution centered on A. Sabadash's loans with Tavrichesky Bank.

32  Tavrischesky happened to be the bank for several major public utilities. Authorities alleged A.

33

ATABEK & ASSOCIATES, P.C.
Attorneys at law
10171.3

14

Second Amended Cross-
Complaint of Garry Y. Itkin
LASC Case No.: BC647351

Sabadash, and the head of Tavrichesky Bank, conspired to enter into loans to A. Sabadash that were never meant to be repaid, thereby allowing A. Sabadash to effectively steal those funds.

96.    Tavrichesky subsequently went defunct, and had to be saved through the Russian equivalent of an FDIC takeover, because of its role as a bank for several major public utilities.

97.    During the investigation phase of A. Sabadash's second prosecution, numerous former employees of the partnership gave written statements under oath to investigators, where they referred to A. Sabadash and Itkin as business partners. A. Sabadash never contradicted the witnesses who asserted he and Itkin were partners.

98.    A. Sabadash was eventually tried, convicted, and sentenced on the new charges relating to the Tavrichesky Bank conspiracy, adding another seven years to his sentence.

99.    A. Sabadash has appealed that decision, and a ruling is expected before the end of the New Year.

100.    If A. Sabadash's second conviction is upheld, his resulting absence will create further grounds to dissolve the Partnership.

101.    Itkin is also informed and believes Russian authorities are in the process of initiating a third prosecution against A. Sabadash.

I.    **Threats and Harassment Toward Itkin, and Witnesses in This Action.**

102.    Since this litigation began, Itkin has received anonymous threats and harassment seemingly related to this lawsuit.

103.    On April 24, 2017, Itkin received an anonymous email from a "spoofed" account, purporting to send "greetings" form Itkin's "partner," asserting the sender was "neighbors" with Itkin's partner, and demanding that Itkin cease efforts to collect on any debts, asserting that Itkin and his family were not safe, even on another continent.

104.    On October 25, 2017, someone in a BMW rammed the front gate to Itkin's home—which event was caught on video.

105.    Between November 10, 2017, and November 27, 2017, someone shot what police ballistics personnel described as a high-powered air rifle at Itkin's home, aiming at Itkin, his automobiles, and his gardener. The slugs, which appear to be hollow-points, were so large they resembled slugs from a 9 mm caliber hand gun, and caused significant property damage.

106.    Itkin also found evidence that someone had climbed onto his property, and left behind a sheath for a very large knife.

107.    Also on November 27, 2017, an individual (the "Assailant") showed up at Itkin's home in a seven series BMW, with all of the windows rolled down, following Itkin onto his

ATABEK & ASSOCIATES, P.C.
Attorneys at law
10171.3

15

Second Amended Cross-
Complaint of Garry Y. Itkin
LASC Case No.: BC647351

property after having waited just outside for Itkin to show up. The Assailant called out to Itkin by his Russian name (Yuri), and began to speak in Russian, asserting that "voices" in his head told him bad things were happening in Itkin's home, that he should find Itkin, and that the voices were talking to him about death relating to the Itkin family.

108.    Itkin understood the individual was making a veiled threat of violence toward him. Itkin believed the Assailant was communicating that he would harm Itkin (or his family), and later assert an insanity defense.

109.    Itkin later followed the Assailant back to a nearby home. Notably, the car that crashed through the gate to Itkin's home was also parked at this same residence. The Assailant was later arrested.

110.    Itkin later called the Los Angeles Police Department ("LAPD") to let them know of the Assailant's apparent address.

111.    LAPD investigators went to the Assailant's residence, where they found the rifle they believe the Assailant used to shoot at Itkin's home. Accordingly, LAPD arrested the Assailant.

112.    Itkin is informed and believes the Los Angeles District Attorney's office has charged the Assailant, and is now holding him without bail.

113.    Itkin is further informed and believes that some or all of the Sabadash Parties have hired, conspired, or coordinated with the Assailant in order to intimidate and threaten Itkin into dropping his lawsuit, either directly, or through intermediaries.

### **FIRST CAUSE OF ACTION**

### **Dissolution of Partnership by Itkin Against A. Sabadash**

114.    Plaintiff re-alleges and incorporates by reference into this cause of action each and every allegation set forth in each and every paragraph of this Complaint.

115.    Itkin and A. Sabadash, by their oral agreement to enter into the Partnership, created a partnership at will.

116.    Additionally, by carrying on as partners, sharing in efforts, profits, and losses, Itkin and A. Sabadash carried on as a partnership implied in fact.

117.    Itkin wishes to dissolve the partnership, and wind up its remaining business, pursuant to Corp. Code §16801(1).

118.    In the alternative, Itkin seeks a judicial determination that A. Sabadash has "engaged in conduct relating to the partnership business that makes it not reasonably practicable to carry on the" Partnership, and dissolution pursuant to Corp. Code § 16801(5)(B).

119.     Itkin requests judicial supervision of the winding up process for the Partnership pursuant to Corp. Code § 16803(a).

120.     Itkin further requests an application of assets to settle the debt of at least $56,000,000 owed to Itkin, pay off any remaining debts of the Partnership, and distribute any remaining net amounts to Itkin and A. Sabadash according to the terms of the Partnership, pursuant to Corp. Code § 16807(a)-(b).

## SECOND CAUSE OF ACTION

### Declaratory Relief by Itkin Against All Defendants

121.     Plaintiff re-alleges and incorporates by reference into this cause of action each and every allegation set forth in each and every paragraph of this Complaint.

122.     A present dispute exists as between each of the Defendants and Itkin regarding who is/are the valid directors and officers of AFB, as to whether A. Sabadash actually voted any of his shares on October 3, 2016, whether that vote was later ratified, and whether L. Sabadash, Reynolds, and Szymanski were duly appointed to serve as directors of AFB. More specifically, a dispute exists as to whether A. Sabadash could even grant such a power of attorney and proxy in light of the overarching partnership between A. Sabadash and Itkin, in effect swapping a new partner into A. Sabadash's stead without Itkin's consent.

123.     Defendants contend L. Sabadash, Stampfli, Reynolds, and Szymanski were duly appointed as directors of AFB, and that Itkin was removed. Itkin disputes that contention.

124.     An actual and justiciable controversy now exists between and among Itkin and Defendants regarding whether A. Sabadash voted any of his shares on October 3, 2016, and whether L. Sabadash, Reynolds and Szymanski were duly appointed to serve as Directors.

125.     By virtue of the foregoing, Itkin is entitled to an order declaring the invalidity of the vote allegedly cast by A. Sabadash on October 3, 2016, the appointments of new directors, the proper composition of the Board of AFB, and any subsequent putative ratification, determining that Itkin's removal was invalid, the appointments of the new directors was invalid, and that at all times since October 3, 2016, Itkin has been the sole director and officer of AFB.

## THIRD CAUSE OF ACTION

### Breach of Fiduciary Duty by Itkin Against A. Sabadash

126.     Plaintiff re-alleges and incorporates by reference into this cause of action each and every allegation set forth in each and every paragraph of this Complaint.

127.     By way of the Partnership, A. Sabadash and Itkin owe each other the highest fiduciary duty of loyalty.

ATABEK & ASSOCIATES, P.C.
Attorneys at law
10171.3

17

Second Amended Cross-
Complaint of Garry Y. Itkin
LASC Case No.: BC647351

128.    Plaintiff is informed and believes A. Sabadash is working together with Stampfli, L. Sabadash, Reynolds, and Szymanski to remove Iktin from the board of AFB and misappropriate assets belonging to the Partnership. Thus, A. Sabadash has breached his fiduciary duties owed to Itkin.

129.    A. Sabadash, by working together with L. Sabadash, Stampfli, Reynolds, and Szymanski to remove Iktin from the board of AFB and other Partnership entities and to misappropriate assets belonging to the Partnership, has directly and proximately caused interference with the use and enjoyment of Partnership assets, and the Partnership to no longer be able to function, causing waste of those assets in an amount subject to proof at trial.

130.    Specifically, by attempting to execute documents that would wrest control of corporate entities belonging to the Partnership, and conspiring with L. Sabadash, Stampfli, Reynolds, and Szymanski to remove Iktin from the board of AFB and other Partnership entities in order to misappropriate Partnership assets, A. Sabadash has helped to cause a deadlock in those entities in the Isle of Man where MBJEP and MNICE are incorporated, causing the Jets to be grounded, incurring monthly fees, and thereby causing waste to those assets in an amount subject to proof at trial.

131.    Additionally, by working together with L. Sabadash and Lobanova to misappropriate Russian assets belonging to the partnership, A. Sabadash has caused harm to the partnership in the amount of all funds funneled by Lobanova to L. Sabadash, in an amount subject to proof at trial.

132.    Moreover, by engaging in illegal conduct in Russia, resulting in his arrest, prosecution, and conviction, A. Sabadash has caused harm to the partnership by exposing the partnership to efforts by creditors to collect on the personal debts of A. Sabadash (forcing the Partnership's corporate entities in Russia into bankruptcy), and denying the Partnership the benefit of one of its partners due to his incarceration, causing harm to the Partnership in an amount subject to proof at trial.

133.    To the extent A. Sabadash is working together with L. Sabadash, Stampfli, Reynolds, and Szymanski to remove Iktin from the board of AFB and misappropriate assets belonging to the Partnership, such conduct is fraudulent, and malicious, thereby entitling Itkin to exemplary damages against A. Sabadash, in an amount subject to proof at trial.

/ / /

/ / /

/ / /

ATABEK & ASSOCIATES, P.C.
Attorneys at law
10171.3

18

Second Amended Cross-
Complaint of Garry Y. Itkin
LASC Case No.: BC647351

# FOURTH CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duty by Itkin Against L. Sabadash, Stampfli, Reynolds, and Szymanski

134.    Plaintiff re-alleges and incorporates by reference into this cause of action each and every allegation set forth in each and every paragraph of this Complaint.

135.    As described above, L. Sabadash, Stampfli, Reynolds, and Szymanski (the "Conspirators") have each served a role in substantially aiding A. Sabadash in his efforts to remove Itkin from AFB in order to misappropriate assets belonging to the Partnership, and thereby breaching A. Sabadash's fiduciary duties he owed to Itkin arising from the Partnership.

136.    The Conspirators each knew of the Partnership, and thus the fiduciary duties owed by Itkin and A. Sabadash to one another.

137.    The Conspirators, and each of them, substantially assisted and encouraged A. Sabadash to breach his fiduciary duties owed to Itkin.

138.    Specifically, Stampfli purported to step into the shoes of A. Sabadash for the partnership's underlying entities, knowing full well that Itkin was A. Sabadash's partner, and that the purpose of doing so was to prevent Itkin from sharing in the Partnership's assets.

139.    Along those lines, L. Sabadash worked with Stampfli and other counsel to obtain the records of Partnership entities, including AFB, in order to have herself appointed as director, and remove Itkin from any management roles in those entities, to prevent Itkin from sharing in the Partnership's assets. Additionally, L. Sabadash worked with Lobanova to misappropriate funds from the Partnership's Russian entities.

140.    Similarly, Reynolds and Szymanski each accepted directorships of entities, knowing the purpose of doing so was to remove Itkin from his position within those entities, and to prevent Itkin from sharing in the Partnership's assets.

141.    L. Sabadash, Stampfli, Reynolds, and Szymanski, by their conduct, were each a substantial factor in causing the Partnership to no longer be able to function, thereby prompting its dissolution, and causing damages to Itkin in an amount subject to proof at trial. Specifically, as noted above, by causing deadlock in the Partnership's entities, the Conspirators caused a deadlock resulting in waste of those assets.

142.    Additionally, by refusing to take measures to mitigate waste (such as selling assets and escrowing the funds), each of the Conspirators have violated their duties to act with due care, and with no perceivable business purpose or business judgment, but rather for the sole purpose of causing harm to Itkin.

ATABEK & ASSOCIATES, P.C.
Attorneys at law
10171.3

19

Second Amended Cross-
Complaint of Garry Y. Itkin
LASC Case No.: BC647351

143.    L. Sabadash, Stampfli, Reynolds, and Szymanski, by their conduct, have acted fraudulently, maliciously, and despicably, thereby entitling Itkin to exemplary damages against each of them, in an amount according to proof at trial.

## FIFTH CAUSE OF ACTION

### Unfair Business Practices by Itkin Against All Defendants

144.    Plaintiff re-alleges and incorporates by reference into this cause of action each and every allegation set forth in each and every paragraph of this Complaint.

145.    Itkin is informed and believes that L. Sabadash, by misappropriating funds through Lobanova illegally, and repatriating those funds in the United States, is engaging in money laundering in violation of 18 U.S.C. §§ 1956-1957, thereby triggering the unlawful prong of California's Business & Professions Code § 17200, et seq ("UCL").

146.    Itkin is also informed and believes that the Sabadash Parties, by conspiring with the Assailant and others to threaten and intimidate Itkin, have violated California Penal Code §§ 422, 646.9, and 653.2, again triggering the unlawful prong of California's UCL.

147.    Defendants, and each of them, have directly and proximately caused Itkin and the Partnership harm as a result of their unfair business practices as described herein.

148.    Moreover, L. Sabadash has personally enriched herself by the above-described misappropriation, to the detriment of Itkin and the Partnership. Accordingly, Itkin is entitled to seek restitution in an amount according to proof at trial.

149.    Itkin is entitled to an injunction enjoining Defendants and each of them from further such unfair conduct.

150.    Specifically, Itkin seeks permanent injunctions prohibiting any of the Sabadash Parties from: (a) Holding themselves out as having any authority to act on behalf of any of the Partnership entities, or to exert control over any of the assets of the Partnership; (b) Hiring, or otherwise working with any person to intimidate or harass Itkin in the future; and (c) misappropriating any of the Partnership's assets from Russia, or otherwise using any part of the Partnership's assets to engage in money laundering.

## SIXTH CAUSE OF ACTION

### Breach of Lease Contract by Itkin and NAPL Against L. Sabadash

151.    Plaintiff re-alleges and incorporates by reference into this cause of action each and every allegation set forth in each and every paragraph of this Complaint.

152.    Itkin currently owns all outstanding shares of NAPL.

/ / /

153.   A. Sabadash and L. Sabadash's agreement with Itkin, in effect, constitutes an agreement between NAPL and/or Itkin on the one hand, and both A. Sabadash and L. Sabadash on the other hand, whereby A. Sabadash and L. Sabadash shall pay all mortgage payments, upkeep, and property taxes for the Beverly Hills Mansion in exchange for the right to exclusive use of the property, constitutes an enforceable oral contract.

154.   L. Sabadash, by failing to make timely property tax payments on the Beverly Hills Mansion, has breached a material term of the lease contract.

155.   L. Sabadash's performance under the lease contract has not been excused.

156.   Itkin and NAPL have performed all obligations required of them under the terms of the lease contract.

157.   Itkin and NAPL have been damaged by L. Sabadash's breach of the lease contract, in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

### Conversion Against L. Sabadash

158.   Plaintiff re-alleges and incorporates by reference into this cause of action each and every allegation set forth in each and every paragraph of this Complaint.

159.   L. Sabadash, by conspiring with persons in Russia to funnel funds from Partnership entities to L. Sabadash, has converted those funds to her own use at the cost of the Partnership.

160.   As a result, Itkin, via his interest in the Partnership, has been damaged in a sum according to proof at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.   For general and special damages in an amount according to proof at trial;

2.   For an order of dissolution pursuant to Corp. Code §16801(1);

3.   In the alternative, for a judicial determination that A. Sabadash has "engaged in conduct relating to the partnership business that makes it not reasonably practicable to carry on the" Partnership, and an order of dissolution pursuant to Corp. Code § 16801(5)(B);

4.   Judicial supervision of the winding up process for the Partnership pursuant to Corp. Code § 16803(a), and the appointment of a receiver for all corporate entities falling under the auspices of the Partnership;

5.   An application of assets of the Partnership pursuant to Corp. Code § 16807(a)-(b), to: (1) Settle the debt of $56,000,000 owed to Itkin; (2) Pay off any remaining debts of the

ATABEK & ASSOCIATES, P.C.
Attorneys at law
10171.3

21

Second Amended Cross-
Complaint of Garry Y. Itkin
LASC Case No.: BC647351

1  Partnership; and (3) Distribute any remaining net amounts to Itkin and A. Sabadash

2  according to the terms of the Partnership.

3  6. For an order permanently enjoining Defendants from engaging in further unfair

4  business practices, as described above;

5  7. For exemplary damages against Defendants for their fraudulent and malicious conduct;

6  8. For costs of suit incurred herein; and

7  9. For any other and further relief as the Court deems just and proper.

8

9  Dated: December 20, 2017                    ATABEK & ASSOCIATES, P.C.

10

11                                            By: _____

12                                                JON A. ATABEK
                                                  Attorneys for Defendant and Cross-Complainant
13                                                GARRY Y. ITKIN

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

33

1

## **JURY DEMAND**

2

3        Itkin and NAPL hereby demand a trial by jury on all claims and remedies triable by a jury.

4

5    Dated:  December 20, 2017              ATABEK & ASSOCIATES, P.C.

6

7                                          By: _____

8                                              JON A. ATABEK

9                                              Attorneys for Defendant and Cross-Complainant
                                               GARRY Y. ITKIN
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

33

## PROOF OF SERVICE
### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Orange, State of California. I am over the age of eighteen (18) and not a party to the within action. My business address is 16330 Bake Parkway, Irvine, CA 92618.

On December 20, 2017, I served the foregoing document described as: **SECOND AMENDED CROSS-COMPLAINT FOR: 1. DISSOLUTION OF PARTNERSHIP [CORP. CODE §§ 16801, ET SEQ]; 2. DECLARATORY RELIEF; 3. BREACH OF FIDUCIARY DUTY; 4. AIDING AND ABETTING BREACH OF FIDUCIARY DUTY; 5. UNFAIR BUSINESS PRACTICES [BUS. & PROF. CODE §§ 17200, ET SEQ]; 6. BREACH OF LEASE CONTRACT; 7. CONVERSION; JURY DEMAND,** on the interested parties in this action referenced in the attached service list by placing ( ) the original **(X)** true copies thereof enclosed in sealed envelopes addressed as follows:

| (x) BY MAIL | ( ) BY FACSIMILE TRANSMISSION |
|---|---|
| I caused such envelope to be deposited in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. postal service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit. | I caused said document(s) to be transmitted by facsimile transmission to the name(s) and facsimile telephone number(s) of the person(s) set forth on the attached service list. The facsimile machine telephone number of the sending facsimile machine was (213) 394-5943. A transmission report was issued by the sending facsimile machine confirming that the transmission was completed without error. A true and correct copy of said transmission report is attached hereto. |
| ( ) BY OVERNIGHT DELIVERY | ( ) BY PERSONAL DELIVERY |
| Said document was placed in an envelope designated by the express service center and placed for collection in a box regularly maintained by said carrier with whom we have a direct billing account, to be delivered to the office of the addressee listed above on the next business day. | I caused personal service of the above-referenced document by requesting that an appropriate agent deliver the above referenced documents to the office of the recipient named below, either by handing the document(s) to the recipient or by leaving the document(s) with the receptionist or other person apparently in charge of the recipient's office. |
| (x) BY ELECTRONIC SERVICE | |
| By transmitting the document(s) listed above from my email to the e-mail address(es) of the person(s) set forth on the attached service list. The transmission was reported as complete and without error. *See* California Rules of Court, rule 2060. | |

**(X)    STATE**    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

(X)    EXECUTED    on February 13, 2018 at Irvine, California.

_____

UGUR ATABEK

1

## SERVICE LIST

2

3  Robert H. Platt, Esq.
Reid P. Davis, Esq.

4  Michael Zorkin, Esq.
MANATT, PHELPS & PHILLIPS, LLP

5  11355 West Olympic Boulevard
Los Angeles, California 90064

6  rplatt@manatt.com
redavis@manatt.com

7  mzorkin@manatt.com

8  *ALEXANDER SABADASH, CONRAD*
*STAMPFLI, AFB TRADING ONE, INC.,*

9  *MNICE LTD., MBJEP LTD., LARISA*
*SABADASH, THOMAS REYNOLDS, and*

10  *putative counsel for NEW ALBION*
*PROPERTY LTD*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

33

ATABEK & ASSOCIATES, P.C.                          25                  Second Amended Cross-
Attorneys at law                                                       Complaint of Garry Y. Itkin
10171.3                                                                LASC Case No.: BC647351

# Exhibit E

Jon A. Atabek SBN 269497
(jatabek@atabeklaw.com)
Shella Alcabes (of counsel) SBN 267551
(salcabes@atabeklaw.com)
ATABEK & ASSOCIATES, P.C.
16330 Bake Parkway
Irvine, CA 92618
Tel: (213) 394-5943
Fax: (213) 402-3413

Attorneys for Defendants and Cross-Complainants
GARRY Y. ITKIN and NEW ALBION PROPERTY LTD.

### SUPERIOR COURT FOR THE STATE OF CALIFORNIA

### COUNTY OF LOS ANGELES, STANLEY MOSK COURTHOUSE

| | |
|---|---|
| AFB TRADING ONE, INC., a California corporation; M-BJEP LIMITED, an Isle of Man corporation; M-NICE LIMITED, an Isle of Man corporation; GOLDEN SPHINX LIMITED, a Jersey corporation; NEW ALBION PROPERTY LIMITED, an England corporation;<br><br>        Plaintiffs,<br><br>v.<br><br>GARRY Y. ITKIN, an individual; THE LIGHTHOUSE PARTNERSHIP LIMITED, an England corporation, and DOES 1 through 100, inclusive,<br><br>        Defendants. | Case No. BC647351<br><br>[Assigned: Hon. Michael L. Stern, Dept. 62]<br><br>**DEFENDANT AND CROSS-COMPLAINANT ITKIN'S SUPPLEMENTAL RESPONSES TO SPECIAL INTERROGATORIES BEFORE TRIAL PROPOUNDED BY PLAINTIFF AFB TRANDING ONE, INC.** |
| GARRY Y. ITKIN, an individual; NEW ALBION PROPERTY LIMITED, an England corporation;<br><br>        Cross-Complainants,<br><br>v.<br><br>ALEXANDER SABADASH, an individual; LARISSA SABADASH, an individual; CONRAD STAMPFLI, an individual; PIOTR SZYMANSKI, an individual; THOMAS REYNOLDS, an individual; and ROES 1 through 30, inclusive,<br><br>        Cross-Defendants. | Case Filed: 1/19/17<br>Trial Date: 7/22/19 |

ATABEK & ASSOCIATES, P.C.
Attorneys at Law
10171.3

ITKIN'S SUPPLEMENTAL RESPONSES TO
SPECIAL INTERROGATORIES BEFORE TRIAL
LASC Case No. BC647351

1   PROPOUNDING PARTY:    Plaintiff AFB TRADING ONE, INC.

2   RESPONDING PARTY:    Defendant and Cross-Complainant GARRY Y. ITKIN

3   SET NO.:    1 THROUGH 3, SUPPLEMENTAL

4

5   Defendant and Cross-Complainant GARRY Y. ITKIN ("Responding Party") submits the

6   following supplemental responses to Special Interrogatories, Set One, Set Two, and Set Three,

7   pursuant to a request to supplement responses to requests for production propounded by Plaintiff

8   AFB TRADING ONE, INC. ("Plaintiff" or "Propounding Party").

9                    **PREFATORY STATEMENT/GENERAL OBJECTIONS**

10   These responses are made solely for the purpose of this action.

11   All responses contained herein are based only upon such information and documents, which

12   are presently available to and specifically known to this Responding Party.

13   Except for explicit facts admitted herein, no incidental or implied admissions are intended

14   hereby. The fact that this Responding Party has answered any interrogatories should not be taken as

15   an admission that this responding party accepts or admits any documents produced constitute

16   admissible evidence.

17   The following responses are given without prejudice to this Responding Party's right to

18   produce evidence of any subsequently discovered fact or facts, which this Responding Party may

19   later recall. This Responding Party accordingly reserves the right to change any and all answers

20   herein as additional facts are ascertained, analyses are made, legal research is completed, and

21   contentions are made. The responses contained herein are made in a good faith effort to supply as

22   much factual information and as much specification of legal contentions as are presently known, but

23   should in no way be to the prejudice of this Responding Party in relation to further discovery,

24   research, or analysis.

25   These supplemental responses incorporate by reference each and every objections previously

26   asserted in all prior responses to the same requests.

27                    **RESPONSES TO SPECIAL INTERROGATORIES**

28   **SPECIAL INTERROGATORY NO. 1:**

29   IDENTIFY the "corporate entities falling under the auspices of the Partnership" referred to in

30   Paragraph 44 of YOUR CROSS-COMPLAINT.

31   (As used in these interrogatories, the term "IDENTIFY" means to state with particularity the unique

32   characteristics of the thing being described. When referring to a PERSON, the term IDENTIFY

33   means to provide, to the extent known, the PERSON's full name, present or last known address, and

ATABEK & ASSOCIATES, P.C.                    0
Attorneys at Law
10171.3

ITKIN'S SUPPLEMENTAL RESPONSES TO
SPECIAL INTERROGATORIES BEFORE TRIAL
LASC Case No. BC647351

1  when referring to a natural PERSON, additionally, the present or last know place of employment.

2  When referring to a DOCUMENT the term IDENTIFY means to provide the bate stamp number if

3  the DOCUMENT has already been produced in this litigation, or to provide all identifying

4  information to enable Defendant to identify the particular DOCUMENT, including but not limited

5  to, the title of the DOCUMENT, the date and time the DOCUMENT was created, the author of the

6  DOCUMENT, and the recipient of the DOCUMENT. As used in these interrogatories,

7  "DOCUMENT" shall be defined as handwriting, typewriting, printing, photostating, photocopying,

8  tape recording, video recording and every other means of recording upon any tangible thing any

9  form of communication or representation, including letters, words, pictures, sounds, or symbols, or

10  combinations thereof. The reference to "DOCUMENTS" includes without limitation, abstracts,

11  analyses, books, calendars, comments, correspondence, diagrams, letters, notes, emails, employment

12  records, diaries, financial records, summaries, transcriptions of notes, work papers, worksheets, and

13  any other writings or tangible things on which any forms of communication are recorded, stored, or

14  reproduced, as well as all notations on the foregoing, and originals and all drafts and copies of all the

15  above which are not absolutely identical. As used in these interrogatories, the term "YOU" or

16  "YOUR" refers to Garry Y. Itkin. As used in these interrogatories, the term "CROSS-COMPLAINT"

17  refers to the cross-complaint filed by YOU in LASC Case no. SC127283.)

18  **RESPONSE TO INTERROGATORY NO.1**

19          Defendant incorporates the Prefatory Statement/General Objections herein by reference.

20  Defendant objects to the extent this interrogatory seeks information which implicates Defendant's

21  personal financial privacy to the extent AFB and its subsidiaries fall under the umbrella of his

22  partnership with Alexander Sabadash ("A. Sabadash"), as well as sensitive business information

23  belonging to AFB and its related entities, which information requires the protection of an appropriate

24  protective order.

25          Subject to and without waiving the foregoing objections, Responding Party responds as

26  follows:

27          a.  AFB Trading One, Inc.;

28          b.  M-BJEP Limited;

29          c.  M-NICE Limited;

30          d.  New Albion Property Limited;

31          e.  SCI La Desirade;

32          f.  VLK Air LLC;

33          g.  Golden Sphinx Limited;

h. Vyborg Limited and all its subsidiaries*, affiliated or non-affiliated companies owing Pulp, Paper, and Pellet producing plant or any property it comprises, including real property, located in Poselok Sovetsky, Vyborg District, Russia;

i. Diesel Limited and all its subsidiaries*, affiliated or non-affiliated companies owing real property commonly known as Russkiy Diesel, located in Vsevolzhsk, St. Petersburg Region, Russia;

j. ZAO Liviz and all its subsidiaries*, affiliated or non-affiliated companies owing vodka producing plant, or any property it comprises, located on Sinopskaya Embankment, St. Petersburg, Russia;

k. OOO Liviz and all its subsidiaries*, affiliated or non-affiliated companies owing vodka producing plant, or any property it comprises, located on real property commonly known as Russkiy Diesel, located in Vsevolzhsk, St. Petersburg Region, Russia;

l. OOO Liviz (Krasnoe Selo) and all its subsidiaries*, affiliated or non-affiliated companies owing vodka producing plant, or any property it comprises, located, including real property, located in Krasnoe Selo, St. Petersburg Region, Russia;

m. Graf Suvorov and all its subsidiaries*, affiliated or non-affiliated companies or any entity owing real property commonly known as Moyka River Embankment 64, St. Petersburg, Russia;

n. Royalty Group Limited (BVI), OOO "ZAPAD", and all its subsidiaries*, affiliated or non-affiliated companies owing all land entitlements to and all real property commonly known as collective farm "Leninsky Luch".

* Responding Party has been unable to track changes in structure relating to many of the entities falling under the Partnership, as Alexander Sabadash, or someone purporting to act on his behalf, appointed a manager named Tatiana Lobanova, who has been instructed not to communicate with Responding Party in any way, and to restrict any information regarding Partnership assets away from Responding Party.

Discovery is ongoing. Responding Party reserves the right, but is not obligated, to supplement these responses up to and through the time of trial as appropriate.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

Subject to and without waiving the foregoing objections, Responding Party responds as follows: Responding Party has no further information to provide in supplementing this response.

**SPECIAL INTERROGATORY NO. 2:**

IDENTIFY all the corporate entities which YOU contend are owned in whole or in part by

ATABEK & ASSOCIATES, P.C.
Attorneys at Law
10171.3

2

ITKIN'S SUPPLEMENTAL RESPONSES TO
SPECIAL INTERROGATORIES BEFORE TRIAL
LASC Case No. BC647351

1  the partnership alleged in YOUR CROSS-COMPLAINT that are listed or registered in YOUR name.

2  **RESPONSE TO INTERROGATORY NO.2**

3      Defendant incorporates the Prefatory Statement/General Objections herein by reference.

4  Defendant objects to the extent this interrogatory seeks information which implicates Defendant's

5  personal financial privacy to the extent AFB and its subsidiaries fall under the umbrella of his

6  partnership with Alexander Sabadash ("A. Sabadash"), as well as sensitive business information

7  belonging to AFB and its related entities, which information requires the protection of an appropriate

8  protective order.

9      Subject to and without waiving the foregoing objections, Responding Party responds as

10  follows:

11      New Albion Property Limited.

12      Discovery is ongoing. Responding Party reserves the right, but is not obligated, to supplement

13  these responses up to and through the time of trial as appropriate.

14  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

15      Subject to and without waiving the foregoing objections, Responding Party responds as

16  follows: Responding Party has no further information to provide in supplementing this response.

17  **SPECIAL INTERROGATORY NO. 3:**

18      IDENTIFY all property that YOU contend is owned in whole or in part by the partnership

19  alleged in YOUR CROSS-COMPLAINT.

20  **RESPONSE TO INTERROGATORY NO.3**

21      Defendant incorporates the Prefatory Statement/General Objections herein by reference.

22  Defendant objects to the extent this interrogatory seeks information which implicates Defendant's

23  personal financial privacy to the extent AFB and its subsidiaries fall under the umbrella of his

24  partnership with Alexander Sabadash ("A. Sabadash"), as well as sensitive business information

25  belonging to AFB and its related entities, which information requires the protection of an appropriate

26  protective order.

27      Subject to and without waiving the foregoing objections, Responding Party responds as

28  follows:

29      a.  Gulfstream G-550 aircraft, tail # M-BJEP, S/N 5070;

30      b.  Gulfstream G-200 aircraft, tail # M-NICE, S/N 246;

31      c.  Real Property (mansion 1) located at 58 Beverly Park, Beverly Hills, Ca 90211;

32      d.  Real Property (mansion 2) located at 17 bd Général de Gaulle, St Jean Cap Ferrat,

33        France, 06230;

ATABEK & ASSOCIATES, P.C.               3              ITKIN'S SUPPLEMENTAL RESPONSES TO
Attorneys at Law                                       SPECIAL INTERROGATORIES BEFORE TRIAL
10171.3                                           LASC Case No. BC647351

1 | **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 33:**

2 |   Subject to and without waiving the foregoing objections, Responding Party responds as

3 | follows: Responding Party has no further information to provide in supplementing this response.

4 | **SPECIAL INTERROGATORY NO. 34:**

5 |   State the CONTACT INFORMATION for Lighthouse Partnership Limited.

6 | **RESPONSE TO INTERROGATORY NO.34**

7 |   Defendant incorporates the Prefatory Statement/General Objections herein by reference.  The

8 | term "cash contributions" is vague and ambiguous, to the extent it is not a defined term, has potential

9 | use as a term of art in both law and accounting, and does not distinguish between outside cash and

10 | re-investment of revenue share. The request improperly refers to a prior pleading that has been

11 | superseded, and thus refers to matters that are no longer relevant to, and outside of the scope of these

12 | proceedings, or designed to lead to the discovery of admissible evidence.

13 |   Subject to and without waiving the foregoing objections, Responding Party responds as

14 | follows:

15 |   New Burlington House,

16 |   1075 Finchley Road,

17 |   London, NW11 0PU

18 |   United Kingdom

19 |   Discovery is ongoing. Responding Party reserves the right, but is not obligated, to

20 | supplement these responses up to and through the time of trial as appropriate.

21 | **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 34:**

22 |   Subject to and without waiving the foregoing objections, Responding Party responds as

23 | follows: Responding Party has no further information to provide in supplementing this response.

26 | Dated: June 17, 2019       ATABEK & ASSOCIATES, P.C.

28 |             By: _____
            JON A. ATABEK
            SHELLA ALCABES
            Attorneys for Defendant and Cross-Complainants
            GARRY Y. ITKIN and NEW ALBION
            PROPERTY LIMITED

ATABEK & ASSOCIATES, P.C.
Attorneys at Law
10171.3

42

ITKIN'S SUPPLEMENTAL RESPONSES TO
SPECIAL INTERROGATORIES BEFORE TRIAL
LASC Case No. BC647351

**<u>VERIFICATION</u>**

I, GARRY Y. ITKIN, hereby declare as follows:

 I am the Plaintiff in the above action described in this verification. I have read the foregoing **DEFENDANT AND CROSS-COMPLAINANT ITKIN'S SUPPLEMENTAL RESPONSES TO SPECIAL INTERROGATORIES BEFORE TRIAL PROPOUNDED BY PLAINTIFF AFB TRANDING ONE, INC.,** and know its contents. I have personal knowledge of the facts alleged herein, and on allegations based upon information and belief, I am informed and believe that such matters are true and correct and on those grounds certify or declare under penalty of perjury under the laws of the State of California that the same are true and correct.

 Executed this ___June 17___ , 2019, at ___Los Angeles,___ California.
      (Date)         (City)

               GARRY ITKIN

ATABEK & ASSOCIATES, P.C.     43    ITKIN'S SUPPLEMENTAL RESPONSES TO
Attorneys at Law           SPECIAL INTERROGATORIES BEFORE TRIAL
10171.3             LASC Case No. BC647351

# Exhibit F

Jon A. Atabek, Esq. SBN 269497
(jatabek@atabeklaw.com)
ATABEK & ASSOCIATES, P.C.
16330 Bake Parkway
Irvine, CA 92618
Tel: (213) 394-5943
Fax: (213) 402-3413

Attorney for Plaintiff
GARRY Y. ITKIN

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARRY Y. ITKIN, an individual,<br><br>Plaintiff,<br><br>v.<br><br>GOLDEN SPHINX LIMITED, a limited liability company incorporated in the Isle of Jersey; and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 21-cv-4907<br><br>**COMPLAINT FOR RELIEF UNDER FOREIGN COUNTRY MONEY JUDGMENTS RECOGNITION ACT** |

ATABEK & ASSOCIATES, P.C.
Attorneys at Law

COMPLAINT
[FOREIGN COUNTRTY MONEY JUDGMENTS RECOGNITION ACT]

ATABEK & ASSOCIATES, P.C.
Attorneys at Law

## INTRODUCTION

1.     This action seeks to domesticate a foreign-country money judgment pursuant to California's Uniform Foreign-Country Money Judgments Recognition Act (the "Act").

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the claims brought under federal law pursuant to 28 U.S.C. §§ 1332, as there is complete diversity between Plaintiff and Defendant, and the amount of the foreign money judgment that is being domesticated is in excess of $75,000.

3.     Venue over Plaintiff's claims is proper in the Central District of California because Plaintiff resides in the Central District of California within the meaning of 28 U.S.C. § 1391, because Defendant's sole director resides in the County of Los Angeles, California, and because the assets sought for enforcement of the judgment are all in the County of Los Angeles, California.

## PARTIES

4.     Plaintiff GARRY Y. ITKIN ("Plaintiff") is, and at all times relevant was a resident of Los Angeles County, California.

5.     Defendant GOLDEN SPHINX LIMITED ("Defendant") is, and at all times relevant was a limited liability company incorporated in the Isle of Jersey, with its principal place of business in St. Helier, Jersey, United Kingdom.

6.     Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES 1 through 10, inclusive, and therefore sue those defendants by their fictitious names.  Plaintiff will amend this complaint to allege the true names and capacities of the fictitiously named defendants when the same has been ascertained. Each of the fictitiously named defendants is liable as a co-debtor or alter-ego on the foreign country money judgment at issue. Unless otherwise stated, all references to named defendants shall include DOE defendants as well.

/ / /

ATABEK & ASSOCIATES, P.C.
Attorneys at Law

7.    Plaintiff is informed and believes, and based on this information and belief alleges, that at all times mentioned in this Complaint, Defendants were the alter-egos, partners, joint-venturers, or other co-responsible parties to their codefendants.

## COMMON ALLEGATIONS

8.    Plaintiff sued Defendant in the Royal Court of Jersey for unpaid director's fees and costs due and owing in the amount of £505,000.

9.    Defendant was duly served in that action pursuant to the laws of the Isle of Jersey.

10.    Defendant failed to appear in that action.

11.    Accordingly, on December 2, 2016, the Royal Court of Jersey granted a default judgment in favor of Plaintiff and against the Defendant in the sum of £505,000 (the "Jersey Judgment"). A true and correct copy of the Jersey Judgment is attached hereto as Exhibit 1.

12.    On July 24, 2018, Defendant filed an application to set aside the Jersey Judgment (the "Application"). In its Application, Defendant argued that Defendant was not given adequate notice of the proceedings, that Plaintiff obtained the Jersey Judgment through fraud and self-dealing, and that the Jersey Judgment was invalid as a matter of law as it was predicated on agreements and actions that were taken in violation of rules regarding self-dealing and conflicts of interest by directors and agents of a company.

13.    On April 20, 2021, the Royal Court of Jersey denied the Application in a "Judgment" setting forth the court's reasoning for denying the Application (the "Denial Judgment"). The Denial Judgment includes a recitation of the relevant procedural history of the Jersey Judgment and Denial Judgment, as well as the reasoning of the court associated with the Denial Judgment. A true and correct copy of the Denial Judgment issued by the Royal Court of Jersey on April 20, 2021, is attached hereto as Exhibit 2.

14.     Under the law of the Isle of Jersey, Defendant's deadline to appeal the Denial Judgment is 28 days from the date judgment is entered, or May 18, 2021.

15.     As of the date of filing of *this* action, Defendant has not filed an appeal of the Denial Judgment. Thus, the Jersey Judgment and Denial Judgment are final, unappealable judgments of the Royal Court of Jersey.

## **FIRST CAUSE OF ACTION**

### **(Recognition of Foreign Judgment (C.C.P. §§ 1713, et seq) by Plaintiff Against Defendant)**

16.     Plaintiff realleges and incorporates by reference into this cause of action the allegations set forth in paragraphs 1 through 15 of this Complaint.

17.     The Judgment grants Plaintiff the recovery of money in the sum of £505,000 ($715,150.70 USD as of June 4, 2021).

18.     Under the law of the Isle of Jersey, the Jersey Judgment is final, conclusive, and enforceable, as all applicable appeal periods have expired.

19.     The Royal Court of Jersey of the Isle of Jersey provide an impartial tribunal and procedure compatible with the requirements of due process of law under the laws of the State of California and the United States of America.

20.     The Royal Court of Jersey had personal jurisdiction over Defendant based on Defendant's incorporation and local presence in the Isle of Jersey.

21.     The Royal Court of Jersey had subject matter jurisdiction over the lawsuit giving rise to the Jersey Judgment, because the Royal Court of Jersey is a court of original jurisdiction for collection and breach of contract claims against companies incorporated in the Isle of Jersey.

22.     As noted in the Denial Judgment, Defendant and Plaintiff each had actual notice of the proceedings associated with the Jersey Judgment and/or Denial Judgment, as made clear by Defendant's attempt to set aside the Jersey Judgment in the Isle of Man.

/ / /

ATABEK & ASSOCIATES, P.C.
Attorneys at Law

23.     The Jersey Judgment was not obtained through fraud. And in any case, Defendant argued fraud and self-dealing before the Royal Court of Jersey in a collateral lawsuit to set aside the Jersey Judgment, which argument was adjudicated against Defendant as set forth in the Denial Judgment, and thus any argument of fraud or self-dealing is barred by the doctrine of *res judicata*.

24.     The Jersey Judgment and the grounds for it are not repugnant to the public policy of the State of California or the United States of America.

25.     The action giving rise to the Jersey Judgment was not contrary to any agreement between the parties regarding the manner in which any dispute would be resolved.

26.     Personal jurisdiction in the lawsuit giving rise to the Jersey Judgment was not based solely on personal service of process—it was filed where Defendant is incorporated and domiciled.

27.     The Jersey Judgment was not rendered under circumstances that raise substantial doubt about the integrity of the rendering court with respect to the Jersey Judgment—indeed, the Isle of Jersey is part of the United Kingdom and follows common law principals after which our own laws are modeled.

28.     The proceedings before the Royal Court of Jersey related to the Jersey Judgment and Denial Judgment were compatible with the requirements of due process of law under the laws of the State of California and the United States of America.

29.     On balance, the grounds for recognition of the Jersey Judgment outweigh any grounds for nonrecognition.

30.     The Jersey Judgment does not conflict with another final and conclusive judgment of any other court.

/ / /

/ / /

/ / /

ATABEK & ASSOCIATES, P.C.
Attorneys at Law

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendant and Does 1 through

10, inclusive, and each of them, as follows:

    1.  For recognition of and entry of judgment upon the Jersey Judgment;

    2.  For interest at the legal rate from the date of entry of Jersey Judgment;

    3.  For costs of suit incurred herein; and

    4.  For any other and further relief as the Court deems just and proper.


Dated:  June 16, 2021          ATABEK & ASSOCIATES, P.C.




          By: /s/ Jon A. Atabek_____
             JON A. ATABEK

             Attorneys for Plaintiff
             GARRY Y. ITKIN

ATABEK & ASSOCIATES, P.C.
Attorneys at Law

COMPLAINT
[FOREIGN COUNTRTY MONEY JUDGMENTS RECOGNITION ACT]

# EXHIBIT 1

# In the Royal Court of Jersey

**Samedi Division**

**2016/335**

**In the year two thousand and sixteen, the second day of December.**

Before Timothy John Le Cocq, Esquire, Deputy Bailiff of Jersey, assisted by Jurats Jeremy John Ramsden and Pamela Jean Pitman.

BETWEEN Golden Sphinx Limited (defendant), OF THE ONE PART; and Garry Yuri Itkin (plaintiff), OF THE OTHER PART; actioning the defendant to pay the sum of five hundred and five thousand pounds, which the plaintiff claims to be due to it in respect of unpaid directors fees.

The defendant not having appeared, the Court:-

(1)     condemned the defendant to pay to the plaintiff:

    (a)     the amount claimed;

    (b)     interest thereon in accordance with Practice Direction 05/6 from this day to the date of repayment in full;

    (c)     the fixed costs of the action;

    (d)     interest on such costs in accordance with Practice Direction 05/6 from this day to the date of payment; and

(2)     authorised the plaintiff to cause the defendant's movables to be distrained on and sold.

Greffier Substitute

BL(OB)

# EXHIBIT 2

**0000/00**

**ROYAL COURT**
**(Samedi Division)**

**20th April 2021**

Before:        **Sir William Bailhache, Commissioner**
                    **and Jurats Olsen and Hughes**

Between                          **Garry Yuri Itkin**                          **Plaintiff**

And                              **Golden Sphinx Limited**                    **Defendant**

**Advocate I Jones for the Plaintiff**
**Advocate M L A Pallot for the Defendant**

**JUDGMENT**

**Introduction**

1.    On 2nd December 2016, judgment was given in favour of the Plaintiff by the Royal Court (Le Cocq
      Deputy Bailiff, sitting with Jurats Ramsden and Pitman) against the Defendant in the sum of
      £505,000 which the Plaintiff claimed to be due in respect of unpaid director's fees, interest and
      costs.  It was a default judgment, the Defendant not having appeared. The present application
      arises out of a summons by the Defendant to have the judgment set aside, the action placed on
      the pending list with the Plaintiff filing particulars of claim within 21 days.

2.    There is no dispute that the summons, in respect of which judgment was given on 2nd December
      2016, was properly served on the Defendant in Jersey.  Advocate Pallot submitted that,
      notwithstanding that it was properly served, the summons could not have come to the attention of
      the Defendant, but there is no evidence before us to this effect and we have to assume that the
      company would have made arrangements to ensure that details of the litigation were brought to
      the attention of those who needed to know them.  The more cogent arguments of Advocate Pallot
      in this respect, however, are that the judgment is fatally flawed because, at the time the summons
      was served, the Plaintiff was the only director of the Defendant, and it is said that he deliberately
      acted for his own benefit to the detriment of the company in failing to take steps to mitigate the

impact of his conflict of interest by not causing the company to be independently advised and / or represented at the hearing.  Accordingly, the Defendant was prevented from advancing any defence to its claim.  As to the substance of the claim, it is said that the Plaintiff was the sole director of the Defendant as at 21st August 2015 when it is said he entered into an employment agreement, that agreement being made between him as an individual and also as agent for the Defendant.  The Defendant complains that the Plaintiff purported to hold a meeting of the Board of Directors at which he was the sole attendee, the chairman and the secretary, and that at that meeting as director, he purported to resolve on behalf of the company to acknowledge a debt said to be owed to him personally, authorising the company to enter into a Promissory Note to secure that debt owed to him, and then on behalf of the company purported to resolve to hold himself as Plaintiff harmless in almost any circumstances notwithstanding any breaches of duty.

3.    In oral submissions before us, Advocate Pallot went rather further.  He said that the Plaintiff had perpetrated a massive fraud on the Defendant, and it was unconscionable that the Royal Court should assist the Plaintiff by allowing the default judgment to stand.  In the particulars accompanying the Defendant's summons, the Defendant claims that the agreement was not one which ought to be enforced as a matter of public policy because it was entered by the Plaintiff, as sole director of the Defendant, acting in breach of duty, and / or because it arose from a purported agreement between the Plaintiff and the Defendant which was made without the knowledge or consent of the shareholders in the Defendant and / or because the liability was said to arise in respect of a contract of employment dated 21st August 2015 which included sums which had arisen prior to that date for which there was no legal liability.  In the written materials accompanying the present application were extracts from the Companies (Jersey) Law 1991 – in particular Articles 74 dealing with the duties of directors, and Article 74ZA dealing with persons connected with a director for the purposes of Article 74; also Article 74A dealing with contracts with sole members who are also directors, and Article 75 dealing with the duty of directors to disclose interests.

4.    The Court had before it two affidavits from Mr Piotr Szymanski, who was appointed as director of the Defendant on 28th February 2017 on the Plaintiff being removed as sole director by resolution of the members of the Defendant; and an affidavit from Advocate Garrood dated 23rd January 2021, to which we will refer in more detail later.  The Court has also had regard to three affidavits sworn by the Plaintiff, supported by an affidavit from Mr William Buck, an English barrister representing the Plaintiff in the Isle of Man, and a declaration of Mr Whitney Ackerman, a US attorney-at-law in California.  We have also had the advantage of reading some correspondence between the advocates and other papers presented to the Court by both parties.

5.    The Royal Court has power to set aside judgments by default as set out in Rule 11/2 of the Royal Court Rules 2004:-

> "1.    Any judgment by default may be set aside by the Court on such terms as to costs or otherwise as it thinks fit.
>
> 2.    An application under paragraph (1) must be made by summons supported by an affidavit stating the circumstances under which the default has arisen…"

6.    The test to be applied by this Court is set out in <u>Strata Surveys Limited v Flaherty and Company Limited</u> [1994] JLR 69, a decision of the Court of Appeal.  The Court was considering the interpretation of the comparable rule in the Royal Court Rules 1992: these have been superseded by the 2004 Rules but the former Rule is substantially to the same effect as the Rule which we are now applying.  At page 71, line 23, Southwell JA, delivering the judgment of the Court, said this:-

> *"Paragraph (1) provides the Royal Court with a broad power to set aside default judgments on appropriate terms.  This is a discretionary but not an unfettered power.  It is a power to be exercised judicially.  The essential requirement to be met in its exercise is the requirement to do justice between the parties.  In the present case, that means justice to the plaintiff and justice to Strata.  The Court has always to keep in mind that judgments obtained where there is default by a defendant have not been preceded by any trial or other consideration of the merits of the claim, nor of any arguable defence to the claim which the defendant may have.*
>
> *In the well-known case in the English jurisdiction of <u>Evans v Bartlam</u> [1937] AC 473, the House of Lords considered the power of the Court to set aside default judgments.  In the course of his speech in that case, Lord Atkin said this (at 480):*
>
>> *"The principle obviously is that unless and until the Court has pronounced a judgment upon the merits or by consent, it is to have the power to revoke the expression of its coercive power where that has only been obtained by a failure to follow any of the rules of procedure."*
>
> *Rule 9/3(1) is similar in terms to O.13, R9 of the English Rules of the Supreme Court.  In Jersey, just as as much as in England, the power is to be exercised having regard to what is fair and just, keeping always in mind the principle as stated by Lord Atkin."*

7.    Advocate Pallot relied upon this extract in his trenchant submissions that the Court had to have regard to where the overall balance of justice lay. In his submission it was obvious that the Court should not allow a judgment based upon a fraud practiced on his client to stand.

8.    In Strata, it was plain that there are a number of factors which the Court, hearing an application to set aside a default judgment, should take into account:-

  1.    Was there a reasonably arguable defence on the merits? A failure to show this could result in a default judgment being allowed to stand without injustice to the defendant.

  2.    What were the reasons for the default judgment to have been permitted by the defendant – was it the fault of the advocate or was there a fault on the part of the defendant?

  3.    Was there a delay in making an application to set the judgment aside?

  4.    Would injustice be done to the defendant if the judgment were to stand; and

  5.    Would there be no injustice caused to the plaintiff if the action were to proceed because the judgment was set aside?

9.    We have applied these principles to the exercise of our discretion in the present case. We have also had regard to Rule 1/6 of the Royal Court Rules 2004, which provide for the overriding objective. That Rule is expressed in these terms:-

    *"(1)    The overriding objective of the Court in proceedings is to deal with cases justly and at proportionate cost.*

    *(2)    Dealing with a case justly and at proportionate cost includes, so far as is practicable –*

        *…..*

        *(b)    saving expense;*

        *(c)    dealing with the case in ways which are proportionate –*

            *(i)    to the amount of money involved,*

*(ii)      to the importance of the case,*

*(iii)      to the complexity of the issues, and*

*(iv)      to the financial position of each party;*

*(d)      ensuring that it is dealt with expeditiously and fairly;*

*…..*

*(f)      enforcing compliance with Rules, Practice Directions and orders;*

*(3)      The Court must seek to give effect to the overriding objective when it –*

*(a)      exercises any power given to it by these Rules; or*

*(b)      interprets any Rules.*

*…..”*

10.    It is clear that these considerations can often pull in different directions, and this case is no exception.  Nonetheless, the introduction of these provisions in the Royal Court Rules was the result of judicial experience that parties were formerly inclined to play procedural games which delayed and sometimes frustrated a fair hearing of the case; and which allowed parties with the more substantial means to avoid or establish liability by the depth of their pockets rather than the merits of their case.

11.    The Plaintiff accepts that he was the sole director of the Defendant company at the material time. It does not appear from the Articles of Association exhibited by Mr Szymanski in July 2018 that there is any objection to there being a sole director because Article 61 provides expressly that the company may in general meeting fix the maximum and / or minimum number of directors, but unless so fixed the number of directors shall be one for any period in which the company is a private company.  The quorum for a meeting of directors is one, when only one director is in office because Article 86 expressly provides that in those circumstances the director shall have and may exercise all the powers in and over the affairs of the company as are conferred by the articles upon the directors, provided the company is a private company.  There are a number of provisions in

the articles between Article 80 and Article 92 which deal with director's appointments, interests and disclosure obligations.  What is apparent from both the Articles of Association and Article 74 of the Law is that there is room for the members of the company to authorise what would otherwise be a breach of duty by a director having a conflict of interest in his personal dealings with the company.  It is therefore right to say that the Plaintiff's approach to the current dispute is to indicate that it forms part of a much larger factual dispute between him and a Mr Sabadash, with whom the Plaintiff asserts that he was in partnership and that one of the assets of the partnership was the beneficial shareholding in the Defendant.  The Court has no information from Mr Sabadash who is apparently currently incarcerated in Russia, but reference has been made by the Plaintiff to documents allegedly agreed by Mr Sabadash approving an arrangement giving the Plaintiff a guarantee by the Defendant of all the underlying obligations due to the Plaintiff by Mr Sabadash.  We are informed by the Plaintiff that these and other claims are before the California State Court in proceedings commenced by AFB Trading One Inc, the Defendant and others against the Plaintiff.  In two Californian complaints, there are cross-complaints which have been issued by the Plaintiff in the same proceedings.

12.    At the outset of the hearing, we asked Advocate Jones whether he conceded that the Defendant would have an arguable defence if the judgment were to be set aside and the matter proceed to trial, and he readily agreed that that was so.  He was clearly right to do so.  We do not accept at face value the allegations of fraud made by Advocate Pallot, noting as we do that there are cross-allegations of fraud against Mr Sabadash and others in the California proceedings.  We think the right construction to be placed on the facts presented to us at present is that both sides have an arguable case, and a decision as to which was correct could only be reached following evidence being given at trial.

The first part of the <u>Strata</u> test is therefore satisfied.

13.    We next consider the arrangements which led to judgment being taken.  Central to this part of the argument, as it is to some of the argument on the question of delay, is the role of Advocate Garrood, at the time a partner in Messrs Carey Olsen.  The Plaintiff indicates in his affidavit evidence that, before acting against him, Advocate Garrood was engaged by the Plaintiff and provided him with various pieces of legal advice.  It is said that Advocate Garrood knew precisely the basis upon which the Plaintiff sought judgment.  In his first affidavit the Plaintiff says he does not recall speaking to Advocate Garrood on 1st December 2016, the day before the default judgment was taken, and he believes that the email exchange accurately reflected the limits of the exchanges he had with Advocate Garrood on that day.  The email exchange to which he refers goes as follows:-

*1.     1 December 2016, 7.51 am, Garrood to Plaintiff:*

> *"Dear Garry*
>
> *I note from the published Court list that the matter of Itkin v Golden Sphinx Limited has been listed for tomorrow.*
>
> *At the date hereof I understand that you remain the sole director of Golden Sphinx and it is unclear to me how the action can be quorate. [sic] Without seeking to ask you to reveal any privileged information, could you confirm how you expect the action to proceed?*
>
> *Regards, Jerry."*

14.    The response from the Plaintiff was sent the same day at 16.32 and is in these terms:-

> *"Dear Jerry*
>
> *As plaintiff I would like to adjudicate amounts owed me pursuant documents [sic] related to my employment by the Company, contained in Company files.  All documents that will be presented to Court tomorrow have been provided to you previously.*
>
> *As a sole director of defendant I do not have any defenses against these claims and absolutely agree with amounts owed.  Not being in position to argue I neither plan to attend this hearing myself, nor instruct anyone to attend on behalf of Company.*
>
> *I am happy to discuss on the phone if you would like.  Please feel free to call me at ….."*

15.    Advocate Garrood has not given evidence on this particular point.  However, in his evidence addressing a different question, to which we will come shortly, he confirmed that at the relevant time his firm was receiving instructions from the Plaintiff as the purported director of the company AFB Holdings Limited, and that the Plaintiff was seeking to have a company called Diesel Limited restored to the company's register.   In that context, Advocate Garrood received some correspondence from the Plaintiff in January 2017.  The various companies in respect of which the Plaintiff was then purporting to give Advocate Garrood instructions are all lined up against the Plaintiff in the different jurisdictions in which litigation continues.  We obviously do not have access to privileged information, but what does seem to be clear, as indeed Advocate Pallot seemed to

accept, is that when the dispute between the Plaintiff and those on the other side arose towards the end of 2016, Advocate Garrood lined up with Plaintiff's opponents.

16.  What are we to make of this in relation to the default judgment obtained on 2nd December 2016? On the one hand, the Plaintiff, acting as sole director of the Defendant, procured that a summons be delivered to the company's registered office in Jersey with a return date on which the company was advised that a default judgment would be taken if it did not appear.  We do not know what, if any, steps were taken to bring this action to the attention of Mr Sabadash or his colleagues.  We can anticipate that if it had been brought to their attention, arrangements would have been made for the company to appear in Court to place the action on the pending list.  On the other hand, Advocate Garrood, who, as has been said, was lined up with the Plaintiff's opponents, spotted the action on the Court list the day before it was called, and was in correspondence by email with the Plaintiff.  Although we do not have evidence from Advocate Garrood on this point, it is obvious from that exchange of emails that he must have appreciated that judgment would be taken in default.  It seems to us to be likely, given that Advocate Garrood took the step of contacting the Plaintiff in the first place, that he brought the proceedings to the attention of those hostile to the interests of the Plaintiff.  He may not have done so; but on the balance of probabilities we think it is likely that he did and there is no evidence to the contrary.  Equally, we take the view that the probability is that Advocate Garrood contacted the Judicial Greffe after the return date to ascertain whether a default judgment had been taken.  On the assumption that he did so, he would have been informed that judgment had been taken and, we think it more likely than not, that he would have been in contact with those hostile to the Plaintiff to inform them that the judgment had been taken.

17.  In this analysis we emphasise that these are provisional views expressed on the balance of probability as to what is likely to have been the case.  If it were the case, then of course the Defendant cannot attribute blame for the default judgment to any default on the part of its lawyers. The fact is that neither the Defendant nor Advocate Garrood has provided any evidence one way or the other.  This Court is therefore left with making the best it can of the information which has been provided.  In those circumstances, we find it more likely than not that the taking of the default judgment was permitted by the Defendant company because it would have been quite straightforward to instruct Advocate Garrood to attend the Court to place the matter on the pending list, or, at the very least, to attend on behalf of the members of the company to indicate that there was a real conflict between the Plaintiff acting in his individual capacity and the Plaintiff as sole director of the Defendant company, and for that reason judgment ought not to be given.  Indeed, we are sure that had he done so, the Court would not have given such a judgment.

18.  We have taken this into account in the exercise of our discretion.

**Delay**

19. We now come to the question of delay.  Assuming we are wrong in our assumptions mentioned above as to whether the Defendant was informed of the existence of the judgment shortly after it had been given, we are left with a conflict of evidence between Mr Ackerman and the Plaintiff on the one hand and Advocate Garrood on the other as to when the judgment was brought to the attention of the Defendant.  Mr Itkin says that in January 2017, he procured the delivery of a copy of the judgment to the offices of Messrs Carey Olsen in a Fedex registered package sent from California.  This package contained not only the Act of Court in respect of the default judgment of 2 December 2016, but also the Annual Returns of Shareholders to be submitted to the Jersey Financial Services Commission in relation to Diesel Limited and Golden Sphinx Limited. Advocate Garrood says that the Carey Olsen document management system does not disclose that a copy of the judgment was received, and he asserts that the Plaintiff has been untruthful in his second affidavit when he says that the judgment was sent at that time.

20. This evidence is regarded by the Plaintiff as astonishing.  He accepts that he may have been mistaken, but he does not think he was; he is satisfied that he did enclose the judgment with the January 13th Fedex package and in support of that, he has the declaration from Mr Ackerman who saw him with a small stack of documents on top of a Fedex envelope on the day in question.  He was consulting the Plaintiff on an unrelated business matter, but he noticed that the documents in question included a judgment issued by the Royal Court of Jersey.  Because he is a lawyer, and as he described it *'out of tangential professional interest'* he asked to look at it.  Having done so, he noted that it was a judgment dated 2nd December 2016 in favour of the Plaintiff, and he says in his affidavit that the Plaintiff sealed the envelope in his presence and indeed that he dropped off the sealed and labelled Fedex envelope for the Plaintiff as he, Ackerman, had a package of his own to deliver, which he did on his way back to his office.

21. There is therefore a direct conflict of evidence as to whether the judgment was sent to Advocate Garrood in January 2017.  It seems to us that it is a conflict which is impossible to resolve on affidavit evidence alone.  Advocate Pallot attempted to suggest that we could accept Advocate Garrood's affidavit evidence because he was an officer of the Court, and, as it were, was one of *'ours'* rather than, as he put it, a random lawyer in California.  We do not accept that is the right way to approach it. In our judgment, this evidence must be seen in the round with the other evidence which has been produced in order to identify the date on which the existence of the judgment came to the attention of the Defendant (by which we mean, those now in charge of the Defendant, hostile to the interests of the Plaintiff).

22.    On the most favourable case for the Defendant, it received notice of the default judgment on 18th December 2017 when a cross-complaint in California was served on it, in which a reference to the default judgment appears.  The Plaintiff has deposed in his affidavit to the reasons for the delay in serving this cross-complaint.   He describes how he deliberately did not file the Californian complaints for over a year after he obtained the judgment in Jersey, the reason for which was to ascertain whether the Defendant would bring an application to set aside the judgment.   He regarded it as prudent and responsible to allow a reasonable passage of time before taking steps in America to rely upon it.  If the Defendant is right that it did not have notice of the judgment until this time, then of course the delay between taking judgment and December 2017 does not count against it; on the other hand, if on the balance of probability Advocate Garrood was aware of the judgment at an earlier stage, and, in the absence of other evidence, can be taken to have informed his clients of its existence, then the delay would weigh against the Defendant.

23.    Some two and a half months later, on 28th February 2018, Advocate Garrood wrote to Advocate Blakeley, then acting for the Plaintiff, to assert that the judgment obtained on 2nd December 2016 was procured in breach of fiduciary and other duties, and that an application would be made to set the judgment aside.   The letter was sent to Advocate Blakeley notwithstanding that Advocate Garrood was aware that Preston Law had been instructed; the letter to Advocate Blakeley had been sent because he was on the record as acting for the Plaintiff.  Seven days later, no reply having been received, Advocate Garrood advised that he was instructed to apply to the Royal Court for setting aside the judgment.  He received an email response the same day to the effect that Advocate Blakeley was away on leave, and, given the urgency, although they had not been instructed, the Plaintiff had been advised that Advocate Blakeley would not be able to assist him. The same day, a letter was sent by Advocate Garrood to Advocate Preston at Preston Law advising him of the correspondence.  Thus it was that a summons was issued with a return date of 24th July 2018 for setting aside the default judgment.  Affidavits from Mr Szymanski and the Plaintiff were provided; but it is clear that the information available to the Court was deemed insufficient because the matter was then adjourned for further consideration on 10th December 2018.  Further affidavits were made available to the Court on that occasion; and because it was thought that it would be helpful to ascertain the date on which the Defendant became aware of the existence of the default judgment, which was in dispute, Advocate Garrood appearing for the Defendant, the Court then ordered a further adjournment on the basis that Advocate Garrood should file an affidavit confirming the contents of a package delivered to his firm on Tuesday 17th January 2017 as confirmed by email correspondence; and the Plaintiff should file his affidavit in reply twenty-one days after receipt of Advocate Garrood's affidavit.  The parties should then attend on the Judicial Secretary within seven days of the Plaintiff's affidavit being filed to fix a date for the hearing of the application to set aside the default judgment.  It is clear that by making those orders, the Court identified that Advocate Garrood was in a hopeless position as counsel; he had material evidence to give personally, and he could not be both advocate and witness.

24.  In the event, nothing happened for nearly twelve months.  In November 2020, the Plaintiff, through his advocate, gave notice of a date fix appointment with the Judicial Secretary for the purposes of hearing an application that the summons to set aside the default judgment be struck out for failure to comply with the order of the Court of 10th December 2019.  Advocate Pallot indicated that he was not instructed, and a date was fixed for the hearing of the Plaintiff's application on 22nd January 2021.  On 20th January 2021, a copy of Advocate Garrood's affidavit of the same day was provided to the Plaintiff.  This led to the adjournment and / or withdrawal of the Plaintiff's summons and the fixing of 30th March as the date upon which the Defendant's application to set aside the default judgment would be heard.  There is no doubt that the Defendant, which received notice of the default judgment no later than December 2017 (and we think on the balance of probabilities in fact received that notice no later than January 2017) is responsible for the delay in taking forward the application to set aside the default judgment from December 2017.  In his submissions, Advocate Pallot suggested that the Plaintiff was also at fault – he put it that it was, as it were, a score draw. The basis for this submission was that the Plaintiff could have taken steps earlier to bring on the Defendant's summons for hearing.  We reject that submission.  It is clear to us that if the Plaintiff had not fixed a date for the hearing of his summons to strike out the Defendant's summons to have the default judgment set aside, no steps would have been taken by the Defendant in this case. Advocate Garrood had by this stage left Messrs Carey Olsen, and no one else in that firm had been instructed.

25.  The delay in applying to set aside the default judgment is in our view entirely down to the Defendant, probably from January 2017 but at least from December 2017, and furthermore the delay from December 2018 is down to the failure of the Defendant to comply with an order of the Court.  We have taken this issue of delay very much into account for the purposes of exercising our discretion.

**Prejudice**

26.  We turn next to the question of prejudice to Defendant and Plaintiff depending on whether we set aside the default judgment or not.  As far as the Defendant is concerned, there is clearly the prejudice that a judgment in the sum of £505,000 with interest and costs has been awarded against it.  That is a prejudice, and it stands alongside the contention of Advocate Pallot that the merits of the claim to that sum of money have never been adjudicated because it was a default judgment. We do not accept the claim of Advocate Pallot that the Plaintiff has taken $34 million, approximately, to which he is not entitled.  There is no sufficient evidence of that contention, and we disregard it.  The purpose of making that submission was, we think, to suggest that one of the reasons for the delay was that all assets had been removed from the Defendant.  However, there is no financial information provided by the Defendant to enable us to reach that conclusion. Furthermore, we accepted the submission of Advocate Jones that the absence of funds did not apparently mean that the Defendant could not continue litigating in California, and indeed possibly

in the Isle of Man.  Accordingly, we take the prejudice of the Defendant to be the existence of the default judgment.

27.   The prejudice to the Plaintiff does not directly lie in the removal of a judgment in his favour when there has never been any trial on the merits, albeit that any litigation carries with it pressure and stress for the litigants, especially individual litigants.  The prejudice which is asserted here however is that in the interval between the taking of the default judgment and the hearing of the application to have it set aside, steps have been taken elsewhere in reliance upon the existence of that judgment.  Those steps respectively have been taken in California and in the Isle of Man.

28.   We are not convinced that the Isle of Man proceedings would be adversely affected by the setting aside of the default judgment in Jersey.  We have read the affidavit of Mr Buck carefully, but it is not obvious to us that there is a connection between the setting aside of the default judgment and any downside in the Plaintiff's proceedings in the Isle of Man.

29.   On the other hand, there is in our judgment a serious potential downside in relation to the proceedings in California.  Since December 2017, these have proceeded on the pleaded basis of a judgment obtained by the Plaintiff against the Defendant in Jersey.  This is part of the factual matrix which, so he claims, led the Plaintiff to determine it necessary to dissolve the alleged partnership between him and Mr Sabadash and apply its assets towards its debts, including the sums due to the Plaintiff.  As Advocate Jones put it, the ship has sailed for the purposes of setting aside a judgment and it no longer lies in the Defendant's mouth to criticise what has happened to date, because that judgment has been deployed in proceedings elsewhere.

30.   We have a discretion to exercise and we have considered all the material which has been put before us.  In our judgment, the Defendant comes far too late to bring this application to Court.  It has not brought the application soon enough and, having brought it, has not proceeded with it expeditiously.  It is said by Advocate Pallot that the Plaintiff has made no attempt to enforce the judgment in the meantime, but we do not think that is necessarily the case – there may have been no enforcement in Jersey, but in practice the judgment appears to have been part of the case taken by the Plaintiff in California over the last two years.  Looking at the overall justice of the position, which we are required to do, we think it is impossible to say that it is necessarily unjust to the Defendant to allow the default judgment to stand.  It may be difficult to say where the merits of the Plaintiff's substantive claim against the Defendant in Jersey lie.  We think it is right to describe the Defendant as having an arguable defence, but there is no knock out blow with it.  On the other hand, it has prevaricated for years and defaulted on performance of an order of the Court for over a year.  In those circumstances, given the prejudice to the Plaintiff which we accept in relation to the Californian proceedings, we think it is right to refuse the application to set aside the default judgment and that application accordingly is dismissed.

# Exhibit G

1   MICHAEL ZORKIN (Bar No. CA 313308)
    THE ZORKIN FIRM
2   Email: mz@thezorkinfirm.com
    6320 Canoga Ave., 15th Floor
3   Woodland Hills, California 91367
    Telephone:  323.493.8075
4
    Attorneys for Defendant and Counterclaim
5   Plaintiff Golden Sphinx Limited

6

7

8                 UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10

11  Garry Y. Itkin, an individual,            No.  2:21−cv−04907 JAK (RAOx)

12              Plaintiff,                     Assigned to Hon. John A. Kronstadt

13       v.                                    **GOLDEN SPHINX'S FIRST
                                               AMENDED COUNTERCLAIMS
14  Golden Sphinx Limited, a limited          AGAINST GARRY Y. ITKIN**
    liability company incorporated in the
15  Isle of Jersey; and Does 1-10, inclusive
                                               Complaint Filed: June 16, 2021
16              Defendant.

17  Golden Sphinx Limited, a limited
    liability company incorporated in the
18  Isle of Jersey,

19              Counterclaim Plaintiff,

20       v.

21  Garry Y. Itkin, an individual; and Does
    1-10, inclusive
22
                Counterclaim
23              Defendant.

24

25

26

27

28


THE ZORKIN FIRM    (1)

GOLDEN SPHINX'S FIRST AMENDED
COUNTERCLAIMS
CASE NO. 2:21−CV−04907 JAK (RAOX)

Counterclaim Plaintiff Golden Sphinx Limited alleges as follows:

## I.
## JURISDICTION AND VENUE

1.      Diversity jurisdiction exists under 28 U.S.C §§ 1332(a)(2), because Golden Sphinx is a citizen of a foreign state (Isle of Jersey), Mr. Itkin is a citizen of California, and the amount in controversy exceeds $75,000, exclusive of costs and interest.

2.      Further, this Court has supplemental jurisdiction over the Counterclaims under 28 U.S.C. § 1367.

3.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Mr. Itkin resides in Los Angeles County, CA.

## II.
## THE PARTIES

4.      Counterclaim Plaintiff Golden Sphinx Limited is a corporation organized and existing under the laws of the Isle of Jersey.

5.      Counterclaim Defendant Mr. Itkin is an individual residing in the State of California, County of Los Angeles.

6.      The true names and capacities, whether individual, corporate, associate or otherwise of Defendants, Does 1 through 10, inclusive, are unknown to Golden Sphinx, who therefore sues these Defendants by fictitious names.  Golden Sphinx will amend this Complaint to show the true names and capacities of such fictitiously named Defendants once learned.  Golden Sphinx is informed and believes, and based thereon alleges, that each of the fictitiously named Defendants was involved in some or all of the wrongful conduct alleged and that Golden Sphinx's rights against the fictitiously named Defendants arise from such conduct.

## III.
## COMMON ALLEGATIONS

7.     This case is about Mr. Itkin, a disgraced former director of Golden Sphinx, and his campaign of fraud against Golden Sphinx and its owners, the Sabadash family.

8.     In the mid-nineties, Mrs. Sabadash created a family trust to protect the family's assets in the U.S. and overseas.  This is an irrevocable, discretionary trust, meaning that only the trustees, and not the beneficiaries, are allowed to dispose of trust property (with the view of the best interest of the beneficiaries).  The trustees formed Golden Sphinx to be one of the companies underlying the trust and holding trust assets.  The shareholders of Golden Sphinx and trustees of the trust were a professional Isle of Jersey trust corporation.   The Sabadash family are the beneficiaries of the trust.

9.     The Sabadash family was introduced to Mr. Itkin as an accountant and Mr. Itkin began preparing the family's taxes in California.  Later, Mr. Sabadash asked Mr. Itkin to work for him as an accountant and financial manager.  Mr. Itkin readily accepted because the salary that Mr. Sabadash offered greatly exceeded Mr. Itkin's earnings in his tax practice.

10.     For many years, Mr. Itkin worked for Mr. Sabadash as an accountant and financial manager.  To allow Mr. Itkin to carry out his functions, Mr. Itkin was appointed to the board of directors of Golden Sphinx.  Later, Mr. Itkin became the sole director.  In his fiduciary function as a director, Mr. Itkin had access to bank accounts of Golden Sphinx, (and other corporations that he managed.)  Mr. Itkin was authorized make payments on behalf of Golden Sphinx for routine business needs for the benefit of the Sabadash family trust.  Mainly, as related to Golden Sphinx, Mr. Itkin ensured the family's expenses and bills were paid.  Mr. Itkin has never had any ownership interest in any of the Sabadash companies or assets.

11.     Mr. Itkin was fired when the Sabadash family learned that Mr. Itkin has started a scheme to secretly take over the family's assets.  This wide-reaching

GOLDEN SPHINX'S FIRST AMENDED
COUNTERCLAIMS
CASE NO. 2:21−CV−04907 JAK (RAOX)

1   operation involved several entities related to Mr. Sabadash, including Golden

2   Sphinx.  Among other things, Mr. Itkin,

3        a)    Over the period of many years, misappropriated Golden

4             Sphinx's funds for his own benefit.  Golden Sphinx is informed

5             and believes that Mr. Itkin took for himself many millions of

6             dollars from Golden Sphinx's bank accounts;

7        b)    Secretly transferred to himself promissory notes issued to

8             Golden Sphinx worth millions;

9        c)    Created a secret employment agreement that he signed on behalf

10             of all parties promising himself £15,000 per month for no more

11             than ten hours of work;

12        d)    Created a secret promissory note that he signed on behalf of all

13             parties purporting to allow Mr. Itkin to transfer every single

14             asset Golden Sphinx may own or later acquire if Mr. Itkin's self-

15             awarded director's fees are not paid;

16        e)    Based on the secret employment agreement, sued Golden

17             Sphinx in the Isle of Jersey, failed to properly serve the

18             company, failed to notify the trustees or the beneficial owners,

19             instructed an attorney who questioned Mr. Itkin about the

20             propriety of the suit not to appear in court, and obtained a

21             default judgment against Golden Sphinx (this is the basis for Mr.

22             Itkin's Complaint);

23        f)    Most egregiously, Mr. Itkin transferred to himself the shares of

24             Golden Sphinx's subsidiary company, New Albion Property

25             Limited.  New Albion owns the Sabadash family home, where

26             Mrs. Sabadash and her children have lived since 2004.  Golden

27             Sphinx is informed and believes that the family home is worth

28

over $40,000,000.  Mr. Itkin now holds himself out as the owner of New Albion.  Mr. Itkin claims that he transferred the shares to himself under the default judgment but, in reality, he did so three months before suing Golden Sphinx.

12.    This is just a sampling of Mr. Itkin's improper conduct as only Mr. Itkin knows the full extent of his scheme.

13.    At no point did Mr. Itkin inform the shareholders of Golden Sphinx, the trustees of the trust, or the Sabadash family of his actions.  Once the fraud and breaches of fiduciary duty committed by Mr. Itkin came to light, the trustees of the trust removed Mr. Itkin from the board of Golden Sphinx.  Mr. Itkin was also removed from all other fiduciary positions with the Sabadash affiliated companies.

14.    Once Mr. Itkin was removed as director, he was required to return all records and books of Golden Sphinx to his successor but has not done so.  By not returning the books and records, Mr. Itkin prevented the next director, shareholders, and trustees from discovering Mr. Itkin's dishonest acts.

15.    Golden Sphinx is thus entitled to a setoff and recoupment against any judgment that may be entered against it on the Complaint, damages, restitution, an accounting and imposition of a constructive trust over all money and property obtained by Mr. Itkin, as well as delivery up of all property of Golden Sphinx held by Mr. Itkin.

**IV.**
**COUNTERCLAIM PLAINTIFF'S CLAIMS**

**FIRST CAUSE OF ACTION**
**FOR A SET OFF**

16.    Golden Sphinx incorporates by reference the allegations in Paragraphs 1-15 as though set forth in full below.

17.    Without conceding that any act of Golden Sphinx harmed Mr. Itkin or any other person in any respect, or the validity of the default judgment and

THE ZORKIN FIRM

GOLDEN SPHINX'S FIRST AMENDED
COUNTERCLAIMS
CASE NO. 2:21−CV−04907 JAK (RAOX)

agreements described in the Complaint, Golden Sphinx has a right to offset and recoup against any judgment that may be entered against it on all obligations of Mr. Itkin owing to Golden Sphinx.

18.    Set off and recoupment are appropriate because of Mr. Itkin's actions, including, but not limited to, Mr. Itkin's misappropriations of Golden Sphinx's money and property to his own benefit.

19.    As an example, Mr. Itkin was the authorized signatory of the bank accounts belonging to Golden Sphinx, but never the account owner.  Mr. Itkin transferred to himself, and to corporations under Mr. Itkin's control, millions of dollars from Golden Sphinx's bank accounts.  No part of Golden Sphinx's money has ever belonged to Mr. Itkin.

20.    Mr. Itkin concealed the illicit transfers and the full extent of the amounts taken.  The dates and amounts of every misappropriation is known only to Mr. Itkin and not to Golden Sphinx.

21.    As another example, Mr. Itkin transferred from Golden Sphinx to himself shares of a corporation that owns the Sabadash family home that is worth millions.

22.    Mr. Itkin has never had any ownership interest in Golden Sphinx or its property.  Mr. Itkin has never been a shareholder of Golden Sphinx.  Golden Sphinx is, and at all times was, an asset of the Sabadash family trust.  Mr. Itkin has never been a trustee, a beneficiary, or the settlor of the trust.

23.    Finally, Golden Sphinx has sued Mr. Itkin in California state court for, among other things, breach of fiduciary duty, fraudulent concealment, and conversion.  The trial in that matter is set for Dec. 6, 2021.  If Golden Sphinx obtains a money judgment against Mr. Itkin in state court, it will offset against any judgment obtained by Mr. Itkin in this case.

24.    As a result of Mr. Itkin's conduct, Golden Sphinx was harmed in an

1    amount greater than $75,000 to be established at trial.

2        25.    Further facts related to Mr. Itkin's conduct are within the knowledge

3    of Mr. Itkin and are unknown to Golden Sphinx.

4        26.    Accordingly, if this Court recognizes the foreign judgment in

5    California, Golden Sphinx is entitled to setoff and recoup against that judgment for

6    money and property Mr. Itkin wrongfully took from Golden Sphinx.  If Golden

7    Sphinx proves that its claim against Mr. Itkin exceeds the value of Mr. Itkin's

8    claim, Golden Sphinx is entitled to affirmative relief.

9
10

**SECOND CAUSE OF ACTION**
**FOR UNJUST ENRICHMENT**

11   27.    Golden Sphinx incorporates by reference the allegations in Paragraphs

12   1-25 as though set forth in full below.

13       28.    Mr. Itkin was entrusted with access to the bank accounts of Golden

14   Sphinx and in this way received money that belonged to Golden Sphinx and was

15   intended to be used for the benefit of Golden Sphinx.

16       29.    Mr. Itkin took Golden Sphinx's money and did not use it for the

17   benefit of Golden Sphinx.  Mr. Itkin has not given the money to Golden Sphinx, the

18   owners of Golden Sphinx, or the beneficiaries of the trust to which Golden Sphinx

19   belongs.  Instead, Mr. Itkin used Golden Sphinx's money for his own benefit.

20       30.    Mr. Itkin concealed and continues to conceal the full extent of his

21   misappropriations from Golden Sphinx.  The dates and amounts of every

22   misappropriation is known only to Mr. Itkin and not to Golden Sphinx.

23       31.    Mr. Itkin also transferred property of Golden Sphinx to himself,

24   including, but not limited to, corporate shares and promissory notes.

25       32.    In this way, Mr. Itkin has been unjustly enriched at the expense of

26   Golden Sphinx.  As described above, there was no legal basis for Mr. Itkin to enrich

27   himself at the expense of Golden Sphinx and it would be unjust to permit Mr. Itkin

28   to retain the money and property he took from Golden Sphinx while allowing Mr.

THE ZORKIN FIRM

7

GOLDEN SPHINX'S FIRST AMENDED
COUNTERCLAIMS
CASE NO. 2:21-CV-04907 JAK (RAOX)

Itkin to enforce a default judgment against Golden Sphinx. Mr. Itkin must restore to Golden Sphinx the money and property he wrongfully acquired and kept.

33.    As a result of Mr. Itkin's conduct, Golden Sphinx was harmed in an amount greater than $75,000 to be established at trial.

## V.
## PRAYER FOR RELIEF

Golden Sphinx prays for judgment against Mr. Itkin:

1.    Compensatory damages in an amount to be proven at trial but not less than this Court's jurisdictional limit;

2.    A setoff and recoupment against any judgment entered on the Complaint;

3.    Disgorgement of ill-gotten profits or gains received by Mr. Itkin;

4.    For an accounting of all moneys and property of Golden Sphinx obtained by Mr. Itkin;

5.    For restitution for unjust enrichment of Mr. Itkin at the expense of Golden Sphinx;

6.    For delivery of Golden Sphinx's property held by Mr. Itkin, including, but not limited to, the shares of New Albion Property Limited and books and records of Golden Sphinx;

7.    Imposition of a constructive trust on all improperly obtained gains, including all moneys obtained by Mr. Itkin and the shares of New Albion Property Limited;

8.    For costs of suit;

9.    For any other relief available at law or equity; and

10.    For such other further relief as the Court may deem just and proper.


THE ZORKIN FIRM

8

GOLDEN SPHINX'S FIRST AMENDED
COUNTERCLAIMS
CASE NO. 2:21-CV-04907 JAK (RAOX)

Dated:      October 25, 2021          THE ZORKIN FIRM


                                      By:/s/ Michael Zorkin
                                         Michael Zorkin
                                         Attorneys for Defendant and
                                         Counterclaim Plaintiff Golden
                                         Sphinx Limited

# Exhibit H

**GOLDEN SPHINX LIMITED**

**(Company No. 78090)**

**(the "Company")**

I, the undersigned, being the sole director of the Company at the date when the following resolutions are deemed passed, note the following matters and pursuant to Article 90 of the Articles of Association of the Company **HEREBY RESOLVE** that the following resolutions be and are hereby approved and such resolutions shall be as valid and effective for all purposes as resolutions passed at a meeting of the directors of the Company duly convened and held, such resolutions being deemed to be passed when this instrument is signed:

1. **PURPOSE OF THESE RESOLUTIONS**

1.1     It is noted that the purpose of these resolutions is to:

   1.1.1     approve the written resolutions to be proposed to the Shareholders (the "**Shareholder Resolutions**");

   1.1.2     approve the report to be laid before the meeting of creditors (the "**Report**");

   1.1.3     approve the statement of affairs to be presented to the meeting of creditors (the "**Statement of Affairs**") and authorise the swearing of an affidavit verifying the same; and

   1.1.4     to appoint a director to chair that meeting.

1.2     the Shareholder Resolutions are that:

   1.2.1     the Company be wound up in accordance with Chapter 4 of Part XXI of the Companies (Jersey) Law 1991; and

   1.2.2     Andrew Wood and Alexander Adam, of Teneo Financial Advisory Limited of Forum 3, Grenville Street, St Helier, Jersey, JE2 4UF be and are hereby nominated as Joint Liquidators for the purposes of such winding up.

2. **DIRECTORS' INTERESTS**

2.1     It is noted that, pursuant to Articles 91 and 92 of the Articles of Association, any director of the Company who has, directly or indirectly, an interest in a transaction entered into or proposed to be entered into by the Company or by a subsidiary of the Company which to a

1

material extent conflicts or may conflict with the interests of the Company and of which the director is aware, is required to disclose to the Company the nature and extent of the director's interest and all such interests have already been disclosed.

2.2    It is noted that, notwithstanding such interests, each of the directors are entitled vote on these written resolutions pursuant to Article 30 of the Articles of Association.

3.    **DOCUMENTS**

3.1    The Director noted and confirmed that she has received and reviewed:

    3.1.1    the Shareholder Resolutions;

    3.1.2    the Report; and

    3.1.3    the Statement of Affairs and the verifying affidavit.

4.    **RESOLUTIONS & AUTHORISATIONS**

    **IT IS RESOLVED** that:

4.1    the Shareholder Resolutions were in proper form and are approved;

4.2    the Statement of Affairs is a proper and accurate statement of the financial affairs of the Company, and is approved;

4.3    the director is authorised to swear an affidavit verifying the Statement of Affairs;

4.4    the Report is a proper reflection of all relevant facts and matters relating to the position of the Company and is approved for presentation to the meeting of creditors; and

4.5    the director should chair the meeting of creditors.

**Director**

Name:  Mrs Larisa Sabadash

Date:    5·7·22

2

# Exhibit I

**JTC Services Limited**

(the "**Company**")

Minutes of a meeting of the Directors of the Company in nominee for JTC Trust Company Limited (as trustee of the Amber Trust or Successor Trust) held at 28 Esplanade, St.Helier, Jersey JE2 3QA on the 6th day of July 2022 (the "**Meeting**").

| | | |
|---|---|---|
| Present | : | Mark Christopher Woodford |
| | | Jodi Hill  *JH* |

**Chairman**

Mark Christopher Woodford was elected to take the Chair.

**Notice and Quorum**

**IT WAS NOTED THAT** the Meeting had been duly convened in accordance with the Company's Articles of Association (the "**Articles**") and that a quorum was present.

**Directors' Interests**

In accordance with the provisions of all relevant laws and the Company's Articles the Directors considered whether there were any interests to be disclosed in relation to the matters to be discussed at the Meeting there were no interests to disclose.

**APPROVAL OF SHAREHOLDER RESOLUTION – WINDING UP OF GOLDEN SPHINX LIMITED**

The Meeting was reminded that the Company is a nominee shareholder for JTC Trust Company Limited (as trustee of the Amber Trust or Successor Trust) for its 100% shareholding in Golden Sphinx Limited.

**IT WAS NOTED** that the Chairman tabled to the Meeting a shareholder resolution in order to confirm that Golden Sphinx Limited be wound up and that Andrew Wood and Alexander Adam of Teneo Financial Advisory Limited of Forum 3, Grenville Street, St Helier, Jersey, JE2 4UF be and are hereby nominated as Joint Liquidators for the purposes of such winding up. This forms part of the wider process to retain control of the underlying property held within New Albion and distribute this to Larissa Sabadash, who currently resides in the property (the "**Resolution**").

**IT WAS FURTHER NOTED** that the purpose of the Meeting was to consider, review and if thought fit, approve the Resolution.

After due and careful consideration, **IT WAS RESOLVED** that the Resolution be and is hereby approved.

**Conclusion**

There being no further business, the Chairman declared the Meeting closed.

_____
**Chairman**

# Exhibit J

**JTC Nominees Limited**

(the "**Company**")

Minutes of a meeting of the Directors of the Company in nominee for JTC Trust Company Limited (as trustee of the Amber Trust or Successor Trust) held at 28 Esplanade, St.Helier, Jersey JE2 3QA on the 6th day of July 2022 (the "**Meeting**").

| Present | : | Mark Christopher Woodford |
|---|---|---|
| | | Jodi Hill *JH* |

**Chairman**

Mark Christopher Woodford was elected to take the Chair.

**Notice and Quorum**

**IT WAS NOTED THAT** the Meeting had been duly convened in accordance with the Company's Articles of Association (the "**Articles**") and that a quorum was present.

**Directors' Interests**

In accordance with the provisions of all relevant laws and the Company's Articles the Directors considered whether there were any interests to be disclosed in relation to the matters to be discussed at the Meeting there were no interests to disclose.

**APPROVAL OF SHAREHOLDER RESOLUTION – WINDING UP OF GOLDEN SPHINX LIMITED**

The Meeting was reminded that the Company is a nominee shareholder for JTC Trust Company Limited (as trustee of the Amber Trust or Successor Trust) for its 100% shareholding in Golden Sphinx Limited.

**IT WAS NOTED** that the Chairman tabled to the Meeting a shareholder resolution in order to confirm that Golden Sphinx Limited be wound up and that Andrew Wood and Alexander Adam of Teneo Financial Advisory Limited of Forum 3, Grenville Street, St Helier, Jersey, JE2 4UF be and are hereby nominated as Joint Liquidators for the purposes of such winding up.  This forms part of the wider process to retain control of the underlying property held within New Albion and distribute this to Larissa Sabadash, who currently resides in the property (the "**Resolution**").

**IT WAS FURTHER NOTED** that the purpose of the Meeting was to consider, review and if thought fit, approve the Resolution.

After due and careful consideration, **IT WAS RESOLVED** that the Resolution be and is hereby approved.

**Conclusion**

There being no further business, the Chairman declared the Meeting closed.

_____
**Chairman**

#VPF:FRQ162678#

Exhibit K

**GOLDEN SPHINX LIMITED**

**(Company No. 78090)**

**(the "Company")**

Minutes of a meeting of the Creditors of the Company held at 28 Esplanade, St Helier, Jersey JE2 3QA on the 7th day of July 2022 (the "Meeting").

| Present: | Mrs Larisa Sabadash – Director by video link |
|---|---|
| | Mr Conrad Stampfli – By video link |
| | JTC Law – By proxy held by Mr Conrad Stampfli |
| | Mrs Larisa Sabadash (as creditor) – By proxy held by Mr Conrad Stampfli |
| | JTC (Jersey) Limited – By proxy held by Mr William Byrne in person |
| In attendance | Advocate Jeremy Garrood – JTC Law in person |
| | Mr Andrew Wood – Teneo Financial Advisory Limited by video link |

**CHAIRMAN**

1. Mrs Larisa Sabadash chaired the meeting.

**NOTICE AND QUORUM**

2. It was noted that the Meeting had been duly convened in accordance with the Companies (Jersey) Law 1991 (the "Law") and that a quorum was present.

**PURPOSE OF THE MEETING**

3. The purpose of the Meeting was to report on the affairs of the Company and to appoint liquidators for the Company. The Company nominated Andrew Wood and Alexander Adam to be its liquidators.

4. The Chairman noted the following for the benefit of those present:

   (i) The Company is a company incorporated in Jersey with company number 78090 with its registered office at Suite 3, Burlington House, St. Saviour's Road, St. Helier, JE2 4LA, Jersey.

   (ii) The director had sworn an affidavit verifying the Statement of Affairs which was tabled before the Meeting.

1

   (iii)   The director and the shareholders, having reasonably and properly formed the view that the Company is insolvent within the meaning of the Law, and had each resolved to and had commenced a creditors' winding up process within the meaning of Part 21 Chapter 4 of the Law, in accordance with their obligations under the Law.

   (iv)   The Statement of Affairs shows that the Company has liquid or readily converted assets of £2 and liabilities of £ 2,248,011.80, and is insolvent.

**PROPOSAL AND NOMINATION**

5.    The Company proposed that Andrew Wood and Alexander Adam, of Teneo Financial Advisory Limited, Forum 3, Grenville Street, St Helier, Jersey, JE2 4UF should be and they were nominated as Joint Liquidators for the purposes of such winding up.

6.    The Director invited the Creditors to propose an alternative liquidator. but none was nominated.

**RESOLUTIONS**

7.    The creditors unanimously resolved that:

   (i)   Andrew Wood and Alexander Adam, of Teneo Financial Advisory Limited, Forum 3, Grenville Street, St Helier, Jersey, JE2 4UF should be and were appointed as Joint Liquidators for the purposes of such winding up the Company.

8.    The creditors further unanimously resolved that:

   (i)   the remuneration of the Joint Liquidators should be fixed on the basis of time spent by time and their staff in attending to matters arising prior to and during the winding up of the Company plus disbursements and GST if applicable; and

   (ii)   any act required or authorised to be done by the Joint Liquidators may be done by them jointly or by either of them acting alone.

9.    There being no other business for the Meeting, the Meeting was closed.

Signed _____

Mrs Larisa Sabadash, Chairman

2

Exhibit L

Jon A. Atabek SBN 269497
(jatabek@atabeklaw.com)
**MOLNAR ATABEK LLP**
610 Newport Center Dr., Ste. 420
Newport Beach, CA 92660
Tel: (213) 394-5943
Fax: (213) 402-3413

Boris Treyzon, Esq. (SBN 188893)
(btreyzon@actslaw.com)
Scott E. McClain, Esq. (SBN 265412)
(semcclain@actslaw.com)
**ABIR COHEN TREYZON SALO, LLP**
16001 Ventura Blvd, Suite 200
Encino, CA 91436
Telephone  (424) 288-4367
Facsimile   (424) 288-4368

Attorneys for Defendant and Cross-Complainant
GARRY Y. ITKIN

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| AFB TRADING ONE, INC., a California corporation; M-BJEP LIMITED, an Isle of Man corporation; M-NICE an individual, an Isle of Man corporation, | Case No.: BC647351<br>[Assigned: Michael L. Stern, Dept. 62]<br><br>**DEFENDANT GARRY Y. ITKIN'S NOTICE OF MOTION AND MOTION TO BIFURCATE OR, IN THE ALTERNATIVE, TO DETERMINE PROPER VENUE, OR, DISMISS FOR FORUM NON CONVENIENS** |
|        Plaintiffs, | |
| v. | |
| GARRY Y. ITKIN, an individual; and DOES 1 through 40, inclusive, | |
|        Defendants. | Date: October 11, 2022<br>Time: 9:00 a.m. |
| AND RELATED CROSS-CLAIMS | Dept.: 62<br>Reservation ID: 076240934476<br><br>Complaint Filed: April 5, 2017<br>Trial Date:    August 22, 2022<br><br>Code of Civil Procedure § 397 |

DEFENDANT GARRY Y. ITKIN'S NOTICE OF MOTION AND MOTION TO BIFURCATE OR, IN THE ALTERNATIVE, TO DETERMINE PROPER VENUE, OR, DISMISS FOR FORUM NON CONVENIENS

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

     **PLEASE TAKE NOTICE** that on October 11, 2022 at 9:00 a.m. in Department 62 of the Superior Court for the State of California, County of Los Angeles, Stanley Mosk Courthouse, located at 111 North Hill Street, Los Angeles, California 90012, Defendant GARRY Y. ITKIN ("Defendant" or "Itkin"), by and through his counsel of record, will and hereby does move the Court for an order bifurcating trial in this matter to proceed in the first phase solely on the causes of action in Itkin's Second Amended Cross-Complaint, or in the alternative, determining proper venue, staying, or dismissing certain claims on the grounds of forum non conveniens (the "Motion").

     As grounds, the current status of several of the plaintiff entities is so uncertain that it does not make sense to proceed on those Plaintiff's claims until the uncertainties are resolved. Two of the Plaintiffs in this action, Golden Sphinx Limited and M-BJEP Limited, are the subject of liquidation proceedings in the Isle of Jersey and the Isle of Man, respectively, where those entities were formed. A third Plaintiff, New Albion Property Limited, is poised to commence winding up proceedings in the United Kingdom. Golden Sphinx has, in the meantime, filed largely identical litigation against Itkin in the Isle of Jersey, where that entity has declared the Isle of Jersey the sole proper venue for those claims. Itkin still maintains claims in both sets of liquidation proceedings, including on an unappealable money judgment rendered by the Royal Court of Jersey in 2014 that remains unpaid.

     In comparison, Itkin's partnership/fiduciary duty claim against Sabadash is straight forward and would help to resolve significant portions of the other claims pending abroad. It merely seeks money damages against Sabadash, and a judicial determination regarding the existence of the partnership. Those claims clearly belong in California, where the partnership was formed. And such findings would inevitably help to resolve the foreign claims.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

DEFENDANT GARRY Y. ITKIN'S NOTICE OF MOTION AND MOTION TO BIFURCATE OR, IN THE
ALTERNATIVE, TO DETERMINE PROPER VENUE, OR, DISMISS FOR FORUM NON CONVENIENS

This Motion is based on this Notice of Motion and Motion, the moving papers, any opposing and reply papers, the declarations and evidence submitted therewith, any oral argument that may be received, and the Court's own file and records.

Respectfully Submitted,

Dated:  July 28, 2022

MOLNAR ATABEK, LLP
ABIR COHEN TREYZON SALO, LLP

By: _____

JON ATABEK
BORIS TREYZON
Attorneys for Defendant
GARRY Y. ITKIN

DEFENDANT GARRY Y. ITKIN'S NOTICE OF MOTION AND MOTION TO BIFURCATE OR, IN THE
ALTERNATIVE, TO DETERMINE PROPER VENUE, OR, DISMISS FOR FORUM NON CONVENIENS

## I.    INTRODUCTION

This matter is a partnership dispute—in exchange for a one-third partnership interest, Itkin modernized a budding vodka business in Russia, and turned it into a multi-industry conglomerate worth billions. But his partner, Alexander Sabadash ("Sabadash"), squandered that fortune through ill-advised and illegal activity in violation of fiduciary duties he owed to Itkin. Itkin took steps to secure his claims against his former business partner, both domestically and abroad, and Sabadash responded in kind. The result is a complicated, international litigation landscape.

For instance, Itkin obtained a foreign money judgment against Plaintiff Golden Sphinx in the Isle of Jersey, where Golden Sphinx was formed. After Golden Sphinx exhausted all efforts (and failed) to set aside that judgment, Itkin sought to domesticate that judgment in California. Since then, Golden Sphinx filed its own, separate lawsuit against Itkin in the Isle of Jersey, for many of the same claims asserted in this lawsuit, taking the position in that lawsuit that the Isle of Jersey is the *only* appropriate venue for those claims to be heard. Adding complexity, Golden Sphinx then filed for liquidation (the Jersey equivalent of bankruptcy—a fact which Golden Sphinx has failed to give notice of in this litigation). The liquidator in that action has yet to appoint counsel in California, decide whether to continue with this litigation, or otherwise take action to pay, settle, or resist Itkin's now-unappealable judgment in the Isle of Jersey.

Similarly, Itkin asserted claims in the Isle of Man against two private jets registered in the Isle of Man, owned by Plaintiffs M-NICE and M-BJEP—both of which are Limited Companies registered in the Isle of Man. Since then, M-BJEP was put into involuntary liquidation in the Isle of Man (again, M-BJEP has failed to give this Court proper notice). That liquidation is still pending. And while the liquidator did initially appoint the Manatt firm to represent M-BJEP, the former sole board member of M-BJEP, Larissa Sabadash, lacking any authority, purported to substitute out the Manatt firm for the most-junior member of that litigation team, Michael Zorkin. The question of who properly represents M-BJEP has not yet been resolved. Moreover, M-BJEP is presently the subject of an Order to Show Cause re: Terminating Sanctions in light of M-BJEP's improper assertion of boilerplate objection in response to discovery, and its counsel apparently being unable to communicate with his client.

Further, a lawsuit for a judicial determination regarding New Albion's ownership and control was filed in the United Kingdom, where that entity is incorporated. Golden Sphinx's liquidator in the Isle of Jersey has indicated they may intervene in that action. The complexity of this tapestry of foreign litigation cannot be overstated. The procedural posture and potential effect of those foreign proceedings renders the domestic fate of the Plaintiffs' claims uncertain.

Conversely, Itkin's cross-claims here in California are relatively simple. Itkin's Second Amended Cross-Complaint ("Cross-Complaint") against Sabadash seeks damages and declaratory relief for various personal causes of action related to the partnership. Those claims are against Sabadash, personally, and are not affected by any of the international litigation.

Trial in this matter should be bifurcated into two phases: first, trying Itkin's cross-claims against Sabadash; and second, any remaining claims against Itkin. Bifurcating this matter promotes judicial economy, because finding the existence of a partnership and resolution of the foreign proceedings would resolve most, if not all of Plaintiffs' competing claims. Doing so will also address Golden Sphinx's assertion that its claims in this action do not belong here, but rather before the Royal Court of Jersey. The doctrine of international comity suggests a stay on Plaintiff's claims is proper, while Itkin's personal claims against Sabadash move forward. Doing so will allow this Court to reduce the complexity of the litigation while ensuring the parties do not run afoul of international law and impact the foreign liquidation and winding up proceedings.

Accordingly, Itkin respectfully requests that this Court bifurcate the trial to hear his cross-claims against Sabadash, and to stay the remainder of the litigation until the impact of the foreign liquidations and winding up proceedings can be determined. In the alternative, Itkin requests this Court stay the entire matter for improper venue or dismiss the claims of Golden Sphinx. Finally, should this Court deny Itkin's motion to bifurcate and stay based on improper venue, Itkin seeks a determination that this is not the most convenient forum for this matter.

## II.    LEGAL STANDARD

### A.    This Court may bifurcate the claims and try Itkin's cross-complaint first.

Pursuant to Code of Civil Procedure § 598, this Court "may, when the convenience of witnesses, the ends of justice, or the economy and efficiency of handling the litigation would be promoted thereby … make an order … that the trial of any issue or any part thereof shall preced the trial of any other issue or any part thereof in the case." This Court may order bifurcation so long as the pretrial conference has not been held. (*Id*.)[1]

The objective of section 598 is to avoid wasting the Court's time and resources trying issues that ultimately are irrelevant or improper. (*See, e.g., Trickey v. Sup. Ct. Sacramento Cty.* (1967) 252 Cal.App.3d 650). Although initially enacted to bifurcate issues of liability and damages, the principal of judicial economy and maintenance of the Court's and parties' resources

---

[1] Due to Plaintiffs' refusal to answer discovery, this Court continued the Final Status Conference until August 18, 2022.

1   applies to any issue subject to section 598. (*See, e.g., Foreman & Clark Corp. v. Fallon* (1971) 3
2   Cal.3d 875.)

3       Moreover, pursuant to Code of Civil Procedure § 1098, subsection b, this Court "in
4   furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to
5   expedition and economy, may order a separate trial of any cause of action."

6       Here, the unknown effects of the multiple international liquidations as well the uncertainty
7   of who actually represents M-BJEP in the liquidation make the bifurcation the most efficient use
8   of judicial resources.

9   **B.    In the alternative, this Court has the authority to stay this matter for
10          improper venue.**

11      Two statutes govern venue challenges. Challenges brought under Code of Civil Procedure
12  § 396 must be brought at the time of answer. However, venue challenges brought under Code of
13  Civil Procedure §397 may be filed at any time after commencement of the action. (*Walt Disney
14  Parks & Resorts U.S., Inc. v. Sup. Ct. (Galvan)* (2018) 21 Cal.App.5th 872, 879-880.)

15      On Itkin's timely motion, this Court may order a transfer of an action "when the court
16  designated in the complaint is not the proper court." (Code Civ. Proc., § 397 (a).) "Where, as here,
17  the Legislature has chosen to include a phrase in one provision of the statutory scheme, but to omit
18  it in another provision, we presume that the Legislature did not intend the language included in the
19  first to be read into the second." (*Disney, supra*, 21 Cal.App.5th at 879.) The Court further
20  concluded that the issue the trial court must decide is whether a venue challenge brought under
21  Section 397 is waived, not whether it was brought at the time of answer.

22      Additionally, there is no fixed time when an action may be transferred to promote justice,
23  and the trial court has the discretion to determine if the motion is timely based on the facts.
24  (*Cooney v. Cooney* (1944) 25 Cal.2d 202.) A motion for transfer operates as a stay to all
25  proceedings. (*Pickwick Stages System v. Sup. Ct.* (1934) 138 Cal.App. 448.)

26  **C.    In the alternative, this Court has the authority to determine this is not the
27          most convenient forum for this action.**

28      Forum non conveniens is a common law doctrine codified in Code of Civil Procedure
29  section 410.30. "When a court upon motion of a party or its own motion finds that in the interest
30  of substantial justice an action should be heard in a forum outside this state, the court shall stay or
31  dismiss the action in whole or in part on any conditions that may be just. (Code Civ. Proc., §
32  410.30 (a).)

33

DEFENDANT GARRY Y. ITKIN'S NOTICE OF MOTION AND MOTION TO BIFURCATE OR, IN THE
ALTERNATIVE, TO DETERMINE PROPER VENUE, OR, DISMISS FOR FORUM NON CONVENIENS

1   Forum non conveniens is an equitable doctrine "invoking the discretionary power of a

2   court to decline to exercise the jurisdiction it has over a transitory cause of action when it believes

3   that the action may be more appropriately and justly tried elsewhere." (*Stangvik v. Shiley Inc.*

4   (1991) 54 Cal.3d 744, 751.) This Court must first determine whether the alternative forum is a

5   suitable forum for trial. (*Id.*) Generally, an alternative forum is suitable if there is jurisdiction and

6   no statute of limitations bar to hearing the case on the merits. (*American Cemwood Corp. v.*

7   *American Home Assurance Co.* (2001) 87 Cal.App.4th 431.) That the law may be less favorable to

8   Plaintiff in the alternative forum is irrelevant. (*Guimei v. General Electric Co.* (2009) 172

9   Cal.App.4th 689, 696.)

10  **III.     BIFURCATION OF ITKIN'S COUNTER-CLAIMS FROM PLAINTIFFS' CLAIMS**

11  **IS ECONOMIC AND MORE EFFICIENT.**

12  The foreign liquidations of two Plaintiffs – M-BJEP and Golden Sphinx – have escalated

13  the difficulty of efficiently and effectively litigating against Plaintiffs' claims at this time. For

14  instance, Itkin has submitted to the jurisdiction of courts in both of those countries as a result of

15  his claims against M-BJEP and Golden Sphinx. Itkin cannot issue third party subpoenas or other

16  necessary action regarding those entities without violating stays of litigation in those countries.

17  Preparing for trial in this matter would put Itkin in legal jeopardy.

18  Additionally, Jersey law imposes an automatic stay on proceedings involving entities in

19  liquidation. "After the commencement of the winding up no action shall be taken or proceeded

20  with against the company except by leave of the court and subject to such terms as the court may

21  impose." (Companies (Jersey) Law 1991 (as amended), Official Consolidated Version, Article

22  159, subsection 4.) Therefore, subject to M-BJEP and Golden Sphinx's ongoing liquidations, as

23  well as the pending winding up of New Albion, only the foreign liquidator has the authority to

24  govern the direction of the litigation.

25  Accordingly, M-BJEP and Golden Sphinx's status as a result of the liquidations is

26  uncertain, as are the effects of the liquidations. The liquidator in the Isle of Jersey could yet

27  recognize Itkin's claims, settle the dispute, or authorize new or different counsel, but has barely

28  had enough time to familiarize themselves with the claims and issues currently pending. The

29  liquidator in the Isle of Man, conversely, has apparently stopped communicating with counsel,

30  resulting in a currently pending Order to Show Cause re: Terminating Sanctions against that

31  entity. Additionally, New Albion Property Limited is in a declaratory relief proceeding in the

32  United Kingdom, where that entity was formed, the result of which would either confirm or

33

DEFENDANT GARRY Y. ITKIN'S NOTICE OF MOTION AND MOTION TO BIFURCATE OR, IN THE
ALTERNATIVE, TO DETERMINE PROPER VENUE, OR, DISMISS FOR FORUM NON CONVENIENS

condemn Itkin's possession of the shares and control of that entity. The Isle of Jersey liquidator has indicated they may intervene in that declaratory relief action.

The multiple international parties and cross-complaint ensured this was never going to be a straightforward trial. However, the uncertainty surrounding not just who will represent Plaintiffs, but the impact of the various liquidation procedures make it impossible to efficiently try Plaintiffs' claims while also ensuring the litigation does not run afoul of international liquidation proceedings, or giving due respect to the findings regarding internal governance matters of jurisdictions where the entities were formed.

The doctrine of comity allows that the forum state will apply the substantive law of a foreign country to causes of action which arise there. (*Wong v. Tenneco, Inc.,* (1985) 39 Cal.3d 126, 134.) The philosophy of comity is that the forum state recognizes and respects the sovereignty of the foreign jurisdiction in determining matters over which it has authority. (*Blythe v. Ayres* (1892) 96 Cal. 532, 561.) Here, it will be impossible to determine what substantive law of which foreign nation will apply to this matter for which specific Plaintiff, as the liquidations of the two Plaintiffs (and the pending declaratory relief regarding a third Plaintiff) has created a significant level of uncertainty in that respect.

Itkin properly obtained a foreign money judgment against Plaintiff Golden Sphinx in the Isle of Jersey. Golden Sphinx has tried – and failed – to set aside that judgment. Golden Sphinx's most recent attempt to set aside the judgment was to initiate its own lawsuit against Itkin in the Isle of Jersey, asserting nearly identical claims as this lawsuit, and arguing that the Isle of Jersey is the *only* proper venue to hear such claims. However, after initiating the lawsuit, Golden Sphinx then filed for liquidation in Jersey (and has failed to notify this Court of that development). The liquidation proceeding is ongoing, and no California counsel has been appointed to address the instant litigation.

Additionally, M-BJEP has been involved in involuntary liquidation proceedings in the Isle of Man, which are still pending. Although California counsel was appointed in that matter, Larissa Sabadash has complicated the matter by unilaterally substituting out that counsel for Mr. Zorkin. For both Golden Sphinx and M-BJEP there are legitimate questions as to the effects both the ongoing foreign liquidations will have on the instant litigation, and also whether this litigation will negatively affect the foreign liquidation procedures. These liquidation processes are intertwined not just with this instant litigation, but with each other, and the effects are unknown.

By contrast, Itkin's claims against Sabadash are straightforward. Itkin does not seek to delay trial; rather, he seeks to move forward in the most judicially economic manner. Itkin merely

seeks monetary damages against Sabadash for breach of fiduciary duty, as well as a judicial determination on the existence of the partnership. None of these decisions will affect the foreign liquidations. The uncertainty of the foreign liquidations, outstanding discovery, and unavailability of Plaintiffs' witnesses and corporate representatives all weigh against litigating Plaintiffs' claims at this time.

However, there are no such limitations on Itkin's counterclaims. Keeping the current trial date and litigating the only claims which are certain – Itkin's counterclaims against Plaintiffs – is the most judicially-efficient use of resources. For these reasons, Itkin respectfully requests this Court grant his motion for bifurcation.

## III.    ALTERNATIVE ARGUMENT

### A.    In the alternative, Itkin has properly challenged venue.

Although Itkin did not bring a change of venue motion under Code of Civil Procedure section 396 at the time of answer, Itkin has always argued that this forum is improper, and the Royal Court of Jersey is the proper venue for Golden Sphinx's claims against him.

Now, evidence has recently emerged indicating that even Plaintiff now agrees that this venue is improper, and the Royal Court of Jersey is the proper venue. (Exhibit 4.) Itkin now moves to change the forum for this action to the Royal Court of Jersey based on Plaintiff's recent admission.

### B.    The Isle of Jersey is the proper court.

There is now no doubt that the Royal Court of Jersey is the proper forum for this action. The facts and actions of all parties support this transfer.

Itkin has a valid and enforceable default judgment against Golden Sphinx in the amount of £505,000.00 (approximately $642,814.50 on December 2, 2016, the date of judgment.) ("Jersey Judgment"). (Exhibit 1.)

Golden Sphinx did not appear in the action until 2018, when it filed a collateral action to set aside the default judgment. Golden Sphinx argued that Itkin engaged in self-dealing and fraud and did not give Golden Sphinx proper notice of the proceedings that resulted in the Jersey Judgment. ("Collateral Action".) The Royal Court of Jersey considered evidence and argument in the Collateral Action.

On April 20, 2021, the Royal Court of Jersey fully rejected Golden Sphinx's claims and refused Golden Sphinx's Collateral Action to set aside the Jersey Judgment. (Exhibit 2.) Golden Sphinx had 28 days to appeal and did not do so. The Jersey Judgment is therefore final and unappealable. (Exhibit 3.)

DEFENDANT GARRY Y. ITKIN'S NOTICE OF MOTION AND MOTION TO BIFURCATE OR, IN THE
ALTERNATIVE, TO DETERMINE PROPER VENUE, OR, DISMISS FOR FORUM NON CONVENIENS

1    In an end run around their failure to properly challenge the Jersey Judgment in the proper

2    venue of the Isle of Man, Plaintiffs filed this action alleging Itkin acted improperly as director.

3    These are the same arguments that were later considered and rejected as untimely by the Royal

4    Court of Jersey – the proper forum for this action.

5    It is clear that Plaintiffs are attempting to claw back their repeated failures to properly

6    challenge or appeal the Jersey Judgment and are using competing venues to do so. However, in so

7    doing they have sealed their own fate. Golden Sphinx's sole director, Larissa Sabadash, **admits**

8    **under oath that the proper forum for this action is the Isle of Jersey**.

9    In an April 26, 2022, sworn declaration related to the original Jersey Judgment, Sabadash

10    disputes the Jersey Judgment debt is due, seeks leave of the Royal Court of Jersey to "restrain" the

11    Jersey Judgment, and states that "I believe that Jersey is the proper forum for the determination of

12    the claims set out in the Representation and there is no other convenient forum." (Exhibit 4 ¶ 20.)

13    Based on this recent evidence that even Plaintiffs consider Jersey as the proper forum to consider

14    the Jersey Judgment, Itkin now moves for a change of venue to the Royal Court of Jersey or, in the

15    alternative, a determination that this is not the most convenient forum for this action

16    M-NICE and M-BJEP are incorporated in the Isle of Man. The claims and liquidation

17    associated with those entities are governed by Isle of Man law. Golden Sphinx is a Jersey limited

18    company organized and existing under the laws of Jersey. Itkin properly filed a lawsuit in Jersey

19    against Golden Sphinx seeking a judgment for unpaid director fees, which judgment is now

20    unappealable under the law of the Isle of Jersey. Golden Sphinx filed suit to set aside that

21    judgment in the Isle of Jersey, under Jersey law. Even now, Golden Sphinx has sued Itkin for

22    breach of fiduciary duty claims relating to issues of internal governance under Jersey law and

23    represented to that Court that Jersey is the *only* appropriate forum. These are all matters that

24    clearly implicate venue in the Isle of Man and Isle of Jersey. Golden Sphinx cannot now argue that

25    California is the proper forum.

26    For these reasons, if this Court does not grant the motion to bifurcate, Itkin respectfully

27    requests this Court transfer venue to the Royal Court of Jersey.

28    **IV.    SECONDARY ALTERNATIVE ARGUMENT**

29    In the alternative to both the bifurcation and venue motions, Itkin moves this Court to

30    dismiss the claims of Golden Sphinx in this matter under the doctrine of forum non conveniens. In

31    ruling on this alternative relief, this Court must determine whether the Royal Court of Jersey is a

32    suitable forum for this matter; specifically, whether jurisdiction is proper and that there is no

33    statute of limitations bar to hearing the case on the merits.

### A.    Jurisdiction is proper in the Royal Court of Jersey.

The sworn declaration of a party to be bound to the jurisdiction of a forum outside California is sufficient grounds for determination that a more convenient forum exists to hear the action. (*Zhi An Wang v. Fang* (2021) 59 Cal.App.5th 907, 918.)

In *Wang*, the defendants sought to transfer an action to a Chinese court. Plaintiffs challenged, citing that they did not expressly agree to submit to the jurisdiction of the Chinese court. However, in a sworn declaration, Plaintiff stated under penalty of perjury that he would be subject to Chinese laws. Additionally, the *Wang* court held that substantial litigation had already occurred in China, indicating that it was a proper forum.

Here, the Royal Court of Jersey has already been established as a proper forum suitable for trial. As outlined above, jurisdiction is proper in the Royal Court of Jersey. Not only have the parties already appeared before the Royal Court of Jersey in an action based on the same facts as alleged here, a final judgment has been rendered against Golden Sphinx in favor of Itkin. Golden Sphinx disputes – in the Royal Court of Jersey – that a debt is owed, and filed their own countersuit. In that counter suit, Larissa Sabadash attests that Jersey is the *only* proper court.

It is clear that Jersey has proper jurisdiction over these claims and has already rendered judgment over these claims and these parties.

### B.    The statute of limitations does not apply.

Itkin anticipates that Plaintiffs may argue that they cannot properly have their case heard on the merits because the time to appeal the Jersey Judgment and Collateral Action has passed. However, this is not a proper basis for a challenge to the forum non conveniens clause. "That the law is less favorable to the plaintiffs in the alternative forum, or that recovery would be more difficult if not impossible, is irrelevant to the determination whether the forum is suitable unless the alternative forum provides no remedy at all." (*Guimei v. General Electric Co.* (2009) 172 Cal.App.4th 689, 696.)

In this action, Plaintiffs already had ample opportunity to litigate this matter and in fact are still litigating this matter in Jersey. They could have appeared for the initial lawsuit that resulted in the default judgment – they failed to do so. They could have timely appealed the Collateral Action – they failed to do so. They are currently litigating the debt in Jersey, and Sabadash's sworn declaration proves Jersey is the proper forum. Although Plaintiffs have repeatedly failed to properly challenge the Jersey Judgment in the Royal Court of Jersey, they still have ongoing litigation to challenge the debt. Therefore, there is a potential remedy, and the Royal Court of Jersey is a proper forum.

## V.    CONCLUSION

Itkin does not seek to delay trial. Rather, Itkin merely seeks to maximize judicial efficiency and economy by bifurcating the trial into two phases: first, Itkin's cross-claims and only then Plaintiffs' claims against Itkin.

Itkin seeks bifurcation because of the uncertainty of the foreign liquidation actions affecting multiple Plaintiffs. Plaintiff M-BJEP is in liquidation in the Isle of Man, and their representation in the California action is questioned. Plaintiff Golden Sphinx has recently begun liquidation in the Isle of Jersey, and is also intertwined in the compulsory liquidation of New Albion. The effects of both the California litigation on the foreign proceedings, and the foreign liquidation proceedings on the California litigation are unknown at this point, and it does not make sense from a judicial economy standpoint to proceed with litigation these matters.

However, Itkin's cross-claims are personal in nature and will not affect the foreign matters. Bifurcating Itkin's claims promotes judicial efficiency because it allows the parties to keep the current trial dates while not affecting any other pending litigation or liquidation.

Alternatively, these proceedings should be stayed because this is not the proper venue. The foreign litigation, parties, and Larissa Sabadash's own declaration all point to the Isle of Jersey being the proper venue for this litigation.

As a second alternative, these proceedings should be dismissed as this is not the most convenient forum due to the foreign litigants, location of parties, status of liquidation, and ongoing litigation in the foreign courts.

Respectfully Submitted,

Dated:  July 28, 2022

MOLNAR ATABEK, LLP
ABIR COHEN TREYZON SALO, LLP

By: _____

JON ATABEK
BORIS TREYZON
Attorneys for Defendant
GARRY Y. ITKIN

DEFENDANT GARRY Y. ITKIN'S NOTICE OF MOTION AND MOTION TO BIFURCATE OR, IN THE ALTERNATIVE, TO DETERMINE PROPER VENUE, OR, DISMISS FOR FORUM NON CONVENIENS

## PROOF OF SERVICE
### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Orange, State of California. I am over the age of eighteen (18) and not a party to the within action. My business address is 16001 Ventura Blvd, Suite 200, Encino, CA 91436.

On July 28, 2022, I served the foregoing document described as: **DEFENDANT GARRY Y. ITKIN'S OPPOSITION TO PLAINTIFF M-NICE LIMITED'S MOTION FOR RENEWAL OF ITS MOTION FOR ISSUE AND EVIDENTIARY SANCTIONS** on the interested parties in this action referenced in the attached service list by placing ( ) the original **(X)** true copies thereof enclosed in sealed envelopes addressed as follows:

| ( )    **BY MAIL** | ( )    **BY FACSIMILE TRANSMISSION** |
|---|---|
| I caused such envelope to be deposited in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. postal service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit. | I caused said document(s) to be transmitted by facsimile transmission to the name(s) and facsimile telephone number(s) of the person(s) set forth on the attached service list. The facsimile machine telephone number of the sending facsimile machine was (213) 394-5943. A transmission report was issued by the sending facsimile machine confirming that the transmission was completed without error. A true and correct copy of said transmission report is attached hereto. |
| ( )    **BY OVERNIGHT DELIVERY** | ( )    **BY PERSONAL DELIVERY** |
| Said document was placed in an envelope designated by the express service center and placed for collection in a box regularly maintained by said carrier with whom we have a direct billing account, to be delivered to the office of the addressee listed above on the next business day. | I caused personal service of the above-referenced document by requesting that an appropriate agent deliver the above referenced documents to the office of the recipient named below, either by handing the document(s) to the recipient to by leaving the document(s) with the receptionist or other person apparently in charge of the recipient's office. |
| ( x )    **BY ELECTRONIC SERVICE** | |
| By transmitting the document(s) listed above from my email to the e-mail address(es) of the person(s) set forth on the attached service list. The transmission was reported as complete and without error. *See* California Rules of Court, rule 2060. | |

**(X)    STATE**    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

(X)    EXECUTED    on July 28, 2022 at Encino, California.

_____

Christine Archanian

DEFENDANT GARRY Y. ITKIN'S NOTICE OF MOTION AND MOTION TO BIFURCATE OR, IN THE ALTERNATIVE, TO DETERMINE PROPER VENUE, OR, DISMISS FOR FORUM NON CONVENIENS

1

## SERVICE LIST

2

3   Michael Zorkin (Bar No. CA 313308)
    THE ZORKIN FIRM
4   6320 Canoga Ave., 15th Floor
    Woodland Hills, CA 91367
5   mz@thezorkinfirm.com
    Tel: (323) 493-8075
6

7   Lloyd E. Kelley (Bar No. TX 11203180;
    admission *pro hac vice* pending)
8   THE KELLEY LAW FIRM
    2726 Bissonnet Ste 240 PMB 12
9   Houston, Texas 77005
10  Tel: 281-492-7766
    Fax: 281-652-5973
11  kelley@lloydekelley.com
12
    James D. Pierce (Bar No. CA 324513)
13  115 Guenther St.
    Sugarland, Texas 77478
14  Tel: 713-419-3775
15  jim@jamespierce.com
16
    Attorneys for ALEXANDER SABADASH,
17  AFB TRADING ONE, INC., M-BJEP
    LIMITED, MNICE LIMITED, GOLDEN
18  SPHINX LIMITED, AND NEW ALBION
    PROPERTY LIMITED
19

20

21

22

23

24

25

26

27

28

29

30

31

32

33

DEFENDANT GARRY Y. ITKIN'S NOTICE OF MOTION AND MOTION TO BIFURCATE OR, IN THE
ALTERNATIVE, TO DETERMINE PROPER VENUE, OR, DISMISS FOR FORUM NON CONVENIENS

**Journal Technologies Court Portal**

# Make a Reservation

## AFB TRADING ONE INC VS GARRY Y ITKIN

Case Number: BC647351    Case Type: Civil Unlimited    Category: Unlawful Detainer/Residential (not drugs or wrongful eviction)
Date Filed: 2017-01-19    Location: Stanley Mosk Courthouse - Department 62

### Reservation

| | |
|---|---|
| Case Name: | Case Number: |
| AFB TRADING ONE INC VS GARRY Y ITKIN | BC647351 |
| Type: | Status: |
| Motion to Bifurcate | RESERVED |
| Filing Party: | Location: |
| Garry Y. Itkin (Defendant) | Stanley Mosk Courthouse - Department 62 |
| Date/Time: | Number of Motions: |
| 10/11/2022 9:00 AM | 1 |
| Reservation ID: | Confirmation Code: |
| 076240934476 | CR-JQ5OGE3VENTA8URZU |

### Fees

| Description | Fee | Qty | Amount |
|---|---|---|---|
| Motion to Bifurcate | 60.00 | 1 | 60.00 |
| Credit Card Percentage Fee (2.75%) | 1.65 | 1 | 1.65 |
| TOTAL | | | **$61.65** |

### Payment

| | |
|---|---|
| Amount: | Type: |
| $61.65 | Visa |
| Account Number: | Authorization: |
| XXXX4966 | 718282 |

🖶 Print Receipt    ➕ Reserve Another Hearing    👤 View My Reservations

Copyright © Journal Technologies, USA. All rights reserved.

Chat