LEVENE, NEALE, BENDER, YOO
& GOLUBCHIK L.L.P.
Kurt Ramlo (SBN 166856)
2818 La Cienega Avenue
Los Angeles, CA 90034
kr@lnbyg.com
Telephone: (310) 229-1234

TOGUT, SEGAL & SEGAL LLP
Kyle J. Ortiz (NY 4818571) (admitted *pro hac vice*)
kortiz@teamtogut.com
Ronald Howard (NY 5256086) (admitted *pro hac vice*)
rhoward@teamtogut.com
Eitan Blander (NY 5693213) (admitted *pro hac vice*)
eblander@teamtogut.com
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000

Attorneys to the Foreign Representatives
of Golden Sphinx Limited

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

| | |
|---|---|
| In re Golden Sphinx Limited,<br><br>Debtor in a Foreign Proceeding. | Case No. 2:22-bk-14320-NB<br><br>Hon. Neil W. Bason<br><br>Chapter 15<br><br>**FOREIGN REPRESENTATIVES' STATUS REPORT (LASC CASE NO. BC647351; USDC CASE NO. 2:21-CV-04907)**<br><br>Hearing Date: March 5, 2024<br>Hearing Time: 2:00 p.m.<br>Courtroom: 1545 and via ZoomGov |

Andrew Wood and Alexander Adam, in their capacities as the joint liquidators and authorized foreign representatives (in such capacity, the "**Foreign Representatives**") of Golden Sphinx Limited, a corporation organized and existing under the laws of Jersey (the "**Debtor**"), by and through their undersigned counsel, respectfully submit this status report in advance of the

March 5, 2024 hearing pursuant to this Court's (i) *Order Determining Applicability of Automatic Stay and Continuing Hearing on Creditor Garry Y. Itkin's Motion for Relief from Stay* [Docket No. 70] and (ii) *Order Determining Applicability of Automatic Stay and Continuing Hearing on Creditor Garry Y. Itkin's Motion for Relief from Stay* [Docket No. 71] (collectively, the "**Stay Orders**") to provide this Court with an update with respect to matters bearing upon creditor Garry Y. Itkin's ("**Itkin**," and collectively with the Foreign Representatives, the "**Parties**") motions for orders modifying the automatic stay to allow continuation of the California Action[1] and the Federal Action [Docket Nos. 48 & 49] (collectively, the "**Stay Motions**").

## STATUS REPORT

In their most recent status report filed on November 28, 2023 [Docket No. 124], the Foreign Representatives reported that the Royal Court of Jersey (the "**Jersey Court**") had scheduled a hearing for January 17, 2024 to consider a proposed application by the Debtor to amend the order of justice[2] to consolidate litigation involving the Debtor and Itkin in the Jersey Action (the "**Application to Amend**"). At the hearing held before this Court on December 19, 2023 (the "**December 19 Hearing**"), the Foreign Representatives reported that the hearing scheduled for January 17, 2024 would be procedural in nature, and that the Jersey Court was expected to rule on the merits of the Application to Amend at a hearing scheduled for February 7, 2024 (the "**Amendment Hearing**"). The Foreign Representatives had filed the Application to Amend with the Jersey Court on October 31, 2023.

At the Amendment Hearing, Itkin confirmed his consent to the Application to Amend, and executed a consent order ("the **Consent Order**"), by which the Parties agreed to the Application to Amend, and therefore that the Debtor's claims against Itkin be consolidated in Jersey. The Consent Order cannot be appealed by either Party. The Jersey Court subsequently entered an order (the "**Amendment Order**") that same day, granting leave to the Debtor to file

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Foreign Representatives' Omnibus Objection to Creditor Garry Itkin's Motions for Relief from Stay dated September 27, 2022 [Docket No. 50] (the "**Stay Objection**") or the Joint Status Report dated January 26, 2023 [Docket No. 67] (the "**January Status Report**") (each incorporated herein by reference), as applicable.

[2] An order of justice is analogous to a complaint in American litigation.

and serve the amended order of justice (the "**Amended Order of Justice**") by February 9, 2024. Itkin was ordered by the Jersey Court to pay the Debtor's costs of the Application to Amend on the standard basis. A copy of the Amendment Order is annexed hereto as **Exhibit A,** and a copy of the Amended Order of Justice is annexed hereto as **Exhibit B**. The Debtor filed and served the Amended Order of Justice on February 9, 2024.

The Amendment Order also fixed deadlines by which Itkin must file an amended answer to the Amended Order of Justice (which will be due by March 1, 2024), and the Debtor must file a reply. It thereafter stays the Jersey Action for 12 weeks, effectively until June 14, 2024, to allow the Parties the opportunity to reach a settlement. The Jersey Court additionally scheduled a procedural hearing for June 24, 2024 in the event that the Parties are unable to reach a settlement.

At the December 19 Hearing, the Court indicated that it intended to issue an order pursuant to section 1525(b) of the Bankruptcy Code directing the Parties to propose revisions to a draft form of request to the Jersey Court asking for the Jersey Court's perspective on the automatic stay issues (the "**1525(b) Order**"). In light of the Amendment Order approving the consolidation of the Debtor's claims before the Jersey Court and the Parties' agreement to seek a consensual resolution to the Jersey Action, the Foreign Representatives submit that the 1525(b) Order is no longer warranted.

Furthermore, and as set forth in its tentative ruling in advance of the hearing held September 7, 2023, the Court's final determination of the Stay Motions was contingent upon the Jersey Court reaching its own determination as to "whether it should abstain or defer to proceedings in other courts or, alternatively, whether it had jurisdiction or could exercise jurisdiction to consolidate various proceedings in the Jersey Court." As the Jersey Court has determined that the Foreign Representatives may consolidate the Debtor's claims involving Itkin in the Jersey Action, the Foreign Representatives submit that this Court may enter final orders limiting modification of the automatic stay created under sections 362 and 1520 of the Bankruptcy Code (the "**Bankruptcy Stay**") to the extent set forth in the Stay Orders.

## CONCLUSION

**WHEREFORE**, the Foreign Representatives respectfully request that the Court enter final orders with respect to the Stay Motions limiting modification of the Bankruptcy Stay to the extent set forth in the Stay Orders.

Dated: February 22, 2024

TOGUT, SEGAL & SEGAL LLP

By: */s/Kyle J. Ortiz*
Kyle J. Ortiz
Ronald Howard
Eitan Blander

*Attorneys to the Foreign Representatives of Golden Sphinx Limited*

LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.

By: */s/Kurt Ramlo*
Kurt Ramlo

*Local Counsel to the Foreign Representatives of Golden Sphinx Limited*

# EXHIBIT A

**Amendment Order**

# *In the Royal Court of Jersey*

**Samedi Division** **2021/149**

**In the year two thousand and twenty-four, the seventh day of February.**

Before Advocate David Michael Cadin, Master of the Royal Court.

| | | |
|---|---|---|
| BETWEEN | Golden Sphinx Limited<br>(In Creditors' Winding Up) | PLAINTIFF |
| AND | Garry Itkin | DEFENDANT |

WHEREAS at the hearing before the Master on the 7 February 2024, the Parties agreed, by consent, that the following order should be made AND IT IS HEREBY ORDERED THAT:

1. the Plaintiff shall be given leave to file and serve its Amended Order of Justice, appended hereto, within 2 days of the date of this order, without prejudice to any applications that the Defendant might make;
2. permission is given to serve the Amended Order of Justice out of the jurisdiction pursuant to Rule 3(1) of the Service of Process Rules (2019), such service to be effected by email to the Defendant's advocate, Advocate Ian Jones, at ij@boothmanjones.com;
3. the Defendant shall be given leave to file and serve his Amended Answer, with such amendments being limited to those consequential to the amendments made in the Amended Order of Justice, within 21 days of the date on which the Plaintiff files and serves its Amended Order of Justice;
4. the Plaintiff shall be given leave to file and serve an Amended Reply within 21 days of the date on which the Defendant files and serves his Amended Answer, with such amendments to the Plaintiff's Reply being limited to those consequential to the amendments made in the Amended Answer;
5. the Defendant's summonses to strike out part of the proceedings and for security in respect of the default judgment and costs shall be adjourned generally;

6. the proceedings shall thereafter be stayed for ADR for a period of 12 weeks from the date on which the Plaintiff files and serves its Amended Reply, pursuant to Rule 6/28 of the Royal Court Rules 2004, as amended (the Stay);
7. in the event that the parties reach a settlement prior to the expiry of the Stay, the parties shall notify the Court of the fact of settlement;
8. in the event that no settlement is reached prior to the expiry of the Stay, the Plaintiff shall, within 7 days of the expiry of the Stay, apply to the Master's Judicial Secretary in order to fix a date for a directions hearing;
9. there be liberty to apply; and
10. the Defendant's costs of and occasioned by the amendments to the Order of Justice shall be paid by the Plaintiff, on the standard basis, and to be taxed if not agreed.

AND WHEREAS upon the application of the Plaintiff and having heard submissions on behalf of the Plaintiff and the Defendant, the following order was made:

1. the Defendant shall pay the Plaintiff's costs of and incidental to the Plaintiff's Summons dated 31 October 2023 (the Amendment Summons) on the standard basis, and to be taxed if not agreed.

Master of the Royal Court

Ardent Chambers (MO'C)
BJ (IJ)

# EXHIBIT B

**Amended Order of Justice**

Court Ref: 2021/149

**IN THE ROYAL COURT OF JERSEY**

**(Samedi Division)**

**BETWEEN**

GOLDEN SPHINX LIMITED (in liquidation)

Plaintiff

-and-

MR GARRY ITKIN

Defendants

---

AMENDED ORDER OF JUSTICE

---

The Plaintiff, the Nominees and the Trust

1. The Plaintiff is a company incorporated on 31 August 2000 in accordance with the laws of and domiciled in Jersey, with company number 78090.

2. At all material times, ~~T~~the Plaintiff's share capital has comprised~~s~~ 2 shares of £1 each (the "**Golden Sphinx Shares**"). The registered shareholders of the Plaintiff, holding 1 share each, are and at all material times have been JTC Nominees Limited (a Jersey company with company number 50844 that, until 30 November 2018, was named ~~formerly~~ Minerva Nominees Limited) and JTC Services Limited (a Jersey company with company number 46991 that, until 30 November 2018, was named ~~formerly~~ Minerva Services Limited) (together the "**Nominees**") as nominees for JTC Trust Company Limited (a Jersey company with company number 16982 that, until 30 November 2018, was named ~~formerly~~ Minerva Trust Company Limited) in its capacity as trustee (the "**Trustee**") of the Amber Trust (the "**Trust**").

2A. The Trust is an irrevocable discretionary trust settled by Mrs Larissa Sabadash ("**Mrs Sabadash**") pursuant to an Instrument of Trust dated 8 November 1996 (the "**Trust Deed**") and governed by the

laws of Jersey. Under clause 1(4) of the Trust Deed, the class of beneficiaries of the Trust was defined to comprise the International Red Cross and any person appointed by the trustees of the Trust in writing as an additional beneficiary. By a written resolution dated 25 May 2005, Mrs Sabadash, her husband, Mr Alexander Sabadash ("**Mr Sabadash**") and their children (together, the "**Sabadash Family**") were appointed additional beneficiaries of the Trust. Thereafter, the Sabadash Family have remained members of the class of beneficiaries of the Trust save that with effect from 6 July 2022 Mr Sabadash ceased to be a beneficiary pursuant to an Instrument of Exclusion and Acknowledgment of Disclaimer dated 6 July 2022.

2B. The Plaintiff was formed, and at all times thereafter operated, as an investment-holding vehicle forming part of the wealth management structure to which the Trust belonged.

2C. On 6 July 2022, the Nominees passed a members' resolution to wind up the Plaintiff and to nominate Mr Andrew Wood and Mr Alexander Adam as Joint Liquidators of the Plaintiff (the "**Joint Liquidators**"). At a meeting of the Plaintiff's creditors held on the same day, the Joint Liquidators' appointment was approved and confirmed. This action is continued by the Joint Liquidators in the name of the Plaintiff.

The Defendant

3. The Defendant is a businessman resident in California and was, from some point in the 1990s until the events that form the basis of this action, a close associate and trusted confidante of Mr Sabadash and the Sabadash Family. ~~and~~ He served, from the date of the Plaintiff's incorporation ~~until 23 November~~ until 28 February 2017, ~~w~~as a~~n appointed~~ director of the Plaintiff. Between 23 November 2009 and 28 February 2017, he was the Plaintiff's sole director. By resolution ~~of its members~~ passed at a general meeting of the Plaintiff held on 28 February 2017 the Defendant was removed as a director of the Plaintiff and replaced by Mr Piotr Szymanski ("**Mr Szymanski**"). Upon Mr Szymanski's retirement as a director, ~~At the date hereof the sole director of the Plaintiff is~~ Mrs ~~Larissa~~ Sabadash was appointed as the Plaintiff's sole director.

4. The Defendant was, between 11 August 2000 and 6 July 2017, a Joint Protector of the Trust. and It is to be inferred from his position as Joint Protector and from his association with Mr Sabadash as set out at paragraph 3 above that at all material times the Defendant knew that the Plaintiff and the Trust were passive investment-holding vehicles, created by and operated as wealth preservation protection and planning vehicles, for the ultimate benefit of the Sabadash Ffamily.

4A. As a director of the Plaintiff, the Defendant owed the Plaintiff fiduciary duties, in particular fiduciary duties: (a) to act in the best interests of the Plaintiff; (b) to place himself in no position where his duty to the Plaintiff might conflict with either his own interests or his duties to any third party; (c) to make no profit out of his office; and (d) to disclose breaches of, and matters which might lead to a breach of, the foregoing duties (the "**Fiduciary Duties**"). The Defendant also owed the Plaintiff customary law duties, in particular duties to: (a) act in good faith; (b) exercise powers for a proper purpose; (c) avoid conflicts of interest; and (d) not misuse company property (the "**Customary Law Duties**").

5. Further, By reason of his appointment as a director, by pursuant to Art. 74 of the Companies (Jersey) Law (the "**1991 Law**") the Defendant was, in exercising his powers and discharging his duties as a director of the Plaintiff, obliged to:

   (a) act honestly and in good faith with a view to the best interests of the Plaintiff company; and

   (b) exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances

   (the "**Art. 74 Duties**").

6. The Art. 74 Duties owed by the Defendant to the Plaintiff were also fiduciary duties. Further and alternatively the Defendant owed the Plaintiff fiduciary duties, including but not limited to duties of fidelity and loyalty.

The Guaranty Claim

7. By a document bearing the ~~said to be~~ dated~~d~~ 9 October 2012 and signature of the Defendant purportedly as "*Sole Director and Officer*" of the Plaintiff and entitled "*Guaranty*" (the "**Guaranty**"), the Defendant purported to cause the Plaintiff "*to further securitize, guarantee, and provide surety for any and all promises and obligations*" ~~collateralise by way of a pledge for the benefit of one or more unidentified third parties, the assets of the Defendant as security for the unidentified obligations~~ of Mr ~~Alexander~~ Sabadash pursuant to "*any and all documents, instruments, certificates and agreements, whether oral or in writing*". The Defendant has since purported to call on the Guaranty as a beneficiary.

8. The governing law of the Guaranty is said, by clause 7 of the Guaranty, to be the law of Jersey and it provides for the Royal Court to have non-exclusive jurisdiction to determine any and all disputes in respect of the Guaranty.

9. It is the Plaintiff's case that the Guaranty is ineffective as a matter of law and, further or alternatively, is void *ab initio* on any and all of the following grounds, namely that:

(i) The Plaintiff did not consent at all, alternatively did not properly consent, to the entry into the Guaranty, any consent being tainted and being void or voidable by the Defendant's self-dealing in breach of the Fiduciary Duties and/or the Art. 74 Duties and/or the Customary Law Duties;

(ii) The Guaranty lacks any or any sufficient *objet* to give rise to an enforceable agreement;

(iii) The Guaranty lacks any or any sufficient *cause* to give rise to an enforceable agreement;

(iv) The Guaranty fails for want of any or any sufficient certainty as to terms;

(iva) The Guaranty is a unilateral declaration purportedly entered into by the Plaintiff (purportedly acting by the Defendant) with no counterparty and cannot be the source of any binding contractual or other legal rights or obligations; and

(v) The Guaranty is unenforceable as it does not comply with the Security Interest (Jersey) Law 1983, and in particular does not comply with Art.3(1)(d) and/or Art.3(1)(g).

10. Without prejudice to the averments made above, if, or to the extent that, the Guaranty had any binding legal effect, in causing the Plaintiff to enter into the Guaranty the Defendant breached the Fiduciary Duties and/or the Art. 74 Duties and/or the Customary Law Duties in that he acted in a way which he could not have *bona fide* believed to be in the best interest of the Plaintiff, in that he purported to cause the Plaintiff to provide an irrevocable guarantee unlimited in scope and duration in respect of the obligations of a third party for the benefit of unnamed fourth parties for no (alternatively, no material) advantage to the PlaintiffTo the extent that the Guaranty was or is a voidable transaction, it is hereby avoided.

11. By reason of the matters averred in the foregoing paragraph At no material time was it in the interests of the Company to entering into the Guarantee.:

(i) The Guaranty is liable to rescission by order of the Court and/or is voidable at the Plaintiff's election (and has been so voided).

(ii) Further or alternatively, the Defendant is liable to pay equitable compensation to place the Plaintiff in the position it would have been but for his breach of Fiduciary Duties and/or Art. 74 Duties and/or the Customary Law Duties.

(iii) In the alternative, the Defendant is liable to account to the Plaintiff for the profits (if any) which he has received but for breach of his Fiduciary Duties and/or Art. 74 Duties and/or the Customary Law Duties.

12. By reason of the matters aforesaid, causing the Defendant to enter into the Guaranty was a breach of Art.74(1)(a) and/or 74(1)(b) of the 1991 Law.

13. Without prejudice to the averments made above and Nnotwithstanding that the entry into the Guaranty gave rise to no legal rights or obligations and that the Guaranty is void *ab initio* and was a nullity, the director of the Plaintiff Company resolved on 17 October 2018 to treat the Guaranty as a nullity. Further, and for the avoidance of any doubt, on 17 October 2018, the Plaintiff Company agreed with Mr Alexander Sabadash, acting though his lawful attorney, that the Guaranty was terminated.

The 2015 Promissory Note Claim

14. By an document instrument in writing purporting to be a promissory note and/ or a pledge and/ or a security interest agreement within the meaning of the Security Interests (Jersey) Law 2012 and purporting to be bearing the dated 21 August 2015 and entitled "*Promissory Note Secured by Pledged Collateral*" and expressed to be "*governed by and construed in accordance with the laws of the Ise of Jersey*" (the "**2015 Promissory Note**"), the Defendant purported to cause the Plaintiff to promise "*to pay to the order of* [the Defendant] *at such place as* [the Defendant] *may designate in writing, the principal sum of Two Hundred Ninety-Five Thousand G.B. Pounds (£295,000), together with any unpaid and past due payments for services rendered pursuant Employment Agreement of 21/8/2015*" and to grant to himself various purported forms of security for said promise.

15. The governing law of the 2015 Promissory Note is the law of Jersey and this will be confirmed on discovery:

(i) The Defendant habitually used the law of Jersey for documents relating to the Plaintiff and the Plaintiff refers to the other documents referred to herein; and

(ii) The Plaintiff notes that the purported assignment of the 2015 Promissory Note was said to be effected by an agreement in writing dated 20 September 2016 which is governed by Jersey

~~law, and as a matter of general law, an agreement to modify obligations in an agreement will typically have the same governing law as the agreement being modified.~~

16. ~~The 2015 Promissory Note purports to evidence a loan of £295,000, but no such loan was ever made to the Plaintiff, by the Defendant or at all.~~

17. ~~The 2015 Promissory Note unlawfully purports to require payment of various and diverse but unascertained sums.~~

18. It is the Plaintiff's case that the 2015 Promissory Note is ineffective as a matter of law and, further or alternatively, is void *ab initio* on any and all of the following grounds, namely that:

(i) The Plaintiff did not consent at all, alternatively did not properly consent, to the entry into the 2015 Promissory Note, any consent being tainted and being void or voidable by the Defendant's self-dealing in breach of the Fiduciary Duties and/or the Art. 74 Duties and/or the Customary Law Duties;

(ii) The 2015 Promissory Note lacks any or any sufficient *objet* to give rise to an enforceable agreement;

(iii) The 2015 Promissory Note lacks any or any sufficient *cause* to give rise to an enforceable agreement;

(iv) The 2015 Promissory Note fails for want of any or any sufficient certainty as to terms;

(v) The 2015 Promissory Note is unenforceable as a pledge of assets, no delivery having been given;

(vi) The 2015 Promissory Note is unenforceable and does not attach to any or all of the Plaintiff's as it does not comply with the Security Interest (Jersey) Law 2012, and in particular does not comply with Art.18(1)(a) and Art.18(1)(b).

18A. In the alternative to paragraph 18, if, or to the extent that, the 2015 Promissory Note was effective at all, the counterparty to it was not the Defendant personally but AFB Trading One Inc ("**AFB**"), on behalf of whom the Defendant purported to sign in his capacity as AFB's director. Accordingly, the 2015 Promissory Note was ineffective in creating any obligations as between the Plaintiff and the Defendant.

19. Without prejudice to the averments made above, if or to the extent that the 2015 Promissory Note had any effect as between the Plaintiff and the Defendant (which is denied), in causing the Plaintiff to enter into the 2015 Promissory Note the Defendant breached the Fiduciary Duties and/or Art. 74 Duties and/or the Customary Law Duties in that ~~To the extent that the 2015 Promissory Note was or is a voidable transaction, it is hereby avoided.~~:

(i) he acted in a way which he could not have *bona fide* believed to be in the best interest of the Plaintiff, in that he sought to take for himself the benefit of the Plaintiff's promises under the 2015 Promissory Note for no value; and

(ii) he profited from his office, in that he received (at least) the benefit of the Plaintiff's obligations under the 2015 Promissory Note including the benefit of a purported debt in the amount of £295,000.

20. By reason of the matters averred in the foregoing paragraph ~~At no material time was it in the interests of the Company to entering into the 2015 Promissory Note~~:

(i) The 2015 Promissory Note is liable to rescission by order of the Court and/or is voidable at the Plaintiff's election (and has been so voided).

(ii) Further or alternatively, the Defendant is liable to pay equitable compensation to place the Plaintiff in the position it would have been but for his breach of Fiduciary Duties and/or Art. 74 Duties and/or the Customary Law Duties to the Plaintiff.

(iii) In the alternative, the Defendant is liable to account to the Plaintiff for the profits (if any) which he has received for breach of Fiduciary Duties and/or Art. 74 Duties and/or the Customary Law Duties.

21. ~~By reason of the matters aforesaid, causing the First Defendant to enter into the 2015 Promissory Note was a breach of Art.74(1)(a) and/or 74(1)(b) of the 1991 Law.~~

The Asset Misappropriation Claim

21A. On or about 21 January 2013, Sphinx Corporation AG (a Swiss company the shares in which were ultimately held by the Trustee on the terms of the Trust) transferred to the Plaintiff the entire issued share capital (comprising 2 ordinary shares of £1 each) of New Albion Property Limited ("**NAPL**" and the "**NAPL Shares**"), an English company incorporated on 11 April 2002 with registered number 04414858. On or about the same date, the Plaintiff became the sole registered shareholder of NAPL.

21B. At the time the Plaintiff acquired the shares of NAPL and at all times thereafter, NAPL operated as a special purpose vehicle the sole valuable asset of which was a property at 58 Beverley Park Court, Beverly Hills, California 90210 in the United States of America (the "**Beverly Hills Property**"). NAPL had purchased the Beverly Hills Property in 2004 for a purchase price of US$22,136,500 as a home for the Sabadash Family (save that, to the best of the Joint Liquidators' knowledge, Mr Sabadash continued to reside in Russia).

21C. By a Deed of Assignment dated 13 August 2013 entered into by the Plaintiff, M-NICE Limited ("**M-NICE**") (a company incorporated in the Isle of Man) and Golden Spirits Limited ("**Golden Spirits**") (a company incorporated in Jersey) and governed by English law, the Plaintiff took a legal assignment of the benefit of a Loan Agreement dated 23 July 2013 by which Golden Spirits made an interest-free loan to M-NICE in the amount of US$15,504,000 (the "**M-NICE Debt**").

21D. By a Deed of Assignment dated 13 August 2013 entered into by the Plaintiff, M-BJEP Limited ("**M-BJEP**") (a company incorporated in the Isle of Man) and Golden Spirits and governed by Manx law,

the Plaintiff took a legal sub-assignment from Golden Spirits of the benefit of a Promissory Note dated 11 October 2012 by which Farner Airwings AG ("**Farner**") (a company incorporated in Switzerland) advanced a loan to M-BJEP in the amount of US$19,516,000 (the "**M-BJEP Debt**"). The benefit of the M-BJEP Debt had previously been assigned, by a Deed of Assignment 12 October 2012, to Golden Spirits by Farner.

21E. By a document dated 20 September 2016, addressed to the "*Directors and Executive Officers of Golden Sphinx*" and entitled "*Demand for payment under Guarantee*" (the "**Demand**"), the Defendant asserted that Mr Sabadash had failed to pay the Defendant $55,520,000, purported to notify the Plaintiff of the alleged failure to make payment and demanded "*prompt payment upon Guarantee*". As at the date of the Demand and as the Defendant knew (alternatively, must have known), the Defendant was the sole director of the Plaintiff and the Plaintiff had no employees or other individuals who could have been characterised as "*Executive Officers*".

21F. On 20 September 2016, the Defendant signed minutes of a meeting of the Plaintiff's "*board of directors*" recording resolutions (the "**20 September Resolutions**") that purported to recognise on behalf of the Plaintiff the validity of the debt claimed by him in the Demand and to authorise the Plaintiff's transfer to the Defendant of substantially all the Plaintiff's valuable assets "*to satisfy* [Mr] *Sabadash's debt to him* [i.e. the Defendant]". The 20 September Resolutions included resolutions purporting:

(i) to authorise the Defendant "*to distrain, transfer, sell and keep proceeds of sale of, or any collection upon, below Company's property*" and listing a number of the Plaintiff's assets including the M-BJEP Debt, the M-NICE Debt and the NAPL Shares;

(ii) to approve the Defendant's "*actions and whatever deeds he chooses to undertake to fulfil and comply with Company's obligations pursuant Guarantee* [sic]"; and

(iii) to "*unconditionally release and fully discharge*" the Defendant "*whether in capacity of sole Director and Officer of Company or claimant pursuant to Guarantee* [sic], *from any and all*

*claims, liabilities and demands of any nature whatsoever with respect to any of his acts, omissions, or responsibilities with respect to his services to the Company. The Company further agrees to indemnity, protect, defend and hold* [the Defendant]*, his estate, heirs, and personal representatives, harmless from and against any actual or threatened action, suit or proceeding, whether civil, criminal administrative or investigative, including but not limited to Director's errors and omissions, and all losses, liabilities, damages and expenses, including reasonable attorney's fees incurred by* [the Defendant] *reasonably in connection with this Agreement* [sic] *or his services hereunder.*"

21G. Thereafter the Defendant proceeded to take steps to transfer the Plaintiff's valuable assets into his own name for no or nominal consideration. In particular:

(i) The Defendant executed a Deed of Assignment dated 20 September 2016 on behalf of the Plaintiff, M-NICE and himself purporting to assign to the Defendant personally "*all rights, title, interests and obligations which now or at a later time* [the Plaintiff] *has under the* [M-NICE Debt]" (the "**M-NICE Deed of Assignment**").

(ii) The Defendant executed (alternatively, has claimed to have executed) a Deed of Assignment dated 20 September 2016 on behalf of the Plaintiff and Golden Spirits purporting to assign to the Defendant personally the Plaintiff's rights under the M-BJEP Debt (the "**Alleged M-BJEP Deed of Assignment**"). The Joint Liquidators have not seen a copy of the Alleged M-BJEP Deed of Assignment and the Plaintiff does not possess one. The Plaintiff reserves its right to plead further as to the Alleged M-BJEP Deed of Assignment upon disclosure and/or exchange of witness statements.

(iii) On 26 September 2016, the Defendant executed a Stock Transfer Form purportedly on behalf of the Plaintiff transferring the NAPL Shares into his own name for a nominal consideration of £1 (the "**NAPL Share Transfer**").

21H. The Defendant breached his Fiduciary Duties and/or Art. 74 Duties and/or the Customary Law Duties to the Plaintiff in that:

(i) He acted in a way which he could not have *bona fide* believed to be in the best interest of the Plaintiff in that he sought to take for himself for no value the benefit of the M-NICE Debt and the M-BJEP Debt and the beneficial interest in the NAPL Shares; and

(ii) He placed himself in a conflict of interest, in that he acted in relation to the M-NICE Deed of Assignment, the Alleged M-BJEP Deed of Assignment and the NAPL Share Transfer for both parties to the transactions.

(iii) He profited from his office, in that he took a gratuitous assignment of the M-NICE Debt and M-BJEP Debt and a gratuitous transfer of the NAPL Shares in circumstances where each of the M-NICE Debt, the M-BJEP Debt and the NAPL Shares were valuable assets of the Plaintiff.

21I. By reason of the matters averred in the foregoing paragraph:

(i) The M-NICE Deed of Assignment, the Alleged M-BJEP Deed of Assignment and the NAPL Share Transfer are liable to rescission by order of the Court and/or are voidable at the Plaintiff's election (and have been so voided).

(ii) Alternatively, the Defendant holds the M-NICE Debt, the M-BJEP Debt and the NAPL Shares on constructive trust for the Plaintiff and/or is liable to account for their value to the Plaintiff.

(iii) Further or alternatively, the Defendant is liable to pay equitable compensation to place the Plaintiff in the position it would have been in but for his breach of Fiduciary Duties and/or Art. 74 Duties and/or the Customary Law Duties to the Plaintiff, including insofar as applicable and without limitation:

(a) An amount equivalent to the present value of the M-NICE Debt, being currently US$15,504,000;

(b) An amount equivalent to the present value of the M-BJEP Debt, being currently US$18,786,150;

(c) An amount equivalent to the present value of the NAPL Shares, as to which the Plaintiff will rely at trial on expert evidence but currently estimates as at least US$40,105,424.

(iv) In the alternative, the Defendant is liable to account to the Plaintiff for the profits (if any) which he has received for the breach of his Fiduciary Duties and/or Art. 74 Duties and/or the Customary law Duties, including, without limitation the whole of the present value of the M-NICE Debt, the M-BJEP Debt and the NAPL Shares.

The Curaçao Cclaim

22. At all material times the Plaintiff had the benefit of held a bank account with maintained at First Curaçao International Bank N.V. in Curaçao, Kingdom of the Netherlands (the "**Curaçao Bank Account**"), and was beneficially entitled to all money held in the account.

23. By Restated Articles of Incorporated dated 1 July 2013 filed with the Secretary of State for the State of California Oon or about 5 September 2014, the Defendant caused changed the name of a California Corporation of which Defendant he was the president, secretary and sole shareholder, Famous Brands Distribution Management Corporation ("**Famous Brands**"), to change its name to "Golden Sphinx Limited", the a name identical to that of the Plaintiff. References in this Order of Justice to Famous Brands are to the corporation irrespective of the name by which it was known at the relevant time.

24. On a date unknown but in any event before 30 December In late July or early August 2015, the Defendant then opened a bank account in California, USA with JPMorgan Chase Bank N.A. ("**JPMorgan Chase**") in the name of and for the benefit of Famous Brands (the "**California Bank Account**"), his own corporation, which now bore the same name asof the Plaintiff. In opening the California Bank Account, the Defendant gave his personal address as the business address for the

account holder and represented to JPMorgan Chase that he was the "President" of the account holder.

24A. By reason of the matters pleaded in paragraphs 23 and 24 above, the Defendant is to be considered Famous Brands' directing mind and will, and his knowledge and intent are to be attributed to Famous Brands.

25. On or about 30 December 2015, the Defendant unlawfully and in breach of the Fiduciary Duties and/or the Art. 74 Duties and/or the Customary Law Duties duty caused the sum of US $ 473,55409.29 (the "**Curaçao Funds**") to be transferred to from the Curaçao Bank Account Plaintiff's bank account in Curaçao into the California Bbank Aaccount for no consideration and/or in return for no benefit of any *bona fide* value for the Plaintiff opened in same name as the Plaintiff and his Californian corporation, but in which the Plaintiff had no interest. Famous Brands received the Curaçao Funds on notice of the Defendant's breaches of the Fiduciary Duties and/or the Art. 74 Duties and/or the Customary Law Duties such that it was itself liable to account for the Curaçao Funds to the Plaintiff and/or held such funds on constructive trust for the Plaintiff.

26. The Defendant then caused Famous Brands to apply applied the Curaçao Funds aforesaid US $ 473,509.29 to Famous Brand's and/or the Defendant's his own use, and did so knowing that neither Famous Brands nor he had any entitlement had no title to those funds.

26A. In the premises, the Defendant breached his Fiduciary Duties and/or Art. 74 Duties and/or the Customary Law Duties to the Plaintiff in procuring the transfer of the Curaçao Funds to Famous Brands and thereafter causing Famous Brands to dissipate such funds in that:

(i) He acted in a way which he could not have *bona fide* believed to be in the best interest of the Plaintiff. He misappropriated assets that belonged to the Plaintiff and in doing so secured a substantial and wholly unearned windfall for Famous Brands and / or the Defendant at the Plaintiff's expense.

(ii) He placed himself in a conflict of interest. As president and shareholder of Famous Brands, his economic interests in the assets of Famous Brands (and, in particular, the California Bank Account) were directly opposed to the interests of the Plaintiff, as were his fiduciary and director's duties to Famous Brands.

(iii) He profited from his office as director of the Plaintiff, in that he received, by way of his ownership and control of Famous Brands, at a minimum the whole of the value of the Curaçao Funds.

26B. By reason of the matters averred in the foregoing paragraph:

(i) The Defendant holds the Curaçao Funds (alternatively, so much of the Curaçao Funds as remain in his hands) on constructive trust for the Plaintiff and/or is liable to account for the value of the Curaçao Funds.

(ii) Further or alternatively, the Defendant is liable to pay equitable compensation to place the Plaintiff in the position it would have been but for his breach of Fiduciary Duties and/or Art. 74 Duties and/or the Customary Law Duties, including, insofar as applicable and without limitation, the amount of the Curaçao Funds.

(iii) In the alternative, the Defendant is liable to account to the Plaintiff for the profits he has received for the breach of his Fiduciary Duties and/or Art. 74 Duties and/or the Customary Law Duties, including, without limitation, the full value of the Curaçao Funds and any and all investment returns and/or avoided funding costs that he has benefited from as a consequence of Famous Brands receiving the Curaçao Funds and (through his sole ownership and control of Famous Brands) the Defendant having use of the Curaçao Funds.

27. Further, or in the alternative, tThe said transfer of the Curaçao Funds was not made for any or any sufficient cause, or for a cause which has totally failed. The Defendant has been enriched at the Plaintiff's expense by the payment to Famous Brands of the Curaçao Funds and, further or

alternatively, by Famous Brand's payment of funds in the same amount as the Curaçao Funds to or for the benefit of the Defendant. Such enrichment was unjust, in that it was conferred in circumstances where there has been a total failure of cause.

The Default Judgment Claim

27A. On or about 22 November 2016, the Defendant procured a summons dated 21 November 2016 with a return date of 2 December 2016 to be delivered by post to the Plaintiff's registered office (the "**Summons**"). By the Summons, the Defendant claimed £505,000 together with interest in the amount of £17,066.33 and costs. The particulars included in the Summons provided that the claim was:

> "*in respect of unpaid directors' fees, together with statutory simple interest calculated from the date on which the said fees were due to the date of repayment in full at the current rate of 2.25% per annum or at such rate as the court may deem just and to pay the costs of the action.*"

27B. The particulars set out in the Summons were false and were known by the Defendant to be false, alternatively he is to be taken to have known their falsity, in that:

(i) At no time did the Defendant have a legal or other entitlement to fees or payment in respect of his position as a director of the Plaintiff;

(ii) Accordingly, no fees were due or outstanding to the Defendant at the time the Summons was served;

(iii) In the circumstances, the alleged debt referred to in the particulars was entirely fictious.

27C. At the time the Summons was served, the Defendant was (and knew that he was) the sole director of the Plaintiff and the only natural person with authority to cause the Plaintiff to take any steps to defend the Summons on behalf of the Plaintiff. Intending to procure for himself a judgment debt at

the expense of the Plaintiff, the Defendant dishonestly procured that the Plaintiff took no steps to defend the Summons or arrange representation for itself at the hearing of the Summons.

27C. At the hearing of the Summons on 2 December 2016, no appearance was entered for the Plaintiff and the Defendant sought default judgment on his Summons. In requesting default judgment, the Defendant implicitly represented to the Royal Court that he had a genuine entitlement to judgment on the particulars set out in Summons.

27D. By reason of the Defendant's dishonesty, the Royal Court entered judgment by default against the Plaintiff in the sum of £505,000 plus interest, fixed costs and interest on costs (the "**Default Judgment**").

27E. In the circumstances, the Default Judgment was procured by the Defendant's fraud and is liable to be set aside.

27F. Further or in the alternative, the Defendant breached his Fiduciary Duties and/or Art. 74 Duties and/or the Customary Law Duties to the Plaintiff in that:

(i) He acted in a way which he could not have *bona fide* believed to be in the best interest of the Plaintiff in that he dishonestly procured the Default Judgment to be entered against the Plaintiff for his own benefit; and

(ii) He profited from his office, in that he used his position as sole director of the Plaintiff in order to disable the Plaintiff from defending the Summons for his own benefit.

27G. By reason of the matters averred in the foregoing paragraph:

(i) The Defendant holds the benefit of the Default Judgment on constructive trust for the Plaintiff and/or is liable to account for its value to the Plaintiff;

(ii) Further or alternatively, the Defendant is liable to pay equitable compensation to place the Plaintiff in the position it would have been in but for his breach of Fiduciary Duties and/or Art. 74 Duties and/or the Customary Law Duties to the Plaintiff;

(iii) In the alternative, the Defendant is liable to account to the Plaintiff for the profits (if any) which he has received for the breach of his Fiduciary Duties and/or Art. 74 Duties and/or the Customary Law Duties.

28. ~~Further or alternatively, the said loan was made in breach of Art.74(1)(a) and/or 74(1)(b) of the 1991 Law.~~

The Credit Cards Claim

28A. At all material times, the Plaintiff held bank accounts with UBS AG ("**UBS**") in Zurich, Switzerland denominated in US Dollars (with account number ending 60W) (the "**UBS USD Account**") and in Euros (with account number ending 70K) (the "**UBS EUR Account**").

28B. During the period in which the Defendant was the Plaintiff's sole director (as pleaded above at paragraph 3), the Defendant had full and exclusive control over the operation of the UBS USD Account and the UBS EUR Account.

28C. During 2013 and 2014, the Defendant caused the Plaintiff to make substantial payments totalling over US$1.4 million and EUR138,000 to pay off credit card debts incurred by the Defendant. The best particulars that the Plaintiff is able to provide of these payments, prior to disclosure, are as follows:

(i) Between February 2013 and May 2014, the Defendant caused the Plaintiff to make the following payments (the "**Amex Payments**"):

(a) 16 payments from the UBS USD Account in the aggregate amount of US$1,361,539.17 and one payment from the UBS EUR Account in the amount of EUR101,314.34 to

American Express to discharge debts incurred by the Defendant using a Business Platinum Card with account number ending 2-04000 (the "**Business Platinum Card**");

(b) Two payments from the UBS USD Account in the aggregate amount of US$30,000 and one payment from the UBS EUR Account in the amount of EUR14,061.86 to American Express to discharge debts incurred by the Defendant using a Personal Platinum Card with account number ending 9-32008 (the "**Personal Platinum Card**");

(c) Three payments from the UBS USD Account in the aggregate amount of US$67,000 and one payment in the amount of EUR23,412.66 to American Express to discharge debts incurred by the Defendant using a Personal Centurion Card with account number ending 23009 (the "**Centurion Card**").

(ii) The statements for the Business Platinum Card were addressed to the Defendant at 8510 Wilshire Boulevard, Suite 330, Beverly Hills, California (an address habitually used by the Defendant for his personal business affairs) and named an entity or business called "AS Trading Tech Co". There is no record of any company by that name in the company registers for California, Jersey, the Isle of Man, England and Wales and Switzerland. The Defendant has refused or ignored requests by the Plaintiff to explain what "AS Trading Tech Co" is or was and, if it was or is an entity, to provide full details of his connection to it. In the premises, it is to be inferred that "AS Trading Tech Co" either was a name by which the Defendant purported to trade or refers to an entity that the Defendant ultimately owned and controlled and that the Defendant was personally liable to discharge debts incurred using the Business Platinum Card. The Plaintiff reserves the right to plead further following disclosure and exchange of witness statements.

(iii) The Personal Platinum Card and the Centurion Card were credit cards issued personally to the Defendant. The Defendant was personally liable to discharge debts incurred using the Personal Platinum Card and the Centurion Card.

(iv) None of the debts incurred by the Defendant using the Business Platinum Card, the Personal Platinum Card and the Centurion Card which the Amex Payments discharged secured or provided any commercial or other benefit to the Plaintiff. On the information currently available to the Plaintiff, the vast majority of expenditure to which such debts was of a personal nature that benefitted the Defendant, his family or his close associates.

28D. In the premises, the Defendant breached his Fiduciary Duties and/or Art. 74 Duties and/or the Customary Law Duties to the Plaintiff by procuring the Amex Payments in that:

(i) He acted in a way which he could not have *bona fide* believed to be in the best interests of the Plaintiff in that he used the Plaintiff's funds to discharge liabilities which were not the Plaintiff's in circumstances where no commercial or other legitimate basis existed to justify the Amex Payments; and

(ii) He profited from his office, in that he used his position as sole director of the Plaintiff in order procure the Amex Payments so as to discharge his own personal liabilities.

28E. By reason of the matter averred in the foregoing paragraphs, the Defendant is liable to pay equitable compensation to place the Plaintiff in the position it would have been in but for his breach of Fiduciary Duties and/or Art. 74 Duties and/or the Customary Law Duties to the Plaintiff.

~~Loss and Damage~~

29. ~~By reason of the breaches of duties aforesaid the Plaintiff has suffered loss and damage, a claim for which is made as particularised hereinafter and as may be further particularised.~~

~~Relief in respect of the Guaranty~~

30. ~~Further, the Plaintiff is entitled to and claims a declaration that;~~

~~(i) The Guaranty is a nullity and was void ab initio, or has been avoided; and/or~~

(ii) The Defendant is obliged to indemnify the Plaintiff for any loss or damage arising from or under the Guaranty.

Relief in respect of the 2015 Promissory Note

31. Further, the Plaintiff is entitled to and claims a declaration that;

(i) The 2015 Promissory Note is a nullity and was void ab initio, or has been avoided; and/or

(ii) The Defendant is obliged to indemnify the Plaintiff for any loss or damage arising from or under the 2015 Promissory Note .

Relief in respect of the Curaçao claim

32. The Plaintiff is entitled to delivery up of the US $473,509.29 transferred to the Defendant as money had and received, there being insufficient or no *cause* for the payment or such cause having totally failed.

33. Alternatively, the Plaintiff has suffered loss and damage in the sum of US $473,509.29, by reason of the Defendant's breach of duty, a claim for which is made.

Additional claims

34. The Plaintiff shall rely on the principle of ex turpi causa non oritur actio at trial for its full meaning and effect in respect of the Guaranty.

Interest

35. Further, the Plaintiff is entitled to, and claims, interest pursuant to the Court's equitable jurisdiction and/or as damages and/or pursuant to the Interest on Debts and Damages (Jersey) Law 1996 at such rates and for such periods and compounded at such rests as the Court thinks fit on such sums as are found to be due to it from the Defendant.

**WHEREBY the Plaintiff has each of themn suffered a wrong.**

**WHEREFORE the Plaintiff prays that the Defendant be convened before the Royal Court so that in the Defendant's presence and upon proof of the matters herein and fully set out the Defendants be condemned to pay to the Plaintiff or otherwise provide just relief to the Plaintiff as follows:**

The Guaranty Claim

(i) ~~An order that the First Defendant be disgorged of all and any benefit arising from or in connection with any and all breaches of duty~~ A declaration that the Guaranty is a nullity and/or is void *ab initio*;

(ii) ~~Damages for breach of statutory and/or fiduciary duty~~ In the alternative, rescission of the Guaranty;

(iii) ~~A declaration that the Guaranty is a nullity and of no effect~~ In any event, consequential orders that the Defendant account and/or pay equitable compensation to the Plaintiff;

The 2015 Promissory Note Claim

(iv) ~~An indemnity for all and any loss and damage suffered by reason of the entry into the Guaranty~~ A declaration that the 2015 Promissory Note is a nullity and/or is void *ab initio*;

(v) ~~A declaration that the 2015 Promissory Note is a nullity and of no effect~~ In the alternative, a declaration that, to the extent that the 2015 Promissory Note had any legal effect, the Plaintiff was not party to the 2015 Promissory Note;

(vi) ~~An indemnity for all and any loss and damage suffered by reason of the entry into the 2015 Promissory Note~~ In the further alternative to the relief claimed at paragraphs (iv) and (v), rescission of the 2015 Promissory Note;

(vii) ~~Damages for unjust enrichment~~ In any event, consequential orders that the Defendant account and/or pay equitable compensation to the Plaintiff;

The Asset Misappropriation Claim

(viii) ~~Delivery up of US $473,509.29 as money had and received to the Defendant's use~~ A declaration that the M-NICE Deed of Assignment, the Alleged M-BJEP Deed of Assignment and the NAPL Share Transfer are all void;

(viiia) Alternatively, rescission of the M-NICE Deed of Assignment, the Alleged M-BJEP Deed of Assignment and the NAPL Share Transfer;

(viiib) Further to the relief claimed at paragraphs (viii) and (viiia):

(a) a declaration that the Defendant holds the NAPL Shares on constructive trust for the Plaintiff; and

(b) an order requiring the Defendant to transfer legal title to the NAPL Shares to the Plaintiff and to take all necessary steps to procure the registration of the Plaintiff as holder of the NAPL Shares;

(viiic) In any event, consequential orders that the Defendant account and/or pay equitable compensation to the Plaintiff;

The Curaçao Claim

(viiid) A restitutionary award for the Defendant's and/or Famous Brand's unjust enrichment and/or an account of the money paid by the Plaintiff to Famous Brands and/or a declaration that the Defendant holds the Curaçao Funds and their traceable proceeds on constructive trust for the Plaintiff;

(viiie) In any event, consequential orders that the Defendant account and/or pay equitable compensation to the Plaintiff;

The Default Judgment Claim

(viiif) An order setting aside the Default Judgment and all orders of the Royal Court arising from it;

(viiig) Further to the relief claimed at paragraph (viiif) of this prayer, consequential orders that the Defendant account and/or pay equitable compensation to the Plaintiff;

Other

(ix) Further or other relief;

(x) Interest on all sums found to be due to the Plaintiff to be assessed;

(xi) Costs on an indemnity basis, alternatively costs on the standard basis.

**SET ASIDE THE DEFAULT JUDGMENT AND ALL ORDERS FLOWING FROM IT**

**SAVING ALL JUST EXCEPTIONS**

Given at St. Helier this 29th day of March 2022

Amended this 9th day of February 2024

____________________

~~Advocate Jeremy Garrood~~

Advocate Michael O'Connell and Advocate Simon Hurry

**The Plaintiff's Address for Service:**

~~JTC Law~~
~~28 Esplanade~~
~~St Helier~~
~~JE2 2PQ~~

Collas Crill LLP
Gaspé House
66-72 Esplanade
St Helier
JE1 4XD

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
2818 La Cienega Avenue, Los Angeles, CA 90034

A true and correct copy of the foregoing document entitled: **FOREIGN REPRESENTATIVES' STATUS REPORT (LASC CASE NO. BC647351; USDC CASE NO. 2:21-CV-04907)** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005−2(d); and (b) in the manner stated below:

**1.** **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **February 22, 2024**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Schuyler Carroll scarroll@loeb.com
- Benjamin R King bking@loeb.com, karnote@loeb.com;ladocket@loeb.com;bking@ecf.courtdrive.com
- Dare Law dare.law@usdoj.gov
- Daniel J McCarthy dmccarthy@hillfarrer.com, spadilla@hillfarrer.com;dflowers@hfbllp.com
- Kyle Ortiz kortiz@teamtogut.com, dperson@teamtogut.com;rhoward@teamtogut.com;eblander@teamtogut.com;astolp@teamtogut.com
- Keith C Owens kowens@foxrothschild.com, khoang@foxrothschild.com
- Kurt Ramlo kr@lnbyg.com, kr@ecf.courtdrive.com
- Boris Treyzon btreyzon@actslaw.com, pjs@actslaw.com
- United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov

**2.** **SERVED BY UNITED STATES MAIL**: On **February 22, 2024**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

None.

☐ Service information continued on attached page

**3.** **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **February 22, 2024**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

None.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| February 22, 2024 | D. Woo | /s/ D. Woo |
| *Date* | *Type Name* | *Signature* |