1  RAMLO LAW
   Kurt Ramlo (SBN 166856)
2  15021 Ventura Blvd. #544
   Los Angeles, CA 91403
3  RamloLegal@gmail.com
   Telephone: (310) 880-9208
4
   HERBERT SMITH FREEHILLS KRAMER (US) LLP
5  Kyle J. Ortiz (NY 4818571) (admitted *pro hac vice*)
   Kyle.Ortiz@hsfkramer.com
6  1177 Avenue of the Americas
   New York, New York 10036
7  Telephone: (212) 715-9100

8  Attorneys to the Foreign Representatives
   of Golden Sphinx Limited
9
                    UNITED STATES BANKRUPTCY COURT
10
        FOR THE CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION
11

12
   | In re                          | Case No. 2:22-bk-14320-NB |
13 |                                | Hon. Neil W. Bason |
   | GOLDEN SPHINX LIMITED,         |  |
14 |                                | Chapter 15 |
   |            Debtor in a Foreign |  |
15 |            Proceeding.         | **Foreign Representatives' Opposition to** |
   |                                | **Motion for Court-Ordered Mediation** |
16 |                                |  |
   |                                | Hearing Date: December 16, 2025 |
17 |                                | Hearing Time: 2:00 p.m. |
   |                                | Courtroom: 1545 and via ZoomGov |
18

19        Andrew Wood and Alexander Adam, in their capacities as the joint liquidators and

20  authorized foreign representatives (in such capacity, the "**Foreign Representatives**") of Golden

21  Sphinx Limited ("**Golden Sphinx**"), a corporation organized and existing under the laws of Jersey

22  (the "**Debtor**"), by and through their undersigned counsel, respectfully submit this opposition to

23  the Motion for Court-Ordered Mediation (ECF No. 183) (the "**Motion**"), filed by Garry Y. Itkin

24  ("**Mr. Itkin**").[1]

25  _____

26  [1] Mr. Itkin filed substantially similar motions in the Chapter 15 case of Aleksandr Vitalievich
    Sabadash, Case No. 2:23-bk-15574-NB (ECF No. 138) (the "**Sabadash Motion**") and the
27  involuntary Chapter 7 case of Itkin & Sabadash, Case No. 2:25-bk-11235-NB (ECF No. 118) (the
    "**Itkin & Sabadash Motion**").  For the avoidance of doubt, the Foreign Representatives also
    oppose to the relief requested in the Sabadash Motion and Itkin & Sabadash Motion, and
28  contemporaneously with the filing of this opposition, have filed responses in those cases.  Unless
    stated otherwise, references to docket entry numbers refer to filings in the above-captioned case.

## PRELIMINARY STATEMENT

This is a Chapter 15 ancillary case initiated in support of the main proceeding in Jersey. The Motion is Mr. Itkin's latest attempt to circumvent, or at the least stall, the liquidation process (the "**Jersey Liquidation**"), including Golden Sphinx's proceedings against Mr. Itkin (the "**Jersey Proceedings**"), which are under the ultimate supervision of the Royal Court of Jersey (the "**Jersey Court**").  The Foreign Representatives continue to be focused on administering the Jersey Liquidation.  This Court has already recognized the Jersey Liquidation in Jersey Court as a foreign main proceeding.  *See Order Granting Foreign Representatives' Motion for (I) Recognition of the Jersey Liquidation as a Foreign Main Proceeding and (II) Certain Related Relief* (ECF No. 42) (the "**Recognition Order**").  Despite this Court's Recognition Order and the progress being made in the Jersey Liquidation, Mr. Itkin has repeatedly tried to stall the Jersey Proceedings.  *See Statement Regarding Motion for Reconsideration of Order Dismissing Involuntary Case* at 2-3 (*In re Itkin & Sabadash*, Case No. 25-11235, ECF No. 112).  By the Motion, Mr. Itkin seeks to further delay and distract from the Jersey Liquidation and the Jersey Proceedings by forcing the Foreign Representatives to a "global mediation," in the forum of his choosing.  Such a request is improper and is just the latest effort (following objecting to recognition, seeking to lift the stay, and filing the involuntary case) to forum shop and avoid the Jersey Liquidation this Court long ago recognized as the foreign main proceeding.  The appropriate forum for any such discussions with respect to Golden Sphinx is the Jersey Proceedings in Jersey Court.  In fact, just last year, the parties to the Jersey Proceedings engaged in settlement discussions, though no resolution was reached.  The Jersey Court is the appropriate forum for any motion practice about continued or renewed settlement discussions, and it would be improper for this Court, in an ancillary capacity, to interfere with ongoing proceedings in Jersey.

The Jersey Court has repeatedly found that Mr. Itkin is in breach of the Jersey Court's orders.  *See, e.g.*, Foreign Representatives' Status Report at 1-2 (ECF No. 181); Foreign Representatives' Status Report at 2-3 (ECF No. 180); Foreign Representatives Status Report at 2 (ECF No. 179).  Having been unsuccessful in the Jersey Court, Mr. Itkin now seeks to use this Court to further delay the Jersey Liquidation and the Jersey Proceedings.  Such transparent attempt

should not be countenanced.  Indeed, there is not even any current dispute pending in this Chapter 15 case, which, again, is an ancillary proceeding commenced to support the foreign main proceeding in Jersey.  In contrast, there are active disputes in the Jersey Proceedings and there have been numerous hearings in the Jersey Court this past year, including within the last week. Accordingly, any settlement of the issues before the Jersey Court should be determined in the Jersey Proceedings in connection with the Jersey Liquidation.

<u>**BACKGROUND**</u>

In September 2022, this Court recognized the Jersey Liquidation as a foreign main proceeding – over Mr. Itkin's objection (ECF No. 37) – and the Jersey Proceedings have been proceeding in the Jersey Court despite Mr. Itkin's relentless efforts to obstruct them.  *See* Recognition Order.

Shortly after the Recognition Order was entered, Mr. Itkin then sought relief from the automatic stay with respect to certain actions pending in California and federal court.  Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362 (ECF No. 48) (the "**Relief from Stay Motion**").  This Court denied the Relief from Stay Motion.  *See* Order Denying Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362 (ECF No. 153).

On October 11, 2022, Mr. Itkin filed an application in the Jersey Court seeking to remove the Foreign Representatives as Joint Liquidators of Golden Sphinx.  That application was unsuccessful, with the Jersey Court issuing its final decision on June 23, 2023.  *See* June 23, 2023 Judgment, attached hereto as **Exhibit 1**.

A year later, in October 2023, Golden Sphinx applied to amend its claims in the Jersey Proceedings, which Mr. Itkin opposed.  A hearing took place on February 7, 2024, in respect of the application to amend, at which Mr. Itkin ultimately consented to the application and to the Jersey Court continuing to administer the Jersey Liquidation.  Following that hearing, both parties filed their amended pleadings.  In his amended answer, Mr. Itkin claimed that an alleged partnership existed between him and Mr. Sabadash and that the alleged partnership owns Golden Sphinx and all its assets.  Golden Sphinx made requests for further information and clarification from Mr. Itkin (the "**Requests**"), largely in relation to this alleged partnership.  Mr. Itkin refused to answer most

of the Requests and Golden Sphinx had to apply to the Jersey Court for an order to compel. At a

hearing on December 2 and 3, 2024, the Jersey Court ordered Mr. Itkin to provide answers to the

majority of the Requests by January 17, 2025. In doing so, the Jersey Court exercised jurisdiction

over the alleged partnership issue. The Jersey Court also ordered Mr. Itkin to pay Golden Sphinx

£78,432 on account of its costs awarded following a hearing on February 7, 2024 on Golden

Sphinx's motion to amend its pleadings. *See* February 25, 2025 Judgment, attached hereto as

**Exhibit 2**. On February 3, 2025, Mr. Itkin sought to stay the Jersey Proceedings, claiming he was

unable to consult with either his US or Jersey counsel as a result of the California wildfires. The

Jersey Court refused that motion and ordered Mr. Itkin to comply with its prior orders.

   In February 2025, in another collateral attack on this Court's Recognition Order, Mr. Itkin

commenced an involuntary Chapter 7 proceeding against a purported debtor, Itkin & Sabadash.

*See* Case No. 25-11235. That had the practical effect of putting the Jersey Proceedings on hold, as

the parties' conflicting positions on the applicability of the automatic stay caused the Jersey Court

to not continue with the Jersey Proceedings pending the involuntary Chapter 7 proceedings. In

June 2025, this Court dismissed that Chapter 7 involuntary petition. *See Order Dismissing

Involuntary Petition* (Case No. 25-11235, ECF No. 76). Following dismissal, on June 20, 2025,

the Foreign Representatives' Jersey counsel wrote to Mr. Itkin's Jersey counsel inviting agreement

on directions for the Jersey Proceedings, as well as parties' approach to discovery. Although the

Jersey Court issued directions by order dated July 23, 2025, those directions were not able to be

complied with owing to Mr. Itkin's continued breach of the Jersey Court's prior orders (to answer

the Requests and pay £78,432 on account of Golden Sphinx's costs). Matters have continually

been adjourned since then to give Mr. Itkin further opportunity to comply with those orders. By

order dated November 27, 2025, the Jersey Court issued fresh directions, and a hearing has now

been scheduled for February 11, 2026. *See* November 27, 2025 Order, attached hereto as

**Exhibit 3**; *see also* December 1, 2025 Judgment, attached hereto as **Exhibit 4**.

   As detailed in the last several status reports filed the Foreign Representatives, Mr. Itkin and

the Joint Liquidators have been actively engaged in disputes in the Jersey Court. *See* (ECF Nos.

171, 176, 180, 181). Indeed, hearings before the Jersey Court involving a dispute with Mr. Itkin

have been held as recently as last week.   The Motion is just the latest attempt by Mr. Itkin to get around recognition, the stay ruling, and the Jersey Proceedings in the Jersey Court.  It would be the antithesis to the purpose of Chapter 15, to have the ancillary case dictate how parties in the main case approach settlement discussions.

**OPPOSITION**

The Motion is an improper attempt to ask this Court to wrest control of the parties' disputes which are subject to the Jersey Proceedings pending in the Jersey Court, and of the Jersey Liquidation, which this Court has recognized as the foreign main proceeding.  The Motion asks this Court to require mediation – but this Chapter 15 case is ancillary to the foreign main proceeding.  This Chapter 15 case serves as a tool to enforce the Jersey Liquidation.  Accordingly, the appropriate forum to seek appointment of a mediator is in the Jersey Court.  Indeed, if this Court grants the Motion, it would be interfering with the Jersey Liquidation, as opposed to supporting it.

It is well established that courts will generally defer to foreign insolvency proceedings following recognition of a foreign main proceeding.  *See Wanechek Mink Ranch v. Alaska Brokerage Int'l, Inc.*, No. C06-089RSM, 2009 U.S. Dist. LEXIS 144897, at *6 (W.D. Wash. Dec. 2, 2009) ("Once a case is recognized as a foreign main proceeding, Chapter 15 specifically contemplates that the court will exercise its discretion consistent with principles of comity.") (copy of this decision is attached hereto as **Exhibit 5**); *see also In re Artimm, S.r.l.*, 335 B.R. 149, 161 (Bankr. C.D. Cal. 2005) ("In general, comity should be accorded to foreign proceedings if they do not violate the laws or public policy of the United States, and if the foreign court abides by fundamental standards of procedural fairness.") (citations omitted).  "Deference to foreign insolvency proceedings will often facilitate the distribution of the debtor's assets in an equitable, orderly, efficient, and systematic manner, rather than in a haphazard, erratic, or piecemeal fashion." *In re Artimm, S.r.l.*, 335 B.R. at 161.  Moreover, courts should reject as inappropriate an attempt by a creditor to circumvent the foreign main proceeding and seeking relief directly with the Bankruptcy Court.  *Id.* at 164-65 (overruling the objection by a U.S. creditor to the bankruptcy court's approval of a settlement previously approved by the Italian court, and that would transfer

assets of the debtor in the United States to the jurisdiction of that court, on the grounds that the

creditor's claim can be just as expeditiously and economically adjudicated in that forum).  The

Motion asks this Court to initiate and oversee mediation of disputes already properly before the

Jersey Court and heavily litigated in the Jersey Proceedings.  Mr. Itkin's attempts to circumvent

the Jersey Court's authority should not be permitted.

Furthermore, Mr. Itkin's basis for this Court's authority to grant the relief requested is

thin.  The sole authority he cites to is section 5.2 to Appendix III, of the Local Bankruptcy Rules

for the Central District of California (the "**Local Bankruptcy Rules**"), which provides in part that

a bankruptcy judge may assign matters to the mediation program.  The Local Bankruptcy Rules do

not state that a bankruptcy judge may assign matters that are the subject of a foreign main

proceeding to mediation.  And the purpose and scope of the mediation program make clear that

could not be the intention.  The mediation program is intended to provide an opportunity for

litigants to disputes in bankruptcy cases and adversary proceedings to resolve those disputes in an

efficient and economic manner.  *See* Local Bankruptcy Rules, Appendix III, § 1.0.  Cases that are

eligible for assignment to mediation are, "[u]nless otherwise ordered by the judge handling the

particular matter . . . , all controversies ***arising in an adversary proceeding, contested matter, or***

***other dispute in a bankruptcy case*** are eligible for referral to the Mediation Program."  *Id.* § 2.0

(emphasis added).

Mr. Itkin asks this Court to require the Foreign Representatives to participate in this

Court's mediation program even though there is no controversy "arising in an adversary

proceeding, contested matter, or other dispute in [this chapter 15] case."  There is no dispute in this

Chapter 15 case that is before this Court.  Any disputes between the Foreign Representatives and

Mr. Itkin in the Jersey Proceedings are appropriately addressed with the Jersey Court.

Accordingly, there is nothing to mediate in this Chapter 15 case, and there is no authority to

require the Foreign Representatives to submit to such mediation in contravention of the purpose of

Chapter 15.

In any event, even if the Foreign Representatives could be compelled to mediation in this

Chapter 15 case, any resolution reached in connection therewith would not be enforceable in the

1  Jersey Court, thereby highlighting the absurdity and futility of Mr. Itkin's request to compel

2  mediation in this Court.

3       Finally, Mr. Itkin's statement in the Motion that there has been "no effort of the parties to

4  attempt to settle any of their disputes until the November 3rd mediation" is false.  In fact, the

5  Foreign Representatives, in their capacities as Joint Liquidators, along with counsel, attended a

6  settlement conference in the Jersey Liquidation with Mr. Itkin and his counsel in September 2024.

7  While the contents of that conference cannot be disclosed, given Mr. Itkin's misleading statement

8  regarding efforts to settle matters between the parties, attempts at a settlement have been

9  previously made – and they were made in the appropriate forum.

10  **<u>CONCLUSION</u>**

11       **WHEREFORE**, the Foreign Representatives respectfully request that this Court deny the

12  Motion.

13  Dated:  December 2, 2025           HERBERT SMITH FREEHILLS KRAMER (US) LLP

14

15                                     By:*/s/ Kyle J. Ortiz*
                                    Kyle J. Ortiz

16                                     Attorney to the Foreign Representatives of GOLDEN SPHINX LIMITED

17

18  Dated:  December 2, 2025           RAMLO LAW

19                                      By:*/s/ Kurt Ramlo*

20                                      Kurt Ramlo

21                                     Local Counsel to the Foreign Representatives of

22                                     GOLDEN SPHINX LIMITED

23

24

25

26

27

28

# Exhibit 1

# Exhibit 1

Companies.

**[2023]JRC106**

**ROYAL COURT**
**(Samedi)**

**23 June 2023**

Before    :    **Sir William Bailhache, Commissioner, and Jurats**
**Hughes and Ramsden**

**Between**                           **Garry Yuri Itkin**                    **Representor**

**And**                                  **Andrew Wood**

**And**                                  **Alexander Adam**                  **Respondents**

**(In their capacity as Joint Liquidators of**
**Golden Sphinx Limited)**

**Advocate I. C. Jones for the Representor.**

**Advocates M. St. J. O'Connell and S. A. Hurry for the Respondents.**

**JUDGMENT**

**THE COMMISSIONER:**

1.    On 23 May 2023, judgment was handed down in respect of the application by the Representor for orders preventing Golden Sphinx Limited ("the Company") from instructing Advocate Jeremy Garrood and removing the Respondents from their appointment as Joint Liquidators.   In its judgment, the Court expressed concern about a number of features of the liquidation.   In essence there were three:

    (i)    There was uncertainty about whether proper notice was given to the Representor, as a creditor of the Company, of the proposed appointment of the Respondents as liquidators.

    (ii)    There was concern about the approach which had been taken by Advocate Garrood, who had been instructed by the Company before it resolved to go into liquidation and who was initially instructed by the Respondents thereafter.   In referring to that concern, we reiterate

what was said at paragraphs 9 and 10 of the Court's judgment of 23 May – Advocate Garrood did not appear before the Court at the hearing of the Representation and we accordingly did not hear directly from him. Thus, for the avoidance of doubt, we made and make no findings or criticism as to the propriety of his conduct to date, albeit we did conclude that it would be inappropriate for the Respondents to instruct him as counsel to assist them as liquidators in the liquidation of the Company.

(iii)    There was concern as to whether the funding of the Respondents by Mrs Sabadash would have an impact on their ability to perform their functions as liquidators.

2.    As we said at paragraph 47 of the judgment, we are satisfied that the Respondents are professionals who seek to do their job as liquidators notwithstanding the concerns which we have expressed earlier. However, in the circumstance that at its heart the litigation in the different jurisdictions seems to us to be an argument between two individuals, Mrs Sabadash on the one hand and the Representor on the other, we think it is important that the Respondents, who have a special status as liquidators which is recognised in Courts outside the island, have the legitimacy of that status endorsed in relation to the actions which they propose to take. They have asserted firmly to this Court that, notwithstanding that they are funded by Mrs Sabadash, they are able to apply an independent approach to the functions which they have as liquidators. We are satisfied that they intend to do so and, as we think we made plain in our judgment of 23 May, we do not express any personal or professional criticism of them beyond the comment that it was in our view an error of judgment in the particular circumstances of this case not to confirm until put under pressure in Court the identity of the party funding the liquidation and thus the conduct of the litigation.

3.    In our judgment of 23 May, we indicated at paragraph 48 that the Respondents should return to Court with details of the progress they had made on the proposed alternative funding arrangements for the liquidation and the conduct of the litigation. We had such a hearing on the date on which the judgment was handed down.

**The submissions then made**

4.    Advocate O'Connell submitted that we should sit in private to hear details of the funding arrangements which the Respondents had made. He said that these were privileged and it was likely that the Court would see materials which would include a range of options from the possibility of external funding through to the continuation of funding by Mrs Sabadash. Any funding provided externally would inevitably be linked to the question of the likely success of the litigation, which was why the submission should be heard in private.

5.    Advocate O'Connell went on to submit that the Respondents would have no difficulty in scrutinising the activities of Mrs Sabadash.  He said that if she metaphorically turned off the funding tap, then the Respondents could come back to Court and at that stage seek alternative funding.  Furthermore, the Respondents were not only comfortable with that but also with the proposition that they would update the Court from time to time, but they must be able to do so in private.  In that context he relied upon Craig v Humberclyde Industrial Finance Group Limited and Others [1999] 1 WLR 129.  In that case, a company was wound up by order of the Court (as opposed to going into liquidation at the instance of the shareholders, as in this case) but the official receiver was unable to pursue litigation in the interests of the company for shortage of funds.  The liquidator sought directions from the Court and the judge directed him to assign the actions to the former directors.  On appeal by the putative defendants of such actions, the Court of Appeal held that the liquidators' power to sell the property (which included the causes of action) was subject to the control of the Court and in exercising that control the Court's function was essentially administrative, to ensure as far as practicable the proper exercise of fiduciary powers or obligations.  In the circumstances, the judge had been entitled to exclude the representatives of the putative defendants from that part of the hearing dealing with evidence and submissions as to the merits of the company's actions against those members of the group; and the judge had given counsel for those putative defendants an adequate opportunity to be heard.  Accordingly, there was nothing unfair in the course of the proceedings taken.

6.    The decision in Craig v Humberclyde was in our judgment one of general principle, albeit that there was reference to the particular provisions of the Insolvency Act 1986 and the Insolvency Rules made thereunder, which are missing from our legislation.  In our judgment, Advocate Jones rightly agreed that Craig v Humberclyde was relevant and applied in the instant case, and accordingly we heard from Advocate O'Connell with Advocate Jones present, and briefly from Advocate Jones who then retired.  We then heard from Advocate O'Connell in private and Advocate Jones returned to make some final submissions.  This judgment is available to the Representor because it represents the conclusion of his application for the dismissal of the Respondents as liquidators of the Company, but we have sought to protect the confidence of what was said to us in private albeit, as is clear, we are taking that into account.

7.    As to the merits of their position, Advocate O'Connell noted in open hearing that the Court had been rightly concerned with Advocate Garrood's involvement at the outset, and also that the Court was able to look at the reality of the position overall.  He submitted that at one time the Company had assets of over £75 million.  It is now before the Court in an insolvent state and the reason he contended for that position was that the Representor had removed the assets or a substantial part of them.  Indeed, Advocate O'Connell submitted that the Representor admits that he did so, as part of an exercise to *'lock down'* the assets.  On his own case, it was said that the Representor had indulged in self-help security.

8.   As to the position in relation to different funding possibilities, Advocate O'Connell described the process by which litigation funders might consider a proposal.  At step one, a confidentiality agreement would be prepared in respect of the transmission of information about the litigation to prospective funders.  With that confidentiality agreement would generally be provided an opinion from counsel on the merits, sufficient to justify interest on the part of the litigation funders.

9.   Step two would represent that stage where there was active due diligence and closer discussion. A term sheet would identify the matters to be negotiated.

10.  Step three would involve the investment of funds in the litigation and the execution of the deal in respect of which such funding would be provided.

11.  Step four would involve ongoing monitoring of the litigation in respect of its progress and potential returns.  That was an onerous stage in the proceedings because the funders would set up a credit committee or investment committee to consider the extent to which they would continue to put their own funds at risk.

12.  The cost of all this was enormous.  The external funder generally took a substantial uplift which could be up to 50% on all the actual outlay, depending on the extent of the risk.  The result was that there was less money available to creditors at the end of the litigation, if it were successful.

13.  It was furthermore said that there was no current complaint of what Mrs Sabadash had done as director (other than in her convening of the creditors' meeting) so any investigation of her conduct was theoretical rather than real at this stage.

14.  That was the extent of the submissions made in Advocate Jones' presence insofar as external funding was a possibility.  It was said to us that the materials which the Respondents wished to put forward would disclose their independence as liquidators, but it might be against the interests of the Company to do so in the presence of Advocate Jones.

15.  Advocate Jones submitted that, as far as one could tell, we were not at the process point at the moment.  He had no objection in principle to third party funding, but it is difficult for the liquidators if they are funded by Mrs Sabadash, and their conduct since August 2022 shows that to be so. As director, she refused payment of a substantial judgment debt due by the Company to his client, the Representor.  The Company under her direction opposed his application to have the Company wound up and issued its own claims in respect of the substance of the judgment debt which it owed.  The bottom line is that the Representor criticises Mrs Sabadash at every point,

and it is entirely accurate to describe the litigation as, in effect, litigation between his client and Mrs Sabadash.

16.  In response, Advocate O'Connell submitted that Advocate Hurry had written to Advocate Jones on 21 February 2023 seeking details of what the precise concerns were, and yet there had been no reply.  Advocate Jones confirmed that was correct.  He said he had set out the problems already.

17.  At that point, Advocate Jones left Court and Advocate O'Connell addressed us in confidence. However, it is not necessary or relevant to our decision to refer to anything said to us in private for the purposes of this judgment.

18.  We were presented with a draft affidavit called the second affidavit of Andrew Wood.  It was unsworn, but as Mr Wood was present in Court, he swore it before us as being true to the best of his knowledge, information and belief.  In his affidavit, Mr Wood explains how the Respondents' consistent view has been that before they cause the Company to continue or commence Court proceedings to recover the Company's assets, they need to have clarity on the funding arrangements for any such proceedings, including any adverse costs award.

19.  Apart from being registered as an approved liquidator in Jersey, Mr Wood is managing director of Teneo Financial Advisory Limited and, as mentioned, joint liquidator of the Company.  He put before us a copy of an agreement (the "Teneo Agreement") entered into with Mrs Sabadash on 4 July 2022.  In that agreement, Mrs Sabadash undertook to pay the Respondents in respect of their remuneration and all the liquidation costs, expenses and disbursements.  There was no uplift or other high percentage recovery for Mrs Sabadash in the event of recoveries being made by the Company.  That distinguished the Teneo Agreement from what was common in funding agreements with commercial funders.  As a result, the Teneo Agreement was advantageous to the Company's stakeholders.

20.  However, that agreement did not provide a sophisticated framework for handling the litigation which might be necessary.  A draft of a litigation funding agreement (the "DFA") was first provided to Mrs Sabadash for comment on 14 December 2022.  It remained unsigned by both parties at the date of the hearing, albeit that both the Respondents and Mrs Sabadash appear to have acted so far as if it had been signed.  Mrs Sabadash has approved the costs budget and the additional commitment (as defined by the DFA) thereby paving the way for the Respondents to attempt to recover assets of the Company with potentially considerable value.  The DFA has in fact been amended from time to time, albeit still remaining unsigned, given the lapse of time since

it was first drafted, and the developments which have taken place.  The Court was shown the amendments.

21.   What is particularly important, according to Mr Wood, is that one notices from the revised version of the DFA, that Clause 9, which relates to the control and conduct of each action, has not changed.  It provides as follows:

> *"9.1   The joint liquidators [the Respondents] (on behalf of the Company) shall have overall and day to day control and conduct of, and responsibility for, each Agreed Action.*
>
> *9.2.   The funder shall have no control or conduct of any Agreed Action."*

22.   *"Agreed Action"* is defined in the DFA as action or additional action as agreed between the funder and the Company in accordance with Clause 4.3.  Although it may subsequently have changed, at the date of the hearing, that clause was in these terms:

> *"Upon receipt of the Initial Advice the Company will procure that a copy of the Initial Advice is delivered to the funder.  The funder and the Company will negotiate in good faith to agree to investigate, commence and / or pursue one or more agreed actions."*

23.   Mrs Sabadash is the funder.  The Initial Advice is defined as a written advice on the merits of the actions comprising the litigation between the Company and, among others, the Representor, and any other additional action provided by legal counsel.

24.   Advocate O'Connell emphasised that nothing in the Teneo Agreement or in the DFA gave Mrs Sabadash any right to require the Respondents to take particular steps.  As a result it could fairly be said that the Respondents were entirely independent of the funder and it was proper for them to proceed on that basis.

25.   As to external funding, the Respondents had made some enquiries.  Their enquiries with Harbour Litigation Funding were more advanced than enquiries with others – counsel's advice had been provided and Harbour had indicated a potential interest.  Detailed negotiations had not however taken place, although it was indicated by Harbour that they would want a return of between 1.35 and 3 times their investment.  The discussions with two other funders had barely started.

26.   In Advocate O'Connell's submission, if the Court were satisfied that the Respondents could properly fulfil their functions, funded as they were by Mrs Sabadash, then there was no reason to spend additional monies through an external funding agreement of the kind described.  He said that we should be so satisfied – if the Respondents found themselves in difficulties, then they could make a Beddoe application and seek approval for external funding.  He agreed that Advocate Jones could be informed of this.  He also agreed that Advocate Jones could be informed that Mrs Sabadash has promised only to pay for the agreed actions.  When Advocate Jones was informed of this on his return, he submitted that the possibility of a Beddoe application did not address the difficulties which have been identified, other than that the Court will be able to supervise the performance of the Respondents' functions.

27.   We make the following observations about the DFA as it was shown to us at the hearing:

(i)   It remained unsigned.  In our judgment it should be executed as soon as convenient.  It may be that Mrs Sabadash has so far acted in accordance with its terms, but this is not the type of contract in our judgment which could successfully lead to a conclusion that its part performance revealed its binding nature.

(ii)   The funding obligation on Mrs Sabadash was to pay the amount of a funding request within five business days of receipt.  Amounts paid are then treated as an expense of the liquidation of the Company.  The funding request must be accompanied by such information as Mrs Sabadash may at any time reasonably require.  It follows that if the Respondents were to come across circumstances which they considered should be investigated but which were potentially adverse to the interests of Mrs Sabadash, they would, on the face of it, be obliged to inform her that this is what the funding was required for.

(iii)   The DFA only provides for Mrs Sabadash and the Company to negotiate on the basis of the initial advice for the investigation, commencement or pursuit of one of more Agreed Actions – that is to say, actions agreed between Mrs Sabadash and the Company.  There is indeed an additional provision headed *'Additional Commitment'* – this refers to the need for agreement between Mrs Sabadash and the Company of a costs budget for any agreed actions.

(iv)   When we said in our earlier judgment that in litigation he who pays the piper calls the tune, it seems to us that this was entirely apposite to the present case, not in Mrs Sabadash having the ability to tell the Respondents what they must do, but rather as a mechanism for curtailing what they were able to do simply by reason of her control of the purse strings.

(v)    The DFA provides that Mrs Sabadash may at any time discontinue the making of advances in respect of a commitment at her absolute discretion save that she would remain liable for discontinuation costs and any adverse costs order.

**Conclusion**

28.    It was said to us by Advocate O'Connell that, if the Respondents found themselves in difficulties with the performance of their obligations, then they would be able to return to Court and apply for directions, seeking approval for external funding.  That submission was made in Advocate Jones' presence and arose in the context of an acceptance that Mrs Sabadash had promised only to pay for the Agreed Actions.  In his submission in response, Advocate Jones said that the possibility of a Beddoe application did not address the difficulties which previously had been identified, other than to show that the Court could supervise the performance of the Respondents' functions.

29.    Nothing that we have seen has caused us to change our view that Mrs Sabadash in essence retains practical control over what the Respondents are able to do because, if she does not approve of their intended actions, she is not obliged to provide the funds for them.  For as long as the Respondents take steps in the liquidation which are acceptable to her, she will continue to pay for them.  Nothing that we have seen or heard suggests that any of the preliminary concerns which we expressed in our judgment of 23 May have dissipated, although we do accept, as we indicated at the hearing, that the Respondents have every intention of acting professionally as liquidators of the Company and taking steps which are in the best interests of its stakeholders.

30.    The far more difficult question has been the next steps from here.  The Company has resolved to go into liquidation.  It is not a resolution to go into voluntary liquidation, so far as one can tell, because the Company does not seem to be able to procure that a statement of solvency is provided: Mrs Sabadash would have to accept an obligation to come up with payment of the substantial judgment debt in favour of the Representor for that to take place.

31.    Accordingly, if we were make to an order relieving the Respondents of their functions, the question we must address would be what further order would be right or proper.

32.    Under Article 175 of the Companies (Jersey) Law 1991, as amended (the "Law"):

*"175.  Appointment or removal of liquidator by the court*

> *(1)      The court may appoint a liquidator if for any reason there is no liquidator acting in a creditors' winding up.*
>
> *(2)      The court may, on reason being given, remove a liquidator in a creditors' winding up and may appoint another.*
>
> *(3)      The appointment or removal of a liquidator under this Article may be made on request by the company, a director of the company, a creditor, the Viscount, the Commission, the Minister or any other person."*

33.    Although it is slightly unclear, we think that this is a creditors' winding up and therefore the Court has the power under Article 175(2) to remove the Respondents.  However, the liquidation would continue.  Article 185A of the Law allows for a termination of the creditors' winding up, but by paragraph (2) of that Article, any application, whether by the liquidator of the Company or, by the members sanctioned by special resolution by the Company, is to be refused unless the Court is satisfied that the Company is then able to discharge its liabilities as they fall due.  There is no basis at present for thinking that the Company would be able to do so.

34.    Replacing the present Respondents with any other professional liquidators funded by Mrs Sabadash would essentially raise the same concerns as have been raised in connection with the Respondents.

35.    It would seem to follow that if we were to adopt this course, it would be to drive the appointment of external funders, a much more expensive solution which these Respondents have indicated they will follow in any event if it becomes necessary for them to do so to fulfil their obligations as liquidators.

36.    None of these options appears necessarily attractive.  In our judgment, the least worst option is that the Respondents should continue in their appointment and accordingly we have reached the conclusion that the Representation, insofar as it seeks the removal of the Respondents, should be dismissed.  Having received from the Respondents their undertaking that Advocate Garrood will not be reinstructed by them in the course of this liquidation, it is unnecessary to make the further orders in that connection which the Representor had sought.

37.    It will clearly be necessary, if Mrs Sabadash gets to the point she does not wish to fund the liquidation any further, for the Respondents to make a Beddoe style application to the Court for approval to seek third party funding.  On the basis, however, that the liquidation will continue to

be funded by Mrs Sabadash, we think it right to add to our decision just given that it would be appropriate for the Respondents to apply at this stage for a direction pursuant to Article 186A of the Law, to seek approval of the steps which the Respondents intend to take in litigation in Jersey or in other jurisdictions.  In our view, it would be inappropriate to convene the Representor to any such application insofar as the application concerns litigation hostile to his position.  Inevitably, it would be necessary for the Respondents to set out in any such application the merits and demerits of the proposed action, as they are advised at that time.  The purpose of the application, as we currently see it, is not to advise the Respondents as to what action they should or should not take; but rather to ensure that, given the special status which liquidators have in most other advanced jurisdictions, this Court can be satisfied that, in the circumstances of this case, which as we have said we regard as essentially litigation between two warring creditors of the Company, no unfair advantage is obtained by one of those creditors through her appointment and payment of these liquidators.  It goes without saying that approval of any such action, whether in Jersey or other jurisdictions, would not amount to an endorsement of the merits of the action in question of itself – and given the possibility that much of the litigation may yet occur in Jersey, it is also necessary that a different Court be constituted to deal with that litigation than with any application under Article 186A.

38.    Finally, we are available to be addressed on costs of the Representation if either party wishes to make an application in that connection, and they should apply to the Bailiff's Judicial Secretary to fix a date in the usual way in that event.  It may, however, be helpful to give a preliminary indication of our current views.  It will be apparent that, although the Representation has been dismissed, it has been partially successful in the sense that an undertaking has been given not to reinstruct Advocate Garrood, and because the Court has been satisfied that there are circumstances unconnected with the integrity or professionalism of the Respondents which cause concern in relation to their appointment; and yet on the other side, the Representation has been dismissed and that prayer for relief has not been granted.  Our preliminary view is that the equity in these circumstances is that each side should bear their own costs – that has the effect of neutrality as between the two warring creditors on this particular issue, which, provisionally, as indicated, if not heard by the parties, might seem at this stage to be the equitable result.

**Authorities**

Companies (Jersey) Law 1991.

Insolvency Act 1986.

Craig v Humberclyde Industrial Finance Group Limited and Others  [1999] 1 WLR 129.

# Exhibit 2

# Exhibit 2

# In the Royal Court of Jersey

---

**Samedi Division**                                    **2021/149**

---

**In the year two thousand and twenty-five, the twenty-fifth day of February.**

Before Advocate David Michael Cadin, Master of the Royal Court.

BETWEEN                          Golden Sphinx Limited
                              (In Creditors' Winding Up)              PLAINTIFF

AND                               Garry Itkin                    DEFENDANT

      UPON hearing Counsel for the Parties;

      AND for the reasons set out in a File and Parties' judgment of even date;

      THE COURT ORDERED THAT:

1.     the parties may disclose the said File and Parties' judgment to the US Court;

2.     the proceedings shall be adjourned for 6 weeks, and a date shall be fixed for the said adjourned hearing, TE ½ day, by close of business on 28 February 2025.

Master of the Royal Court

CC (JB) & AC (MO'C)
BJ (IJ)

# 2021/149
# File and Parties Only

**ROYAL COURT**
**(Samedi Division)**

**25th February 2025**

Before    :   Advocate David Michael Cadin, Master of the Royal
Court.

Between                        Golden Sphinx Limited                        **Plaintiff**

(In Creditors'' Winding Up)

And                             Garry Itkin                                **Defendant**

Advocate J Barham/Advocate M O'Connell for the Plaintiff.

Advocate I Jones for the Defendant.

**JUDGMENT**

**Introduction**

1.    This judgment is provided to explain my reasons for granting a short adjournment of the
proceedings for 6 weeks on 25 February 2025.

**Background**

2.    GSL issued proceedings against Mr Itkin in April 2022.  In July 2022, proceedings were stayed
following GSL having entered into a creditors' winding up.  That stay was lifted on 6 February 2024
and permission was given to GSL to file an Amended Order of Justice and for consequential
amended pleadings.  Thereafter the proceedings were stayed for ADR.

3.    The matter came back before me in December 2024, when for the reasons set out in a judgment,
reported at [2024] JRC 279, I ordered that Mr Itkin pay GSL the sum of £78,432 on account of
costs, and that he answers a number of Requests for Further Information by 17 January 2024.  A

hearing to determine the costs of the applications and to give further directions was originally scheduled for 14 January 2025 but this was subsequently moved, by consent, to 25 February 2025.

4. By an email dated 10 January 2025, Advocate Jones, for Mr Itkin, notified Advocate Barham, for GSL, that Mr Itkin had been the subject of an evacuation order relating to the Californian wildfires, and that the principal lawyer in his US legal team had been similarly impacted. Advocate Jones proposed an extension of 7 days *"in the first instance"* to the deadline for the provision of the further information. Advocate Jones wrote again on 23 January 2025, indicating that matters had not changed, and he requested a further extension to 31 January 2025. Advocate Barham replied, agreeing to *"a final extension to 31 January 2025 on condition that the interim payment on account of costs (the Costs) is also paid by that date."* On 31 January 2025, Advocate Jones notified Advocate Barham that matters had not improved in California and he was therefore instructed to seek a stay.

5. Advocate Barham's response, dated 31 January 2025, is relevant in that he noted that:

> *"…we have had access to publicly available information which shows that your client's home is not in an evacuation zone but is in a zone marked as "safe". Accordingly, if your client would like the JLs to consider agreeing a further extension (a general stay clearly being inappropriate in the circumstances), please provide detailed evidence to support the assertion that your client and his legal team have been displaced. We would expect this to include copies of the evacuation orders/notices, detail their current circumstances, explain what systems and documents they require access to in order to respond to the RFIs and why they are unable to access them from their present locations and provide you with instructions, if that is the issue.*
>
> *Further, we note that you have not addressed the payment of outstanding Costs. Please could you confirm, by return, that they will now be paid or provide an explanation as to why they cannot be paid."*

6. Mr Itkin issued an application on 3 February 2025 to stay the proceedings and to vacate the hearing listed for 25 February 2025. The Plaintiff also issued an application on the same day for unless orders.

7. Those applications were heard by me on 17 February 2025, when for the reasons given in an *ex tempore* judgment, I refused Mr Itkin's application for a stay and varied my previous order of 13

December 2024, so as to require Mr Itkin to pay the monies on account of costs and to answer the various requests for further information, by noon on 24 February 2024.

8.   By email dated 21 February 2025, Advocate Jones for Mr Itkin, notified the Court that Mr Itkin had filed a bankruptcy petition in relation to the "Itkin-Sabadash Partnership" and that that petition prevented both him and the Plaintiff from taking any further action in the proceedings before the Royal Court on the basis that:

> *"As the Joint Liquidators will doubtless be advised, the filing by Mr Itkin of the Involuntary Petition operates as an automatic stay under '11 U.S.C. section 362(a)'. The stay applies to all and any actions which concern any property claimed to be directly and indirectly owned by the Itkin-Sabadash partnership. As your clients will be aware, the Itkin-Sabadash partnership asserts claims ownership of the real property at 58 Beverley Park in Beverly Hills; '11 U.S.C. section 362(a)' as of yesterday, operates so as to prevent your clients taking any further action in GSL -v- Itkin - 2021/149."*

**The Hearing**

9.   Having recently sat, and delivered an *ex tempore* judgment, matters relating to this case, and in particular, the evidence filed, were fresh in my mind.

10.   Mr Itkin swore an affidavit on 11 February 2025 setting out the basis for his application for a stay.  That affidavit recorded his address as 8501 Wilshire Blvd., Suite 330 Beverly Hills, California, USA and noted that:

> *"3... The reason I seek an adjournment and / or a stay is because of the recent devastating events in the Los Angeles area; specifically, the Wildfires. Since 7th January this year I have not been able to engage meaningfully with this litigation. I have not had the time or proper opportunity to speak with Advocate Jones, certainly not substantively, nor have I been able to take any advice from my US legal team who have been similarly impacted by the Wildfires...*
>
> *5... Many homes suffered extensive smoke damage to their homes - mine was one of these homes - in particular to their HVAC systems. My own system is yet to be repaired and / or replaced and until it is, living at home with my family and my nearly 87 year old mother is extremely difficult owing to the various respiratory problems that it causes. Naturally a lot of my time and focus has had to be on the well-being and safety of my family - not to mention myself...*

*9. While I feel very fortunate to have been left with my own home largely intact - notwithstanding the extensive smoke damage to the HVAC system; and while I am fortunate to not have been directly impacted by the Wildfires in the way that others have, I have nevertheless been living in close proximity to the impacted areas, at this point on a long term basis - I and my legal team, continue to face a range of long-term challenges such as our mental and physical health, economic stability, and overall sense of security….*

*16. Unfortunately, the reality of the situation, as I have tried to detail above, is that I remain unable to consult with my US legal team and as a consequence I am unable to give Advocate Jones full instructions. I will therefore not be able to comply with the requirements of the current orders of the Court; nor would I be able to meet or otherwise satisfy the proposed 'unless order'. As matters stand that is simply not possible."*

11. Mr Wood, one of the Joint Liquidators of GSL, swore an affidavit on 12 February 2025.  In that affidavit, he noted that:

(i)    in all of the affidavits sworn by Mr Itkin in these proceedings, Mr Itkin had given his address as 8501 Wilshire Blvd., Suite 330 Beverly Hills, California;

(ii)   Mr Itkin's US lawyer, Mr Atabek, made a solemn declaration under pain of perjury on 17 March 2022 in support of an application by Mr Itkin to set aside a default judgment in which he stated that:

*"Mr. Itkin further advised me that he obtained the CMC Statement from the offices of his accountant located at 8501 Wilshire Blvd., Suite 330, Beverly Hills, California (the "Wilshire Address"). Mr. Itkin stated to me that he used to work out of the Wilshire Address, but ceased doing so in the year 2015."*

(iii)  in other Californian proceedings, Mr Itkin appears to be associated with a property at 13355 Mulholland 20 Drive, Beverly Hills, CA 90210;

(iv)   Mr Itkin is represented by ACTS Law and by Atabek & Co. with addresses at 16001 Ventura Boulevard and New Beach respectively;

(v)    according to the publicly available information, neither of Mr Itkin's addresses, nor those of his lawyers, fall within the area affected by the wildfires.

12.    Notwithstanding Mr Itkin's apparent inability to consult with his US lawyers, within 2 days of my orders, he managed to engage with US lawyers and to file a bankruptcy petition in relation to the alleged partnership.  He did not however pay the monies on account of costs or file any responses to the Requests for Further Information.

13.    Moreover, in issuing the bankruptcy petition, he recorded both his mailing address and that of the alleged partnership, as 8501 Wilshire Blvd., Suite 330 when according to his lawyer's 2022 declaration, this was neither his residential address nor his business address.

14.    At the hearing, Counsel for the joint liquidators was at pains to stress that the joint liquidators did not want to breach, wilfully or at all, any orders of the US Court and that it was a matter for me as to how I progressed the litigation, if indeed, I did so.  Counsel for Mr Itkin submitted that having issued the petition, it was now for the joint liquidators to get guidance from the Royal Court, in the form of a separately constituted bankruptcy court, as to what they should do.

15.    From the Court's perspective, this was not a very satisfactory position.  Having chosen to issue a petition rather than to comply with my orders, and to have done so this close to the hearing in Jersey, it was incumbent on Mr Itkin to provide both the Court and the joint liquidators with proper evidence as to what he alleged the consequences of his actions to be.  Bald assertions in correspondence were not sufficient.

16.    However, out of an abundance of caution and with proper deference to the US Courts, it appears to me that I should not, at this stage, take any substantive steps in the Jersey proceedings until all parties have had an opportunity to take advice, to consider their respective positions and to bring such applications, if any, as they think fit.

17.    Accordingly, I adjourn the proceedings for 6 weeks and direct that a date be fixed for the said adjourned hearing by close of business on 28 February 2025.

# Exhibit 3

# Exhibit 3

# *In the Royal Court of Jersey*

---

**Samedi Division**                                              **2021/149**

---

**In the year two thousand and twenty-five, the twenty-seventh day of November.**

Before Advocate David Michael Cadin, Master of the Royal Court.

BETWEEN                  Golden Sphinx Limited
                         (In Creditors' Winding Up)                PLAINTIFF

AND                          Garry Itkin                        DEFENDANT

UPON hearing Counsel for the Plaintiff and Mr Itkin in person IT IS HEREBY ORDERED THAT:

1.  the unless order set out in paragraph 2 of the Act of Court dated 2 October 2025 and paragraph 1(a) of the Act of Court dated 23 July 2025 be discharged without prejudice to the sum of £78,432 payable on account of costs under the Act of Court dated 13 December which remains extant and enforceable as a judgment debt without further order in accordance with the provisions of Rule 12/4 of the Royal Court Rules 2004.

2.  by 9 January 2026:
    a.  the parties shall provide to one another, on affidavit, details of the extent of the hard copy documents in their custody power and/or possession which are or might be subject to Practice Direction RC 17/07 together with the information required pursuant Practice Direction RC17/08; and
    b.  the parties shall exchange draft discovery protocols in relation to documents held in electronic form;

3.  thereafter the parties shall use reasonable endeavours to agree the scope of the said protocols before 30 January 2026;

4.  unless Mr Itkin complies with the orders in paragraphs 2 and 3 above, his Answer shall be struck out;

5.  any issues arising in relation to the said affidavits or protocols shall be determined at the hearing scheduled for 11 February 2026, TE 1 day;

6.  the Case Centre bundle freeze date for the said hearing shall be noon on 4 February 2026;

7.  the Defendant shall pay the Plaintiff's costs of and incidental to the application to

enforce the unless order and of and incidental to the Defendant's summons, to be summarily assessed on an indemnity basis, if not agreed and it is further provided in accordance with Practice Direction RC 17/11 that:

a.  by 4pm on 4 December 2025, the Plaintiff shall provide to the Defendant a schedule of the costs claimed and such schedule shall be in the form of a live excel document containing the information required under paragraph 4 of Practice Direction RC 17/11 together with such other information as it wishes to rely on for the purposes of the summary assessment and for the avoidance of doubt, any costs relating to the summary assessment shall be separately identified;

b.  by 4pm on 11 December 2025, the Defendant shall provide to the Plaintiff such submissions or objections as he thinks fit in relation to the costs claimed and if there are granular objections to individual items claimed in the schedule of costs, these shall be identified in additional columns added to the said live excel document (which may include for example columns labelled Objections, Time allowed, Costs allowed) together with such other material as he thinks fit;

c.  thereafter the parties shall have until 18 December 2025 in which to agree the amount of costs to be paid; and

d.  in default of agreement, on 19 December 2025, the Plaintiff shall upload to Case Centre under section M [Costs]:

   i.  the live excel document containing the costs claimed and the objections; and

   ii.  any further material relied upon by either party and provided to the other in accordance with the above directions; and iii. any relevant offers which either of the parties might wish the court to take into account when assessing the costs of the taxation, such offers to be entitled "Offer Correspondence: Open/ WPSATC: [date]: [from]" (as the case may be).

e.  such summary assessment shall occur on or after 5 January 2026.

8.  liberty to apply.

Master of the Royal Court

CC (JB)
Mr G Itkin (LiP)
Bailiff's Judicial Secretary (by email for information)

# Exhibit 4

# Exhibit 4

# [2025]JXXnnn

**ROYAL COURT**
**(Samedi Division)**

**1st December 2025**

Before  :  **Advocate David Michael Cadin, Master of the Royal Court.**

Between                            **Golden Sphinx Limited**                    Plaintiff

**(In Creditors'' Winding Up)**

And                                **Garry Itkin**                        Defendant

**Advocate J Barham for the Plaintiff.**

**The Defendant in person.**

## JUDGMENT

**Introduction**

1.    This is my judgment in relation to applications by:

(i)    the Defendant, Mr Itkin, to set off the amount due by way of interim payment on account of costs and the subject of an unless order, against his existing judgment against the Plaintiff ("GSL"); and

(ii)    GSL for judgment against Mr Itkin on the basis of his failure to comply with the unless order.

**Background**

2.    The background to these proceedings is set out fully in my judgments of 13 December 2024, reported at [2024] JRC 279, 25 February 2025 reported at [2025] JRC 055 and 2 October 2025, reported at [2025] JRC 244. I do not propose to recite that background in this decision.

16492165.1

3.   Since giving judgment on 2 October 2025, Mr Itkin has:

(i)   filed a Re-Amended Answer to reflect the amendments effected by that judgment;

(ii)   provided further information and documents which GSL acknowledges, in its Skeleton Argument, amount to *"compliance in substance"* with the orders made for further information;

(iii)   failed to pay the sum of £78,432 required under the unless order;

(iv)   had further orders made against him for taxed costs in the sum of £15,284.45 and an interim payment on account of costs in the sum of £79,960.64;

(v)   filed a further affidavit (sworn on 19 November 2025) and issued an application to strike out the proceedings (due to be heard in February 2026).

4.   Mr Itkin remains unrepresented and complains that he is at a material disadvantage as a result of his previous advocate's refusal to allow a new advocate to be instructed.   Given that Mr Itkin managed, without representation, to answer satisfactorily the outstanding Requests for Further Information, and to issue a further application, any disadvantage may be more perceived than real.

**The Parties' Submissions**

5.   GSL submits that Mr Itkin has failed to comply with the terms of the unless order in relation to costs which, by Act of Court dated 23 July 2025, required the Defendant to pay by 31 July 2025 the sum of £78,432 on account of the costs ordered on 7 February 2024, and in default, *"the Defendant's Amended Answer shall be struck out and he shall be debarred from defending the proceedings"*. The date for compliance was subsequently extended by an Act of Court dated 2 October 2025 to 31 October 2025.   As at the date of the hearing on 24 November 2025, those monies had not been paid.   GSL notes that:

(i)   as set out in an affidavit from a Mr Keenan dated 14 November 2025, Mr Itkin has, or has had, company appointments and/or interests in property which he has not disclosed to the Court;

(ii)   despite Mr Itkin arguing that there must be a trial on the merits, he is still causing procedural issues and/or unnecessary costs to accrue through his lack of full and frank disclosure as to his means and/or the additional summons he has now issued; and

(iii)   Mr Itkin has continued to take steps in related US proceedings and, until recently, to instruct his Jersey Advocate; however, he had never provided any cogent explanation as to why he has been unable to make the payment on account of costs.

6.    Mr Itkin rejects the material set out in Mr Kennan's affidavit and submits that he is impecunious and unrepresented.  He says that it is therefore inappropriate to trigger the sanction in the unless order, particularly since he has an outstanding judgment against GSL.

**Set Off**

7.    In this case:

(i)    GSL has the benefit of an order for an interim payment on account of costs against Mr Itkin in the sum of £78,432;

(ii)    Mr Itkin has a judgment from the Royal Court in 2016 for the sum of £505,000, which was upheld by the Royal Court in 2021 and remains outstanding in the sum of approximately £867,162 including interest.

(iii)    whilst that judgment is impugned in these proceedings, Commissioner Bailhache described the merits of that challenge as *"both sides have an arguable case, and a decision as to which was correct could only be reached following evidence being given at trial"*;

(iv)    if the amount of the interim payment for costs were set off against the order obtained by Mr Itkin against GSL, the unless order will have been satisfied and there will be no need to consider enforcement.

8.    Mr Itkin submits that it is entirely illogical and inappropriate not to set one judgment off against the other; both are judgments of the Royal Court requiring payment of sums of money and there is a right of *"legal or equitable set-off"* in respect of these mutual debts.  Moreover, he says that it would be wholly wrong for the Royal Court to prefer one judgment to another by enforcing the unless order and ignoring the other.  Conversely, GSL submits that there is no jurisdiction to set off one judgment

against another; alternatively, to the extent that a discretion exists, it should not be exercised in favour of Mr Itkin.

9.    The Royal Court Rules (Rules 8/1 and 8/2) make provision for the Court to take set-offs into account when determining interim payments under RCR Part 8.  However, for the purposes of that Part of the Royal Court Rules, an interim payment excludes an interim payment on account of costs (RCR 8/1(1)).  There is no express provision under RCR 12/2(3) dealing with interim payments on account of costs and set-off, but in T v S [2025] JRC 162, I held that:

> **"22.    As to whether cost orders in favour of the paying party should be taken into account when deciding to make an interim payment, in my judgment, this is a matter for the discretion of the Court making the order, albeit that the usual approach is to take such orders into account…"**

10.   The position in Jersey can be contrasted to that in England where section 72 of the County Courts Act 1984 expressly allows judgments to be set off against one another in accordance with the provisions of CPR r.40.13.  In Fearns v Anglo Dutch Paint and Chemical Co. Ltd [2010] EWHC 2366 (CH), the High Court held that:

> **"37. CPR r.40.13 applies where the court gives judgment for specified amounts both for the claimant on his claim and against the claimant on a counterclaim: in such circumstances the court may order the party whose judgment is for the lesser amount to pay the balance.  More generally, it has long been the practice of the courts as part of their inherent jurisdiction over their own proceedings to allow cross-judgments given in the same action, or in different actions, to be set off against each other: see Edwards v Hope (1885) 14 QBD 922; Reid v Cupper [1915] 2 KB 147; In re a Debtor, No 21 of 1950 (No 2) [1951] 1 Ch 612. As these cases show, this jurisdiction encompasses judgments for damages and also orders for costs. Unlike legal or equitable set-off, such a 'set-off involves treating the judgment in favour of one party as satisfying pro tanto the judgment in favour of the other. There is accordingly an extinction of liabilities.**
>
> **38. It is clear from the authorities mentioned, and from the word "may" in CPR r.40.13(2), that the power of the court to order such a set-off is discretionary. In Edwards v Hope, supra, Brett MR (at 926) and Bowen LJ (at 927) described the power as "an equitable jurisdiction". By this they plainly did not mean a jurisdiction exercised by courts of equity (as they were referring to the**

*practice of the common law courts) but a jurisdiction to order a set-off where the*
*court considers it just and equitable to do so."*

11.  Whilst there may not be a statutory provision allowing set off, it would appear from <u>Fearns</u> that the English Courts asserted power so to do under their inherent jurisdiction and in my judgment, the position in Jersey is no different.  Moreover, as Master Thompson noted in <u>Bertrand des Pallieres v RBC Trustees (CI) Limited</u> [2018] JRC 172, although the Master does not have a *"general inherent jurisdiction"*, unlike the Royal Court, he does have such inherent jurisdiction as may allow him *"all procedural power necessary to act as a court in a meaningful sense"* (reflecting the words of the Court of Appeal in paragraph 37 of <u>Halabi v Wilson and HMRC</u> [2018] JCA 114).  In my judgment, I have a general inherent jurisdiction to stay enforcement of orders, and to direct that any order issued by me be set off against any other existing order.  Absent such a power, I would not be a court in a meaningful sense.  Accordingly, I reject GSL's submission that I do not have jurisdiction to set off the order requiring an interim payment from Mr Itkin, against the judgment of the Royal Court.

12.  However, this is not a simple case of two, equally enforceable, mutual judgments.  GSL is in a creditors' winding up and Article 166 of the Companies (Jersey) Law 1991 provides that:

*"…the same rules prevail with regard to the respective rights of secured*
*and unsecured creditors, to debts provable, to the time and manner of proving*
*debts, to the admission and rejection of proofs of debts, to the order of payment*
*of debts and to setting off debts as are in force for the time being with respect*
*to persons against whom a declaration has been made under the Désastre Law*
*."*

13.  Under the Bankruptcy (Désastre) (Jersey) Law 1990 (the "Désastre Law"), judgments are provable in the *désastre* (under Article 29(1)), and only recoverable in the *désastre* (Article 10(1)(a):

*"10(1)     With effect from the date of the declaration a creditor to whom*
*the debtor is indebted in respect of a debt provable in the "désastre" shall not –*

*(a)     have any other remedy against the property or person of the debtor*
*in respect of the debt;…"*

14.  Accordingly, Mr Itkin's judgment against GSL is unenforceable outside of the proof process and in my judgment, any set off is currently prohibited as a result of Article 10(1)(a) of the Désastre Law.  If I am wrong about that, to allow a set off at this stage would be to give an impermissible preference

to Mr Itkin (following <u>Guidon Investments Ltd v Malet de Carteret</u> (1980) JJ 109) in that it would involve the acceptance of a liability, the validity of which is being questioned on grounds that Commissioner Bailhache found were *"arguable"*, and that has not been proven in the liquidation. I therefore reject Mr Itkin's application.

**Enforcement of the Unless Order**

15.    In the absence of any full and frank evidence to the contrary, I remain of the view, as noted in the judgment of 2 October 2025, that Mr Itkin can pay, but will not pay, the order on account of costs.

16.    At paragraphs 41 to 46 of the judgment of 2 October 2025, I set out my rationale for not triggering the unless order on that occasion.  In short:

(i)    I acknowledged that the proceedings were *"both complex and aged, and if the sums set out in the Amended Order of Justice are recovered at full value, these claims amount to a sum in excess of USD 50 million, if not USD 100 million"* (paragraph 41);

(ii)    it would not be *"just or proportionate to impose a liability on Mr Itkin running to many millions of dollars simply for failing to comply with an order requiring him to pay slightly less than £80,000 on account of costs"* (paragraph 42);

(iii)    *"there are alternative and proportionate remedies which do not involve the striking out of the Defendant's Amended Answer, at least at this first stage"* (paragraph 44); and

(iv)    an order for costs, to be summarily assessed on an indemnity basis, together with an extension of time for compliance and consideration of a <u>Hadkinson</u> order was appropriate (paragraphs 45 and 46).

17.    GSL criticises that assessment as being *"misconceived"* insofar as the effect of judgment is concerned as:

*"The main operative provisions of the draft order provide declaratory relief, the effect of which would be to enable to return of significant assets to the Plaintiff which the Defendant admits that he took from the Plaintiff (but claims that he was entitled to do so). The draft order then provides, at paragraph 3, for an assessment of quantum*

*and, aside from paragraphs 5 and 6, there would be no money judgment against the Defendant which would be immediately enforceable."*

18.  The terms of the draft order proposed by the Plaintiff are as follows:

*"1. The judgment of the Royal Court dated 2 December 2016 (File number 2016/335) entered against the Plaintiff in favour of the Defendant in the sum of £505,000 plus interest, fixed costs and interest on costs (the Default Judgment) and all orders of the Royal Court arising from it is set-aside;*

*2. The Court declares that:*

*a. the document entitled "Guaranty" dated 9 October 2012 and signed by the Defendant as "Sole Director and Officer" of the Plaintiff (the Guaranty) is a nullity and is void ab initio;*

*b. the document entitled "Promissory Note secured by Pledged Collateral" dated 21 August 2015 (the 2015 Promissory Note) is a nullity and is void ab initio;*

*c. the Deed of Assignment dated 20 September 2016 executed on behalf of the Plaintiff and M-NICE Limited (a company incorporated in the Isle of Man) in favour of the Defendant (the M-NICE Assignment) is void;*

*d. the Deed of Assignment dated 20 September 2016 executed on behalf of the Plaintiff and M-BJEP Limited (a company incorporated in Isle of Man) in favour of the Defendant (the M-BJEP Assignment) is void;*

*e. the transfer of the shares in New Albion Property Limited (an English company incorporated on 11 April 2002 with registered number 04414858) (NAPL) on 26 September 2016 from the Plaintiff to the Defendant is void;*

*f. the Defendant holds the shares in NAPL on constructive trust for the Plaintiff;*

*g. the Defendant holds the sum of US$473,554.09 (the Curacao Funds) and their traceable proceeds on constructive trust for the Plaintiff,*

*h. the Defendant breached his fiduciary duties and/or duties arising pursuant to Article 74 of the Companies (Jersey) law 1991 or customary law by procuring*

*payments from the Plaintiff's accounts in the aggregate amount of US$1,458,539.17 and EUR € 138,788.86 (the Credit Card Payments)*

*3. The Defendant shall account for or pay to the Plaintiff equitable compensation, in a sum to be assessed, in respect of [the Guaranty, the 2015 Promissory Note, the M-NICE Assignment, the M-BJEP Assignment, the NAPL share transfer, the Curaçao Funds, the Default Judgment, and the Credit Card Payments].*

*4. The Defendant shall transfer legal title to the NAPL shares to the Plaintiff within 14 days of the date of this Act of Court and take all necessary steps to procure the registration of the Plaintiff as legal and beneficial holder of the NAPL shares;*

*5. The Defendant shall pay to the Plaintiff the sum of US$473,554.09 representing the Curacao Funds with interest thereon within 14 days of the date of this Act of Court;*

*6. The Defendant shall pay to the Plaintiff the sum of US$ 1,458,539.17 and EUR € 138,788.86 representing the Credit Card Payments within 14 days of the date of this Act of Court;"*

19. This is significant, and in my judgment disproportionate, relief when viewed against the sum of £78,432 specified in the unless order in that:

(i) the Default Judgment is for some £867,000 and has already been the subject of an unsuccessful set aside application before Commissioner Bailhache in 2021. Whilst a judgment can be set aside for fraud (as noted in paragraphs 21 to 22 of the December 2024 judgment), it does not seem to me to be appropriate for the Master to set-aside on the basis of a default by the Defendant in relation to costs, a judgment of the Royal Court which the Royal Court itself has already declined to set aside, if there are alternatives. If this judgment is to be set aside, it should preferably be done on its merits.

(ii) the sums involved in these underlying claims are far in excess of the amount in the unless order in that the Guaranty was purportedly called upon in relation to a debt of USD 55.52 million; the M-Nice assignment concerns a debt for USD 15.5 million; the M-BJEP assignment concerns a debt for USD 19.5 million; and NAPL owns a property in California that was purchased for USD 22 million.

20. Insofar as the Plaintiff submits that this order would enable the *"return of significant assets to the Plaintiff which the Defendant admits that he took from the Plaintiff (but claims that he was entitled to do so)"*, this is a reference to Mr Wood's First Affidavit, sworn on 5 February 2024, in which he deposed that Mr Itkin had admitted in the US proceedings that he had taken action *"to "lock down" the assets to keep them safe, and that "all [his] actions were designed to protect assets."* In his video deposition dated 28 March 2019, Mr Itkin stated that this applied to the M-BJEP and M-NICE assignments, and other assets. Mr Itkin submits that he was entitled to take all of these assets as they were partnership assets and denies GSL's claims for declaratory relief and/or equitable compensation.

21. In my judgment, the relief sought in the draft order is substantive relief; not simply a change in the identity of the person *"holding the ring"* pending determination at trial. Moreover, none of these declarations is going to be simple to enforce and all may involve satellite litigation in other jurisdictions which may, in turn, be rendered more complex by the judgment having been obtained by default rather than on the merits.

22. Advocate Barham for GSL notes that *"there are few English authorities which assist in relation to the enforcement of unless orders in respect of costs because any sanction for failure to comply has effect unless the party in default applies for and obtains relief from the sanction"* but does rely upon the English decision of the Court of Appeal in <u>Credico Marketing Ltd v Lambert</u> [2023] EWCA Civ 262 to submit that the Court should not be overly concerned at any comparison between the amount of costs and the sums in issue. That case concerned an unsuccessful application for permission to appeal and to adduce fresh evidence. Credico brought proceedings against the defendant for almost £2 million. The High Court made unless orders requiring the defendant to answer requests for further information and to pay costs of some £14,400 failing which the defence would be struck out. Applications were made, and granted, for extensions of time but 2 months after the order was made, the Court refused a further extension of time and triggered the unless order on the basis that *"no good reason had been advanced for why the defendants could not pay the costs ordered"*. It did not trigger it on the basis of the failure to provide the further information and the Court indicated that if the additional information had been the only outstanding issue, it would have granted an extension of time. The Court of Appeal noted that when triggering the unless order:

> ***"13…[the Judge] also referred to the history of the litigation generally. The relevance of this went beyond the simple fact of prolonged non-payment. It included the fact that Mr Lambert had apparently found funds to instruct solicitors in the appeal to the Court of Appeal, which had by then been heard, and indeed for security for costs, but not to pay the (by comparison) fairly small sums which had been ordered to be paid to Credico. The judge also referred to an Instagram post by Mr Lambert in which he appeared to be crowing over the***

*costs which he had caused Credico to incur for no result. He said at paragraph 61 of his judgment:*

> *"The defendants have, in my judgment, been playing fast and loose with both the claimants and the courts in relation to these matters and in the process have been causing the claimants to incur more and more costs in reasonably resisting applications which have been made by the defendants. We thus have the costs of meeting the application of 30 March, the costs of meeting the application of 3 May and the costs of today's application. In my judgment, it is simply inappropriate for the defendants to conduct litigation in this way and that, as Mr Mehrzad submitted, enough is enough and the time has come to put an end to this."*

23. That decision of the English High Court echoes Master Thompson's comments in <u>Newman v de Lima</u> [2018] JRC 155 at paragraph 47 to 49 where he held that:

> *"47. In my judgment in this jurisdiction, the discretion is a more general one. This discretion still requires me to consider whether the case can be dealt with justly and at proportionate cost and any relevant factors listed in Rule1/6. However, I consider that I am also required to look at the case as a whole and the nature of the proceedings in particular, what is in issue where some form of strike out of a claim is contemplated. In cases involving a failure to issue a summons for directions (albeit pre-dating the overriding objective), the Royal Court has noted that the most severe sanction of striking out a plaintiff's claim should not be applied if there are other sanctions which could be applied which would enable justice to be done between the parties - see for example Viera v Kordas [2014] JRC 042 at paragraph 19 and Mayhew v Bois Bois [2016] JRC 024 at paragraphs 8 and 9. Whether the failure is to issue a summons for directions required by the Rules or a failure to comply with a particular order, I consider that the same approach should be taken to imposition of sanction which has the effect of striking out a claim or counterclaim or an answer, thus depriving a party of their day in Court.*

> *48. I also consider it may be possible to make orders which fall short of striking out the entire claim. Depending on the breach it may be possible to limit the sanction to striking out part of a case or that if a particular step is not complied with part of the case will be struck out or evidence may not be adduced on a particular issue. There is also the sanction of costs.*

> *49. I have referred to these different possibilities available to the Court because they are all illustrative of the more general discretion available to the Court where a party has not complied with a Court order. In reaching this view, it should not be forgotten that procedure is a means to an end namely a trial or settlement and breaches should be kept in that context. The key issue is therefore the effect of any non-compliance and whether or not a fair trial can take place after a breach. I accept I have to also take into account, if it is right to impose a sanction for non-compliance, whether that non-compliance was either deliberate or there is no justification for it. In every case <u>there will always come a point where the conduct of a party in ignoring Court orders will lead to the ultimate sanction of a case being dismissed even if a trial could still take place.</u> This judgment should not therefore be taken as any indication that non-compliance of any Rules and Practice Directions is acceptable, will be tolerated, or will not, in appropriate cases lead to the ultimate penalty of a claim or answer being struck out." (Emphasis Added)*

24. In my judgment, notwithstanding any perceived disparity between the quantum of the claim and the outstanding order for costs, there will come a point at which *"enough is enough"* and the Court will strike out an Answer notwithstanding that in numerical terms alone, it might appear disproportionate so to do. However, I do not think that we are at that point yet.

25. As Master Thompson acknowledged, the test in England is different to that applied in Jersey. The discretion as to how to respond to a failure to comply with Court orders is more general and less prescriptive. When I last considered triggering the unless orders, the requests for further information were also outstanding and I noted that:

> *"50. The Requests dealing with the partnership and/or the ownership of GSL and/or the entitlement of Mr Itkin and others to act as they did are at the heart of this case. Without proper responses to those Requests, the Court may well have no option but to strike out the whole of his Amended Answer. However, having admonished his previous failures in this judgment, it seems to me proportionate to give Mr Itkin a final opportunity to respond properly to these Requests, particularly given that they concern factual issues rather than legal principles, and are capable of being answered by Mr Itkin without legal assistance."*

26. Mr Itkin has now answered all of those requests. A fair trial is clearly possible and, in my judgment, the Court and the parties should focus on progressing this matter expeditiously and fairly, particularly given the comments in my judgment of December 2024:

*"70...(ii) the proceedings brought by GSL against Mr Itkin in Jersey are being progressed and further directions will be given at the handing down of this judgment with a view to achieving a trial of all issues as expeditiously as possible and within the next 12 months or so, should the case not settle;*

*(iii) having noted that the claims in Jersey have previously been stayed repeatedly by consent without any resolution having been achieved, and that the parties singularly failed to chase a response to Mr Bason's letter, the Royal Court will be far more proactive in its management of these proceedings going forward;..."*

27.    The issue for the Court is how it should respond to Mr Itkin's repeated failure to comply with the unless order for costs, and the perceived concern on the part of GSL that Mr Itkin will make the future progression of this litigation as difficult as possible, notwithstanding his apparent desire, in submissions, for a judgment on the merits.   In determining a response, I must take into account that:

(i)    Mr Itkin has answered the Requests for Further Information;

(ii)    Mr Itkin has a judgment against GSL for a sum greater than the amount of costs and were the judgment to be proven in the liquidation, the costs order would be set off against it under Article 34 of the Désastre Law;

(iii)    in a complex case such as this one, there are, at this stage, alternative options available to the Court which do not involve striking out the whole of Mr Itkin's Answer;

(iv)    pursuant to the Act of Court dated 23 July 2025, the next stage in the proceedings is for discovery protocols to be agreed and for discovery to take place.

28.    In my judgment:

(i)    it is neither appropriate nor proportionate, at this stage, to strike out Mr Itkin's Answer for non-payment of the sum of £78,432 or to make an order, in whole or in part, in the terms sought by GSL;

(ii)    it is entirely appropriate to impose a sanction given that Mr Itkin will not pay the order for costs previously made by the Court;

(iii)    the appropriate order is one of costs, reminding Mr Itkin of the ability of the Court to decline to hear summonses if he is in default, and of reframing the unless order to ensure that Mr Itkin's failures to comply with Court orders neither repeat nor impact on the orderly, and expeditious, future progression of this litigation.

29.    Accordingly, I discharge the unless order, but not the order for an interim payment on account of costs, and direct that:

(i)    by 9 January 2026:

(a)    the parties shall provide to one another, on affidavit, details of the extent of the hard copy documents in their custody, power and/or possession which are or might be subject to Practice Direction RC 17/07 together with the information required pursuant Practice Direction RC17/08;

(b)    the parties shall exchange draft discovery protocols in relation to documents held in electronic form;

(ii)    thereafter the parties shall use reasonable endeavours to agree the scope of the said protocols before 30 January 2026;

(iii)    unless Mr Itkin complies with the said orders, his Answer shall be struck out;

(iv)    any issues arising in relation to the said affidavits and protocols shall be determined at the hearing scheduled for 11 February 2026, TE 1 day;

(v)    the Defendant pay the Plaintiff's cost of these applications, to be summarily assessed on an indemnity basis, if not agreed.

**Authorities**

[2024] JRC 279

[2025] JRC 055

[2025] JRC 244

Royal Court Rules 2024

T v S [2025] JRC 162

Fearns v Anglo Dutch Paint and Chemical Co. Ltd [2010] EWHC 2366 (CH)

Bertrand des Pallieres v RBC Trustees (CI) Limited [2018] JRC 172

Halabi v Wilson and HMRC [2018] JCA 114

Companies (Jersey) Law 1991

Guidon Investments Ltd v Malet de Carteret (1980) JJ 109

Credico Marketing Ltd v Lambert [2023] EWCA Civ 262

Newman v de Lima [2018] JRC 155

Practice Directions RC 17/07 and 17/08

# Exhibit 5

# Exhibit 5

**A** Neutral
As of: November 26, 2025 3:18 PM Z

## *Wanechek Mink Ranch v. Alaska Brokerage Int'l, Inc.*

United States District Court for the Western District of Washington

December 2, 2009, Decided; December 2, 2009, Filed

CASE NO. C06-089RSM

**Reporter**
2009 U.S. Dist. LEXIS 144897 *

WANECHEK MINK RANCH and SMITH MINK RANCH CORPORATION, on behalf of themselves and all others similarly situated, Plaintiffs, v. ALASKA BROKERAGE INTERNATIONAL, INC., et al., Defendants.

**Prior History:** *Wanechek Mink Ranch v. Alaska Brokerage Int'l, Inc., 2009 U.S. Dist. LEXIS 42287 (W.D. Wash., May 4, 2009)*

## Core Terms

insolvency proceedings, proceedings, comity, cross-border, insolvencies, cooperation, principle of comity, main proceedings, replaced, appropriate relief, appropriate remedy, file a petition, district court, foreign court, post-recognition, contemplates, fashioning, principles, Deference, piecemeal, factors

**Counsel:  [*1]** For Wanechek Mink Ranch, on behalf of itself and all others similarly situated, Plaintiff: Anthony D Shapiro, Steve W. Berman, LEAD ATTORNEY, HAGENS BERMAN SOBOL SHAPIRO LLP (WA), SEATTLE, WA; Gregory P Hansel, Randall B Weill, LEAD ATTORNEY, PRETI FLAHERTY, PORTLAND, ME; Joshua R. Carver, LEAD ATTORNEY, PRO HAC VICE, PRETI FLAHERTY BELIVEAU & PACHIOS LLP, PORTLAND, MA; Douglas C McDermott, MCDERMOTT LEGAL, SEATTLE, WA.

For Smith Mink Ranch Corporation, Plaintiff: Anthony D Shapiro, LEAD ATTORNEY, HAGENS BERMAN SOBOL SHAPIRO LLP (WA), SEATTLE, WA.

For Klondike International Furs, Irving Tax, Allen Tax, Defendants: J Ronald Sim, LEAD ATTORNEY, STOEL RIVES (WA), SEATTLE, WA; Molly Margaret Daily, LEAD ATTORNEY, SEATTLE CITY ATTORNEY'S OFFICE, SEATTLE, WA.

For Delta Trading Corporation, Defendant: Danford Duncan Grant, BAILEY GRANT ONSAGER, P.C., SEATTLE, WA.

For Mechutan Fur Corporation, David Mechutan, Steven Mechutan, Steven Mechutan, Defendants: Alfred E Donohue, John D. Wilson, Jr., LEAD ATTORNEY, WILSON SMITH COCHRAN & DICKERSON, SEATTLE, WA; Laurence B Finegold, LEAD ATTORNEY, GARVEY SCHUBERT BARER (WA), SEATTLE, WA.

For Dean Brenner, Defendant: Christian P Browne, LEAD ATTORNEY, LAZER **[*2]** APTHEKER ROSELLA & YEDID, MELVILLE, NY; Danford Duncan Grant, BAILEY GRANT ONSAGER, P.C., SEATTLE, WA.

For Alvin Glickman, Alvin Glickman Inc, Defendants: David C Lundsgaard, MILLER NASH GRAHAM & DUNN LLP (SEA), SEATTLE, WA.

For Fein & Co Ltd, Defendant: J Aaron Morris, Richard N Carrell, LEAD ATTORNEY, FULBRIGHT & JAWORSKI (HOU), HOUSTON, TX; Layne E Kruse, LEAD ATTORNEY, Norton Rose Fulbright US LLP, HOUSTON, TX; Richard C Yarmuth, LEAD ATTORNEY, Matthew A Carvalho, YARMUTH WILSDON PLLC, SEATTLE, WA.

For Hurwitz Exports Ltd, Steven Hurwitz, Polar Furs Ltd, Defendants: John Arthur Tondini, BYRNES KELLER CROMWELL LLP, SEATTLE, WA; Paul R Taylor, FOSTER PEPPER PLLC, SEATTLE, WA.

For American Legend Cooperative, Interested Party: Kandis M Sells, Michael W Droke, DORSEY & WHITNEY (WA), SEATTLE, WA.

**Judges:** RICARDO S. MARTINEZ, UNITED STATES DISTRICT JUDGE.

**Opinion by:** RICARDO S. MARTINEZ

## Opinion

ORDER ON DEFENDANT'S MOTION TO STAY PROCEEDINGS

This matter is before the Court for a ruling on Defendant Fein & Company's motion to stay proceedings pending foreign insolvency proceedings. Dkt. # 184. Plaintiffs have opposed the motion. After careful consideration of the parties' memoranda and relevant law, the Court has determined **[*3]** that the motion should be denied.

DISCUSSION

On October 19, 2009, defendant Fein & Co., a foreign entity based in London, United Kingdom, filed a voluntary petition for administration (a proceeding analogous to a Chapter 11 reorganization in the United States). Dkt. # 184, Exhibit A. Defendant contends that comity requires that this Court recognize the administration proceedings and stay the case as it would, had defendant filed for bankruptcy in the United States. Plaintiffs, in opposition to the motion, argue that Chapter 15 of the United States Bankruptcy Code is the exclusive means by which a debtor in a foreign insolvency proceeding may obtain relief, including a stay, in the United States district courts. To resolve this dispute, the Court must turn to the history and effect of Chapter 15, *11 U.S.C. § 1501 et seq.*

In 2005, Congress adopted Chapter 15 of the Bankruptcy Code, which is based on the Model Law on Cross-Border Insolvency promulgated in 1997 by the United Nations Commission on International Trade Law. *11 U.S.C. § 1501*. The purpose of the statute is to "provide effective mechanisms for dealing with cross-border insolvency," with the objectives of cooperation,

greater legal certainty, fair and efficient administration, **[\*4]** protection of the debtor's assets, and facilitation of the rescue of financially troubled businesses. *Id.*

Chapter 15 replaced former *Section 304 of the Bankruptcy Code*, which originally provided the statutory framework for cases filed in the United States that are ancillary to insolvency proceedings filed in foreign countries. The philosophies underlying former *Section 304* were deference to the foreign proceeding and the prevention of the piecemeal distribution of the debtor's estate. *See Bank of New York & JCPL Leasing Corp. v. Treco (In re Treco), 240 F.3d 148, 153-54 (2d Cir. 2001)* (citing *In re Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc., 961 F.2d 341, 358 (2d Cir.1992)* (*In re Koreag*); *Cunard S.S. Co. Ltd v. Salen Reefer Servs. AB, 773 F.2d 452, 455 (2d Cir. 1985))*. Former *Section 304* provided a bankruptcy court with broad discretion in fashioning an appropriate remedy in a particular case. *Id. at 154-55*. The section outlined several factors, including comity, that a court should consider before granting a foreign representative any type of relief. *11 U.S.C. § 304(c)* (repealed by *Pub.L. 109-8, title VII, § 802(d)(3)*, April 20, 2005).

With the advent of Chapter 15, the courts have been divested of much of this discretion and are instead directed by objective statutory guidelines. *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, 389 B.R. 325, 333 (S.D.N.Y. 2008)*. Under Chapter 15, in order for a petition for recognition of a foreign proceeding to be granted, it must meet several requirements:

(1) the foreign proceeding for which recognition is sought is a foreign main proceeding or foreign non main proceeding within **[\*5]** the meaning of § 1502;

(2) the foreign representative applying for recognition is a person or body; and

(3) the petition meets the requirements of *§ 1515*.

*11 U.S.C. § 1517(a)*. In order to meet the requirements of *§ 1515*, the foreign representative must file a petition for recognition, must establish that a foreign proceeding exists, and must demonstrate that the petitioner has been appointed as the foreign representative. *11 U.S.C. § 1515(b)*; *In re Gold & Honey, Ltd., 410 B.R. 357, 366 (Bankr.E.D.N.Y. 2009)*.

These objective requirements are statutory prerequisites to recognition. However, once the foreign proceeding has been recognized, "flexible and pragmatic" considerations, including "subjective factors that embody principles of comity" are considered in fashioning appropriate relief. *In re Bear Stearns, 389 B.R. at 333-34*. Thus, while Chapter 15 replaced *Section 304* as the Bankruptcy Code's operative provision for dealing with cross-border insolvencies, many of the principles underlying *Section 304* remain in effect. As stated by one district court,

Significantly, chapter 15 specifically contemplates that the court should be guided by principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief. This is evidenced by the pervasiveness with which comity appears in chapter 15's **[\*6]** provisions. For example, *§ 1509* specifically requires that if the court grants recognition under *§ 1517*, it "shall grant comity or cooperation to the foreign representative." *11 U.S.C. § 1509(b)(3)*. In addition, *§*

*1507* also explicitly directs the court to consider comity in granting additional assistance to the trustee.

*In re Atlas Shipping A/S, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009)*.

Once a case is recognized as a foreign main proceeding, Chapter 15 specifically contemplates that the court will exercise its discretion consistent with principles of comity. There is a logical reason for this. "Deference to foreign insolvency proceedings will often facilitate the distribution of the debtor's assets in an equitable, orderly, efficient, and systematic manner, rather than in a haphazard, erratic, or piecemeal fashion." *In re Artimm, S.r.L.*, 335 B.R. 149, 161 (Bankr.C.D.Cal.2005). Chapter 15 "mandate[s] that the court cooperate 'to the maximum extent possible' with a foreign court or representative . . . " *Id. at 159*. Thus, "while Chapter 15 replaced *§ 304* and provided a more structured framework for recognizing foreign proceedings, Congress specifically granted courts discretion to fashion appropriate post-recognition relief, consistent with the principles underlying *§ 304*." *In re Atlas Shipping, 404 B.R. at 739*.

In Chapter 15, Congress has provided a specific procedure for addressing cross-border insolvencies, **[*7]** together with appropriate remedies. *11 U.S.C. § 1501*. Nowhere has defendant Fein & Co. either shown or argued that it could not file a petition for recognition of the foreign insolvency proceedings under Chapter 15. Should it do so, and should recognition be granted, this Court may then exercise its discretion to fashion appropriate relief. Until that time, the Court declines to stay these proceedings.

Defendant's motion to stay is accordingly DENIED, without prejudice to renewal at an appropriate time.

DATED this 2nd day of December 2009.

/s/ Ricardo S. Martinez

RICARDO S. MARTINEZ

UNITED STATES DISTRICT JUDGE

---

**End of Document**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 15021 Ventura Blvd. #544, Sherman Oaks, CA 90034.

A true and correct copy of the foregoing document entitled

## Foreign Representatives' Opposition to Motion for Court-Ordered Mediation

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **December 2, 2025**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Schuyler Carroll    SCarroll@manatt.com, lduong@manatt.com**
- **Benjamin R King    bking@loeb.com,
karnote@loeb.com;ladocket@loeb.com;bking@ecf.courtdrive.com**
- **Dare Law    dare.law@usdoj.gov**
- **Daniel J McCarthy    dmccarthy@hillfarrer.com,
spadilla@hillfarrer.com;dflowers@hfbllp.com**
- **Kyle Ortiz    kyle.ortiz@hsfkramer.com,
dperson@teamtogut.com;rhoward@teamtogut.com;eblander@teamtogut.com**
- **Keith C Owens    kowens@foxrothschild.com, khoang@foxrothschild.com**
- **Oleg Stolyar    astolyar@loeb.com**
- **Boris Treyzon    btreyzon@actslaw.com, pjs@actslaw.com**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**

**2. SERVED BY UNITED STATES MAIL**: On **December 2, 2025**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

None.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **December 2, 2025**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

None.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| December 2, 2025 | Kurt Ramlo | /s/ Kurt Ramlo |
|---|---|---|
| Date | Type Name | Signature |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                    **F 9013-3.1.PROOF.SERVICE**

EX. 5